

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BILLIE RAY LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 C 3904 |
| | ) | |
| v. | ) | Suzanne B. Conlon, Judge |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Christopher Hicks died during or immediately following his arrest by Chicago police officers. His brother Billie Ray Lewis, as special administrator of the estate, sues the City of Chicago, and police officers Louis Soto, Artemio Pena, Robert Arnolts, and Brian Devan, for civil rights violations under 42 U.S.C. § 1983 (Counts I and II), wrongful death (Count III), pain and suffering under Illinois' survival statute (Count IV), and intentional infliction of emotional distress (Count V). He claims the city is liable for any judgment rendered against the officers (Count VI). The city moves for summary judgment on Count II pursuant to Fed.R.Civ.P. 56.

## BACKGROUND

All facts are undisputed unless otherwise noted.[1] Officers Soto, Pena, Arnolts and Devan are Chicago police officers. On May 26, 2004, all four officers participated in Hicks' arrest. Hicks died during or immediately following his arrest. The medical examiner ruled Hicks' death a

---

[1] The city filed a statement of undisputed facts ("City facts"). Lewis responded to the City facts ("Pl. Resp. facts") and filed a statement of additional undisputed facts ("Pl. facts"). The city responded to Lewis' additional facts ("City Resp. facts").

1

homicide and determined the cause of death to be asphyxiation due to restraint. Pl. facts ¶ 27. As set forth in the court's April 11, 2005 memorandum opinion denying in part the police officers' summary judgment motion, there are numerous factual issues surrounding Hicks' arrest. For example, Lewis presents evidence that Officer Soto placed Hicks in a choke hold and that the choke hold contributed to Hicks' death by asphyxiation. Pl. facts ¶¶ 7, 10, 27, 30. Officer Soto denies using a choke hold, but admits placing Hicks in a headlock. Pl. facts ¶ 49. For purposes of deciding this motion, the court views the evidence in Lewis' favor, and must assume Officer Soto placed Hicks in a choke hold that contributed to his death by asphyxiation.

I. **Chicago Police Department Training**

Lewis claims Hicks' death resulted from the city's failure to train, supervise and discipline its police officers. Pl. Resp. facts ¶¶ 5-6. In 1985, the Chicago Police Department ("CPD") was certified by the State of Illinois to train police officers. Pl. Resp. facts ¶ 15. In the police academy, CPD recruits are trained on control and restraint techniques. Pl. Resp. facts ¶ 25. Before leaving the academy, recruits must pass an operations simulation test to demonstrate that they can properly perform the restraint techniques. *Id.* Currently, CPD does not train its police officers to use choke holds and neck restraints. Pl. Resp. facts ¶ 11. Lewis presents evidence that CPD taught neck restraints, including a carotid neck restraint or "sleeper hold," at the police academy until 1983. Pl. facts ¶ 31. Officer Soto attended the police academy in 1977. Pl. facts ¶ 32. The city claims the police academy training and testing protocol was followed "at all times relevant to the Complaint." City facts ¶ 25. Presumably, police recruits were trained and tested on control and restraint techniques when Officer Soto attended the policy academy.

In addition to police academy training, police officers receive in-service training. Pl. Resp. facts ¶ 26. The majority of in-service training occurs at roll call. *Id.* Roll call training consists primarily of lectures and videos called "streaming videos." *Id.* In 2002, CPD presented a series of lectures and streaming videos regarding General Order 02-08, the CPD written directive that prohibits the use of excessive force or unwarranted physical force. City facts ¶¶ 27-28. The streaming videos discuss general use of force principles. They do not demonstrate specific holds or restraint techniques. Pl. facts, Ex. 1 at 34-35. Officer Soto sometimes missed roll call. He did not view the use of force streaming videos. Pl. Resp. facts ¶ 27. Nor did he recall ever seeing General Order 02-08. *Id.* at ¶ 29. CPD's written directives and streaming videos were available for review at any police district. City facts ¶ 31. There is no evidence officers who missed roll call training were required to make up the training.

Officer Soto could not recall what use of force training he received in the police academy. Nor could he recall what control techniques he was taught in the police academy. Pl. facts ¶ 39. Lewis presents evidence that CPD knows restraint tactics and use of force skills diminish if not practiced over time. Pl. facts ¶ 42. CPD does not provide any hands-on retraining or retesting of control techniques after police officers leave the police academy. Pl. facts ¶¶ 40, 42. For example, Lieutenant Michael Mealer testified that CPD does not provide a refresher course on control tactics. *Id.* at ¶ 40. He testified further that except for officers who are promoted into new positions or when a new weapon is introduced to the police force, CPD provides no post-academy training on control tactics or use of force. *Id.* According to Lieutenant Mealer, the streaming videos do not address specific control techniques. Pl. facts, Ex. 1 at 34-35. Lieutenant Mealer testified that he has no way

3

of knowing whether police officers correctly use control tactics unless he sees the officers using them on the street. Pl. facts Ex. 1, at 42-43.

Officer Soto was told not to use choke holds. Pl. Resp. facts ¶ 60. He could not remember when, how, or by whom he was told not to use choke holds. *Id.* According to Lieutenant Mealer, police officers were notified not to use neck restraints. He did not remember when or how the officers were notified. According to Lieutenant Mealer, the decision not to use choke holds was made in response to public concern over the use of neck restraints. Pl. Facts, Ex. 1 at 7-8. According to Patrick McNulty, CPD Assistant Deputy Superintendent, police officers were trained in the use of a "sleeper hold" in 1970. The sleeper hold was used to close off the blood passage to the suspect's brain until the suspect lost consciousness. Pl. facts Ex. 5, at 102-103. At some point, CPD informed officers not to use the sleeper hold. Assistant Deputy McNulty could not recall when or how officers were notified of this change in policy. *Id.* at 103-104. There is no evidence CPD issued any written directives or notice to officers. For example, Sergeant Jackie Campell, who formerly supervised physical skills training, testified that she is unaware of a written order prohibiting use of choke holds. Pl. facts, Ex. 6 at 14-15. Lewis presents evidence that CPD failed to retrain police officers who were originally trained to use neck restraints in alternative restraint techniques. Pl. facts ¶¶ 40, 42, Ex. 1 at 34-35.

## II. CPD Supervision and Discipline

CPD provides remedial training to police officers who have used excessive force. Pl. Resp. facts ¶ 33. Allegations that a police officer used excessive force are investigated by CPD's Office of Professional Standards ("OPS"). *Id.* at ¶ 44. For every complaint of excessive force made against a CPD police officer, OPS initiates a complaint register file and conducts an investigation. *Id.* at ¶

4

46. When conducting an investigation, OPS investigators are required to contact all complainants and witnesses when necessary to reach a sound conclusion in the case. City facts ¶ 49. However, OPS investigators are not sworn officers and do not have subpoena power. Pl. Resp. facts ¶ 48. OPS officers have no power to compel witnesses to provide statements. *Id.*

From 1994 through 2002, OPS initiated 25,895 investigations into allegations of excessive force and found substantial evidence to justify disciplinary action in 1,939 cases. Pl. Resp. City facts ¶ 52. OPS supervisor Amy Braley investigated Officer Soto's use of force on Hicks. She was unable to obtain information from the Chicago Transit Authority and to identify 911 callers. Pl. facts ¶ 48.

Detective Galbreth led CPD's investigation of Hicks' death. All four officers at the scene testified they told Detective Galbreth about Officer Soto's use of a headlock. Pl. facts ¶ 49. Detective Galbreth did not report Officer Soto's use of a headlock. *Id.* According to Detective Galbreth, no one told him about the headlock or that there were civilian witnesses to the incident. *Id.* at ¶¶ 49, 50. Officer Arnolts testified he told two detectives about civilian witnesses. *Id.* Assistant Deputy Superintendent Patrick McNulty did not call a round table to investigate Hicks' death because he had already spoken to the officers involved and no other witnesses were brought to his attention. *Id.* at ¶ 51.

### III. Police Procedures Expert Testimony

According to John L. Sullivan, Lewis' police procedures expert, all police officers should be trained not to use choke holds. He testified further that CPD should have provided in-service retraining on alternative control tactics to officers who were originally trained to use choke holds. Pl. facts, Ex. 2 at 263-64. In Sullivan's opinion, all police officers should receive mandatory

5

retraining and retesting on use of force tactics. Pl. Resp. facts ¶ 9, Ex. 2 at 266-67. Sullivan opines that CPD's failure to retrain police officers caused Officer Soto to use improper restraint techniques that resulted in a "street-type brawl" and Hicks' death. Pl. facts, Ex. 2 at 123, 127-128, 134, 169, 179. Sullivan testified that it is obvious police officers will not retain the use of force skills taught in the police academy unless they are retrained and retested on those skills. *Id.* at 199-200. In his opinion, CPD showed a blatant disregard for the public's safety by failing to properly retrain police officers in restraint and control tactics. *Id.* at 247-48, 260-61. Sullivan also opined that CPD failed to properly investigate Hicks' death. *Id.* at 236-37, 245-46. His opinion is limited to CPD's investigation of Hicks' death. *Id.* He has not studied CPD's supervision and management. *Id.* at 240.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. National Human Resource Committee, Inc.*, 218 F.3d 719, 723 (7th Cir. 2000). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying evidence that demonstrates the absence of a genuine issue of material fact. The non-moving party must then come forward with evidence and designate specific facts that establish there is a genuine triable issue. *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). A genuine issue of material fact exists when the evidence would support a reasonable jury verdict for the non-moving party. *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

6

## II. Analysis

In Count II, Lewis seeks to hold the city liable under 42 U.S.C. § 1983 for its alleged failure to train, supervise, control and discipline police officers. The city argues there is no evidence of a CPD policy that caused Hicks' constitutional injury. Lewis counters that there is substantial evidence the CPD failed to properly retrain officers in use of force and CPR skills, and failed to properly investigate and discipline officers who used excessive force.

Title 42 U.S.C. § 1983 provides, in relevant part, that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. ...

A municipality is liable under § 1983 when its policy or custom causes the constitutional violation at issue. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38 (1978). A plaintiff can establish municipal policy in three ways: (1) an express policy that, when enforced, caused a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, was so permanent and well-settled as to constitute custom or usage with the force of law; and (3) the act of a person with final policymaking authority. *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). According to the city, Lewis fails to present any evidence that CPD has a policy, custom or practice that resulted in the officers' use of excessive force. For purposes of this motion, the court must assume the officers used excessive force.

7

## A. City's Failure to Retrain Officers

Lewis claims CPD's failure to retrain officers in proper control and restraint tactics caused Officer Soto to use a choke hold.[2] Inadequacy of police training may serve as a basis for § 1983 liability where the failure to train amounts to deliberate indifference to constitutional rights. *City of Canton v. Harris*, 498 U.S. 378, 388, 109 S.Ct. 1197, 1204 (1989). A city is liable under § 1983 only when its failure to train reflects a deliberate or conscious choice. *Id.* at 389, 109 S.Ct. at 1205. To show deliberate indifference, a plaintiff must show that the need for more or different training is so obvious and the inadequacy so likely to result in constitutional injuries, that the city policymakers were deliberately indifferent to the need. *Id.* at 390, 109 S.Ct. at 1205.

> In *City of Canton*, the Supreme Court provided an example of deliberate indifference:
>
> city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.

*Id.* at n. 10. The Supreme Court elaborated on the standard to be applied in failure to train cases. The Court explained that municipal liability is not imposed merely because a police officer is unsatisfactorily trained because the officer's shortcomings may result from factors other than a deficient training program. *Id.* at 391, 109 S.Ct. at 1206. Nor does liability attach merely because

---

[2] The city argues Lewis' policy claims should be barred because they are not alleged in the complaint and were disclosed at the "eleventh-hour." In response, Lewis attaches correspondence showing the parties agreed to complete policy discovery after the occurrence witnesses were deposed and that he revealed his policy arguments in a November 4 letter. Given the parties' agreement, the city's argument must be rejected. Moreover, the complaint alleges the CPD failed to instruct, train, supervise, control and discipline police officers. Complaint, ¶¶ 10-11.

8

an injury could have been avoided with better or more training. *Id.* Rather, a plaintiff must prove that the training deficiency caused the constitutional deprivation. *Id.*

The city argues Lewis cannot demonstrate deliberate indifference because CPD trains its police recruits not to use choke holds and neck restraints. The city's argument misses the point because it relies on CPD's current training program. The current training program is not at issue. The issue is whether CPD adequately retrained officers who were originally trained to use neck restraints. Lewis presents evidence that CPD taught neck restraints, including a choke hold or sleeper hold, in the police academy until at least 1983. Officer Soto attended the police academy in 1977. For purposes of this motion, the present training program is irrelevant. The court must focus on Officer Soto's training.

Lewis presents evidence the city stopped teaching choke holds after Officer Soto left the police academy, presumably due to risk of injury or death. According to Lieutenant Mealer, CPD stopped teaching choke holds in response to public concern raised over their use. Pl. facts, Ex. 1 at 7. There is no evidence CPD provided any written directive or order to police officers to stop using neck restraints. Indeed, the evidence is to the contrary. Pl. facts, Ex. 6 at 14-15. Although Officer Soto testified he was told not to use choke holds, he could not remember when, how or by whom. There is no evidence he or other police officers trained to use neck restraints were later provided retraining on alternative restraint tactics. Lewis presents evidence that police officers received no retraining on restraint tactics after police academy training.

Based on this evidence, a jury could reasonably find the need for retraining was so obvious and the failure to provide it so likely to result in a constitutional violation that the city's failure to provide retraining amounts to deliberate indifference. CPD is aware police officers are required to

arrest fleeing suspects. CPD taught its officers control and restraint tactics, in part, to allow them to accomplish this task. CPD determined choke holds were too dangerous to use, trained new police recruits not to use them, but failed to retrain officers who were originally taught to use choke holds in alternative restraint methods. Even though Officer Soto acknowledged he was later instructed not to use a choke hold, a reasonable jury could conclude that he used the choke hold because CPD failed to train him in alternative restraints.

In addition, Lewis presents evidence that CPD knew restraint skills diminish over time. According to Lewis' police procedures expert, police officers do not retain the restraint skills taught in the police academy and they need retraining to maintain those skills. Officer Soto could not recall what tactics he learned in the police academy. According to Lewis' expert, police officers who are properly trained in restraint techniques would not have reacted with the "shoddy" techniques that resulted in a street brawl with Hicks. Pl. facts, Ex. 2 at 123, 127, 134-35. In the expert's opinion, the city's failure to retrain and retest police officers on restraint tactics shows a blatant disregard for the public's safety. *Id.* at 134-35, 248. Based on this evidence, a jury could reasonably conclude that had Officer Soto been retrained on proper restraint techniques, he would not have used the prohibited choke hold to restrain Hicks. Viewing this evidence in Lewis' favor, a jury could conclude that CPD acted with deliberate indifference in failing to retrain police officers.

The city relies on *Palmquist v. Selvik*, 111 F.3d 1332, 1347 (7th Cir. 1997). In *Palmquist*, a Bensenville police officer shot and killed Palmquist during the course of an arrest. His estate sued under § 1983 for excessive force, alleging the police department inadequately trained police officers in handling abnormally behaving persons. The department's training included instruction on handling abnormal behavior. *Id.* at 1345. The court determined the claim that the police department

should have offered better or more training did not meet the standards set forth in *City of Canton*, 489 U.S. at 391. No evidence was submitted to show village policymakers were aware of the need for more training. Nor was there any evidence of other instances of excessive force used in restraining abnormal behavior. 111 F.3d at 1346. Because of the failure to show training deficiencies and that the village policymaker's were aware of training deficiencies, the jury's verdict – on the failure to train claim – was reversed. *Id.* at 1346-47.

The city's reliance on *Palmquist* is misplaced. Lewis does not challenge the adequacy of the current police academy training program. The city's arguments based on the current program must be rejected. *Palmquist* did not involve a basic policy change to the police training program. Lewis presents evidence that could reasonably support a jury verdict that the need for retraining on alternative restraint tactics was obvious, given the known risk posed by choke holds.

The city relies on *Latuszkin v. City of Chicago*, 250 F.3d 502 (7th Cir. 2001) to argue that Lewis has not shown policymakers were aware of the alleged training deficiencies. According to the city, only the City Council and the Police Board are CPD policymakers. City facts ¶ 61. In *Latuszkin*, a claim was brought against the city for the death of plaintiff's wife, who was killed by a police officer driving while intoxicated after he left a party in the police station's parking lot. In affirming dismissal of the complaint, the appellate court held plaintiff had not alleged a city policy or custom that caused his wife's death. Specifically, he failed to allege city policymakers knew about the police department parties, nor did he allege any facts suggesting that city policymakers should have known about the parties. *Id.* at 505.

Similarly, the city argues there is no evidence the City Council or Police Board was deliberately indifferent to the alleged training deficiencies. *Latuszkin* is distinguishable on many

11

grounds. First, *Latuszkin* was not a failure to train case. Thus, it did not involve a policy decision to prohibit use of choke holds because of the known associated risks. Second, unlike *Latuszkin*, Lewis presents evidence that city policymakers *should have known* of the risk of injury if police officers trained to use choke holds were not retrained in alternative restraint methods. Lewis presents evidence that a policy decision was made to prohibit choke holds in response to public concern over the risk of using neck restraints. Pl. facts, Ex. 1 at 7-8. Neither party identifies the policymaker. Under § 2-84-030 of the Chicago Municipal Code, the Police Board has the power to adopt rules and regulations governing CPD. It is reasonable to infer that the Police Board knew or should have known of the policy change and the reasons for it. Lewis' expert testified that the need to retrain police officers in restraint techniques is obvious because those skills diminish over time. Pl. facts, Ex. 2 at 198-200. Several high ranking CPD officials acknowledged that restraint skills fade over time. Pl. facts, ¶ 42. A jury could reasonably conclude from this evidence that CPD policymakers were deliberately indifferent to the need to retrain police officers on restraint techniques.

In sum, summary judgment must be denied on Lewis' failure to retrain claim. However, the scope of Lewis' failure to retrain claim must be limited in accordance with Fed.R.Civ.P. 56 (d). He argues the city failed to retrain police officers in CPR skills. As set forth in the court's April 11, 2005 memorandum opinion, Lewis presents no evidence the police officers had a duty to administer CPR. *See* 4/11/05 Memorandum Opinion at 16, Dkt. No. 89. The Illinois Tort Immunity Act, 745 ILCS 10/4-105, immunizes officers from liability for failing to furnish medical care. The Act only requires police officers to summon medical care. Because police officers cannot be liable for failing

12

to administer CPR, the city cannot be liable for failing to adequately train them in CPR. *See, e.g., City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

### B. Failure to Properly Investigate and Discipline Officers

Lewis asserts CPD failed to properly investigate excessive force claims. He argues CPD's failure to investigate and discipline created an atmosphere where officers believed they could violate citizens' rights without fear of reprisal. The city argues summary judgment is warranted because there is no evidence of a city policy, practice or custom not to investigate or discipline. To establish liability under § 1983, Lewis must show that a city policy, practice or custom with respect to investigations and discipline proximately caused Hicks' constitutional deprivation. *Calusinksi v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994).

Lewis argues CPD intentionally covered up Hicks' homicide. He points to obvious omissions in Detective Galbreth's report, and OPS' failure to conduct a thorough investigation. Lewis relies on *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993). In *Wilson*, police officers were charged with torture arising from a policy of such treatment of suspects. Dismissal of the complaint against the city was affirmed because there was no evidence of a city policy that caused the constitutional deprivation. *Id.* at 1240-41. The court noted a plaintiff can prove a city practice or policy to condone police brutality by showing policymakers ignored policy brutality complaints. *Id.* at 1240. Lewis relies on this language to support his § 1983 claim against the city for failure to properly investigate and discipline.

Lewis' reliance on *Wilson* is misplaced. He presents no evidence that the city was deliberately indifferent to excessive force complaints prior to Hicks' death. He relies exclusively on evidence relating to CPD's and OPS' deficiencies in investigating Hicks' death. His evidence

13

falls far short of a practice, custom or policy with respect to investigations or discipline. *See Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998) ("[a] plaintiff cannot establish a § 1983 claim against a municipality by simply alleging that the municipality failed to investigate an incident or to take punitive action against the alleged wrongdoer"). Lewis presents no evidence that CPD's alleged failure to investigate excessive force allegations and discipline officers proximately caused Hicks' constitutional injury. Absent evidence of a causal link between the alleged failure to investigate and discipline and Hicks' death, Lewis' § 1983 claim cannot stand. *See City of Canton*, 489 U.S. at 385, 109 S.Ct. at 1203. Lewis' claim that the city failed to investigate and discipline CPD police officers does not withstand summary judgment under Fed.R.Civ.P. 56(d).

## CONCLUSION

There are factual issues whether the city failed to adequately retrain its police officers in restraint and control techniques. Thus, the city's motion for summary judgment on Count II must be denied. However, there are no factual issues regarding Lewis' claim that the city's failure to train police officers on CPR, failure to investigate excessive force complaints and failure to discipline police officers for using excessive force proximately caused Hicks' constitutional injury. Accordingly, these issues do not withstand summary judgment under Fed.R.Civ.P. 56(d).

April 26, 2005

ENTER:

*Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge

14