IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

MAY 25 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| BILLIE RAY LEWIS, as Brother, Next Friend, and Special Administrator of CHRISTOPHER HICKS, deceased, | ) ) ) ) |
| Plaintiff, | ) ) ) No. 04 C 3904 Hon. Suzanne Conlon |
| v. | ) ) |
| CITY OF CHICAGO and CHICAGO POLICE OFFICERS L. SOTO, Star 8403, A. PENA, Star 18513, ROBERT ARNOLTS, Star 19998, and BRIAN DEVAN, Star 3871 | ) ) ) ) ) ) |
| Defendants | ) |

## NOTICE OF FILING

To: Christopher R. Smith
Phillip L. Coffey
Daniel Alexander
Smith, Coffey & Alexander
119 N. Peoria Street, Suite 3A
Chicago, IL 60607

Christopher Murray
Arnold Park
Assistant Corporation Counsels
City of Chicago
30 N. LaSalle St. #900
Chicago, IL 60613

**PLEASE TAKE NOTICE** that I have this day filed with the Clerk of the United States District Court for the Norther District of Illinois, Eastern Division, **DEFENDANT OFFICERS' MOTIONS IN LIMINE** a copy of which is attached hereto and served upon you.

Dated: May 25, 2005.

Respectfully Submitted,

_____
Robert W. Barber, Special Asst. Corp. Counsel

_____
Mary McDonald, Asst. Corp. Counsel

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**FILED**

MAY 25 2005

**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

| | | |
|---|---|---|
| BILLIE RAY LEWIS, as Brother, Next Friend, and Special Administrator of CHRISTOPHER HICKS, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | No. 04 C 3904 **Judge Conlon** |
| CITY OF CHICAGO, and CHICAGO POLICE OFFICERS L. SOTO, Star 843, A. PENA, Star 18513, ROBERT ARNOLTS, Star 19998, and BRIAN DEVAN, Star 3871, | ) ) ) ) ) | **Magistrate Judge Schenkier** |
| Defendants. | ) | |

## DEFENDANTS' MOTIONS IN LIMINE

Defendants Louis Soto, Artemio Pena, Robert Arnolts, and Brian DeVan, by their

attorneys, Robert Barber, Special Assistant Corporation Counsel for the City of Chicago, and

Mary McDonald, Assistant Corporation Counsel, and pursuant to the Federal Rules of Evidence,

respectfully move this Court to enter orders precluding Plaintiff, his attorneys, and witnesses

from adducing at trial testimony or evidence relating to or making any references to the

following:

### DEFENDANTS' MOTION IN LIMINE NO. 1

**DEFENDANTS' MOTION IN LIMINE TO BAR, OR IN THE ALTERNATIVE LIMIT,
EXPERT ECONOMIST STAN SMITH'S TESTIMONY REGARDING
LOST WAGES AND EMPLOYEE BENEFITS, LOSS OF REPLACEMENT SERVICES,
AND HEDONIC DAMAGES**

Plaintiff's expert Stan Smith ("Smith") claims that Plaintiff is entitled to more than three

million dollars in damages, based upon four categories of loss: a) wages and employee benefits;

1

b) replacement services, including advice, counsel, guidance, instruction and training, household and accompaniment services; c) enjoyment of life, or hedonics; and d) society or relationship. In the Federal judicial system, an expert can only present his expert opinions if he is qualified as an expert *and* the information assists the trier of fact in understanding evidence. See Fed. R. Evid. 702; Ayers v. Robinson, 887 F.Supp. 1049, 1058 (N.D.Ill. May 23, 1995). Dr. Smith should be barred from testifying about these four categories of damages because his opinion runs afoul of Fed. R. Evid. 702 and the Supreme Court's admissibility test as set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny.

## A. Lost Wages and Employee Benefits

Stan Smith's opinion regarding loss of Christopher Hicks' future wages and employee benefits is purely speculative, remote, and unreliable and should be barred from being admitted into evidence for purposes of calculating damages in this case. Smith opines that Christopher Hicks' loss of wages and benefits, net of personal consumption is approximately $743,126 under scenario one of his analysis and $494,160 under scenario two. However, Smith's calculations are unreliable because they are based upon little or no prior earnings of Christopher Hicks and are not based upon objective evidence. Two years of sporadic work is simply not enough to reliably project Hicks' earnings into nearly three decades in the future.

The touchstone of the reliability inquiry for purposes of admissibility under Daubert is whether the expert has applied a scientific method in reaching his opinions. Bourelle v. Crown Equipment Corp., 220 F.3d 532,536 (7th Cir. 2000). Evidence of earnings obtained prior to an injury is admissible if it establishes, with a fair degree of probability, a basis upon which the trier of fact may assess damages. Mastandrea v. Chi. Park Dist., 259 Ill. App. 3d 897, 902, 632 N.E.2d

2

1051, 1054 (1st Dist. 1994). The loss need not be proven with absolute certainty; however, testimony as to loss of earnings which is merely speculative, remote, or uncertain is improper. Id. In Mastandrea, the Illinois Appellate court did not find Smith's testimony "so speculative, remote or uncertain as to require" barring it. Id. at 902, 1054. For those calculations, Smith relied upon tax returns and earning records from the year prior to plaintiff's accident, compared to that of the year after the accident, in order to project loss over a two-year period. Id.

In the instant case, Smith's attempts to project Hicks' lost future earnings and employee benefits up to 37.7 years into the future. (Exhibit A, Rpt. Stan Smith, 1 (Nov. 10, 2004).) Smith claims to base his wage and employee benefit calculations on the tax returns and earning records of two of Hicks' previous jobs with Tyson Foods and Home Depot. Smith purportedly claims that Hicks' earning records from Home Depot, the last full-time job Hicks held prior to his death, prove Hicks was earning $10 per hour. (Id. at 1-2, 51-52.) It is undisputed that Hicks was unemployed at the time of his death. (Id. at 2, 51.)

Christopher Hicks' employment history, discovered during litigation, reveals that his employment record is far from exemplar and is a smattering of sporadic jobs held for no longer than six months at a time. However, Smith claims that the erratic earnings history can then translate into projected earnings for the next thirty seven years where Christopher Hicks would work full time, all year long, every year. This over broad assumption is purely speculative, as none of Christopher Hicks' employment records show this pattern over the past seven years. In fact, the largest earning records upon which Smith bases his damage calculations ($11,256 for 2002) shows that Hicks did not work consistently on a full time basis and that Hicks earned less than one-third the salary Smith projected that Hicks would have earned in 2004 ($34,885). (Rpt.

3

Stan Smith at 51-52.)

Thus, Smith's calculations, unlike the calculations he made in <u>Mastandrea</u>, are speculative and not properly based upon reliable past earnings. Instead, Smith's calculations are speculative and unreliable, projecting Hicks' earnings 37.7 years into the future and hypothesizing a work-pattern decedent never displayed. Therefore, Smith's calculated loss of Hicks' future wages and employee benefits should be barred as they are unreliable and inadmissible under Fed. R. Evid. 702 and Seventh Circuit precedent.

**B. Loss of Replacement Services, Including Household, Guidance and Accompaniment Services, and Loss of Society or Relationship**

Smith's opinion also sets forth a calculation for Merlene Hicks', Christopher Hicks' estranged wife's, loss of replacement services and loss of society or relationship as a result of Christopher Hicks' death (Exhibit A, Rpt. Of Stan Smith, p.13). Smith opines that Merlene Hicks is entitled to $1,341,379.00 in loss of household, guidance and accompaniment services. <u>Id.</u> Dr. Smith's opinion on this loss of replacement services should be barred because his opinion on runs afoul of Fed. R. Evid. 702. Additionally, Christopher Hicks did not provide traditional marital services to his estranged wife and any determination of what Merlene Hicks is now "missing" from Christopher Hicks is highly speculative as it is not based upon objective evidence.

The purpose of the Illinois Wrongful Death Act is "to compensate the surviving spouse...for the pecuniary losses sustained due to the decedent's death. It is intended to provide the...benefits that would have been received from the continued life of the decedent." <u>Burke v. J.B. Hunt Transport, Inc.</u>, 1992 WL 137153 at *3 (N.D. Ill. June 10, 1992) (quoting <u>Elliot v.</u>

4

Willis, 92 Ill. 2d 530, 540 (1982)). Illinois law requires that the amount recovered in any such action is to be distributed in proportion to the percentage of dependency upon the deceased. See 740 ILCS 180/2. Because Christopher Hicks did not provide traditional marital services to his estranged wife, Merlene Hicks, Defendants ask that this court bar Smith's estimations of such services, as they are highly speculative and are not based upon the benefits Merlene Hicks was receiving while Christopher Hicks was alive.

Moreover, Christopher Hicks and Merlene Hicks did not lead the traditional marriage envisioned by the legislature when devising this statute. "The law is concerned with the protection of the "relational" interest of married persons and recognizes as an actionable tort any interference . . . with the continuation of the relation of husband and wife." Sostock v. Reiss, 92 Ill. App. 3d 200, 207, 415 N.E.2d 1094, 1099, (1st Dist. 1980). For this reason, Illinois courts refuse to extend recovery of consortium benefits to those who are engaged to be married. Id.

Consortium benefits, as well, should not be extended to Merlene Hicks, who did not share with Christopher Hicks the type of relation the legislature intended to protect. The couple had been separated since Christopher Hicks left for southwest Asia in 1990. (Exhibit B, Rpt. of Gerry Suchanek, p. 7). They had effectively been separated for nearly 14 years; in fact, Merlene Hicks lived in California while Christopher Hicks was located in Illinois at the time of his death. Id. Merlene Hicks testified that although they had not lived together since 1991 Christopher Hicks would send her anywhere from $100-$300 in cash per month. (Exhibit C, p. 71, line 8). Objective evidence supporting Merlene Hicks' receipt of these alleged cash payments was never produced in this litigation.

Furthermore, despite Merlene Hicks' testimony that she and Christopher Hicks were going to

5

reconcile, decedent's purported intention to reconcile (Exhibit C, Dep. Of Merlene Hicks, p. 70, line 5) with his wife is no more than the promise of an engagement and should not be treated any differently than such.

Importantly, such speculative intentions have no place in the calculation of consortium benefits. Rather, "wrongful death damages must be based on actual conditions and actual contributions made by the decedent prior to his death." Johnson v. Inland Steel Company, 1992 WL 396296 *4 (N.D.Ill. Dec. 28, 1992).

There has been absolutely no objective evidence produced by plaintiff that decedent at any time provided such actual services to Merlene Hicks. In fact, because of the geographical distance separating the couple, the provision of such services is unlikely. Accordingly, Merlene Hicks claim a monetary loss for benefits she was not receiving is not supported by reliable evidence.

Even if Merlene Hicks is found to have suffered a loss of consortium benefits, the state of her marriage is relevant to the determination of damages. Perhaps the most instructive case on this issue is Countryman v. County of Winnebago, in which the Appellate Court of Illinois held that evidence of decedent's previous extramarital affair was "relevant to damages because it bore on the value of the consortium" his wife lost. 135 Ill. App. 3d 384, 387, 481 N.E.2d 1255, 1258 (2d Dist. 1985). Not only did Merlene and her "husband" live halfway across the country from each other, Merlene was also aware of Christopher Hicks' other girlfriends, including the girlfriend at his time of death, Erika Stewart. (Exhibit B, Rpt. of Gerry Suchanek, p 7)

Because there is no evidence that Christopher Hicks actually offered replacement services to his estranged wife, their relationship is not one the legislature intended to protect under the

Wrongful Death Act, and the couple engaged in other relationships outside of their marital relationship, damages for loss of replacement services and loss of society should be barred as they are extremely speculative.

## C. Hedonic Damages

Plaintiff's expert Stan Smith further opines that the estate of Christopher Hicks is entitled to hedonic damages in an amount ranging from $1,988,409 to $3,314,023.(Exhibit A. Rpt. Of Stan Smith, p.13) Hedonic damages attempt to place a monetary value on "the pleasure, satisfaction, or utility that human beings derive from life, separate and apart from the labor or earnings value of life." Ayers v. Robinson, 887 F.Supp. 1049, 1051 (N.D.Ill. May 23, 1995) (internal citations omitted). Hedonic damages are calculated based upon how much people are willing to pay for reductions in health and safety risks, and how much they are compensated for assuming extra risk. Mercado v. Ahmed, 974 F.2d 863, 869 (7th Cir. 1992). The Northern District of Illinois has previously rejected Smith's calculations of hedonic damages for their failure to meet the general admissibility standards of scientific evidence. See e.g. Mercado v. Ahmed, 756 F.Supp. 1097, 1103 (N.D. Ill., 1991); Ayers, 887 F.Supp. at 1060-61. For the same reason as those set forth in Mercado, Defendants ask this court to bar Smith's testimony regarding hedonic damages

First, this Honorable court has previously barred Stan Smith from testifying as to hedonic damages. In Doe v. Tag, Inc., 1993 WL 484212, *2 (N.D.Ill. Nov. 18, 1993), Plaintiff was precluded from using Stan Smith's estimations of plaintiff's loss of enjoyment of life. This court reasoned that Smith's conclusions as to the monetary value of enjoyment of life would not assist the trier of fact in determining any issues before the court. Id. at *3. The court based its

7

reasoning off <u>Mercado</u>, where the court stated that Smith was no more of an expert at valuing the loss of pleasure of life than jurors would be. <u>Id</u>. at *3, citing 756 F.Supp at 1103.

Additionally, other courts have found testimony regarding hedonic damages unhelpful to jurors because it is "that of persons who are no more expert than are jurors on the value of life." <u>Mercado</u>, 756 F.Supp. at 1103. Expert testimony is meant "to inform the court about affairs not within the full understanding of the average man." <u>Mercado</u>, 974 F.2d at 863. But such testimony is properly excluded when it fails to satisfy this function. <u>Id</u>. The Seventh Circuit has held that, "despite Smith's training, extensive research and countless calculations, his testimony would not aid the jury in evaluating the evidence . . . because Smith [is] no more expert in valuing life than the average person." <u>Id</u>. at 871. Therefore, Smith's opinion fails to meet the requirement that it assist the trier of fact and should be barred under Fed. R. Evid. 702 and <u>Daubert.</u>

Smith's opinions as to hedonic damages also fail under admissibility of expert opinions because the information is unreliable. Hedonic damages have been found to be unreliable because of the lack of any "basic agreement among economists as to what elements ought to go into" or "which studies ought to be considered" in life valuation. <u>Mercado</u>, 756 F.Supp. at 1103; <u>see also</u> (Exhibit B, Rpt. of Gerry Suchanek, p. 12-14) ("Within the economic profession, there is no accepted economic or statistical methodology for valuing life....most professionals agree that life cannot be valued using market measures or mechanism"). Importantly, even Smith has acknowledged the need for more studies "on the willingness-to-pay issue." <u>Id</u>. A witness is allowed to testify as an expert once the court is convinced that the witness will rely only upon evidence a reasonable expert in the field would rely upon. <u>Mercado</u>, 974 F.2d. at 869-70, citing <u>U.S. v. Lundy</u>, 809 F.2d. 392, 395 (7th Cir. 1987). Because no consensus on hedonic damages

8

exists within the field, expert economist Smith should be barred from testifying on this matter.

Smith's methodology has been found to be unreliable by other courts. See Mercado, 974 F.2d at 871. He utilizes a "willingness-to-pay" model to deduce the value people place on life. See e.g. Id.; Ayers, 887 F.Supp. at 1061. For example, Smith considers the extra wages employers pay to induce people to take risky jobs, as well as the demand and price of products that enhance health and safety. Mercado, 756 F.Supp. at 1102-03. This model has been found to be incomplete.

As recognized by several courts, the "willingness-to-pay" model ignores numerous factors that influence people's employment decisions. Instead, this model assumes workers have free choice in the jobs they take, that workers accurately perceive the risk a job entails, and that they voluntarily accept such risk. Mercado, 974 F.2d. at 871. In addition, the "willingness-to-pay" model fails to consider the numerous factors that surround a consumer purchase, and whether a consumer actually and accurately perceives that risk in purchasing one product rather than another. Id. It also fails to account for each person's individual cautionary nature. Id. Rather, the court has recognized Smith's research as "no more than a compilation of the opinions, expressed through spending decisions, of a large number of Americans as to the value of life." Id. Smith concedes this criticism. Id. For these reasons, Defendants ask that this court bar the testimony of Smith regarding hedonic damages, as his methodology has been proven unreliable.

Courts repeatedly have noted that, even if the factors upon which Smith relies were somehow able to establish the economic value of life, they do not establish the value of its enjoyment. See e.g. Mercado, 974 F.2d at 871; Wilt v. Buracker, 191 W. Va. 39, 443 S.E.2d. 196, 205 (1993), cert. denied, 511 U.S. 1129 (1994). Smith only claims that he can place a value

9

on life. (Exhibit A, Rpt. Of Stan Smith, 5-6.) The value of life itself is, at most, tangentially related to valuing the loss of its enjoyment. <u>Montalvo v. Lapez</u>, 77 Hawaii 282, 303, 884 P.2d 345, 366 (1994). Smith fails to link the two concepts, and thus, his opinion regarding hedonic damages should be barred, as it is misplaced and baseless.

Because Stan Smith's testimony does not assist trier of fact in determining the issues and is based off unreliable methods, all testimony and evidence as to recovery of hedonic damages should be barred under Fed. R. Evid. 702 and <u>Daubert.</u>

**DEFENDANTS' MOTION IN LIMINE NO. 2**

**DEFENDANTS' MOTION IN LIMINE TO BAR
USE OF THE TERM "HOMICIDE" AT TRIAL**

Defendants' request that this court bar use of the term "homicide" from trial because it is a legal conclusion that has not been legally adjudicated. Additionally, the word "homicide" would be unfairly prejudicial and could confuse the jury, making it inadmissable under Fed. R. Evid. 403. Plaintiff has solely alleged wrongful death in his complaint.

Homicide is a word that carries an everyday meaning and a legal meaning. Both, however, refer to the death of someone, caused by another. It would be improper for the jurors to attach either the everyday meaning or the specialized legal meaning to the word homicide for purposes of this trial. Mr. Hicks' estate is suing civilly for money, not to determine in what manner Mr. Hicks' life expired. Additionally, there was no legal adjudication stating that Mr. Hicks' manner of death was through homicide. Therefore, the word "homicide" has no place in this trial and should be barred from being used by plaintiff, his counsel, or any of their witnesses.

Use of the word homicide may also confuse the jurors and it would unfairly prejudice the

defense. As stated above, the word homicide, regardless of how it is used, refers to someone causing another's death. If the jurors were to hear someone say "homicide" at trial, they may immediately come to a conclusion one way or another. Most likely, though, the word homicide would unfairly invoke negative images of Defendant Officers in the jurors' minds and should be inadmissable for use at trial under Fed. R. Evid. 403.

## DEFENDANTS' MOTION IN LIMINE NO. 3

Plaintiff has proffered Mr. Sullivan as an expert in police policies and procedures. Mr. Sullivan has opined, in part, that the "officers(s) used excessive force by applying a choke-hold/neck restraint to HICKS with undue severity resulting in his death." See (Exhibit D, Opinion of Mr. Sullivan at page 3 lines 10 -11).

Plaintiff should be barred from presenting this evidence because it does not comport with the Daubert standard. Daubert requires the Court to apply a two prong test: (1) the testimony must be based on scientific knowledge that (2) will assist the trier of fact. Daubert, 509 U.S. at 592. "The scope of expert testimony is governed by Evidence Rule 702 which limits expert testimony to that which will assist the fact-finder in understanding the evidence or in resolving a fact in issue. But the assistance offered by an expert does not include telling the fact-finder how it should rule. Hence experts are not allowed to give legal conclusions." Hygh v. Jacobs, 961 F.2d 359, 363 (2nd Cir. 1992)(the court held that when an expert testified that an officer conduct "was not justified under the circumstances", "not warranted under the circumstances" and totally improper" - these statement should have been excluded.)

Moreover, an expert can testify to proper police procedures but cannot offer his opinion whether those procedures were properly followed. McCloughan v. City of Springfield, 208

11

F.R.D. 236, (C.D. Ill. 2002). In the McCloughan case, the Plaintiff was offering the testimony of a police expert about the appropriate standard of conduct of off-duty police officers and the use of force. The Court found that the expert would be helpful to the jury regarding proper procedures to be used by the law enforcement officials, but would not allow the expert to opine regarding the specific facts of this case. Id at pg. 239. The Court found that the facts of what occurred were in dispute and if the expert were allowed to offer his opinion as to whether the officer followed proper procedure, the expert would essentially be testifying to his credibility findings regarding the testimony of the witnesses. Id.

This is precisely what the Plaintiff in this case hopes to accomplish with Mr. Sullivan. Mr. Sullivan opines that a choke hold was used and basis this conclusion on the testimony of some of the witnesses and the medical examiner. However, it is disputed what type of hold was applied to Mr. Hicks. Officer Sotos has called it a head lock, Ms. Soria has called it a choke hold, and Mr. Kendall has indicated there was a baton across the neck which was pulled up until Mr. Hick's airway was cut-off. If Mr. Sullivan testifies that a choke hold was in fact used on Mr. Hicks's he would be making a credibility determination among these witnesses. This is not permissible under the rules of evidence.

Additionally, allowing this testimony would not "assist the jury". The jury is capable of understanding what each witness will testify to and making the fact determination of what occurred and whether it was reasonable. Pena v. Leombruni, 200 F.3d 1031, 1034 (7th Cir. 1999)(the court found that the intended testimony of a police expert was whether the officer had acted reasonably given the facts that confronted him and because the jury "needed no help" in deciding if these actions were reasonable because that is within the competence of a lay person).

12

Because the jury is capable of determining what occurred out on the street and whether the actions of the officers were reasonable under the circumstances, Mr. Sullivan should not be permitted to opinion that the "officers(s) used excessive force by applying a choke-hold/neck restraint to HICKS with undue severity resulting in his death."

Moreover, Mr. Sullivan should be prohibited from testifying that the choke hold/ neck restraint "result[ed] in his death." (Exhibit E, Dep. Of Mr. Sullivan, p.3, lines 10-11). Mr. Sullivan, by his own testimony is not a medical doctor and not competent to make this conclusion. "...So I am saying from the evidence that I have seen at this point in time there's preponderance of the evidence that there was a choke hold applied or some injury to the neck. Now what the exact cause of death was, Counselor, I have to let the medical people make that determination. See (Exhibit E, Dep. Of Mr. Sullivan at p. 178 line 19-25). Mr. Sullivan goes on to state, "What I am saying, that there was excessive use of force applied to Mr. Hicks. Now, whether that caused his death or not, I don't know. I'm going to let the medical people fight that battle." (Exhibit E, Dep. Of Mr. Sullivan at p. 179, lines 14-18).

Similarly, in response to questioning at his deposition, Mr. Sullivan offered the following opinions which should also be barred:

1. "I think there's evidence there based upon the documentation that I read that the person died from an improperly restrained choke hold.: (Exhibit E, Dep. Of Mr. Sullivan at p. 87 lines 6-8) (evaluating the evidence before him just as a jury would do, he has no special training to determine what occurred out on the street);

2. "It is hard to separate bad tactics, lack of training, and excessive force if you don't have the tactics, if you don't have training. You don't have skill level then. If Mr. Hicks was fatal or

13

died as a result of this association or some other type of reason, just the officers going out and being unskilled, getting into a wrestling match on the street, there's nothing obvious of excessive force. I think my focal point is on the evidence, the witness statement, and the medical examiners statement that there was a choke hold applied." (again, reviewing the evidence and telling the jury how they should decide what occurred which is not permissible). (Exhibit E, Dep. Of Mr. Sullivan, p. 156 lines 1-12).

3. "So I am saying from the evidence that I have seen at this point in time there's preponderance of the evidence that there was a choke hold applies or some injury to the neck. (Exhibit E, Dep. Of Mr. Sullivan, p. 178 at line 19-22).

Finally, during the course of his deposition, Mr. Sullivan has opined that officers were negligent in certain actions. (Exhibit E, Dep. Of Mr. Sullivan, p. 214, lines 1-11, 167, line12, p.200, lines 2-11 and others). These opinions should all be barred as negligence is not the standard for whether a constitutional violation occurred. The officer must have acted intentionally to cause the constitutional violation. Consequently any opinions related to the negligence of any officer should be barred.

With regards to the conduct of the officers, the only opinion Mr. Sullivan should be permitted to offer is that the use of a choke hold would be excessive if the Officers were not confronted with a situation that is likely to cause death or great bodily harm.

## DEFENDANTS' MOTION IN LIMINE NO. 4

### DEFENDANTS' MOTION IN LIMINE TO BAR ANY EVIDENCE REGARDING RACE OR SPECULATIVE RACIAL MOTIVATION BY THE DEFENDANT OFFICERS

Defendants believe that Plaintiff will attempt to argue or elicit testimony from witnesses

14

regarding the issue of race. Multiple depositions taken by Plaintiff's counsel raised questions regarding the races of the parties[1], the races of prior arrestees, and racial attitudes of Defendants and other witnesses. Specifically, plaintiff may suggest in argument or testimony that the stop of decedent was racial profiling, or decedent's conduct prior to the physical altercation can be explained in part by a generalized fear of potential police brutality by members of the African American community in Chicago. Such testimony and argument should be barred. Racial evidence is irrelevant to the issues before this court and should not be admissible.

Racial evidence is properly admitted at trial if it has probative value in determining the issues before the court. See <u>Hunter v. Allis-Chalmers Corp., Engine Div.</u>, 797 F.2d 1417, 1423 (7th Cir. 1986) (supervisor's derogatory comments were probative to employment discrimination suit). However, inserting race based evidence into a trial where race is not an issue could be considered unfairly prejudicial under Federal Rule of Evidence 403. <u>U.S. v. Frasch</u>, 818 F.2d 631, 634 (7th Cir. 1987). For example, racially derogatory comments or slurs in a tape recording could be unfairly prejudicial to a defendant on trial for a completely unrelated charge and may have to be redacted before the recordings can be used at trial. <u>See id.</u> ("trial court should carefully consider whether substitution or deletion of the offensive words would damage the probative value of the evidence").

Plaintiff nowhere mentions race in the complaint and race is not relevant to any of his six claims. However, Plaintiff's counsel questioned each of the Defendant Officers about various questions regarding race during each of their respective depositions. Counsel asked if the

---

[1] Multiple times Defendant Officers were referred to as being white. However, this is an incorrect categorization, as Defendant Officer Soto is Latino.

15

Defendant Officer was suspicious of Christopher Hicks because of his race, (Exhibit F, Dep. of Louis Soto, p. 146, lines 21-22); whether Defendant Officer had ever been accused of using racially derogatory language, (Exhibit F, Dep. of Louis Soto, p. 147, line 1, Exhibit G, Dep. of Robert Arnolts, p. 57, lines 22-23); the races of prior arrestees and people given citations, (Exhibit F, Dep. of Louis Soto, p. 237, lines 6-7, p. 251, lines 4-14, Exhibit G, Dep. of Robert Arnolts, p. 51, lines 21-24, p. 52, lines 9-12, p. 214, lines 7-8, p. 218, lines 15-16); and whether the Defendant Officer had African American friends, (Exhibit G, Dep. of Robert Arnolts, p. 58, lines 17-21).

Plaintiff also asked a witness in this case, Sergeant Atzlan, multiple questions about race procedures within the Chicago Police Department and general attitudes of Chicago Police officers and personnel. Plaintiff's counsel asked questions such as whether the races of arrestees are recorded, (Exhibit H, Dep. of Sergeant Atzlan, p. 73 lines 23 through p. 74 line 18), and whether the Chicago Police Department compiles racial data on people involved with the department, (id. at p. 75 lines 20 through p. 78 line 8). Sergeant Atzlan was also inappropriately questioned about his feelings about racial discrimination within the police department and if he felt he had ever personally been discriminated against because of his race. (Id. at p. 74 line 24 through p. 75 line 19). Lastly, Plaintiff's counsel asked Sergeant Atzlan to speculate if he thought Christopher Hicks would have been treated differently had he been white. (Id. at p. 78 line 9).

Finally, Laura Soria's deposition testimony reiterates that her 911 call states she saw two White men on top of a Black man. (Exhibit I, Dep. of Laura Soria, p. 69, lines 7-24.) Ms. Soria merely categorized what the parties looked like for the 911 dispatcher, but the races of the parties is in no way relevant to issues at trial.

Any argument or implication that racial profiling, or other disparate treatment occurred in this incident is utterly baseless and should be precluded by the Court. As Magistrate Judge Schenkier stated on the record in ruling on Plaintiff's motion to compel, there is no claim for racial profiling in this case. (Exhibit J, Transcript of May 12, 2005, hearing before the Honorable Sidney Schenkier, Magistrate Judge, p. 7, lines 4-9). Evidence of, or argument about, racial bias as a motivating factor in any encounter that may have occurred between decedent and any Chicago police officers should, therefore, be excluded. The issue of race in this trial is of no relevance, and would serve only to inflame the jury, thereby leading to unfair prejudice to Defendants.

Accordingly, any racial evidence elicited through depositions or any other forms of discovery should be inadmissible at trial because they are irrelevant or unfairly prejudicial and barred by Fed.R.Evid. 402 and 403. For all of the reasons set forth above none of Plaintiff's claims have any racial element or revolve around the race of the parties. Even if this court does not find that the race of the parties is irrelevant and inadmissable under Fed.R.Evid. 402, racial evidence is nonetheless unfairly prejudicial to Defendant's case and should be excluded under Fed.R.Evid. 402 and 403.

## DEFENDANTS' MOTION IN LIMINE NO. 5

### DEFENDANT'S MOTION IN LIMINE TO BAR ANY STATEMENTS, REFERENCES OR EVIDENCE THAT THE DEFENDANT OFFICERS FAILED TO PROVIDE ADEQUATE MEDICAL CARE OR SUMMONED AN AMBULANCE IN A TIMELY MANNER

Defendants anticipate that Plaintiff will attempt to introduce evidence, both lay and expert, that Defendants failed to respond to Hicks' medical needs by not administering CPR

17

and/or could have called for an ambulance sooner. Dr. Jesse Hall, Plaintiff's expert, discusses in

his deposition as well in his report issues regarding C.P.R., C.P.R. training at the Chicago Police

Academy, the issue of the possible effect for C.P.R breathing for Christopher Hicks, etc.(Exhibit

K, Dep. of Dr. Jessie Hall, see pp. 31, 32, 33, 34, 49, 100-103, 105, 106, 109, 111-118, 121, 127,

128, 130, 132-135, 137).   Any testimony, evidence, or argument regarding the police officers'

decision to not perform cardiopulmonary resuscitation or to not call for an ambulance should not

be admissible at trial.

    On April 11, 2005,  this Court granted summary judgment in favor of the defendant

officers regarding their reasonable response to Hicks' medical needs. This Court held that Officer

Pena's call for an ambulance was immediate and did not constitute willful and wanton conduct

under the Tort Immunity Act.  (Summary Judgment Opinion and Order, p 16). Therefore, the

Court has already definitively decided the above issues in favor of the defendant officers and any

reference to medical care or not calling for an ambulance sooner should be barred.

    Furthermore, even if this Court had not correctly ruled as it did, this testimony is

improper because neither federal nor Illinois law require police officers to perform CPR.  Rather,

745 ILCS 10/4-105, finds public employees liable only if they know a prisoner is in need of

medical care and, through willful and wanton conduct, failed "to take reasonable action to

summon medical care."  Here, it is undisputed that Officer Pena immediately called for an

ambulance, which is precisely what Illinois law required him to do. "There is no statute, rule or

regulation that requires Illinois local municipal law enforcement agencies or police officers to

immediately administer CPR upon a body." Pyka v. Village of Orland Park, 906 F.Supp. 1196,

1211 (N.D.Ill. 1995). In particular, the Chicago Police General Order 89-3, which requires

preliminary investigators to a crime scene to render aid to the injured first, has been interpreted

by the court as requiring only that officers place a phone call to summon an ambulance. Torres v.

City of Chicago, 123 F.Supp. 2d 1130, 1133-34 (N.D.Ill. 2000). Officers responding to a crime

scene are not expected to act "as doctors or emergency medical technicians who . . . exercise

discretion in determining the best course of medical care." Id. at 1134. In summoning an

ambulance, Defendant Officers fulfilled their duty to provide medical care. Moreover, the other

defendant officers were able to rely on Pena's call in summoning medical attention and they were

also granted summary judgment for failure to provide medical care. (Summary Judgment

Opinion and Order at p. 22). The same is true of federal law. The Supreme Court in City of

Revere v. Massachusetts General Hospital, 463 U.S. 239, 244 (1983), ruled that police officers

are not required to provide CPR while waiting for an ambulance. Plaintiff should not be able to

discuss or insinuate otherwise.

Hence, the issue of CPR as well as the defendant officers response to Hicks' medical needs

should not be discussed or raised at trial. Furthermore, evidence of what the Defendant Officers

did or did not do while awaiting arrival of the ambulance is not relevant for purposes of trial.

Therefore, this Court should bar all evidence discussing C.P.R. as well as the Defendant Officers

response to Christopher Hicks' medical needs.

## DEFENDANTS' MOTION IN LIMINE NO. 6

### DEFENDANTS' MOTION IN LIMINE TO BAR EVIDENCE
### REGARDING DEFENDANT SOTO'S PRIOR USE OF ALCOHOL

Plaintiff should also not be permitted to discuss Officer Soto's use of alcohol in the1980s

and early 1990s. In his deposition Defendant Soto discussed drinking alcohol and stated that he

19

may have had a problem with alcohol in the 1980s and early 1990s. Defendant Soto's prior alcohol use should not be introduced at trial because it is irrelevant to the issues before the court and even if it were, a person's alcohol use, when unrelated to the incident in question, is unfairly prejudicial under Fed.R.Evid. 403.

Defendant Soto was questioned during his deposition about suspensions from the police department, and he disclosed that his longest suspension was due to an alcohol related incident while off duty. (Exhibit F, Dep. of Louis Soto, p. 32 lines 8-11). Defendant Soto was also suspended for being intoxicated while carrying a firearm off duty. (Id. at p. 34 lines 19-20). Plaintiff's counsel then inquired into whether Defendant Soto ever had a drinking problem. (Id. at p. 31 line 14; p 36 line 12). Lastly, Defendant Soto was asked about his current drinking use. (Id at p. 36 lines 16-24). This line of questioning was irrelevant. By continuing on and asking about his current drinking habits or problems, Plaintiff's counsel was merely trying to illicit improper character evidence.

In Alexander v. CIT Technology Fin. Svcs., Inc., 217 F.Supp. 2d 867 (N.D.Ill. 2002), the plaintiff sued her employer for sex discrimination. Defendants filed a motion in limine requesting that the court bar any evidence regarding plaintiff's supervisors use of alcohol as it would be irrelevant, improper character evidence, and unfairly prejudicial. Id. at 882. The court granted defendant's motion because alcohol or drug use would not have made it any more or less probable that plaintiff was discriminated against and it would likely prejudice the jury. Id.

The factual allegations no where state that Defendant Soto was drunk or under the influence of alcohol on May 26, 2004. Additionally, he was admitted to the hospital and Northwestern Hospital medical records do not indicate that there was alcohol in his system. Therefore, no

20

evidence of Defendant Soto's prior or current alcohol use should be introduced at trial. Similar to the court's decision in <u>Alexander</u>, this court should bar any alcohol related evidence because it is irrelevant. Further, if such evidence was introduced, it would have a tendency to mislead the jurors away from the facts at issue and should be barred under Fed.R.Evid. 403 as it is unfairly prejudicial.

**DEFENDANTS' MOTION IN LIMINE NO. 7**

**DEFENDANTS' MOTION TO BAR EVIDENCE OF MERLENE HICKS ALLEGED MEDICAL STATE AND HOSPITALIZATION SUBSEQUENT TO HICKS' DEATH**

Merlene Hicks should be barred from testifying as to any medical conditions, causation, diagnoses or prognoses she claims to suffer from. Defendants anticipate that Plaintiff will attempt to offer personal testimony that Merlene Hicks had one more medical condition and to offer personal testimony as to diagnoses that have never been made by any treating physician. Plaintiff has not listed any of Merlene Hicks medical doctors as witnesses.

None of this testimony or evidence in regards to Merlene Hicks should be admissible at trial. Pursuant to Fed. R. Evid. 701, 702, and 802, this Court should exclude this testimony. Merlene Hicks is not competent to offer testimony regarding any purported medical condition (physical or psychological) she may have, aside from testifying as to her subjective symptoms. As a lay witness, she lacks, the knowledge, skill, experience, training and education that would qualify her to testify about the nature of any underlying medical conditions, its cause, and its permanence. Such testimony may only be offered by a properly-disclosed expert witness. Additionally, any testimony she gives as to her medical conditions is merely hearsay and should be exclude under Fed. R. Evid. 802.

21

Furthermore, the Wrongful Death Act only compensates surviving beneficiaries for their pecuniary injuries. Thus, this evidence is irrelevant under Fed.R.Evid. 402 and should be barred. Damages under the Wrongful Death Act are only intended to compensate the beneficiary for her pecuniary losses. 740 ILCS 180/2; see also Beetle v. Wal-Mart Associates, Inc., 326 Ill. App. 3d 528, 532, 761 N.E.2d 364, 369 (2d Dist. 2001). Pecuniary losses refer generally to monetary losses, Robertson v. White, 11 Ill. App. 2d 177, 182, 136 N.E.2d 550, 554 (1st Dist. 1956), and can specifically include money, benefits, goods, services, and society that the decedent would have given his family, Turner v. Williams, 326 Ill. App. 3d 541, 548, 762 N.E.2d 70, 77 (2d Dist. 2001).

A widow's health condition is not normally taken into account when determining pecuniary loss under the Wrongful Death Act. See Illinois Pattern Jury Instructions, Civil, No. 31.04 (2005) (*decedent's* health can be factored into damages) (emphasis added). Additionally, the poverty or wealth of the widow or next of kin shall not be considered when determining damages. IPI, Civil, No. 31.07.

Defendants anticipate that Plaintiff will try to introduce evidence of Merlene Hicks' physical state so as to draw sympathy and to increase the possible damages awarded to her under Illinois' Wrongful Death Act. Plaintiff may try to introduce testimony or evidence that implies that Merlene Hicks can no longer work and would, therefore, have been more reliant upon Christopher Hicks for monetary support. Marlene specifically testified that due to her arthritis, slipped discs, and her heart condition, she is unable to work. (Exhibit C, Dep. of Merlene Hicks, p. 11, lines 8-13, p. 12, line 18). However, Merlene Hicks' inability to work and/or resultant "poverty" is not an issue under Illinois' Wrongful Death Act. Even if Merlene's work capability

22

is relevant to the issue of damages under the Wrongful Death Act, it is undisputed that Merlene Hicks testified that she is currently attending school, presumably to continue working once she completes her educational training.

It is well established under Illinois law that pecuniary losses do not include compensation for the grief, sorrow, or bereavement of the decedent's family members. See Opio v. Wurr, 901 F.Supp. 1370, 1375 (N.D.Ill. 1995) ("[plaintiff's] emotional distress, grief and sorrow are not a component of her pecuniary injuries"); Elliot v. Willis, 92 Ill.2d 530, 539, 442 N.E.2d 163, 168 (Ill. 1982) ("parent's mental anguish was not recoverable in a wrongful death action"); Turner, 326 Ill. App. 3d at 548, 762 N.E.2d at 77 ("damages do not include grief or mental anguish resulting from the death"); Person v. Behnke, 242 Ill. App. 933, 937, 611 N.E.2d 1350, 1354 (4th Dist. 1993) ("parent's loss of a child's society is separate from and exclusive of any mental suffering and anguish the parent underwent as a result of the child's death"); Uhr v. Lutheran General Hospital, 226 Ill. App. 3d 236, 267, 589 N.E.2d 723, 744 (1st Dist. 1992) ("damages for mental anguish are not recoverable in a wrongful death action"), Robertson, 11 Ill. App. 2d at 182, 136 N.E.2d at 554 ("It has been specifically held that the pain and suffering of bereavement is noncompensable"); see also IPI, Civil, No. 31.07 ("In determining "pecuniary loss" you may not consider...the grief or sorrow of the widow and next of kin").

According to the above case law any evidence regarding Merlene Hicks' hospitalization cannot be used to calculate damages under Illinois Wrongful Death Act. Such evidence is in no way relevant to a determination of any pecuniary losses Merlene Hicks may have suffered after Christopher Hicks died. Her bereavement and any emotional state are not compensable under

23

the Wrongful Death Act, and facts regarding such are inadmissable because they are irrelevant under Fed.R.Evid. 402.

Any evidence of Merlene Hicks' health problems would serve to distract the jury. Heart problems or other chronic illnesses may induce a jury to decide emotionally and not on the facts of the case, and should be barred under Fed.R.Evid. 403 as it would be unfairly prejudicial to the defense. Thus, Merlene Hicks should be barred from testifying as to any medical conditions, causation, diagnoses or prognoses.

### DEFENDANTS' MOTION IN LIMINE NO. 8

### DEFENDANTS' MOTION IN LIMINE TO BAR EVIDENCE OF CHRISTOPHER HICKS' RELATIONSHIP WITH ANY OTHER FAMILY MEMBERS OTHER THAN MERLENE HICKS IS INADMISSABLE

Any evidence regarding Christopher Hicks' relationship with his surviving family members, other than Merlene Hicks, is irrelevant and should be excluded at trial. Merlene Hicks is the only qualified beneficiary under the Wrongful Death Act. It states, "the jury may give such damages as they shall deem a fair and just compensation...to the surviving spouse and next of kin of such deceased person." 740 ILCS 180/2. Next of kin is defined as the decedent's blood relatives who are in existence at the time of the decedent's death who would take the decedent's property, had he died intestate. Johnson v. Provena St. Theresa Medical Center, 334 Ill. App. 3d 581, 589, 778 N.E.2d 298, 306 (2d Dist. 2002).

Under the rules of descent and distribution, the estate goes completely to a surviving spouse, and is then divided if the decedent had a child or if there is no surviving spouse. See 755 ILCS 5/2. Because Christopher Hicks left a surviving spouse, any resultant damages shall go directly to her, Merlene Hicks. Depositions were taken of many of Christopher Hicks' family

members and information was disclosed regarding his relationship to his mother, brothers, and sisters. These family members discussed the activities they engaged in with Christopher Hicks and their general family relationship. However, this information is irrelevant and immaterial to determining damages under the Wrongful Death Act and would also be irrelevant and inadmissible under Fed. R. Evid. 402. Therefore, evidence regarding how these other family members were impacted by Christopher Hicks' death should be barred.

## DEFENDANTS' MOTION IN LIMINE NO. 9

### DEFENDANTS' MOTION TO IN LIMINE TO BAR EVIDENCE REGARDING CHRISTOPHER HICKS' ALLEGED NEW JOB

Defendants believe that Plaintiff may attempt to introduce testimony and evidence relating to a new job Christopher Hicks was to start the day following his death. Glenn Terry Smith, a friend of Mr. Hicks, stated that Mr. Hicks was supposed to start working at a new job the day after he died. (Exhibit L, Dep. of Glenn Terry Smith, p. 44, line 1). Christopher Hicks allegedly interviewed with an employer, was hired, and was happy to be starting a new job. (Id. at lines 3-5). Even though Glenn Terry Smith drove Christopher. Hicks to his interview with the company, (id. at lines 1-2, 11-13), he could not remember the name of the employer nor where the company was located, (id. at lines 9-10, 19-22). Apparently no one else new that Christopher Hicks was going to start a new job, either. (Id. at p. 46, lines 1-5). This alleged new job is inadmissible hearsay and should be barred at trial. See Fed.R.Evid. 802. Thus, any claim of lost wages is no more than speculation by Plaintiff as to the amount of loss, plaintiff's term of employment, his position or potential for continued employment.

Because plaintiff has brought forward no proof of any new job, and therefore any alleged

25

wage loss as a result of Defendants' conduct should not be admissible at trial There are no records or any other objective evidence to prove Christopher Hicks' new employment and the name of the alleged new employer is still unknown. Evidence of Mr. Hicks' new job could only come in as hearsay because all Plaintiff can introduce is a statement by Mr. Hicks, made while out of court, and is only relevant to this case if we believe the truthfulness that he really was set to start working. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid 801(c). If a statement or assertion meets the three prong hearsay test and does not fall under any exceptions to the rule, it is inadmissible at trial. Fed.R.Evid. 802. Without any other supporting documentation or identification of the employer, any evidence of Mr. Hicks' new job should be inadmissible at trial under Fed.R.Evid. 802.

## DEFENDANTS' MOTION IN LIMINE NO. 10

### DEFENDANTS' MOTION IN LIMINE TO BAR REFERENCE TO PHOTOGRAPHS OF CHRISTOPHER HICKS IN THE ARMY, WITH FAMILY MEMBERS OTHER THAN HIS WIFE, AND THE VIDEO OF HIS FUNERAL SERVICE

Plaintiff has identified a number of photographs of Christopher Hicks while in the Army, of Hicks socializing with family members, and the video of his funeral service as exhibits to be offered into evidence at the trial. All of these photographs and the video of Christopher Hicks' funeral service should be excluded from trial because they are irrelevant, unfairly prejudicial, and cumulative. See Fed.R.Evid. 402, 403.

These pictures and video would serve no other purpose at trial than to unduly prejudice the jury. These photographs show what Christopher Hicks did or attended during his lifetime,

26

but are in no way relevant to determining any factual issues before this Court including damages. As discussed above, Christopher Hicks' siblings and other family members will not be able to recover any damages under Illinois Wrongful Death Act, so there is no need to demonstrate what kind of relationship these family members had with the decedent. Furthermore, the jury could be emotionally swayed by these pictures and distract the jury from the issues in the case. Furthermore, any pictures of Christopher Hicks while in army uniform should be barred as the jury will already know that Hicks served in the United States army. Such pictures could invoke certain unfounded notions that any uniformed citizen is also necessarily an upstanding person. This is simply not so.

Finally, Christopher's Hicks funeral video could also have the tendency to influence the jury based upon the grief exhibited the Hick's family members at his funeral service. No curative instruction could prevent the jury from considering evidence from an emotional perspective. Moreover, Merlene Hicks, the sole beneficiary of Christopher Hicks' estate, did not attend his funeral services.

In the alternative, if this court does conclude that the pictures are relevant and should be introduced at trial, the Defendant Officers request that such pictures be limited in number. Plaintiff disclosed at least ten pictures of Christopher Hicks with his family and at their family reunion/picnic. Presumably one photograph would sufficiently inform the jury. The more pictures that are introduced then make the evidence cumulative and inadmissible under Fed.R.Evid. 403.

## DEFENDANTS' MOTION IN LIMINE NO. 11

## DEFENDANT'S MOTION IN LIMINE TO BAR PLAINTIFF FROM MAKING ANY REFERENCE TO THE INDIVIDUAL DEFENDANTS' DISCUSSIONS WITH UNION REPRESENTATIVES

Defendants believe that Plaintiff will attempt to argue or elicit testimony from witnesses regarding the fact that a representative from the Fraternal Order of Police was called on the night in question. Police Officers have a right to notify their union representative regarding issues relating to their jobs as police officers pursuant to the terms of their collective bargaining contract.

Evidence regarding any of the individual defendants' discussions with union representatives in connection with the alleged incident could unduly prejudice the Defendant Police Officers and unfairly suggest to the jury that the police officers had something to hide or otherwise were making self-incriminating statements. The fact that one or more of the defendant police officers talked with their union representative is a routine matter and has absolutely no probative value for any legitimate issue in this case. Furthermore, that fact that a union representative had a phone conversation with Defendant Officer Soto and visited him is irrelevant to any issues in this case. Finally, permitting introduction or comment regarding the involvement of a union representative would require the Defendants to introduce witnesses and documents from their union to explain why union representatives are involved. This would result in a wholly collateral litigation of the purpose behind such union representation that would distract and unduly lengthen the trial with additional side issues and witnesses. To prevent prejudice to the Defendants, this Court should bar introduction of any such evidence.

28

## DEFENDANTS' MOTION IN LIMINE NO. 12

### DEFENDANTS' MOTION IN LIMINE TO BAR PLAINTIFF FROM MAKING ANY REFERENCE TO THE FRATERNAL ORDER OF POLICE DISCLAIMER CONTAINED ON VARIOUS OFFICERS' WRITTEN STATEMENTS

Any evidence of the standard Fraternal Order of Police disclaimer, which states that a statement given to internal police investigators by a police officer is given "under duress" should be inadmissable at trial. Lodge No. 7 of the Fraternal Order of Police, the bargaining unit for Chicago Police Officers, instructs its members to provide a disclaimer before completing reports or statements related to internal police department investigations. As a preface to statements, the officers include a standard form disclaimer supplied by the Fraternal Order of Police, Lodge No. 7, which represents Chicago Police Officers for purposes of collective bargaining. The disclaimer states that the officer is not providing the statement voluntarily, but rather upon the direct order of a superior officer. The purpose of the disclaimer is to preserve the officer's Fifth Amendment right against self-incrimination while still allowing the Police Department to conduct timely internal investigations. See Garrity v. State of New Jersey, 385 U.S. 493, 499 (1967) (self-incriminating statements obtained from police officers under threat of dismissal were improperly coerced and inadmissible in subsequent criminal proceedings).

Use of this standard disclaimer has no probative value to any of the issues in this case, and its admission would prejudice Defendants by improperly raising the issue of invocation of rights against self-incrimination. The fact that police officers preserve their constitutional rights in cooperating with an internal police investigation has no bearing on Defendant Officers' conduct and state of mind at the time of Christopher Hicks' death. However, this evidence

29

would be extremely prejudicial and unfairly suggest to the jury that the police officers had something to hide or otherwise were making self incriminating statements. Allowing Plaintiff to question an officer on this statement would confuse the jury and create a substantial prejudice to the defendant police officers. In addition, such questioning would undermine an important element of the police department's ability to question officers, without delay, in internal investigations.

Finally, permitting introduction or comment regarding this disclaimer would require the Defendants to introduce witnesses and documents from their union to explain why the disclaimer appears in statements and on reports. This would also result in a wholly collateral litigation of the legitimacy of the disclaimer that would distract and unduly lengthen the trial with side issues and witnesses. To prevent prejudice the Court should permit the redaction of this disclaimer and bar Plaintiffs from referring to it prior to introduction of any documents that might contain such disclaimer.

## DEFENDANTS' MOTION IN LIMINE NO. 13

### DEFENDANTS' MOTION IN LIMINE TO BAR PLAINTIFF FROM ARGUING THAT THE POLICE GENERALLY PROTECT OR COVER UP FOR OTHER OFFICERS' MISCONDUCT OR THAT THERE IS A CODE OF SILENCE WITHIN THE CHICAGO POLICE DEPARTMENT

Defendant Officers anticipate Plaintiff will try to elicit evidence that other Chicago Police Officers, not a party to this lawsuit, engaged in a cover-up, lied to Christopher Hicks' family members, or abided by an unspoken "code of silence." At the many depositions in this case Plaintiff's counsel asked witnesses many questions regarding the accuracy of report writing, quality of investigation, and general behavior of other police officers and investigators.

30

Defendant Officers object to any evidence or allusion that any of these activities occurred because they were never alleged in the pleadings, the Defendants cannot be held liable for others' conduct, and even if it were relevant evidence, it would be unfairly prejudicial. This evidence is barred under Fed. R. Evid. 104 and 402-404.

First and foremost, Plaintiff should not be able to introduce evidence at trial pertaining to theories that were never alleged in the pleadings. The only issue in this case is whether defendants committed excessive force. Nowhere in the complaint does Plaintiff allege a conspiracy theory or any other wrongdoing on the part of non-named Chicago Police Officers and personnel. If Plaintiff wished to claim a conspiracy to deprive Christopher Hicks of his civil rights, he should have stated so in his original complaint or asked the court for leave to supplement the pleadings. However, the evidence adduced at trial is limited to what was stated in the pleadings and that does not include any claim of a conspiracy, cover-up, or wrongdoing by other non-named Chicago Police Officers.

Additionally, the Seventh Circuit has not recognized an allegation of "inadequate police investigatory work" as a civil rights claim in the absence of another recognized constitutional right. Jacobson v. Natl RR Passenger Corp., 1999 WL 1101299 at *10 (N.D. Ill., Nov. 29, 1999); see also Gomez v. Whitney, 757 F.2d 1005, 1006 (7th Cir. 1985); David v. Village of Oak Lawn, 954 F.Supp. 1241, 1245-46 (N.D.Ill. 1996) (holding that plaintiff did not have a constitutional right to have his complaints investigated); Washington v. Godinez, 1996 WL 599055 *3 (N.D.Ill. Oct. 17, 1996).

Second, under federal and state law, Defendant Officers cannot be held liable for the actions of other police officers or investigators. The Illinois Tort Immunity Act states "Except as

31

otherwise provided by statute, a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person." 745 ILCS 10/2-204. Federal courts in Illinois have also applied this statute against police officers being sued in federal court. See Thompson v. City of Chicago, 2004 WL 1197436 *7 (N.D.Ill. May 28, 2004) (Tort Immunity Act shields liability of on-scene officers against a "failure-to-intervene" theory); see also Frazier v. Harris, 266 F.Supp. 2d 853, 872 (C.D.Ill. 2003) (Tort Immunity Act does not shield liability against actions taken outside an officer's scope of employment). An officer will not be protected by 745 ILCS 10/2-204 if he personally participated in the actions at issue. Quinones v. Tentler, 2001 WL 681274 *3 (N.D.Ill. April 18, 2001). In Quinones, defendant officers were sued for trespass to plaintiff's land when plaintiff's landlord requested their presence at Plaintiff's apartment. Id at *1. The parties disputed why Defendant Officers were actually at Plaintiff's place of residence, but they did agree Officers made a threat to arrest Plaintiff. Id. The court held that defendant officers could not claim immunity under 745 ILCS 10/2-204 because the threat to arrest the plaintiff was an act of their own, not something that could be directed by the landlord. Id. at *3.

The instant case is distinguishable from Quinones, however, because the Defendant Officers were not involved in other police actions outside effectuating the arrest of Christopher Hicks. Defendant Officers did not direct any other officers or investigators to allegedly cover-up information, write false reports, or give misleading information to any of Christopher Hicks' family. If there were even any evidence that such actions took place by non-named Chicago Police personnel, the Defendant Officers cannot be held liable for their conduct, as mandated by state and federal law.

32

Lastly, such information about police misconduct by people other than the named Defendants, if it were even relevant, it would be unfairly prejudicial and inadmissible. Generalized allegations of a police code of silence or that police officers cover up for other police officers "is akin to the conclusion that all mechanics, when they have the opportunity, assess over-charges for unnecessary repair; that all politicians, when the public's back is turned, accept bribes; and that all taxpayers, when they think they can get away with it, cheat on their taxes -- and no one ever tells. In a court of law, however justice is dispensed based on evidence of articulated and proven facts, not on generalized assumptions and prejudices." Sanders v. City of Indianapolis, 837 F.Supp. 959, 963 (S.D. Ind. 1992). The sole purpose of introducing this evidence is to invoke unfounded, stereotypical images of police officers in the jurors' minds, when their ultimate verdict has to be based upon facts, not on speculative testimony regarding the general "nature" of police officers. This evidence is then indistinguishable from bad acts evidence except that it is more illusory because it has no particular connection to the Defendants. Accordingly, pursuant to Fed. R. Evid. 104 and 402 -404, plaintiff should be barred from adducing or presenting evidence of any alleged police cover up, or any other alleged police misconduct by officers other than the Defendants.

### DEFENDANTS' MOTION IN LIMINE NO. 14

### DEFENDANTS' MOTION IN LIMINE TO BAR PLAINTIFF'S COUNSEL FROM CREATING ADVERSE TRIAL PUBLICITY AGAINST DEFENDANTS

Defendants anticipate that Plaintiff's counsel will approach the media, namely the newspapers, with adverse trial publicity about Defendants and the case in general directly before trial starts. Any such articles that would be published would be prejudicial to Defendants, could

33

possibly influence the jury, and would most likely deplete or severely diminish the jury pool of possible unbiased jurors. Additionally, the Northern District local rules state that

> A lawyer shall not make an extrajudicial statement the lawyer knows or reasonably should know is likely to be disseminated by public media and, if so disseminated, would pose a serious and imminent threat to the fairness of an adjudicative proceeding.

LR83.56.6. The committee notes to the rule also state that the curtailment of free speech to ensure a fair trial is particularly necessary when the trial is by jury. Id. To avoid compromising a fair trial, this court should prohibit Plaintiff's counsel from disseminating adverse or highly inflammatory information about the trial and Defendants to the media.

## DEFENDANTS' MOTION IN LIMINE NO. 15

### DEFENDANTS' MOTION IN LIMINE TO BAR TESTIMONY REGARDING THE POST-INVESTIGATION OF THIS INCIDENT OR THE QUALITY OR MANNER IN WHICH IT WAS CONDUCTED

Any testimony, evidence, or argument, except for impeachment purposes, regarding actions of individual officers after the altercation with Christopher Hicks and the nature and quality of the post investigation should be inadmissible at trial. For example, Plaintiff may offer evidence regarding investigatory steps that should have been taken or whether any investigatory steps were mishandled. Further, because such investigations are routine, the probative value of this evidence would be substantially outweighed by the risk of jury confusion and prejudice. Finally, Defendants' motion should be granted because well-established public policy prohibits disclosure of such investigations as post-occurrence remedial measures -- as is argued in a separate motion filed herewith -- and any reference to such measures would be unfairly prejudicial.

34

Defendant Officers were not present for the vast majority of this investigation, and neither conducted nor had any responsibility for the investigation. Any negligence or errors by persons conducting the investigation have no probative value for determining whether the Defendant Officers violated Christopher Hicks' constitutional rights or were willful and wanton. Defendants do not seek to exclude use of any statements by any witnesses such as for impeachment purposes. Rather, Defendants seek to limit the officers' potential liability to those actions that they actually performed. It would be manifestly unfair to require Defendant Officers to answer for any perceived negligence of other officers who have not been sued or who are no longer defendants.

Some of the actions of other officers after the altercation include the investigation at the scene, interaction between the family and detectives at the hospital, and the detectives investigation into Christopher Hicks' death. None of these or similar actions are probative of whether the Defendant Officers should be liable to Plaintiff.

Under the both 42 U.S.C. §1983 and Illinois Tort Immunity Act Defendant Officers are not liable "for an act or injury caused by the act or omission of another person." 745 ILCS 10/2-204; and <u>Palmer v. Marion County</u>, 327 F.3d 588, 594 (7th Cir. 2003). Thus, Defendant Officers are immunized from liability for any actions by other police department personnel. As discussed in Defendants' motion in limine on indemnification, the City is only sued in its capacity as principal of the Defendant Officers. Thus, Plaintiff's use of any evidence of events occurring after the altercation with Christopher Hicks are improper attempts to saddle Defendant Officers with liability for the alleged misdeeds of others.

Further, public employees serving in a position involving the determination of policy or

35

the exercise of discretion are not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused. 745 ILCS 10/2-201. "Discretionary acts" that are protected by immunity under the Local Governmental and Governmental Tort Immunity Act are those that are unique to the particular public office and involve the exercise of judgment. Roark v. Macoupin Creek Drainage, 316 Ill. App. 3d 835, 840, 738 N.E.2d 572, 579, (4th Dist. 2000). Conducting a police investigation is a discretionary act under this provision. Konrad v. Genualdi, 1996 WL 556985, *4 (N.D.Ill. Sept. 26, 1996). Accordingly, an improperly performed police investigation cannot lead to any liability; certainly not for Defendant Officers who had no role in that investigation.

Finally, because an investigation is standard operating procedure, the Chicago Police Department undertook an investigation of the events that transpired in this case. It is uncontested that the Chicago Police conduct investigations of all incidents that result in the death of an individual after any interaction with police. The plaintiff should not be allowed to introduce the fact that an investigation occurred to imply that the Defendant Officers were engaged in any wrongdoing.

In the case at bar, admission of any evidence of these investigations would be unfairly prejudicial to the Individual Defendants because the simple decision to collect information and data regarding the incident is not probative of any of the issues involved in this case and the conduct of that investigation was not the responsibility of the Defendant Officers. Accordingly, the risk of taint and jury confusion warrants the exclusion of such evidence and the barring of plaintiff from engaging in this line of inquiry.

36

## DEFENDANTS' MOTION IN LIMINE NO. 16

### DEFENDANTS' MOTION IN LIMINE TO BAR THE TESTIMONY BY DETECTIVE RICKEY GALBRETH, ANY OTHER INVESTIGATORS, OR ANY EVIDENCE REGARDING THE OFFICE OF PROFESSIONAL STANDARDS' INVESTIGATION OF THE MAY 24TH INCIDENT

Any testimony evidence regarding the O.P.S. investigation, its findings, or testimony from the detectives conducting the investigation should be barred. The Detectives conducting the investigation would merely be giving hearsay testimony and the findings are irrelevant to the issues at hand. Defendants' motion should be granted because the proposed testimony consists of inadmissible hearsay, lacks foundation, and constitutes undisclosed expert opinions. Moreover, the investigators' opinions are irrelevant and highly prejudicial. In addition, introducing the findings of O.P.S. would mislead the jury regarding the standard of liability in this case and the jury could base its decision on the O.P.S investigation, rather than the evidence presented at trial.

Plaintiff failed to disclose Detective Galbreth or any other investigators of the Office of Professional Standards as experts pursuant to the requirements of Rule 26. Testimony of these witnesses must be excluded due to Plaintiff's failure to disclose these investigators as expert witnesses. See Musser v. Gentive Health Services, 356 F.3d 751, 758 (7th Cir. 2004). Rule 26 mandates disclosure according to the schedule set by the court and failure to properly disclose experts automatically requires barring the testimony.

Moreover, Detective Galbreth and any other investigators must be barred from testifying as to their personal opinions regarding this incident. None qualify as an expert in police practices and plaintiff has not disclosed them as such. Other than proving up impeachment, which will not

likely be necessary, any of the O.P.S. investigators will lead into a morass of hearsay testimony. They were not present during the incident and do not have any first hand knowledge of anything that occurred. Simply repeating inadmissible hearsay under the guise of "opinion testimony" does not make the proposed testimony admissible. See Fed. R. Evid. 703. Except with respect to statements given by defendant officers, this proposed hearsay testimony is fundamentally flawed and should be barred.

Further, the investigators cannot render any expert opinions on the factual disputes in this case. The investigators do not have any particular expertise regarding any of these determinations and indeed, they do not claim any such expertise. Plaintiff will seek to cherry pick the O.P.S. conclusions favorable to Plaintiff's case and present them to the jury to buttress plaintiff's experts. The investigators are lacking the factual foundation and professional expertise that would be required of disclosed expert witnesses before they could testify. The personal conclusions of O.P.S. investigators regarding certain facts of this case are simply not relevant. They are neither experts nor lay witnesses and therefore their testimony should be excluded.

Finally, the conclusion of the O.P.S. Investigation would mislead the jury. Plaintiff will seek to introduce findings of O.P.S. to induce the jury to believe that Defendants should be held liable. The investigators' personal opinions regarding whether certain departmental general orders were violated would mislead the jury and are irrelevant to the outcome of this case. As Defendants argue in a separate motion, testimony regarding these general orders would be improper because evidence of violation of a Chicago Police general order is not evidence of willful and wanton conduct. Morton v. City of Chicago, 286 Ill.App.3d 444, 454, 676 N.E.2d

38

985, 992 (1ˢᵗ Dist. 1997), "Indeed, the violation of self-imposed rules or internal guidelines, such as [the General Orders], does not normally impose a legal duty, let alone constitute evidence of negligence, or beyond that, willful and wanton conduct." Id. Neither is such a violation evidence that the use of force here was unconstitutional. See Davis v. Scherer, 468 U.S. 183, 194 (1984); Kraushaar v. Flanigan, 45 F.3d 1040, 1048-49 (7ᵗʰ Cir. 1995); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988).

Even if the investigators' opinions were considered to have any arguable probative value, they should still be excluded from trial as they are unfairly prejudicial to Defendants. Where the probative value of the evidence is outweighed by its prejudicial effect, the trial court may properly deny its introduction. Fed. R. Evid. 403. Here, any arguable probative value would be substantially outweighed by the potential for unfair prejudice as the jury would likely place undue reliance upon this testimony in formulating their decision regarding the officers' conduct.

A lay jury likely would, with undoubted encouragement from Plaintiff' counsel, be led to believe that testimony as to O.P.S. findings indicate that a police general order was an appropriate standard by which to measure the officers' conduct. Indeed, there is no logical reason for Plaintiff to offer such evidence other than as an express or implied standard of conduct. Such evidence would, therefore, be extremely unfair, prejudicial and misleading to the jury because both federal and Illinois law clearly hold that a violation of such orders is not evidence of unconstitutional or willful and wanton conduct.

The conclusions reached by O.P.S. investigators are not evidence of liability in this case. At best, those conclusions will influence jurors to believe that Defendant Officers used unreasonable force or willful and wanton simply because a few O.P.S. investigators concluded

that they violated general orders  The minimal probative value such findings may have is greatly outweighed by the certain prejudice to the Defendants which will occur when the jury becomes confused about the standard of liability.  In order to prevent such confusion, the findings of the O.P.S. investigation should be barred from evidence.

Should the Court conclude that the O.P.S. findings are admissible, Defendants respectfully request that the order reflect that all the O.P.S. findings be admissible, including those concluding the officers complied with other departmental rules.

**DEFENDANTS' MOTION IN LIMINE NO. 17**

**DEFENDANTS' MOTION IN LIMINE TO BAR EVIDENCE OF
REMEDIAL MEASURES BY THE CHICAGO POLICE DEPARTMENT**

Plaintiffs may seek to introduce evidence of actions taken by the police department which constitutes remedial measures and, therefore, are inadmissible under the Federal Rules of Evidence and Illinois law.  The Police Department is currently conducting a careful investigation of the incident. Whether or not any remedial measures will be taken after this investigation is completed is unknown.  If such measures are taken Fed. R. Evid. 407 provides that evidence of remedial measures is inadmissible.

This universal rule of evidence is based upon several fundamental legal principles.  First, the subsequent remedial measure rule derives from a vital public policy of encouraging improvements to increase public safety.   Here, important public policy goals are advanced when the City investigates and corrects alleged failure to comply with regulations governing the conduct of police officers.  Admission of evidence of investigations, discipline or subsequent training would undermine this important policy goal.

40

Second, subsequent remedial measures are not considered sufficiently probative of prior negligence, because later carefulness may simply be an attempt to exercise the highest standard of care. As the regulations set forth in general orders do not establish any legal duty, the City's requirement of adherence to the orders is a conscious policy decision to require more from its officers than is necessary under the law. Admission of this evidence would discourage the City from holding its officers to this higher level of responsibility.

Third, evidence of post-incident remedial measures is highly prejudicial because a jury may improperly view such measures as an admission of liability. The risk of prejudice is especially great here because Illinois and federal law plainly state that violation of a police department guideline is not indicative of willful and wanton conduct – the standard of liability in this case. See <u>Morton v. City of Chicago</u>, 286 Ill.App.3d 444, 454, 676 N.E.2d 985, 992 (1st Dist. 1997); Davis v. Scherer, 468 U.S. 183, 194 (1984); <u>Kraushaar v. Flanigan</u>, 45 F.3d 1040, 1048-49 (7th Cir. 1995); <u>Klein v. Ryan</u>, 847 F.2d 368, 374 (7th Cir. 1988). Allowing the jury to infer an admission of liability or even to speculate improperly as to the significance and relevance of such evidence would be prejudicial in the extreme.

This evidence, if taken, should not be permitted at trial, as its admission would undermine well-established public policy, and would punish the City for taking measures to improve public safety. Allowing Plaintiff to use the City's post-occurrence remedial measures as a sword against the City in this civil litigation would thus have a chilling effect on the public policy that is to be served by these measures.

41

## DEFENDANTS' MOTION IN LIMINE NO. 18

**DEFENDANTS' MOTION IN LIMINE TO BAR EVIDENCE INCLUDING, BUT NOT LIMITED TO CIVILIAN COMPLAINTS, LAWSUITS, EMPLOYEE OR OTHER DISCIPLINARY PROCEEDINGS PENDING OR PAST CLAIMS AGAINST DEFENDANT OFFICERS**

Defendants believe that plaintiff may attempt to introduce testimony and evidence relating to prior instances of alleged misconduct by defendants and other non-defendant police officer witnesses who may be called to testify at trial. These complaints usually take the form of a Complaint Register, or C.R. This evidence would most likely be, but not necessarily limited to, prior lawsuits and citizens' complaints against the defendant officers, suspensions, and other police officer witnesses. Defendants move to bar this evidence because it constitutes improper character evidence or propensity evidence under Fed.R.Evid. 404. Moreover, such evidence is irrelevant, hearsay, and any probative value it may have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and its misleading the jury. Fed.R.Evid. 402 and 403.

Any information or allegation that defendants may have acted wrongfully in the past is nothing more than so-called "bad acts" evidence or "propensity evidence." Propensity evidence, however, is inadmissible under Fed.R.Evid. 404(b) to prove that a party acted on the occasion in question consistent with his alleged bad character. See Huddleston v. U.S., 485 U.S. 681, 685 (1988); U.S. v. Shriver, 842 F.2d 968, 974 (7th Cir. 1988). In this case, Plaintiff's only purpose in introducing or suggesting such evidence would be to attempt to taint the jury into believing that accusations of alleged misconduct had been brought against the officers in the past, and therefore it is likely that the officer acted in a similar manner under the circumstances presented

42

here.

Although Rule 404(b) permits the admission of evidence of other acts, if such evidence is directed toward establishing a matter in issue other than a defendant's propensity to commit the act charged, the plaintiff will not be able to satisfy her burden under Rule 404(b) of explicitly articulating which exception to the general rule applies. U.S. v. Zapata, 871 F.2d 616, 620-21 (7th Cir. 1989), Moreover, even if there were some probative value in admitting this evidence, that probative value would be overwhelmingly outweighed by the danger of unfair prejudice. Fed. R. Evid. 403; see also, Berkovich v. Hicks, 922 F.2d 1018, 1022 (2nd Cir.1991) (holding that the admission of evidence of other complaints against officers was irrelevant and overwhelmingly prejudicial to the defendant); Lataille v. Ponte, 754 F.2d 33, 34 (1st Cir. 1985) (prejudicial error to admit past disciplinary record).

Finally, these same arguments would also apply if the plaintiff sought to introduce any evidence of other litigation and/or complaints against any non-defendant police officer witnesses who might be called to testify in these proceedings.

## DEFENDANTS' MOTION IN LIMINE NO. 19

## DEFENDANTS' MOTION IN LIMINE TO BAR PRIOR DISCIPLINARY RECORDS OF ANY OFFICERS INVOLVED IN THE INCIDENT

Defendants believe that Plaintiff may attempt to introduce testimony and evidence relating to disciplinary incidents regarding the Defendant Police Officers. For example, Officer Soto testified in his deposition that he was sued in the early 1980's for a traffic accident (Exhibit F, Dep. of Louis Soto, p.7), for damage to property and for not being home when the Chicago Police Department made a medical check (Exhibit F, Dep. of Louis pp. 31-32). Officer Arnolts

43

was suspended for a car accident and for inappropriately writing a parking ticket (Dep. of Robert Arnolts, Exhibit G, pp. 2-3, 35-36). Any testimony, evidence, or argument regarding the prior disciplinary records of any of the Defendant Officers involved in this incident should be barred at trial. Defendants' motion should be granted because such prior disciplinary records are wholly irrelevant and highly prejudicial to the issue of Defendant Officers' conduct in this case.

Even if there were any *arguable* probative value to this information, the information should still be excluded as its prejudicial effect would substantially outweigh its value. Here, the disciplinary records of any officers are wholly irrelevant to the issues of Defendant Officers' conduct toward Christopher Hicks and thus the probative value is extremely low. The prejudicial effect upon Defendant Officers of recounting unsubstantiated allegations of prior misconduct however could be great. Moreover, because the City's liability is wholly derivative of the Defendant Officers' conduct, there is no reason for any of this material to be introduced to the jury with respect to any claims against the City. An order barring such evidence is necessary to ensure a trial free of prejudicial material.

## DEFENDANTS' MOTION IN LIMINE NO. 20

### DEFENDANTS' MOTION IN LIMINE TO BAR THE MEDICAL EXAMINER'S DEATH CERTIFICATE AND USE OF THE TERM "HOMICIDE" TO REFER TO THE DEATH OF THE DECEDENT IN OTHER TRIAL MATERIALS

In this case, the Office of the Cook County Medical Examiner determined that the manner of decedent Christopher Hicks' death was homicide. This is not a determination that the decedent was killed without lawful justification under the criminal laws of Illinois, see 720 ILCS 5/9-1, but rather a specification of the manner of death from the five categories used by the medical examiner's office: natural; accident; homicide; suicide; and, undetermined.

44

Plaintiff seeks to admit the medical examiner's certificate of death as evidence in this case. <u>See</u> (Exhibit M, Pltf's Trial Exhibit 4). The death certificate indicates the manner of death as "homicide." Additionally, Plaintiff lists the Medical Examiner's Report of Post-Mortem Examination as an exhibit, which also describes Christopher Hicks' manner of death as "homicide." <u>See</u> (Exhibit N p. 6, Pltf's Trial Exhibit 3, p. 6). The term "homicide" is subject to different interpretation depending on the circumstances. The most common usage of the term is synonymous with "murder." It is undisputed that plaintiff's decedent died on the date in question. Thus, introduction of the death certificate containing the term "homicide" should be precluded because any probative value it may have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. Fed. R. Evid. 403.

For the same reasons, the court should also bar any testimony, argument or comments which refer to the death of plaintiff's decedent as a "homicide." Such testimony, arguments or comments would only served to inflame the jury and unfairly prejudice them against the defendants, as well as confuse the issues and mislead the jury. Fed. R. Evid. 403. In the alternative, Defendants request that the term homicide be redacted from the death certificate and the Medical Examiner's Report of Post-Mortem Examination.

## DEFENDANTS' MOTION IN LIMINE NO. 21

### DEFENDANTS' MOTION IN LIMINE TO BAR ANY TESTIMONY OR EVIDENCE SUGGESTING THAT THE DEFENDANTS MAY BE INDEMNIFIED BY THE CITY OF CHICAGO FOR ANY COMPENSATORY DAMAGES RETURNED AGAINST THEM

Plaintiff should not be permitted to argue or introduce evidence that the Defendants may be indemnified by their employer, the City of Chicago, for any portion of a judgment that may be

45

entered against them. Whether or not the City provides indemnity is irrelevant to the issue of whether the individual defendants are liable for any acts they may have performed which proximately caused injury to the plaintiff. Moreover, the defendants contend that by allowing plaintiff to make such references would be highly prejudicial, i.e., the jury may feel that even if there was no liability, the plaintiff should be compensated for his time and efforts in bringing the lawsuit, particularly in view of the fact that the City has the "deep pocket." Reference to indemnity is akin to reference to insurance which is precluded by Fed. R. Evid. 411. Walker v. Saenz, 1992 WL 317188, *3 (N.D.Ill. Oct. 27, 1992) (J. Ann Williams); Larez v. Holcomb, 16 F.3d 1513, 1518 (9th Cir. 1994) (holding that instructions to jury on indemnification in § 1983 action required new trial); Green v. Baron, 879 F.2d 305, 310 (8th Cir. 1989) (stating that instructions concerning indemnification are extremely prejudicial); Griffin v. Hillke, 804 F.2d 1052, 1057 (8th Cir. 1986) (declaring indemnification instructions to constitute reversible error). Accordingly, Plaintiff should be precluded from adducing or implying that Defendants may be indemnified or reimbursed by the City.

Knowledge that the City of Chicago will indemnify defendant officers for possible damages might encourage jurors to find for Plaintiff—regardless of the facts presented at trial. Such knowledge can also lead jurors to inflate an award out of sympathy or other irrelevant factors.

Defendants further move this Court for an Order in limine barring Plaintiff from making any reference to defendants' attorneys or any of the parties as "Corporation Counsel," "Assistant Corporation Counsel," "The City lawyers," or "The City," or similar terms. Defendants' motion should be granted because reference to defendants' attorneys' corporate nature and affiliation

46

with the City is improper and will serve no purpose other than to improperly suggest to the jury that the City of Chicago – not the Defendant Officers – will pay any judgment in this case.

## DEFENDANTS' MOTION IN LIMINE NO. 22

### DEFENDANTS' MOTION IN LIMINE TO BAR OTHER PUBLICIZED EVENTS CONCERNING ALLEGATIONS OF POLICE MISCONDUCT

Defendants believe that Plaintiff may attempt to mention, discuss or refer to other events regarding police misconduct, such as recently highly publicized incidents involving Chicago Police Officers. These recent local events have placed the issue of allegations of police misconduct before the public by way of extensive media coverage, such that law enforcement personnel are often depicted in an unfavorable (even hostile) manner. In this current climate, references to alleged police misconduct during the trial can only serve to inflame the jury against the police in general and against the Defendant police officers in this particular case. Comments and implied references to this effect have absolutely no probative value and are totally irrelevant to the issues presented. Accordingly, Plaintiff should be precluded from making any reference to any alleged police misconduct, including recent highly publicized instances of such misconduct, here in Chicago or in other jurisdictions. Fed.R.Evid. 401, 402, 403.

## DEFENDANTS' MOTION IN LIMINE NO. 23

### DEFENDANTS' MOTION IN LIMINE TO BAR NON-PARTY WITNESSES FROM THE COURTROOM

Defendants move this court to exclude all witnesses (other than the parties) from the courtroom during the opening statements and testimony of any and all other witnesses. Pursuant to F.R.E. 615. Such witnesses shall include all those people Plaintiff intends, expects, or considers calling as a witness.

47

## DEFENDANTS' MOTION IN LIMINE NO. 24

## DEFENDANTS' MOTION IN LIMINE TO EXCLUDE ANY OF CHRISTOPHER HICKS' FAMILY MEMBERS FROM THE COURTROOM

Mr. Hicks' family members, other than Billy-Rae Lewis, were never parties to this action. The damages for the claims brought by Plaintiff do not include loss of society suffered by the mother or any of Mr. Hicks' various siblings. Therefore, the family members, except for Merlene Hicks, should be excluded from the courtroom because their presence would only serve to inflame the passions of the jury and do so in a particular way that is contrary to law in wrongful death cases and §1983 actions.

Second, the family's presence would inflame the jury to consider aspects of damages that are explicitly forbidden by federal law and the Illinois Pattern Jury Instructions. Illinois' Wrongful Death Act provides recovery according to the rules of intestate distribution. Reiser v. U.S., 786 F.Supp. 1334, 1335 (N.D. Ill. 1992). Those rules dictate that the next of kin who may recover through the estate must be blood relatives. Johnson v. Provena St. Theresa Medial Center, 334 Ill. App. 3d 581, 590, 778 N.E.2d 298, 305 (2nd Dist. 2002). Thus the recovery provided for in the Illinois Pattern Jury Instructions limits damages in this case to the loss of society of decedent's wife. See I.P.I. 31.04. Further, I.P.I. 31.07 explicitly forbids the jury from considering the "grief or sorrow of the next of kin."

Additionally, Plaintiff has listed all of Christopher Hicks' family members as "may call" witnesses in his pretrial order. If any of the family members will possibly be witnesses, they should be excluded from the courtroom, as argued in motion number 23, regardless of their family relation.

48

Introducing the family into the courtroom in any fashion has no other purpose than to arouse the jury's passions about the grief and sorrow that they might feel over the loss of decedent. While that loss is tragic, both federal and Illinois law require that the jury not consider that loss in assessing damages. For these reasons, the family should be precluded from appearing in the courtroom either in person, through testimony, or in photographs.

## DEFENDANTS' MOTION IN LIMINE NO. 25

### DEFENDANTS' MOTION IN LIMINE TO BAR PLAINTIFF'S REFERENCE TO ANY VIOLATION OF POLICE DEPARTMENT GENERAL ORDERS

Any testimony, evidence, or argument regarding the existence of, or standards set by, any Chicago Police Department General Orders or other polices and procedures should be inadmissible at trial. Defendants' motion should be granted because such Orders and procedures are not proper evidence on the issue of whether Defendant Officers' conduct was unconstitutional or willful and wanton, and their admission would unduly prejudice and confuse the jury on the appropriate standard of liability.

It is anticipated that Plaintiff will attempt to introduce the General Orders into evidence in order to attempt to prove that Defendant Officers used excessive force or acted in a willful and wanton manner. Chicago Police Department General Orders contain written directives for police activities both in specific situations and for general conduct.

However, violations of Chicago Police Department rules do not rise to the level of a constitutional violation. Violations of state statutes, local ordinances and administrative or department regulations do not give rise to an action under § 1983, unless the rights are guaranteed under the United States Constitution. See Davis v. Scherer, 468 U.S. 183, 194

49

(1984); Kraushaar v. Flanigan, 45 F.3d 1040, 1048-49 (7th Cir. 1995); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988). Courts look to federal law, not state or municipal regulations, to determine the existence and scope of personal liberties and protected by the due process clause of the fourteenth amendment and the "reasonableness" standard under the Fourth Amendment. See Archie v. City of Racine, 847 F.2d 1211, 1215-18 (7th Cir. 1988)(en banc); see also Graham v. Connor, 490 U.S. 386, 393-95 (1989); Smith v. Freland, 954 F.2d 343, 347-48 (6th Cir. 1992) ("Under the § 1983, the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force."). What may not be expressly authorized by a police department's rules may be justified and constitutionally reasonable. See Abbot v. City of Crocker, Mo., 30 F.3d 994, 997-999 (8th Cir. 1994). At issue is here whether the Defendant Officers violated the plaintiffs' constitutional rights. Accordingly, whether the Defendant Officers violated department regulations is irrelevant and immaterial.

Moreover, permitting Plaintiff to present evidence or suggest to the jury that the Defendant Officers or other police officers may have breached some obligation to the City through an "alleged" rules violation would be gravely prejudicial to the Defendant Officers in the defense of this matter. Walker v. Saenz, 1992 WL 317188, *4 (N.D.Ill. Oct 27, 1992) (J. Ann Williams) (granting motion in limine because of confusion in distinguishing a Chicago Police Department rule violation from a Constitutional violation). A jury presented with such a "violation" would have difficulty separating the purported rules violation, for which plaintiff has no claim, from the alleged constitutional violation issues on which the jury is deciding liability and damages. Id. There is a clear risk that a juror presented with evidence of a rules violation would assume, in spite of any instructions to the contrary, that a constitutional violation had

occurred. The resulting jury confusion would only serve to obscure the central issues in this case. Accordingly, Plaintiff should not be permitted to interject the possibility of a rules violations into these proceedings. Fed. R. Evid. 401, 402 and 403.

Introduction of these general orders would also be improper under Illinois law because evidence of violation of a Chicago Police General Order is not evidence of willful and wanton conduct. Morton v. City of Chicago, 286 Ill. App. 3d 444, 454, 676 N.E.2d 985, 992 (1st Dist. 1997). "Indeed, the violation of self-imposed rules or internal guidelines, such as [the General Orders], does not normally impose a legal duty, let alone constitute evidence of negligence, or beyond that, willful and wanton conduct." Id. Moreover, the issue of whether Defendant Watts or his fellow officers violated rules regarding notification of pursuit has no relevance to the issue of whether the Defendant Officers acted willfully and wantonly at the time of the altercation with Christopher Hicks.

Any arguable probative value of the guidelines would be substantially outweighed by the potential for unfair prejudice as the jury would likely place undue reliance upon these standards in formulating their decision regarding Defendant Officers' conduct. A lay jury likely would be led to believe that a police General Order was an appropriate standard by which to measure the officers' conduct in this case. Indeed, there is no logical reason for Plaintiff to offer such evidence other than as an express or implied standard of conduct. Such evidence would, therefore, be extremely unfair and prejudicial to Defendants as Illinois law clearly holds that a violation of such Orders is not evidence of willful and wanton conduct. Morton, 286 Ill. App. 3d at 454, 676 N.E.2d at 992.

As the General Orders or other procedures are not indicative of any legal duty or evidence

51

of willful and wanton conduct, whatever probative value they may have with respect to issues in this case is greatly outweighed by the potential for prejudice to the defendants by the jury placing undue weight on their value. In order to prevent such improper consideration, any reference to General Orders or other unspecified police procedures should be barred from evidence.

WHEREFORE, the Individual Defendants respectfully request that this Court instruct Plaintiff and his witnesses, through counsel, not to mention, refer to, adduce, interrogate concerning, voluntarily answer, introduce any physical evidence concerning, or attempt to convey to the jury at any time during these proceedings in any manner, directly or indirectly, the subject matter as stated above, and that each counsel be instructed to warn and caution each and every witness under their control appearing in this litigation to strictly comply with the ruling of this Court.

Respectfully submitted,

BY: _____

Robert Barber
Special Assistant Corporation Counsel
30 North LaSalle Street
Suite 1400
Chicago, Illinois 60602
(312) 744-5890
Attorney No. 00110280

BY: _____

Mary McDonald
Assistant Corporation Counsel
30 North LaSalle St.
Suite 1400
Chicago, Illinois 60602
(312) 744-8307
Attorney No. 06199995

52



# Corporate Financial Group, Ltd.

*Economics / Finance / Litigation Support*

Stan V. Smith, Ph.D.
President

November 10, 2004

Mr. Christopher R. Smith
Smith & Coffey
119 N. Peoria, Ste. 3A
Chicago, IL 60607

    Re: Hicks

Dear Mr. Smith:

You have asked me to calculate the value of certain losses subsequent to the death of Christopher Hicks. These losses are: (1) the loss of wages and employee benefits; (2) the loss of household services; (3) the loss of the advice, counsel, guidance, instruction and training services sustained by Mr. Hicks's wife; (4) the loss of accompaniment services sustained by Mr. Hicks's wife; (5) the loss of the value of life ("LVL"), also known as loss of enjoyment of life; and (6) the loss of the society or relationship sustained by Mr. Hicks's wife.

Christopher Hicks was a 39.2-year-old, married male, who was born on April 2, 1965, and died on May 26, 2004. Mr. Hicks's remaining life expectancy is estimated at 37.7 years. This data is from the National Center for Health Statistics, <u>United States Life Tables, 2001</u>, Vol. 52, No. 14, National Vital Statistics Reports, 2004. I assume an estimated trial or settlement date of May 1, 2005.

In order to perform this evaluation, I have reviewed the following materials: (1) employment records from Tyson Foods; (2) employment records from Home Depot; (3) records from the veteran's Substance Abuse Residential Rehabilitation Treatment Program; (4) education records from Gordon Technical High School; (5) records from the funeral on June 18, 2004; (6) an article from Chicago Tribune dated September 23, 2004; (7) an article from Chicago Tribune dated May 28, 2004; (8) an article from WMAQ-TV Chicago News on http://msnbc.msn.com/id/5077601; (9) a birth certificate; (10) a death certificate; (11) answers to interrogatories; (12) tax returns from 2002 and 2003; (13) an interview with Michael Lewis on November 9, 2004; and (14) the Case Information Form.

*1165 N. Clark Street ▪ Suite 600 ▪ Chicago, IL 60610 ▪ Fax 312-943-1016 ▪ Tel 312-943-1551*
*www.CFG-Economics.com*



EXHIBIT
A

# CFG

My methodology for estimating the losses, which is explained below, is generally based on past wage growth, interest rates, and consumer prices, as well as studies regarding the value of life.

My estimate of the real wage growth rate is 1.25 percent per year. This growth rate is based on Business Sector, Hourly Compensation growth data from the Major Sector Productivity and Costs Index found at the U.S. Bureau of Labor Statistics website at www.bls.gov/data/home.htm, Series ID: PRS84006103, for the real increase in wages primarily for the last 20 years.

My estimate of the real discount rate is 2.00 percent per year. This discount rate is based on the rate of return on 90 day U.S. Treasury Bills published in the Economic Report of the President for the real return on T-Bills primarily for the last 20 years. This rate is also consistent with historical rates published by Ibbotson Associates, Chicago, in its continuously updated series Stocks, Bonds, Bills and Inflation. This series, which acknowledges me as its founder and creator, is generally regarded by academics in the field of finance as the most widely accepted source of statistics on the rates of return on investment securities. It is relied upon almost exclusively by academic and business economists, insurance companies, banks, institutional investors, CPA's, actuaries, benefit analysts, and economists in courts of law.

Estimates of real growth and discount rates are net of inflation based on the Consumer Price Index (CPI-W), published in monthly issues of the U.S. Bureau of Labor Statistics, CPI Detailed Report (Washington, D.C.: U.S. Government Printing Office) and available at the U.S. Bureau of Labor Statistics website at www.bls.gov/data/home.htm, Series ID: CWUR0000SA0. The rate of inflation for the past 20 years has been 2.92 percent.

## I. LOSS OF WAGES AND EMPLOYEE BENEFITS - Full-Time Employment

Tables 1 through 18 show the loss of wages and benefits in two scenarios. At the time of his death, Mr. Hicks was not employed, however, his brother, Michael Lewis, states that his brother had an interview the following day. Mr. Hicks joined the U.S. Army on May 23, 1984, and he was honorably discharged on July 30, 1993 after participating in both Desert Shield and Desert Storm. On May 5, 1995, he received a certificate of completion from Diesel Driving Academy. Michael Lewis, Mr. Hick's brother, states that Mr. Hicks primarily worked in manufacturing jobs or in shipping and receiving. Based on employment records from Home Depot, Mr. Hicks's last job prior to his death, he was earning $10.00 per hour when he left Home Depot.

2

me

# CFG

The wage estimate for Scenario 1 is illustrated at $10.00 per hour for 40 hours per week in year 2004 dollars. and the wage estimate is assumed to grow in 2009 to $31,397 in year 2001 dollars, based on 90 percent of the average earnings of a Black male with a high school degree between the ages of 35 and 44 of $34,885 in year 2001 dollars. This wage data is published in the U.S. Bureau of the Census and the Bureau of Labor Statistics, Current Population Survey, Annual Social and Economic Supplement, Washington, D.C., 2004.

The wage estimate for Scenario 2 is illustrated at $10.00 per hour for 40 hours per week in year 2004 dollars.

I assume full-time employment each year and show the accumulation through life expectancy. While these tables are calculated through the end of life expectancy, the losses from working full-time through any assumed retirement age can be read off the table.

Employee benefit estimates are based on data from the U.S. Chamber of Commerce, 2003 Employee Benefits Study, (Washington, DC: Statistics and Research Center, 2003). I have assumed that employee benefits grow at the same rate as wages and are discounted to present value at the same discount rate. Since these tables assume full-time work, I do not include employee benefits relating to unemployment, injury, illness or disability; benefits are estimated at 27.6 percent of wages.

Personal consumption is an offset of the income. I use a personal consumption offset based on a study by Earl F. Cheit, Injury and Recovery in the Course of Employment, (New York: John Wiley & Sons, Inc., 1961), p. 78. For 2-adult households, the percentage-of-total-income spending exclusively for an adult ranges from 18 percent to 30 percent depending upon the number of children below the age of 18 in the household. Personal consumption is illustrated at 30 percent.

Based on the above assumptions, my opinion of the wage loss for Scenario 1 for full-time employment is $958,252 ► Table 9. This figure assumes full-time work to age 76.9, but any assumed retirement age may be read from Table 7. For example, the full-time employment wage loss for Scenario 1 to age 67 is $743,126.

Based on the above assumptions, my opinion of the wage loss for Scenario 2 for full-time employment is $631,536 ► Table 18. This figure assumes full-time work to age 76.9, but any assumed retirement age may be read from Table 18. For example, the full-time employment wage loss for Scenario 2 to age 67 is $494,160.

3.

# CFG

## II. LOSS OF REPLACEMENT SERVICES

The following sections estimate the value of replacement services provided to Christopher Hicks's wife. These services do not include loss of love, care, or affection, etc., but are the tangible services, valued as if they were provided by a person unknown to the household.

## II(A). LOSS OF HOUSEHOLD SERVICES

Tables 19 through 21 show the loss of household services. Mr. Hicks's brother, Michael Lewis, indicated that Mr. Hicks was planning to move to California and reconcile with his wife. The number of hours of household services, assuming Mrs. Wynn-Hicks is employed, ranges from 1.0 to 2.0 hours per day and vary over time as family members age. This data is based on a study by William H. Gauger and Katherine E. Walker, <u>The Dollar Value of Household Work</u>, Bulletin 60, New York State College of Human Ecology, Cornell University, Ithaca, NY, 1980. Household services are valued at $7.26 per hour in year 1991 dollars, based on a study by Douglass, Kenney and Miller, "Which Estimates of Household Production are the Best?" <u>Journal of Forensic Economics</u>, Vol. 4, No. 1, Winter 1990, pp 25-45, and unpublished updates from the authors. I value such services at their replacement cost which includes a minimum 50 percent hourly premium paid to agencies who supply such services on a part-time basis and who are responsible for insuring, bonding and vetting the part-time employee. The hourly value of these services grows at the same rate as wages and is discounted at the same rates as wages.

Based on these assumptions, and Mr. Hicks's life expectancy of 76.9 years, my opinion of the loss of the value of household services is $252,958 ▸ Table 21.

## II(B). LOSS OF ADVICE, COUNSEL, GUIDANCE, INSTRUCTION AND TRAINING SERVICES

Tables 22 through 24 show the pecuniary loss of advice, counsel, guidance, instruction and training services sustained by Mr. Hicks's wife. The method of valuing the economic loss of these services is recognized in the economic literature. See, for example, Frank D. Tinari, "Household Services: Toward a More Comprehensive Measure," <u>Journal of Forensic Economics</u>, Vol. 11, No. 3, Fall 1998, p. 253-265. The hourly value of the loss is based on the mean hourly earnings of educational, vocational, and school counselors, marriage and family therapists, child, family and school social workers, social and human service assistants, clergy, directors of religious activities and education, coaches and elementary school teachers, which is $17.54 per hour in year

4

# CFG

2002 dollars. These wage data are based on information from the U.S. Bureau of Labor Statistics, Occupational Employment Statistics, 2002 National Occupational Employment and Wage Statistics found at www.bls.gov/oes. I value such services at their replacement cost which includes a minimum 50 percent hourly overhead premium paid to agencies who supply such services on a part-time basis and who are responsible for insuring, bonding and vetting the background, experience and training of the part-time employee.

Mr. Hicks's brother, Michael Lewis, indicated that Mr. Hicks was planning to move to California and reconcile with his wife. He states that his brother talked to his wife often. Based on a benchmark loss of 1.0 hour per day for Mr. Hicks's wife, my opinion of the loss of advice, counsel, guidance, instruction and training as a result of the death of Christopher Hicks is $349,791 ▸ Table 24 for Merlene Wynn-Hicks.

## II(C). LOSS OF ACCOMPANIMENT SERVICES

Tables 25 through 27 show the pecuniary loss of accompaniment services sustained by Mr. Hicks's wife. The method of valuing the economic loss of these services is recognized in the economic literature. See, for example, Frank D. Tinari, "Household Services: Toward a More Comprehensive Measure," _Journal of Forensic Economics_, Vol. 11, No. 3, Fall 1998, p. 253-265. The hourly value of the loss of accompaniment is based on the mean hourly earnings of licensed practical and licensed vocational nurses and home health aides, which is $12.35 per hour in year 2002 dollars. This wage data is based on information from the U.S. Bureau of Labor Statistics, Occupational Employment Statistics, 2002 National Occupational Employment and Wage Statistics found at www.bls.gov/oes. I value such services at their replacement cost which includes a minimum 50 percent hourly premium paid to agencies who supply such services on a part-time basis and who are responsible for insuring, bonding and vetting the part-time employee.

Mr. Hicks's brother, Michael Lewis, indicated that Mr. Hicks was planning to move to California and reconcile with his wife. Based on a benchmark loss of 3.0 hours per day for Mr. Hicks's wife, my opinion of the loss of accompaniment as a result of the death of Christopher Hicks is $738,630 ▸ Table 27 for Merlene Wynn-Hicks.

## III. LOSS OF VALUE OF LIFE

Tables 28 through 33 show the loss of the value of life. Economists have long agreed that life is valued at more than the lost earnings capacity. My estimate of the value of life is

5

# CFG

based on many economic studies on what we, as a contemporary society, are willing to pay to preserve the ability to lead a normal life. The studies examine incremental pay for risky occupations as well as a multitude of data regarding expenditure for life savings by individuals, industry, and state and federal agencies. Based on societal value and life expectancy of 76.9 years, my opinion of the loss of the value of life for Scenario 1 for Christopher Hicks is $3,314,023 ► Table 30.

At the time of his discharge from Substance Abuse Residential Rehabilitation Treatment Program on January 5, 2004, his diagnosis based on the <u>Diagnostic and Statistical Manual of Mental Disorders-IV</u>, Axis V Global Assessment of Functioning was 60. Scenario 2 for the value of life asssumes that the quality of Mr. Hicks's life did not improve after his diagnosis at discharge and would not have changed in the future. The loss of value of life for Scenario 2 is illustrated at 60 percent give Mr. Hicks's pre-existing condition. Based on societal value and life expectancy of 76.9 years, my opinion of the loss of the value of life for Scenario 2 for Christopher Hicks is $1,988,409 ► Table 33.

My estimate of the value of life is consistent with estimates published in other studies that examine and review the broad spectrum of economic literature on the value of life. Among these is "The Plausible Range for the Value of Life," <u>Journal of Forensic Economics</u>, Vol. 3, No. 3, pp. 17-39(1990), by T. R. Miller. This study reviews 67 different estimates of the value of life published by economists in peer-reviewed academic journals. The results, in most instances, show the value of life to range from approximately $1.6 million to $2.9 million dollars in year 1988 after-tax dollars, with a mean of approximately $2.2 million dollars.

The underlying studies fall into three general groups: (1) consumer behavior and purchases of safety devices; (2) wage risk premiums to workers; and (3) cost-benefit analyses of regulations. For example, one consumer safety study analyzes the costs of smoke detectors and the lifesaving reduction associated with them. One wage premium study examines the differential rates of pay for dangerous occupations with a risk of death on the job. Just as workers receive shift premiums for undesirable work hours, workers also receive a higher rate of pay to accept a increased risk of death on the job. A study of government regulation examines the lifesaving resulting from the installation of smoke stack scrubbers at high-sulphur, coal-burning power plants. As a hypothetical example of the methodology, assume that a safety device costs $460 and results in lowering a person's risk of premature death by one chance in 5,000. The cost per life saved is obtained by dividing $460 by the one in 5,000 probability, yielding $2,300,000. Overall, based on the peer-reviewed economic literature, I estimate the

6

# CFG

central tendency of the range of the economic studies to be approximately $3.6 million in year 2004 dollars.

## IV. LOSS OF SOCIETY OR RELATIONSHIP

Tables 34 through 36 show the loss of society or relationship sustained by Mr. Hicks's wife. The value of the loss of society or relationship by family members with the deceased can be based on a measure of the value of preserving the ability to live a normal life. This is discussed in the article, "The Relevance of Willingness-To-Pay Estimates of the Value of a Statistical Life in Determining Wrongful Death Awards," Journal of Forensic Economics, Vol. 3, No. 3, pp. 75-89 (1990), by L. G. Chestnut and D. M. Violette.

Based on a benchmark loss of 35 percent for Mr. Hick's wife, my opinion of the loss of relationship as a result of the death of Christopher Hicks is $1,321,891 ► Table 36 for Merlene Wynn-Hicks.

-------------------------------------------------

A trier-of-fact may weigh other factors to determine if these estimated losses for Christopher Hicks should be adjusted because of special qualities or circumstances that economists do not as yet have a methodology for analysis.

In each set of tables, the estimated losses are calculated from May 26, 2004 through an assumed trial or settlement date of May 1, 2005, and from that date thereafter. The last table in each set accumulates the past and future estimated losses. These estimates are provided as an aid, tool and guide for the trier-of-fact.

All opinions expressed in this report are clearly labeled as such. They are rendered in accordance with generally accepted standards within the field of economics, and are expressed to a reasonable degree of economic certainty. Estimates, assumptions, illustrations and the use of benchmarks, which are not opinions (but which can be viewed as hypothetical in nature) are also clearly identified.

If there is additional information which I have not yet taken into account and which could alter my opinions, please let me know so that I may incorporate any such information into an update of the opinions expressed in this report.

7

# CFG

If any additional information becomes available in the future which could alter my opinions, again, please let me know so that I may incorporate any such information into an update of the opinions expressed in this report.

If you have any questions, please do not hesitate to call me.

Sincerely,


Stan V. Smith, Ph.D.
President

Corporate Financial Group, Ltd. • *312-943-1551*

# CFG

## APPENDIX: HOUSEHOLD REPLACEMENT SERVICES

Courts have long recognized that members's claims to the value of family household replacement services as an element of damages in personal injury and wrongful death cases, as an aspect of the pecuniary loss in such cases. These services are those that are provided by the injured family member to other family members without charge or cost. Members who receive such services can include spouses, children, parents or siblings; such family members do not necessarily have to reside in the same household to receive such services.

Courts have long recognized that an appropriate method in valuing such services is to value their replacement costs by examining costs paid in labor markets that provide generally comparable services for. "[T]he service must have market equivalents from which a pecuniary standard can be established ..." This standard is set forth the 1913 U.S.Supreme Court Decision, <u>Michigan Central Railroad Company</u> v. Vreeland, 227 U.S. 59 (1913). So this method is a century old.

The Supreme Court's suggesting in valuing compensable services in the Vreeland decision is a standard that is not rigid, but actually rather general: "[The] pecuniary loss or damage must be one which can be measured by some standard.... Compensation for such loss manifestly does not include damages by way of recompense for grief or wounded feelings." <u>Michigan Central v. Vreeland</u>.

Examples of lost household services that used to be performed by victims (whether fatally or non-fatally injured) can include physical chores such as mowing the lawn, painting the house, cleaning the windows, doing the laundry, washing and repairing the car, preparing the meals and doing the dishes, among others. For many decades economists have met the Supreme Court's general standard by using labor market equivalents for cooks, laundry workers, gardeners, maids, etc. in valuing the physical chores regarding housekeeping services.

However, economists have recognized that services to family members include services well beyond the physical housekeeping chores. For example, William G. Jungbauer and Mark J. Odegard, in Maximizing Recovery in FELA Wrongful Death Actions," in <u>Assessing Family Loss in Wrongful Death Litigation: The Special Roles of Lost Services and Personal Consumption</u>, Lawyers & Judges Publishing Co., 1999, p. 284, indicate that a compete analysis of all services performed by the injured or deceased person includes much, much more than the physical chores. Frank D.Tinari, in a peer-reviewed, scientific, economic journal article "Household Services: Toward a More Comprehensive Measure, " <u>Journal of Forensic Economics</u>,11(3), 1998, expresses the same view.

9

# CFG

Jungbauer and Odegard indicate that a victim may have provided services of many other professions such as that of a chauffeur, driving other family members to appointments, or that of a security guard, especially regarding the injury to a male spouse, etc. Every family member acts as a companion to other family members. And is it is common for family members to act as a counselors for one another, typically providing advice and counsel on important personal, family, medical, financial, career or other issues. The marketplace can and does value such items of loss. If the victim cannot provide these services, or does so at a reduced capacity or rate, there is a distinct and definite loss to the other family members. These losses have a definite and easily measurable pecuniary value. <u>Vreeland</u> requires only that a "reasonable expectation" of loss of services be proven and that such loss be valued by some standard, presumably a reasonably-based economic standard, to allow recovery.

Tinari discusses a market-oriented method to assess the pecuniary value of the loss of accompaniment services, as well as the value of advice, guidance and counsel services that family members provide to one another, within a broadly defined scope of family services. See Frank D. Tinari, "Household Services: Toward a More Comprehensive Measure, " <u>Journal of Forensic Economics</u>, 11(3), 1998.

Finally, according to Chief Justice Robert Wilentz of the Supreme Court of New Jersey, in <u>Green v. Bittner</u>, 85 NJ 1, 1980, p. 12, accompaniment services, to be compensable, must be that which would have provided services substantially equivalent to those provided by the companions often hired today by the aged or infirm, or substantially equivalent to services provided by nurses or practical nurses; and its value must be confined to what the marketplace would pay a stranger with similar qualifications for performing such services.

In valuing the household replacement services that are provided by family members to one another, beyond the physical chores, both the U.S Supreme Court and the New Jersey Supreme Court discuss looking at labor markets for the equivalent value of such services. This methodology is identical to what economists have been doing for over four decades in valuing the physical chores involved in housekeeping services.

10

# CFG

## APPENDIX: VALUE OF LIFE

The economic methodology for the valuation of life has been found to meet the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, 113 S.Ct. 2786 (1993). My testimony has been accepted in over 100 jurisdictions nationwide in over half the states. Dozens of other economists have offered this testimony over the past decade also. The Daubert standard sets forth four criteria:

1.  Testing of the theory and science

2.  Peer Review

3.  Known or potential rate of error

4.  Generally accepted.

Testing of the theory and science has been accomplished over the past four decades, since the 1960s. Economists of high renown have published articles in high quality, peer-reviewed economic journals.

A review of this extensive literature can be found in "The Value of Risks to Life and Health," W. Kip Viscusi, Journal of Economic Literature, Vol. XXXI (December, 1993), pp. 1912-1946. Another peer-reviewed article discusses the application to forensic economics: "The Plausible Range for the Value of Life," T. R. Miller, Journal of Forensic Economics, Fall 1990, which discusses the many dozens of articles published in other peer-reviewed economic journals on this topic. This concept is further discussed in "Willingness to Pay Comes of Age: Will the System Survive?" Ted R. Miller, Northwestern University Law Review, Summer 1989, pp. 876-907, and "Hedonic Damages in Personal Injury and Wrongful Death Litigation," by me in Litigation Economics, pp. 39-59. Kenneth Arrow, a Nobel Laureate in economics discusses this method for valuing life in "Invaluable Goods," Journal of Economic Literature, XXXV, No. 2, 1997, p. 759. All of these articles discuss the known or potential rate of error, well within the acceptable standard in the field of economics, generally using a 95% confidence rate for the statistical testing and acceptance of results.

This methodology has been generally accepted in the field of economics. Indeed, according to the prestigious and highly-regarded think tank, The Rand Corporation, by 1988: "Most economists would agree that the willingness-to-pay is the most conceptually appropriate criterion for establishing the value of life," Computing Economic loss in Cases of Wrongful Death, King and Smith, Rand Institute for Civil Justice, R-3549-ICJ, 1988. While first discussed in cutting edge, peer-reviewed economic journals, this methodology is now taught in standard economics

11

# CFG

courses at the undergraduate and graduate level throughout hundreds of colleges and universities nationwide as it is discussed in widely-accepted textbooks in the field of law and economics: Economics, David C. Colander, Irwin, Chicago, 2004, pp. 446-449; this introductory to an economics textbook is the third most widely used textbook in college courses nationwide. Hamermesh and Rees's The Economics of Work and Pay, HarperCollins, 1993, Chapter 13, perhaps the standard advanced textbook in labor economics, also discusses the methodology for valuing life. Other textbooks discuss this topic. Richard Posner, Chief Justice of the U.S. Court of Appeals for the 7th Circuit and Senior Lecturer at the University of Chicago Law School, one of most prolific legal writers in America, details the Value of Life approach in his widely used textbooks: Economic Analysis of Law, 1986, Little Brown & Co., pp. 182-185 and Tort Law, 1982, Little Brown & Co., p 120-126.

Forensic Economics is now taught as a special field in a number of institutions nationwide. I taught what is believed to be the first course ever presented in the field of Forensic Economics at DePaul University in Spring, 1990. My own book, Economic/Hedonic Damages, Anderson, 1990, co-authored with Dr. Michael Brookshire, a Professor of Economics in West Virginia, has been used as a textbook in at least 5 colleges and universities nationwide in such courses in economics, and has a thorough discussion of the methodology. Toppino et. al., in "Forensic Economics in the Classroom," published in The Earnings Analyst, Journal of the American Rehabilitation Economics Association, pp. 53-86, Vol. IV, 2001, indicate that hedonic damages is one of 15 major topic areas taught in such courses.

Finally, this methodology is endorsed by the U. S. Government as the standard and recommended approach for use by all U. S. Agencies in valuing life for policy purposes, as mandated in current and past Presidential Executive Orders in effect since 1972, and as discussed in "Report to Congress on the Costs and Benefits of Federal Regulations," Office of Management and Budget, 1998, and "Economic Analysis of Federal Regulations Under Executive Order 12866," Executive Office of the President, Office of Management and Budget, pp. 1-37, and "Report to the President on Executive Order No. 12866, Regulatory Planning and Review, May 1, 1994, Office of Information and Regulatory Affairs, Office of Management and Budget. Prior presidents signed similar orders as discussed in "Federal Agency Valuations of Human life", Administrative Conference of the United States, Report for Recommendation 88-7, December 1988, pp. 368-408.

12

# CFG

## SUMMARY OF LOSSES FOR CHRISTOPHER HICKS

| TABLE ***** | DESCRIPTION ******************************* | ESTIMATE *********** |
|---|---|---|
| | **EARNINGS** | |
| | LOSS OF WAGES & BENEFITS, NET OF PERSONAL CONSUMPTION | |
| 9 |   Scenario 1 to age 67 | $ 743,126 |
| 18 |   Scenario 2 to age 67 | $ 494,160 |
| | - - - - - - - - - - - - - - - - - - - - - - - | |
| | **REPLACEMENT SERVICES** | |
| 21 | LOSS OF HOUSEHOLD SERVICES | $ 252,958 |
| 24 | LOSS OF GUIDANCE<br>  Merlene Wynn-Hicks | $ 349,791 |
| 27 | LOSS OF ACCOMPANIMENT<br>  Merlene Wynn-Hicks | $ 738,630 |
| | - - - - - - - - - - - - - - - - - - - - - - - | |
| | **LOSS OF ENJOYMENT OF LIFE** | |
| 30 | LOSS OF VALUE OF LIFE - 100% | $3,314,023 |
| 33 | LOSS OF VALUE OF LIFE - 60% | $1,988,409 |
| | - - - - - - - - - - - - - - - - - - - - - - - | |
| | **LOSS OF RELATIONSHIP** | |
| 36 | LOSS OF RELATIONSHIP<br>  Merlene Wynn-Hicks | $1,321,891 |

13

# CONTENTS

|  |  | PAGE |
|---|---|---|
| I. | Decedent's Vital Statistics | 2 |
| II. | Decedent's Work History | 2 |
|  | A. Military | 2 |
|  | 1. Military Service Assignment Summary | 2 |
|  | 2. Military Disciplinary Actions | 3 |
|  | B. Civilian | 3 |
|  | 1. Wage Income History | 5 |
|  | 2. Wage-Time Full-Employment Percentages | 5 |
|  | 3. Average Annual Gross Wages Income | 6 |
| III. | Decedent's Medical History | 6 |
| IV. | Decedent's Household Services History | 7 |
| V. | Medical and Economics Data | 9 |
|  | A. Medical Mortality and Morbidity Data | 9 |
|  | B. Life Expectancy and Work-Life Expectancy Data | 9 |
|  | C. Wage and Benefits Growth Data | 10 |
|  | D. Nominal and Real Discount Rates | 10 |
|  | E. Household Production of Services | 11 |
|  | F. Hedonic Value of Life | 12 |
|  | G. Economic Valuation of Society | 14 |
| VI. | Analysis and Discussion | 14 |
|  | A. Lost Wages | 14 |
|  | B. Lost Benefits | 15 |
|  | C. Lost Household Services | 16 |

EXHIBIT

_B_

## I.     Decedent's Vital Statistics

Name:            Christopher Hicks

Date of Birth:    2 April 1965

Date of Death:    26 May 2004

Age at Death:     39.2 years

Race:            African-American (Black)

Education:        High School Graduate

Medical Conditions:   Long-term substance abuse (alcohol); smoker (cigarettes)

## II.     Decedent's Work History

### A.  Military

#### 1.  Military Service Assignment Summary

Mr. Christopher Hicks, decedent, enlisted in the US Army on

9 March 1984, and was placed on Active Duty under the Army's Delayed Entry Program

on 23 May 1984. He received his basic and advanced individual training at Fort Sill,

Oklahoma as a cannoneer (Field Artillery), and was subsequently stationed at Fort Sill.

On 25 May 1986, Mr. Hicks was placed on casual status with a delay-en-route to his new

assignment in Germany, where he reported for duty on 27 June 1986. While in his delay-

en-route casual status, Mr. Hicks, decedent, married Marlene Elizabeth Hicks on 24 June

1986.

On 16 December 1987, while stationed in Germany, Mr. Hicks was placed on casual

status en route to a new assignment in the continental United States. On 14 March 1988,

he was assigned as a Bridge Specialist with an Engineer Company at Fort Hood, Texas.

Mr. Hicks deployed to South-West Asia (SWA) with his unit on 27 August 1990 in

2

support of Operation Desert Shield, and returned to Fort Hood, Texas on 14 April 1991 following service in Operation Desert Storm. Mr. Hicks was promoted to Sergeant on 1 June 1991. In July 1993, Mr. Hicks requested early release from his current reenlistment contract, and was released from Active Duty effective 30 July 1993.

### 2. Military Disciplinary Actions

On 3 May 1990, Mr. Hicks' Fort Hood, Texas Post driving privileges were suspended because of a DUI (Driving Under the Influence) arrest off-post by the county sheriff. His recorded blood-alcohol content was 0.12. He was also charged with attempting to elude police and with resisting arrest. Mr. Hicks received an Administrative General Officer Letter of Reprimand for the DUI offense and his concurrent conduct. The First Cavalry Division Commanding General directed that the letter become a permanent document in Mr. Hicks' Official Military Performance Records.

On 26 February 1993, Mr. Hicks received a Field Grade Article 15 (Non-Judicial Punishment) for being Absent from his Assigned Place of Duty (the Basic Non-Commissioned Office course). He was reduced one rank (from Sergeant to Specialist pay grade E4), and not recommended for retention in active service.

### B. Civilian

The records and information given to me provide no work history data for Mr. Hicks following his release from active duty with the US Army on 30 July 1993 until April 2000, a period of approximately 6 years and 8 months. With the exception of the following three time periods, I have no verifiable information regarding Mr. Hicks' employment status or earnings:

3

- 9 October 2001 to 18 April 2002 (*Tyson Foods*, Texas)

- 24 May 2003 to 6 October 2003 (*Home Depot*, Chicago)

- 5 January 2004 to 17 March 2004 (*VA Hospital*, Chicago metro
  area),

In his employment application with *Home Depot* (Chicago), Mr. Hicks lists three
previous employers and employment periods. These are *Pak Shur* from April 2002 –
August 2002 (listed as full-time employment, but this is not consistent with the tax return
information and the wage information for Tyson Foods), and *Snelling* from April 2000 –
February 2001 (listed as temporary, meaning on-call or day labor employment). This
self-reported list of prior employers does not include *Tyson Foods*, which was full-time
employment that is verifiable. Therefore, the reported employer information is
inaccurate, and possibly unreliable. For the purposes of my report, I treat the information
as unreliable, pending the receipt of more earnings and employment information and
documents.

For all practical purposes, day-labor and temporary part-time employment are
equivalent to being unemployed. Persons in these employment categories do not receive
benefits or any guarantee of employment from one day to the next. Therefore, I treat
these employment periods as unemployed time for decedent, pending receipt of earnings
records that can be utilized to show how productive Mr. Hicks' labor was during those
periods. In particular, I have requested that I be provided a copy of decedent's taxable
earnings history, as recorded by the Internal Revenue Service. This document would also
provide information of decedent's work earnings during the period 1 August 1993 – April
2000, a period for which I have no information at present.

4

## 1. Wage Income History (Source: Employer Records)

| Year | Wage Earnings | Employer |
|------|---------------|----------|
| 2001 | $3,571 | Tyson Foods |
| 2002 | $5,753 | Tyson Foods |
| 2003 | $10,827 | Home Depot |

Unsigned and incomplete tax return information shows decedent had reported total earnings of $6,219 in 2002 and $11,256 in 2003. Based on the this information along with the immediately preceding wage data for *Tyson Foods* and *Home Depot*, this means that the decedent's part-time employment only paid $466 in 2002 and $429 in 2003.

## 2. Wage-Time Full-Employment Percentages

| Year | % Full Time | % Unemployed |
|------|-------------|--------------|
| 2000 | 75% | 25% |
| 2001 | 25% | 75% |
| 2002 | 29% | 71% |
| 2003 | 37.5% | 62.5% |
| 2004 (5 months) | 0% | 100% (50% in VA Hospital) |
| **Summary Data** | **38%** | **62%** |

Mr. Hicks' employment records with both *Tyson Foods* (Texas) and *Home Depot* (Chicago) indicate that he was terminated from each employment because of work attendance problems. This is corroborated by the deposition testimony of Ms. Ericka Stewart, decedent's girlfriend from April 2003 until January 2004 and possibly until his death in May 2004. Ms. Stewart testifies in particular that Mr. Hicks was fired by *Home Depot* because he repeatedly missed work. She further said that he missed work because

5

of his drinking, and that he had been fired previously from employment with *Dollar General* for the same reason. (I have no record of decedent's employment with *Dollar General*.) Ms. Stewart also testified that decedent worked at day labor for *Labor Ready* following his termination by Home Depot, although I have no record of such employment.

On 5 January 2004 when Mr. Hicks entered the Chicago VA Hospital for substance (alcohol) abuse treatment, he reported that he was unemployed and homeless, and that he could not hold a job or sustain a relationship because of his excessive drinking.

### 3. Average Annual Gross Wage Income

The verifiable earnings data show that Mr. Hicks earned a total of $20,151 while working full-time for 11 months from 2001 through 2003, and a total of $895 while engaged in temporary employment over 16 months in the same two years. Using the full-time and unemployed time percentages of 38% and 62% respectively, this means that decedent's average annual income was approximately $8,841.

## II. Decedent's Medical History

Mr. Christopher Hicks, decedent, had a self-reported history of drinking since age 16, and excessive use of alcohol since age 25 (see VA Hospital records). When admitted to the Chicago VA Hospital on 5 Jan 2004 for substance abuse (alcohol) treatment, Mr. Hicks admitted to drinking on average two 40-ounce bottles of beer per day. In the medical literature, one 12-ounce bottle of beer is equivalent to one drink. Therefore, Mr. Hicks admitted to having more than six drinks per day on average.

6

Mr. Hicks also admitted to previous alcohol abuse treatment by the Salvation Army in Shreveport, Louisiana in 1997. The VA interview records show as well that decedent's drinking resulted in "blackouts", job loss, DUIs and incarceration, and domestic disturbances and lost relationships. This is corroborated by decedent's military records, his employment records, and deposition testimony.

### III. Decedent's Household Services History

Following graduation from high school, Mr. Hicks enlisted in the US Army, and was provided housing or a housing allowance until he was released from active duty on 30 July 1993. While in casual status en route to Germany from 25 May to 27 June 1986, Mr. Hicks met and then married Marlene Hicks on 24 June 1986 after a period of four weeks. (This timeline of events is corroborated by Norris Lewis' deposition testimony.) Marlene Hicks did not accompany her husband Mr. Christopher Hicks (decedent) on his posting to Germany. Mr. Hicks returned to Fort Hood, Texas on 14 March 1988.

Marlene Hicks joined her husband in Kileen, Texas (Fort Hood) in sometime during late 1989 to early 1990, but returned to California when her husband, Mr. Christopher Hicks, deployed to South-West Asia (SWA) on 27 September 1990 in support of Operation Desert Shield. All records and testimony indicate that Christopher Hicks did not live with Marlene Hicks again, effectively a separation of 13 years and 8 months. During this period, Christopher Hicks lived with his mother in Shreveport, Louisiana; a girlfriend in Texas; and most recently, a girlfriend in Chicago. Periodically, he would stay with relatives for short periods of time. When visiting California, he

7

would stay in a facility owned by his brother, Norris, and did not stay with his wife Marlene (maintaining their separation).

The records' evidence and preponderance of testimony also demonstrate that marital reconciliation was very unlikely to ever occur in the future, and that Christopher Hicks was not financially able to provide (and therefore had probably not been providing) any monetary support to his estranged wife, Marlene. For example on 25 November 1992 and again on 23 March 1993 during his required annual military record reviews, Christopher Hicks named his mother, Florence Hicks, to be his sole heir and beneficiary for all military life insurance and unpaid pay and allowances benefits. He did not include his wife, Marlene, as a beneficiary to any military benefits. In addition, while living in Chicago with his girlfriend, Ericka Stewart, they discussed marriage and she became pregnant. Mr. Hicks wanted his girlfriend to have the baby, and told his brother Gary Dean Lewis that he wanted to marry Ms. Stewart and that he wanted a baby with her. In addition, he filed his tax returns for 2002 and 2003 as a single person and not as a married person.

Financially, Mr. Hicks could not even support himself. He was continually borrowing small amounts of money from relatives, and provided no monetary support to them in return at any time. His personal consumption of earned income was necessarily 100 percent or very close to it. For example, his average gross full-time employment monthly income was $298 in 2001, $518 in 2002, and $938 in 2003. The records show no income earned in 2004. He accumulated no assets or savings, and was homeless at the time of his death and during much of the time in previous years.

8

Christopher Hicks had not had either stable long-term employment or residence since leaving the US Army in July 1993.  Consequently, he was never positioned to provide a stream of household services as valued in the economic literature to anyone on a consistent basis, including himself.  (See discussion below regarding the literature on household production and valuation of these services.)

## IV.  Medical and Economics Data

### A.  Medical Mortality and Morbidity Data

Extensive research by the medical profession world-wide has demonstrated that men in the age groups of 30-59 and 39-65 who average more than five drinks per day have increased all-cause mortality risk, ranging from 1.74 to 3 when compared to non-drinkers.  Most studies show that the increased all-cause relative risk of mortality is between 2.2 and 2.3, and that this group has increased morbidity risk of comparable or greater magnitudes (morbidity measures ability to pursue an active quality life).  Statistically, this means that the life expectancy and work-life expectancy of these men are significantly reduced by an average factor of approximately 2.2 to 2.3.

### B.  Life Expectancy and Work-Life Expectancy Data

The life expectancy of a statistically average black male who is 39-40 years of age is 33.4 years, and the work-life expectancy of a statistically average male who is 39-40 years who has a high school education and who is currently unemployed is 18.4 years.  The corresponding life expectancy and work-life expectancy for a 39 to 40-year-old male who averages more than 5 drinks per day are 14.52 years and 8 years, respectively.

9

## C. Wage and Benefits Growth Data

Labor studies show that real wages have increased during the last 30-40 years only for full-time workers who have education beyond high school or who have a high school education and more than five years experience on the job. Men who have a high school education but less than five years of experience exhibited a 20.0% decline in real weekly wages during the 1980s (or approximately 2% per year, on average) and an overall 1.6% decline from 1963 through 1987 (or approximately 0.07% per year, on average). The education and experience premiums continue to dominate national real wage growth rate averages, with the education premium steadily becoming more important.

Employers' real cost of benefits have steadily increased at a rate slightly greater than the rate of increase of the overall average real wage income level, with the greatest increases coming in the area of health care benefits, disability benefits, and legally mandated benefits. The quality of benefits being provided to employees, however, has steadily declined, primarily because employers have been shifting increasingly greater percentages of health care and insurance costs to employees, and also have been moving away from defined benefit pension plans to defined contribution benefit plans. Virtually all pension plans have a vesting period of five years or more. Until vested, employees have limited or no claim on their accrued pension benefits. The real wages paid for temporary or part-time employment have declined, and these employees are not provided pension, vacation, or health benefits.

## D. Nominal and Real Discount Rates

I estimate the nominal and real discount rates using the average annual secondary market yield on 90-day US Treasury Bills and the annual measures of the consumer price

10

index (CPI-U) since 1979. The nominal discount rate is the average bond-equivalent yield for the corresponding T-bill yields, and the real discount rate is calculated by adjusting the nominal discount rates for inflation as measured by the CPI-U.

I use the time period of 1979 to the present for these estimates because the Federal Reserve (Fed) adopted a radical change in monetary policy in October 1979. Prior to October 1979, the Fed focused on stabilizing the rate of interest. After October 1979, the Fed focused on stabilizing and controlling the measured rate of inflation. The different policies have had a measurable and significant effect on both measured inflation and on the market rates of interest. To preserve consistency and continuity, I chose not to mix periods of remarkably different policies when using data for estimations.

My estimates of the nominal and real discount rates are, respectively, 6.38% and 2.1%.

### E.   Household Production of Services

Several economic studies investigate the value of services that persons provide in a home under a variety of circumstances. Using the household productivity data by unemployed men who are 39 years of age, this value is approximately $14,493 per year in 2004 dollars. If employed, the value is approximately $8,540 per year in 2004 dollars. These values should be adjusted for identifiable average annual employment and unemployment proportions. For Mr. Hicks, this adjustment gives an annual value of $12,231 in 2004 dollars for all years in which Mr. Hicks would work, apportioning 38 percent to full-time employment and 62 percent to unemployment.

In the studies, the estimated average weekly hours and annual market valuations reflect national statistical averages. These values are reduced in my analysis to reflect

11

characteristics specific to the decedent, Mr. Christopher Hicks - in particular, a diminished capacity for him to provide services in the home because of substance abuse. Using an increased morbidity factor of 2.2 to measure his diminished capacity, the adjusted value of his household services production is approximately $5,560 in 2004 dollars for years in which Mr. Hicks would work. For years that Mr. Hicks would not have any full-time employment, then his capacity-adjusted value of household services would be $6,588.

### F.  Hedonic Value of Life

Within the economic profession, there is no accepted economic or statistical methodology for valuing life. Despite claims to the contrary by a limited group of forensic economists, most professionals agree that life cannot be valued using market measures or mechanisms.

Hedonic valuation is an economic principal based on ability to compute market-equivalents for value-added to a product for which there is a measurable market value. For example, within a housing development, there may be both two- and three-bedroom units available for sale at market value. Using hedonic pricing techniques, we can estimate the value added for a third bedroom based on differences between sale prices for two- and three-bedroom facilities and differences in construction costs.

The Hedonic Value of Life literature, however, purports to value the worth of a life depending only on age. The supposed methodology is based on the notion that what society pays to adopt safety devices like seat belts and smoke detectors is equivalent to what individuals would pay to save their own lives. This application is absurd.

12

First of all, the methodology to which hedonic value of life economists appeal is predicated on the aggregate social value of small reductions in risk of loss. The reductions in risk of loss apply to loss of life, loss of property, and loss through litigation, all of which impose social costs. To the best of my knowledge, no one has properly separated the value of loss attributable to these different components. In addition, the hedonic value of life economists have not demonstrated application of their willingness to pay arguments to an individual's willingness to pay for risk reduction or shown how such willingness to pay is influenced by an individual's ability to pay. Primary researchers in the area agree that the public policy application of the methodology does not support application for valuation of an individual's life, despite attempts by some economists to do this.

I append two affidavits from professionals in the field who state that application of the hedonic pricing methodology as currently defined in the economic policy literature is inappropriate for valuing the life of any specific person. (See affidavit copies for V. Kip Viscusi and Lauraine Chesnutt.) Other similar affidavits are available in public records, having been filed in other cases in state and federal courts. Finally, the hedonic value of life approach is not generally endorsed by the courts. Both state and federal courts have been excluding this testimony. See, for example, Merecado v. Ahmed (ND IL, App Ct 1992), Ayers v. Robinson (ND IL, 1995), Crespo v. City of Chicago (ND IL, 1997), Anderson v. Nebraska Department of Social Services (1995), Wilt v. Buracker (W. Virginia, 1993, cert. denied 1994), and Fetzer v. Wood (IL AppCt, 1991). Therefore, I do not value decedent's life in a general sense, nor do I speculate as to what the

13

enjoyment value of decedent's life would have been. Neither do I endorse any attempt to do so by other economists.

### G. Economic Valuation of Society

Economists are unable to value society between individuals. Economists can value the time of any individual using market measures such as wage rates. Thus, economists can estimate the market value of the time that any individual spends with others. Economists, however, cannot value the *quality* of that time, and therefore cannot value loss of society in any reliable or meaningful way.

## V. Analysis and Discussion – Lost Wages, Benefits, and Household Services

### A. Lost Wages

To calculate decedent's lost gross wages, I assume that his future employed time would exhibit the same trends that were observed in the years prior to his death, especially in view of the VA Hospital's prognosis that decedent's likely recovery from alcohol abuse was poor. In particular, this means that I assume decedent would, on average, work full time about 38% of each year and be unemployed and engaged in day labor about 62% of each year. I also assume that decedent's real wage income would remain constant or decline at an average rate of 1% per year, reflecting the results from the labor economic literature on real wage rate changes during the last four decades, providing two-wage growth and scenarios that fit decedent's characteristics.

In addition, I assume that decedent's life expectancy and work-life expectancy are 14.5 years and 8.0 years, respectively, reflecting the significant negative impact that his alcoholism would have on the number of years he could have expected to live and to have worked productively. Future real earnings are discounted at a real rate of 2.1 percent. I

14

provide estimated gross wage income loss for two work-life scenarios, one using decedent's expected work-life, adjusted for the impact of his alcoholism; and the second using decedent's expected remaining life, also adjusted for the impact of his alcoholism.

Using decedent's substance abuse-adjusted work-life expectancy of eight years, the estimated lost gross wages range from $62,881 to $65,314. Were decedent to have continued working for his substance abuse-adjusted expected remaining life, then the estimated lost gross wages range from $109,250 to $117,383. Probable loss to decedent's estate, however, is nearer zero because decedent's annual real earnings would be so low as to preclude savings or support to anyone else. Decedent's estimated average monthly gross income in real terms, for example, ranges between $581 and $737 in 2004 dollars. After deductions for Social Security, Medicare, and employee contributions to various benefit plans and taxes, decedent's average real disposable monthly income would be significantly less. For example, while working for *Home Depot*, approximately 21% of decedent's earnings were deducted each month. Using this as a benchmark average for payroll deductions, decedent's real average disposable monthly income would range between $459 and $582, barely enough to sustain his own life with 100 percent consumption.

### B.  Lost Employee Benefits

Employer-paid benefits range between 31% and 41% of gross wages for companies, depending primarily on the number of employees. The three most significant benefit costs are health care (approximately 11%), vacation, paid holidays (10%), and pension and savings plans (8%). The fourth most significant benefit cost for employers is Social Security and Medicare contributions. Although decedent would have enjoyed the

15

benefits of employer-paid health care when employed full time, his inability to maintain stable employment would have prevented him from realizing either pension or vacations benefits. Therefore, I exclude both from my calculations. I benchmark the reduction from the average benefit costs of 36%, thus using a benefit percentage of 18%, applied only to the full-time employment component of annual gross wages. This component is equal to $8,427.

For decedent's expected work life, the value of lost benefits in 2003 dollars ranges from $10,789 to $11,206. Using decedent's expected remaining life, the value of lost benefits ranges from $18,744 to $20,140.

### C. Lost Household Services

The estimated value of lost household services that Mr. Hicks would have provided during his remaining expected life had he not died in May 2004 ranges between $73,821 and $79,880. The range limits depend whether decedent is assumed to work throughout his expected remaining life as he had been in recent years, or whether he is assumed to work as he had been in recent years only for the eight years that constitute his expected remaining work-life.

16

**GERRY L. SUCHANEK, PH.D.**

1 February 2005

RE: Billie Ray Lewis v. City of Chicago, et. al. (04C3904)

SUMMARY
of
REPORT CHANGES

Utilizing new data regarding verifiable employment, hours worked in a full-time or temporary employment capacity, and income and benefits earned, I have been able to refine my estimates of probable losses to decedent's estate. In particular, I can now verify that the tax returns provided to me previously are inaccurate and without validity.

Using the new information, I estimate that decedent's probable lost gross wages over his expected work-life as of April 2004 is between $60,584 and $62,928, and his probable lost benefits are between $7,366 and $7,652. If one assumes that decedent would have continued to work throughout the remainder of his expected life rather than just his expected work-life, then his estimated probable lost gross wages are between $105,258 and $113,095, and his estimated lost benefits in this case are between $12,799 and $13,751. In either case, however, the probable wage income loss to decedent's estate is zero or near zero dollars since his probable annual personal consumption requirements would have exceeded his estimated annual disposable income with very high probability. Estimated value of lost production of household services is between $68,404 and $76,419, also depending on whether decedent is assumed to work for the remainder of his expected life at time of death or to work only for his remaining expected work-life. The household services being valued are those provided by a statistically average male in a statistically average home, and include all manner of normal daily living tasks, to include

child care and home maintenance. I believe these estimates overstate the value of what decedent most likely would have provided as home services.

*Gerry L. Suchanek*  1 Feb 05

**GERRY L. SUCHANEK**  DATE

**31 January 2005**

**Changes to Report, dated 10 December 2004, on Christopher Hicks (04 C 3904) prepared by Gerry L. Suchanek, Ph.D.**

**Section II B.**  See Spreadsheets titled,

1.   Calc of Avg Inc & %s

2.   Hire-Term Dates

3.   P-T & F-T Employment

4.   Wage Income

These spreadsheets document the full extent of information now available regarding Christopher Hicks employment history, hourly wages, hours and months worked in a full- or part-time capacity, gross and net incomes, and reasons why he left full-time employment.  The spreadsheets show that we now have essentially full information for the years 2000-2004, a recent period of 4.42 years.  The data available for this period also permits estimating the percentages of time that Mr. Hicks was engaged in full-time employment, that he was engaged in part-time employment measured in full-time employment equivalents (40 hours work weeks), and that he was unemployed.  The incomplete employment information for the period 1997-1999 is consistent with the information we have for 2000-2004, but is not complete enough to be considered when calculating average earnings levels or employment percentages.

The new verifiable earnings data show that Mr. Hicks earned an average gross annual income of $8,518 from 2000 until his death in 2004 ($5,754 Full-Time and $2,764 Part-Time).  His average annual net income during this period was just $7,568 ($4,952 Full-Time and $2,616 Part-Time).

**Section V E.**      Section V E is revised to read as follows.

Several economic studies investigate the value of services that persons provide in a home under a variety of circumstances. Using the household productivity data by unemployed men who are 39 years of age, this value is approximately $14,493 per year in 2004 dollars. If employed, the value is approximately $8,540 per year in 2004 dollars. These values should be adjusted for identifiable average annual employment and unemployment proportions. For Mr. Hicks, this adjustment gives an annual value of $11,335 in 2004 dollars for all years in which Mr. Hicks would work, apportioning 38 percent to full-time employment and 62 percent to unemployment.

In the studies, the estimated average weekly hours and annual market valuations reflect national statistical averages. These values are reduced in my analysis to reflect characteristics specific to the decedent, Mr. Christopher Hicks - in particular, a diminished capacity for him to provide services in the home because of substance abuse. Using an increased morbidity factor of 2.2 to measure his diminished capacity, the adjusted value of his household services production is approximately $3,882 in 2004 dollars for years in which Mr. Hicks would work. For years that Mr. Hicks would not have any full-time employment, then his capacity-adjusted value of household services would be $6,588. **The total apportioned on a percentage basis would be $5,152.**

**Section VI.**

Section VI A is amended to reflect the percentages and loss calculations provided in the new spreadsheets. In particular, decedent's average percentage time in full-time employment is now estimated to be 34.88%, his average percentage time in temporary employment measured in full-time equivalents is 18.17%, and his average percentage time unemployed is 46.95%, using the data now available for 2000-2004. The estimated

lost gross wages now range between $60,584 and $62,298 using a health-adjusted work-life expectancy, and between $105,258 and $113,095 if it is assumed that Mr. Hicks would have continued to work at the same levels for the remainder of his health-adjusted expected life.

Section VI B is amended to show that the full-time component of annual gross wages is $5,754, and that the estimated value of lost benefits is between $7,366 and $7,652 using the appropriate expected work-life, and is between $12,799 and $13,751 if it is assumed that Mr. Hicks would have continued working as he had been during the remainder of his expected life.

Section VI C is amended to show that the estimated value of lost household services ranges between $68,404 and $76,419.

**Documents Reviewed.**

The list of documents review should be amended to show the new information made available regarding Mr. Hicks' employment history. This includes employment records from Labor Ready and Family Dollar.

## Page 1

```
 (1)        IN THE UNITED STATES DISTRICT COURT
 (2)       FOR THE NORTHERN DISTRICT OF ILLINOIS
 (3)                  EASTERN DIVISION
 (4)
 (5)   BILLIE RAY LEWIS,          )
                                  )
 (6)        Plaintiff,            )
                                  )
 (7)      vs.                     ) NO. 04C3904
                                  )
 (8)   CITY OF CHICAGO, et al.,   )
                                  )
 (9)        Defendants.           )
                                  )
(10)
(11)
(12)
(13)
(14)
(15)
(16)      DEPOSITION OF MERLENE ELIZABETH WYNN-HICKS
(17)               LOS ANGELES, CALIFORNIA
(18)              TUESDAY, NOVEMBER 9, 2004
(19)
(20)
(21)
(22)   REPORTED BY: JINA JANI, RPR, CSR No. 8888
(23)
(24)
(25)
```

## Page 2

```
 (1)        Deposition of MERLENE ELIZABETH WYNN-HICKS,
 (2)   taken on behalf of Defendant, at 1900 Avenue of the
 (3)   Stars, Suite 1650, Los Angeles, California, commencing
 (4)   at 12:50 P.M., Tuesday, November 9, 2004, before Jina
 (5)   Jani, CSR No. 8888.
 (6)
 (7)
 (8)   APPEARANCES:
 (9)
(10)    FOR THE PLAINTIFF:
(11)       SMITH & COFFEY
           CHRISTOPHER SMITH, ESQ.
(12)       119 North Peoria
           Chicago, Illinois  60607
(13)       (312) 850-2600
(14)    FOR THE DEFENDANT:
(15)       ROBERT W. BARBER, ESQ.
           30 North LaSalle Street
(16)       Suite 1400
           Chicago, Illinois  60602
(17)       (312) 744-5890
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

## Page 3

```
                      I N D E X

 (1)
 (2)
 (3)   DEPONENT         EXAMINATION              PAGE
 (4)   MERLENE ELIZABETH WYNN-HICKS
 (5)              BY MR. BARBER                    4
 (6)
 (7)
 (8)
 (9)
(10)   DEFENDANT'S EXHIBITS
(11)   (None offered.)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

## Page 4

(1)  Los Angeles, California
(2)  Tuesday, November 9, 2004
(3)  12:50 P.M.
(4)
(5)  MERLENE ELIZABETH WYNN-HICKS,
(6)  having been first duly sworn, was
(7)  examined and testified as follows:
(8)
(9)  EXAMINATION
(10)
(11)  BY MR. BARBER:
(12)
(13)  Q.  Ma'am, would you state your name, please.
(14)  A.  **Merlene Elizabeth Wynn-Hicks.**
(15)  Q.  Mrs. Hicks, my name is Robert Barber. I
(16)  think we met briefly earlier this morning. I'm an
(17)  attorney and I represent some police officers in this
(18)  lawsuit that Billie Ray Lewis has brought against the
(19)  city of Chicago. Okay?
(20)  A.  **Okay.**
(21)  Q.  And for a period of time this afternoon,
(22)  we're going to be asking you some questions. You're
(23)  speaking very softly. It's very important to speak
(24)  loud enough so that the court reporter gets an
(25)  accurate transcript of what we say here. Okay?

EXHIBIT
C

## Page 9

(1)   A.   Yes.
(2)   Q.   Okay. Do you know the address?
(3)   A.   No. It's on Willow and Grand.
(4)   Q.   Is there only one Extended Stay hotel in
(5)   Long Beach?
(6)   A.   Yes, that I know of.
(7)   Q.   They're all over?
(8)   A.   Yeah.
(9)   Q.   And what did you do at Extended Stay
(10)  America?
(11)  A.   Housekeeping.
(12)  Q.   Why did you leave that employment?
(13)  A.   I left that job because I was injured on the
(14)  job. I had another job at the same time.
(15)  Q.   You were injured on the job at Extended Stay
(16)  America?
(17)  A.   Yes.
(18)  Q.   What kind of injury did you have?
(19)  A.   Back, knee, and right shoulder.
(20)  Q.   And that was some sort of on the job injury,
(21)  you were lifting something or what?
(22)  A.   A slip and fall.
(23)  Q.   Okay. And did you file a claim regarding
(24)  that?
(25)  A.   Yes.

## Page 10

(1)   Q.   Now, did you leave the job because of that
(2)   injury?
(3)   A.   Yes.
(4)   Q.   You had to leave the job because of the
(5)   injury or you just chose to?
(6)   A.   I had to leave that job and my other job. I
(7)   had two jobs at the same time.
(8)   Q.   Okay. And because of the injury?
(9)   A.   Right. I couldn't do nursing anymore
(10)  either.
(11)  Q.   All right. So did you file a lawsuit as a
(12)  result of that injury?
(13)  A.   Yes.
(14)  Q.   Is that lawsuit still pending?
(15)  A.   No.
(16)  Q.   Did it go to trial or did it settle or what?
(17)  A.   Settled.
(18)  Q.   And did you receive some compensation from
(19)  that lawsuit?
(20)  A.   Yes.
(21)  Q.   And how much did you receive?
(22)  A.   27,000.
(23)  Q.   $27,000?
(24)  A.   Yes.
(25)  Q.   And since then you haven't worked?

## Page 11

(1)   A.   No.
(2)   Q.   Are you able to work?
(3)   A.   I'm a college student in school. I'm doing
(4)   my vocational rehab.
(5)   Q.   Okay. But if you wanted to work or if you
(6)   had the time to work, are you able to work?
(7)   A.   No.
(8)   Q.   Why are you not able to work?
(9)   A.   I have arthritis in my right knee. I have
(10)  six slipped discs in my back.
(11)  Q.   And are there any other reasons why you
(12)  can't work?
(13)  A.   No.
(14)  Q.   Okay.
(15)  A.   I have – I have a medical condition right
(16)  now.
(17)  Q.   Okay. Other than the arthritis, slipped
(18)  discs and the medical condition that we'll get to in a
(19)  moment, is there any other reason why you can't work?
(20)  A.   No.
(21)  Q.   Okay. Is the arthritis that you have in
(22)  your right knee, is that a chronic condition that
(23)  you've had for some time?
(24)  A.   Yes.
(25)  Q.   For how many years?

## Page 12

(1)   A.   The last two years. Or actually a little
(2)   more.
(3)   Q.   Okay. You didn't have it prior to that?
(4)   A.   No.
(5)   Q.   Is that arthritis in your knee, is that a
(6)   result of the slip and fall accident?
(7)   A.   Yes.
(8)   Q.   Has a doctor told you that or is it just
(9)   your feeling?
(10)  A.   The doctor told me.
(11)  Q.   Okay. And the slipped discs, is that also a
(12)  result of the slip and fall?
(13)  A.   Yes.
(14)  Q.   Were you told that by a doctor?
(15)  A.   Yes.
(16)  Q.   Okay. And the medical condition that you
(17)  mentioned, tell us about that.
(18)  A.   I have a heart problem.
(19)  Q.   Are you presently under the care of a doctor
(20)  for the heart problem?
(21)  A.   Yes.
(22)  Q.   And what's your understanding of the heart
(23)  problem that you have?
(24)  A.   Do I have to discuss that?
(25)  MR. SMITH:   Yeah. I mean you have to answer the

Case: 1:04-cv-02004 Document #: 123 Filed: 05/25/05 Page 93 of 153 PageID #:1043

### Page 69

(1)  MR. SMITH:  Objection. Foundation.
(2)  BY MR. BARBER:
(3)  Q.  Did he tell you about her?
(4)  A.  Yes.
(5)  Q.  And did he tell you her name was Erica
(6)  Stewart?
(7)  A.  No.
(8)  Q.  Did he tell you what her name was?
(9)  A.  First name.
(10)  Q.  Erica?
(11)  A.  Yes.
(12)  Q.  Did you talk about her over the telephone
(13)  with Christopher?
(14)  A.  Yes.
(15)  Q.  Did Christopher tell you that he wanted to
(16)  marry Erica?
(17)  A.  No.
(18)  Q.  Did Christopher tell you that he wanted a
(19)  divorce?
(20)  A.  No.
(21)  Q.  Did you ever talk about getting a divorce
(22)  from Christopher?
(23)  A.  No.
(24)  Q.  What did you talk about with Christopher
(25)  about Erica?

### Page 70

(1)  A.  He wasn't happy with her. He wanted to come
(2)  back to me. He wanted to come back to California.
(3)  Q.  Okay. And how was he going to do that?
(4)  A.  He was going to get a job and work and save
(5)  up money and he was coming back to live with me.
(6)  Q.  Okay.
(7)  A.  We were making plans to get back together
(8)  and be a family.
(9)  Q.  Did Christopher tell you that Erica had
(10)  gotten pregnant by him?
(11)  MR. SMITH:  Objection. Speculation.
(12)  THE DEPONENT:  No.
(13)  BY MR. BARBER:
(14)  Q.  What kind of job was he going to get to
(15)  enable him to come back to California?
(16)  A.  He wanted to go back to school. He was
(17)  going to get us a house because he hadn't used his
(18)  V.A. loan, and he wanted us to have a baby. He wanted
(19)  us to be a family and have a baby and he talked about
(20)  how important that was to him trying to work things
(21)  out because we still wanted to be with each other.
(22)  After everything, it didn't matter.
(23)  Q.  Now, during this period of time when you
(24)  were separated, did Christopher support you?
(25)  A.  Yes.

### Page 71

(1)  Q.  How did he support you financially?
(2)  A.  Sent me money.
(3)  Q.  How often would he send you money?
(4)  A.  Every month.
(5)  Q.  How much money did he send you?
(6)  A.  It would vary.
(7)  Q.  How? Vary how?
(8)  A.  Anywhere from 100 to $300.
(9)  Q.  Where was he getting this money from?
(10)  MR. SMITH:  Objection. Speculation.
(11)  THE DEPONENT:  I didn't ask.
(12)  BY MR. BARBER:
(13)  Q.  Okay. Other than these employment
(14)  situations that you've told us about, do you know of
(15)  any other employment that he had where he could send
(16)  you money every month?
(17)  A.  Not that I know of.
(18)  Q.  Did he send it to you in cash?
(19)  A.  Yes.
(20)  Q.  So there's no record of it; right?
(21)  A.  No.
(22)  Q.  When you got this money – strike that.
(23)  Did you go to his funeral?
(24)  A.  No, due to medical reasons.
(25)  Q.  Did a doctor tell you you couldn't go to his

### Page 72

(1)  funeral?
(2)  A.  Yes.
(3)  Q.  What's the doctor's name?
(4)  A.  It was – it's the hospital.
(5)  Q.  What's the doctor's name?
(6)  A.  Dr. Choun.
(7)  Q.  Choun?
(8)  A.  (Deponent shakes head.)
(9)  Q.  How do you spell that?
(10)  A.  C– – I think C-H-O-U-N.
(11)  Q.  What's his first name?
(12)  A.  I don't know.
(13)  Q.  What kind of doctor is he?
(14)  A.  It's a heart doctor.
(15)  Q.  And what hospital is he at?
(16)  A.  St. Mary's.
(17)  Q.  Did Christopher have any bank accounts?
(18)  MR. SMITH:  Objection. Foundation.
(19)  BY MR. BARBER:
(20)  Q.  That you know of?
(21)  A.  I only know about the ones we had together.
(22)  Q.  When you were still living together?
(23)  A.  Yes.
(24)  Q.  Since you were separated, did Christopher
(25)  have any bank accounts?

1

2

3

# HICKS-LEWIS

## Verses

# CITY O F CHICAGO ILLINOIS

4

5

### **OPINION REPORT**

6

7    Prepared for Plaintiff's Attorney's

8    Mr. Phillip L. Coffey, ESQ, Christopher Smith, ESQ

9    & Daniel Alexander, ESQ.

10    119 North Peoria Street, Suite 3A

11    Chicago, Illinois

12

13    Prepared by

14

15    John L. Sullivan, President

16    Sullivan & Associates International

17    10901 Hot Oak Court

18    Las Vegas, Nevada 89134

19    (702) 255-0123

20

21

22

23    November 11, 2004,

24



1

HICKS-LEWIS v. CHICAGO POLICE

The Chicago Fire Department Para-medics responded along with an ambulance. HICKS was transported to a hospital where he was pronounced dead.

According to the Cook County Medical Examiner, CLARE H. CUNLIFFE, M.D., there was sufficient physical evidence gathered during the autopsy to determine that HICKS died from having his neck compressed and unable to get oxygen. Death due to asphyxiation due to restraint.

## OPINION

I have been provided sufficient information to formulate a preliminary opinion on this case. As additional factual information concerning this case is obtained, my opinion may be altered.

It is my preliminary opinion that:

A.  The officer(s) used excessive force by applying a choke-hold/neck restraint to HICKS with undue severity resulting in his death.

B.  The Chicago Police Department was negligent by failing to train and certify the officers' knowledge, skill level and ability in contemporary Use of Force policies and procedures, defensive tactics techniques and arrest procedures.

C.  The Chicago Police Department was negligent by failing to supervise and insure that on-duty officers carried the necessary Department issued defensive/offensive equipment and were skilled in its use of this equipment.

D.  The Chicago Police Department demonstrated negligence and indifference to their public safety duties by failing to conduct an objective, detailed and in-depth investigation as to the circumstances surrounding the death of HICKS.

## EXPLANATION FOR THESE OPINIONS ARE AS FOLLOWS

Excessive Force

HICKS was a victim of excessive force at the hands of officers SOTO and ARNOLTS. The extent of injuries inflected on the Deceased by the officers was excessive, unreasonable, unlawful and extreme considering the circumstances and totality of the situation.

In considering if force used by the officers was excessive, the following was considered:

1.  The need for the use of force.

When Officer ARNOLTS confronted HICKS on the street and identified himself as a police officer, HICKS attempted to push by Officer ARNOLTS. Officer ARNOLTS grabbed hold of HICKS and held him until Officer SOTO came to Officer

# In The Matter of:

*Lewis v.*
*City of Chicago*

---

### *DEPOSITION OF*:

## John L. Sullivan
## Volume 1
## *January 31, 2005*

---

*Associated Reporters of Nevada*
*Certified Court Reporters*
*2300 W. Sahara Avenue*
*Suite 770*
*Las Vegas, NV 89102*
*(702) 382-8778    FAX: (702) 382-2050*

**Word Index Included**



EXHIBIT
E

John L. Sullivan Volume 1  January 31, 2005

Page 85

1   information that I had at that time that I made my
2   opinion report. it was definite evidence that a
3   throat restraint was applied on Mr. Hicks and that
4   was the cause of death according to the medical
5   examiner.
6        Q.   You said that at that time you wrote your
7   report, there was definite evidence of throat
8   restraint applied on Mr. Hicks?
9        A.   Yes.
10       Q.   What throat restrained was applied on
11  Mr. Hicks?
12            MR. ALEXANDER: I'm going to object
13  again. He wasn't there to witness it. Are you
14  asking him what documents he's read?
15  BY MR. BARBER:
16       Q.   You can answer the question.
17            MR. ALEXANDER: On the reports he's
18  talking about?
19  BY MR. BARBER:
20       Q.   What throat restraint was applied on
21  Mr. Hicks?
22            MR. ALEXANDER: Object. Lack of
23  foundation. He didn't witness the incident. If you
24  want to ask him what he's read, that would be a fair
25  question. If you want to ask him what happened at

Page 86

1   the incident, he wasn't present.
2   BY MR. BARBER:
3        Q.   All these questions is -- no one was
4   saying you were present at the incident.
5            MR. ALEXANDER: Then why don't you ask a
6   proper question.
7   BY MR. BARBER:
8        Q.   When you were investigating the crime as
9   a police officer in your past life, you certainly
10  weren't present at the scene of every crime?
11       A.   Correct.
12       Q.   However, you put certain things together,
13  and you come to reasonable conclusions; is that
14  correct?
15       A.   Correct.
16       Q.   And based on your examination of this
17  file, what throat restraint was placed on Mr. Hicks?
18       A.   There was -- start with a 911 call of the
19  citizen witness that stated that two men had a black
20  man in a choke hold, and she repeated that twice
21  during her 911 call.
22            One of the witness officers -- one of the
23  two directly involved officers, but one of the
24  officers -- the uniformed officers that arrived at
25  the scene stated that he had the -- Mr. Hicks in a

Page 87

1   headlock with his fist underneath his chin. And to
2   me that would be right into the throat area.
3            And a choke hold probably can take on
4   various shapes and attributes. And then following
5   that up with the medical examiner's report, and you
6   just -- I think there's evidence there based upon the
7   documentation that I read that the person died from
8   an improperly restrained choke hold.
9        Q.   Those two accounts, the 911 call and the
10  officer who said that Mr. Hicks was in a headlock
11  with a fist under the chin, they didn't -- weren't
12  reports of occurrences of happening at the same time;
13  correct?
14            MR. ALEXANDER: I'm sorry. Can you wait
15  a second. I did not understand that question. Maybe
16  if I heard it again.
17  BY MR. BARBER:
18       Q.   You read the -- not only did you listen
19  to the 911 tape.
20       A.   Yes.
21       Q.   That has the 911 caller.
22       A.   Yes.
23       Q.   You also received the deposition of that
24  caller; correct?
25       A.   Correct.

Page 88

1        Q.   And what's that person's name?
2        A.   I'm sorry?
3        Q.   What is that person's name? The 911
4   caller?
5        A.   I didn't pull their name to memory, but
6   it is identified in my file here.
7        Q.   Okay. And you did receive that
8   deposition. You read it?
9        A.   Yes.
10       Q.   And what are the individuals doing at
11  that time that the 911 caller says that she observed
12  the choke hold?
13            MR. ALEXANDER: I'm going to object.
14  what individuals?
15            MR. BARBER: The individuals she's
16  observing.
17  BY MR. BARBER:
18       Q.   what are they doing according to that
19  witness at that time that she makes the observation
20  of the choke hold as she described it?
21       A.   The way she described it, that there was
22  two white males on a black male. And they had the
23  black male in a choke hold.
24       Q.   Okay. But that's in the 911 call. I'm
25  talking about in the deposition. The 911 call lasted

statements were taken. I have a couple in the file there. The statements were very vague. From what I understand, the office of O.P.S. is staffed with citizens, nonpolice officers, noninvestigators. And so the quality of the statements are somewhat vague.

Q. You said in your report paragraph 2, page 4 --

A. No. 2.

Q. -- the first sentence is headed the relationship between the amount of force that was used and the need for the force.

what are you getting at?

A. Sometimes we find in this type of a situation that there is an overkill of use of force. I think in this case here -- and there is a classic example of overkill not adhering to contemporary standards and law enforcement and defense tactics.

Q. Overkill would be the neck restraint hold?

A. Yes. Use of force in a neck restraint hold would be right up there in the deadly force realm.

Q. Let's assume for the sake of argument that a neck restraint hold was not used.

A. Okay.

**Page 153**

Q. Then the actions of the police officers were not using your term, overkill?

MR. ALEXANDER: I'm going to object to that. You're saying in the officers' version.

BY MR. BARBER:

Q. I'm asking you to assume that no neck restraint was used. That would include the neck restraint hold that was given as described by the 911 caller, and that would also include the neck restraint hold that was mentioned by Kevin Kendall.

Assuming that that did not happen, using those terms, was the amount of force used overkill?

MR. ALEXANDER: Are you --

BY MR. BARBER:

Q. Using your term.

MR. ALEXANDER: what about the Kevin Kendall's beating statements? Are you excluding that in your hypothetical?

MR. BARBER: Yes. For purposes of this question.

MR. ALEXANDER: I'm going to object. It's an incomplete hypothetical.

THE WITNESS: If I'm understanding your question, the officers approached him, brief struggle, took him to the ground, handcuffed him, and

**Page 154**

Mr. Hicks went on to live happily ever after and there was no adverse happening, would there be any indications of use of force?

BY MR. BARBER:

Q. No.

A. I'm not understanding your question.

Q. And I'm asking you to assume that no neck restrained hold occurred.

A. Okay. Which would include the statement by the 911 caller and would include the description by Kevin Kendall?

MR. ALEXANDER: Including the beating? Including the kicking?

THE WITNESS: Medical examiner --

MR. ALEXANDER: Assuming nothing bad happened, we'll stipulate nothing bad happened.

BY MR. BARBER:

Q. If you accept the police officers' testimony that they did not use neck restraint, is there anything in their testimony that would indicate to you that their conduct was excessive or overkill using your term?

MR. ALEXANDER: You're just limiting it to your testimony?

MR. BARBER: Yes.

**Page 155**

THE WITNESS: It's hard to separate bad tactics, lack of training, and excessive force if you don't have the tactics, if you don't have training. You don't have skill level then. If Mr. Hicks was fatal or died as a result of this association or some other type of reason, just the officers going out and being unskilled, getting into a wrestling match on the street, there's nothing obvious of excessive force. I think my focal point is on the evidence, the witness statements, and the medical examiners statements that there was a choke hold applied.

There's no other explanation as to how the injuries of the internal organs neck or anything like that.

BY MR. BARBER:

Q. Going down, paragraph 2 on page 4, you talk about O.C. spray.

A. Yes.

Q. Officer Soto didn't have O.C. spray; correct?

A. From what I understand, neither one of them did.

Q. Didn't Officer Arnolts say he did?

A. He said he did.

Q. He said his hands were full with

**Page 156**

**39 (Pages 153 to 156)**

1  witness.
2  BY MR. BARBER:
3      Q.  You also note from reading the documents
4  you received in this case, when officers were in
5  civilian dress, plain clothes, they're not required
6  to have a baton; correct?
7      A.  I don't recall that specific statement.
8  The batons they have nowadays.  Some of my -- many of
9  my officers carried what they call the ASP baton.
10  It's a collapsible baton that the plain-clothes
11  officers primarily designed for plain-clothes
12  officers.
13      Q.  Do all police officers and all police
14  departments across the country carry the ASP?
15      A.  I can't speak for all police officers.  I
16  know some of the more progressive departments do,
17  yes.
18      Q.  And do all police officers in the
19  Las Vegas Metropolitan Police Department all carry
20  the ASP?
21      A.  Again, whether they all do or not, I
22  don't know.  I know that many of the officers --
23  plain-clothes officers under my command in the
24  detective bureau in vice or narcotics, it is not
25  practical to carry.

Page 165

1      Some of them don't even carry firearms on
2  specific assignments for obvious reasons.  But the
3  officer working gang units, undercover, special
4  enforcement details, it's not uncommon at all, and I
5  can't say 100 percent, but it is -- that along with a
6  bullet proof or second-chance vest.  That's another
7  protective equipment.
8      Q.  But apparently it's not required from
9  what I gathered from what you're saying in the Las
10  Vegas Police Department for every officer to carry
11  the ASP?
12      A.  Again, I can't say that for certain
13  because I don't know what the specific policy and
14  procedures are since I've been gone for ten years.
15      Q.  Was the ASP even around while you were on
16  the department?
17      A.  Yes.
18      Q.  And when you were on the department, were
19  all officers required to carry the ASP?
20      A.  Not all officers.  A lot of patrol
21  officers use the site handle baton, the P.C. 24.  A
22  lot of the motor officers went to the ASP.  It's a
23  shorter abbreviated type of baton.  A lot of the
24  undercover officers in the department would provide
25  the officers the -- these type of weapons.

Page 166

1      Q.  Okay.
2      A.  And -- but like I say, and a lot of
3  undercover situation -- and this thing here -- I
4  would say this is not a critical undercover.  It's
5  not like a narcotic officer coming in to buy
6  narcotics and be shaken down or a vice officer.
7  These are the so-called aggressive enforcement units.
8      And again, going back to my definition of
9  aggressive is that they are out there to take direct
10  action.  And to ill equip these officers to handle
11  these type of confrontations that's very much
12  ingrained in the job itself I think is negligence
13  only.  Supervisors on the police department and
14  officers themselves.
15      Q.  On the officers themselves, if they don't
16  carry a piece of equipment, they're unauthorized to
17  carry?
18      MR. ALEXANDER:  Are you talking about the
19  ASP or the O.C. spray?
20      MR. BARBER:  ASP.
21      THE WITNESS:  They're going through an
22  evaluation period at that time on the ASP.  So not
23  all officers -- it was not totally accepted.
24  BY MR. BARBER:
25      Q.  Right.

Page 167

1      A.  But there was a mandate in the manual
2  that says all officers without exception will
3  carry mace.  I'm just saying again, Counselor, if you
4  only have a firearm, you know you're not going to
5  shoot this individual.  But in -- there's evidence
6  there that, in applying this choke hold, it equates
7  to a deadly force the use of force spectrum if, in
8  fact, this individual did die from a choke hold at
9  the hands of the officer.
10      Q.  Turn to go paragraph 5 on page 5.
11      A.  Physical odds against the officer.
12      Q.  You say that there's nothing in the
13  reports that indicate that Hicks was, and then
14  there's a semicolon.
15      A.  Okay.
16      Q.  And then going down to physically
17  superior in strength or size.  There's nothing in the
18  record that indicate that Hicks was physically
19  superior in strength and size?
20      A.  In looking at the few officers involved,
21  that -- I get those two confused.  But his
22  description he was probably of comparable size to
23  Mr. Hicks.
24      And again, this is just because you run
25  into an individual that is a little taller, maybe.

Page 168

A.   It's in the -- yes.  Hyoid.  Adam's apple.

Q.   That's where you would expect to see the injury?

A.   I'm sorry?

Q.   That's where you would expect to see the injury?  Adam's apple?

A.   There -- it wouldn't surprise me to see telltale signs of injury.  But I don't want to say specifically.

Q.   Okay.  You read Dr. Wetli's report?

A.   I'm sorry?

Q.   You've read Dr. Wetli's report?

A.   That is the doctor from New York?

Q.   Yes.

A.   Yes.

Q.   And he gives an opinion that's different from the medical examiner?

A.   That's correct.

Q.   He gives an opinion that explains the presence of the hemorrhages that have been found; correct?

A.   From what I can recall from his report, he ruled death to heart attack instead of restrictions from the neck.

Page 177

Q.   Well, heart attack is a term that I guess is used generically.  But he's talking about a sudden death?

A.   Sudden death, yes.  From an enlarged heart, yes.

MR. ALEXANDER:  Spontaneous death.

THE WITNESS:  Spontaneous death.  That's correct.

BY MR. BARBER:

Q.   Do you disagree with his opinion?

MR. ALEXANDER:  I'm going to object.  You know, he's not giving medical testimony.

BY MR. BARBER:

Q.   You are agreeing with Dr. Cunliffe's position; correct?

A.   Again, I know there is some conflict between the two pathologists.  And apparently there's a third pathologist that agrees with the original medical examiner's report.  So I'm saying from evidence that I have seen at this point in time there's preponderance of the evidence that there was a choke hold applied or some injury to the neck.  Now, what the exact cause of death was, Counselor, I have to let the medical people make that determination.

Page 178

Q.   But you state in your report that Mr. Hicks -- you're accepting that Mr. Hicks died of asphyxiation due to restraint; is that correct?

A.   That's before I had any conflicting information from the opposing medical examiner.

Q.   And now that you have conflicting information, are you still accepting that Mr. Hicks died as a result of asphyxiation due to restraint?

MR. ALEXANDER:  Are you talking about official ruling of the medical examiner?

BY MR. BARBER:

Q.   Are you?

A.   This is something I'm going to have to hold in abeyance as to my official opinion on.  What I am saying, that there was excessive use of force applied to Mr. Hicks.  Now, whether that caused his death or not, I don't know.  I'm going to let the medical people fight that battle.

The only thing I know is that his lack of training -- they used excessive force.  There's evidence of excessive force.  Whether he lived or died, there would still be the issue of excessive force and inadequate training and negligent by the Chicago Police Department.

Q.   The evidence of excessive force is the

Page 179

injuries that the medical examiner found in addition to the account of the 911 caller and Kevin Kendall.

MR. ALEXANDER:  Are you excluding all the other witness statements?  The O.P.S. statements?  The other officers?  They talk about the hand to the chin.  This is your game that you always play.

BY MR. BARBER:

Q.   Is Mr. Kendall -- I don't have any other questions.

MR. MURRAY:  I do.

(Recess taken.)

BY MR. BARBER:

Q.   When you say there was excessive force in this case --

A.   Yes.

Q.   -- you're assuming that a neck restraint was applied to Mr. Hicks; is that correct?

A.   That is my primary concern, yes.

Q.   Okay.  All right.

CROSS-EXAMINATION

BY MR. MURRAY:

Q.   Mr. Sullivan, my name is Chris Murray.  I represent City of Chicago.

A.   Okay.

Q.   I have some questions, and maybe a little

Page 180

45 (Pages 177 to 180)

1  shut my mind to -- from what I read here in this
2  case, the officers' statements as to what type of
3  training -- in-service training that they have had,
4  the documentation of their training records and these
5  little vignettes that they have.
6        MR. ALEXANDER:  Training videos.  Let me
7  object.  We're going to be getting -- the depositions
8  from Friday are not going to be ready until tomorrow.
9  So we're -- so we are going to get those to
10  Mr. Sullivan.  The C.P.R. guy and the sergeant in
11  charge of the training.  So we're going to get him
12  those.
13  BY MR. MURRAY:
14        Q.  Let me put this another way.
15        A.  Okay.
16        Q.  Your understanding as to how the Chicago
17  Police Department trains its police officers is based
18  on what?
19        A.  Again, Counselor, I have to go back to
20  just the material that I have read in this case that
21  pertains to training.
22        Q.  And what material are you referring to?
23        MR. ALEXANDER:  He's already been through
24  all that.  Why do you have to ask him three times?
25        THE WITNESS:  As I've stated before.

Page 197

1        MR. ALEXANDER:  Just have her read it
2  back.
3        (Record read.)
4        THE WITNESS:  The transcripts of the
5  officers' testimony as to their training.  Not only
6  use of force, but C.P.R. for medical assistance,
7  first aid, the training records, the training bureau
8  or the divisions outlined.  Use of force training.
9  The course syllabus of the basic academy training for
10  Chicago police officers.  I think that pretty much
11  encompasses the areas that I read.
12        I might have forgotten some, but right
13  now that's the main points.
14  BY MR. MURRAY:
15        Q.  Now, that's the materials that you relied
16  upon?
17        MR. ALEXANDER:  You're not going to ask
18  him again.  You're not going to answer again.  If you
19  ask him again, I'm not going to let him answer.
20  BY MR. MURRAY:
21        Q.  So how is it that you have come to the
22  conclusion Chicago Police Department was negligent in
23  training?
24        A.  Well, I guess the first thing you look at
25  is the actions of the officers.  You look at the

Page 198

1  cause and effect.  In my opinion, that the
2  officers -- there's evidence the officers used
3  excessive force.  Excessive force may or may not have
4  been a direct cause of Mr. Hicks's death.
5        Then you start working backwards as to
6  how were the officers equipped.  Were the officers
7  trained in the equipment that they carry such as the
8  O.C. spray?  There's no indication in any of the
9  training records of the O.C. spray type of training.
10        I think there's one incident, and I think
11  that was one of those video type of training.  You go
12  back and you look at the academy.  Basic academy
13  training syllabus.  It does talk about defensive
14  tactics and the various types of techniques and
15  control holds and compliances and the use of O.C.
16  spray and the use of deadly force and things of this
17  nature.
18        But there's nothing for in-service
19  training after the basic academy training, and these
20  officers testified that no, I haven't received
21  anything other than my basic academy training.
22        And for me to sit here and think from
23  firsthand information that an officer will retain
24  these techniques, skills, and concept five or six
25  years down the line with no refresher training, I

Page 199

1  think is ludicrous.
2        It's negligence on the Chicago Police
3  Department's part by not continually training these
4  individuals.  There's no indication like the PR-24.
5  The side handle baton or street stick baton.  In
6  normal contemporary law enforcement, there is a
7  recertification every year and every two years at the
8  least.  There's no indications of any recertification
9  of any control holds and compliance holds and baton
10  tactics, O.C. spray, anything.
11        Q.  So the negligence you're referring to in
12  opinion B deals with the in-service training of the
13  Chicago Police Department; is that correct?
14        MR. ALEXANDER:  Well, I think he answered
15  your question.
16  BY MR. MURRAY:
17        Q.  Is that correct?
18        A.  To clarify, in-service training -- and I
19  can answer that with a little more clarity.  These
20  little cadets being viewed at roll call training.
21  That is a form of in-service training.  What we're
22  looking at in contemporary law enforcement is state
23  mandated, and I have to plead ignorance on Illinois
24  if they require like certain continuing education
25  requirements and lawyers, doctors, things of this

Page 200

50 (Pages 197 to 200)

1  use of force type of cases.
2         In this case, there was no -- other than
3  just what I would consider a superficial
4  investigation that was conducted into this.  To have
5  an administrative review to take a critical look at
6  the actions of the officers, take a critical look at
7  the policies and procedures and govern the action of
8  the officer, take a critical look at the training or
9  the lack of training that caused this situation to
10  see if any one of those elements could be improved
11  upon.
12         But to sit there and say, well, we
13  developed this policy six years ago, and we haven't
14  revisited to see if it is functional is, to me, not
15  the proper way of running the police department.
16     Q.  I'm going to hand you the general order
17  again.
18         Is there something written that you take
19  issue as to the administrative review issue you've
20  just testified about, or is it an omission that you
21  believe should be there?
22     A.  I think -- they talk about tactical
23  response reports, discharge of firearms.  That's
24  another thing.  Accidental discharge.  A lot of
25  departments don't buy accidental discharge of

**Page 213**

1  firearms.  It's negligent.  Officer mishandling the
2  weapon, and he was negligent in mishandling the
3  weapon that caused discharge.
4     Q.  What page were you talking about?
5  Accidental discharge of firearm?
6     A.  Page 6 of City number 000331.
7     Q.  So you take issue with that policy?
8     A.  Yeah.  Primarily the title of it.
9  They're saying it's an accident.  You can't hold the
10  officer responsible or accountable for that.
11         Now, it's negligent.  I think that gives
12  them a little more of an objective view of the
13  incident.
14         (Discussion was held off the record.)
15  BY MR. MURRAY:
16     Q.  I don't know if I got an answer to the
17  question whether there was something expressly
18  written about administrative review that you took
19  issue with.
20     A.  I think there was more of an omission.  I
21  don't see anything -- they talk about somebody in the
22  chain of command.  He reviews the reports.  You have
23  this office of professional standards that's staffed
24  by civilians that apparently does an investigation in
25  this.

**Page 214**

1         And I see several snares and pitfalls in
2  that type of an operation.  I think that the more of
3  a formal setting, a combination of command level
4  officers, line officers, union representatives,
5  civilians should -- but mostly when there's a death
6  as a result of the officer's actions.
7         Whether they are liable for the death or
8  not, as long as they were involved, and it should be
9  taken very critical look at.
10     Q.  So you're saying there's an omission as
11  to that review?
12     A.  More of an omission than a wrongful
13  policy.
14     Q.  We're limiting it just to general order
15  0208 that I've handed you?
16         MR. ALEXANDER:  I object to that.  In an
17  omission.  How could you possibly limit it?  He's
18  talking about the fact that the whole structure of
19  the way Chicago police investigate police killings.
20  And now you're trying to limit it to one document.
21  That's ridiculous.
22  BY MR. MURRAY:
23     Q.  What you just examined was the general
24  order 0208; correct?
25     A.  The document you just handed me, I felt

**Page 215**

1  there was a lot to be lacking or a lot to be desired
2  in that document.  But to say that that is the only
3  problem I have with all the documents, that's the one
4  I sit in on.  I can't answer other than what the
5  document that you showed me.
6     Q.  Right.  I'm talking just about what I
7  handed you, general order 0208.
8         Aside from the administrative review
9  issue you just told us about and the accidental
10  discharge firearms, do you find any other deficiency
11  as to the written policy stated under general order
12  0208 as to use of force guidelines?
13         MR. ALEXANDER:  Other than what he's
14  testified to?
15         MR. MURRAY:  That's what I said.
16         THE WITNESS:  The -- well, I guess if we
17  really take a real hard critical look at it, I think
18  there may be some provisions about maintaining
19  proficiency and the various weapons the officers use
20  and how that proficiency is maintained and what
21  happened if that proficiency is not maintained, as
22  far as remedial training and firearms and things of
23  this nature, the use of the police baton, the O.C.
24  spray.
25         I don't recall seeing any type of

**Page 216**

54 (Pages 213 to 216)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ORIGINAL

BILLIE RAY LEWIS, as Brother,  )
Next Friend and Special        )
Administrator of CHRISTOPHER    )
HICKS, Deceased,               )
                               )
        Plaintiff,             )
                               )
    vs.                        )  No. 04 C 3904
                               )
CITY OF CHICAGO, and CHICAGO   )
POLICE OFFICERS L. SOTO,        )
STAR 0403, A. PENA, STAR 18513; )
ROBERT ARNOLTS, STAR 19998; and )
BRIAN DEVAN, STAR 3871,         )
                               )
        Defendants.            )

    The Deposition of LOUIS SOTO, taken before
JEANINE WATKINS, C.S.R. and Notary Public within and
for the State of Illinois, pursuant to the
provisions of the Federal Rules of Civil Procedure
of the United States District Court, pertaining to
the taking of depositions, taken at 119 North Peoria
Street, Chicago, Illinois, commencing at the hour of
approximately 10:00 a.m., on October 28, 2004.

Patti Blair Court Reporters, p.c.
(312) 782-8376

---

A P P E A R A N C E S:

    SMITH, COFFEY & ALEXANDER, LTD, by
    MR. DANIEL ALEXANDER and
    MR. PHILLIP L. COFFEY
        119 North Peoria Street, Suite 3A
        Chicago, Illinois 60607

        Appeared on behalf of the Plaintiff;

    OFFICE OF THE CORPORATION COUNSEL,
    CITY OF CHICAGO, by
    MR. CHRISTOPHER M. MURRAY
        30 North LaSalle Street, Suite 700
        Chicago, Illinois 60602

        Appeared on behalf of the Defendant
        City of Chicago;

    OFFICE OF THE CORPORATION COUNSEL,
    CITY OF CHICAGO, by
    MR. ROBERT W. BARBER
        30 North LaSalle Street, Suite 1400
        Chicago, Illinois 60602

        Appeared on behalf of the
        Individual Defendants.

ALSO PRESENT:

OFFICER A. PENA
OFFICER ROBERT ARNOLTS
OFFICER BRIAN DEVAN

Patti Blair Court Reporters, p.c.
(312) 782-8376

---

                I N D E X

WITNESS:                                  PAGE

    LOUIS SOTO

Examination by Mr. Alexander                4

EXHIBITS:

Soto Exhibit No. 1                          65
Soto Exhibit No. 2                          68

Patti Blair Court Reporters, p.c.
(312) 782-8376

---

 1          (The witness was duly sworn.)
 2               LOUIS SOTO
 3   having been first duly sworn, was examined and
 4   testified as follows:
 5               EXAMINATION
 6          BY MR. ALEXANDER:
 7     Q.   State your full name, please.          10:17 36
 8     A.   Louis Soto.                            10:17 40
 9     Q.   How do you spell Louis?                10:17 40
10     A.   L-o-u-i-s.                             10:17 42
11     Q.   Do you have a middle name?             10:17 44
12     A.   I have a confirmation name, not a middle  10:17 46
13   name.                                        10:17 50
14     Q.   Do you have any nicknames you go by?   10:17 50
15     A.   No.                                    10:17 52
16     Q.   Have you ever given a deposition before,  10:17 52
17   Officer Soto?                                10:17 54
18     A.   Yes.                                   10:17 56
19     Q.   How many times?                        10:17 56
20     A.   I don't know. Handful. Three, four times,  10:18 00
21   probably.                                    10:18 02
22     Q.   What were those cases about?           10:18 04
       There were civil matters.                  10:18 06
       What kinds of civil matters? Were you a     10:18 10

Patti Blair Court Reporters, p.c.
(312) 782-8376

EXHIBIT
F

6

1  defendant in any cases?  10:18:14
2     A.  Yes, I was.  10:18:14
3     Q.  All of them?  10:18:16
4     A.  Yes, I was.  Except -- I think one of them  10:18:16
5  I was not.  10:18:20
6     Q.  Can you try and speak up a little bit here  10:18:22
7  today so we can all hear you?  10:18:24
8     A.  Sure.  10:18:28
9     Q.  Well, you've been present for the  10:18:30
10  depositions of the other three defendant officers,  10:18:32
11  right, sir?  10:18:36
12     A.  Yes.  10:18:36
13     Q.  And you heard my little spiel on deposition  10:18:36
14  rules that you -- you want me to go over it again  10:18:40
15  for you?  10:18:42
16     A.  No.  10:18:44
17     Q.  The only thing I'll say is if you -- you  10:18:44
18  probably learned by now my questions always don't  10:18:48
19  come out right, especially the first time.  So, if  10:18:50
20  you don't understand a question, let me know before  10:18:52
21  you answer and I'll try to rephrase it for you, all  10:18:56
22  right?  10:18:58
23     A.  Yes.  10:19:58
24     Q.  If you go ahead and answer, I'll assume you  10:18:58

7

1     Q.  And you reviewed them for truthfulness and  10:22:38
2  accuracy before you signed the verification?  10:22:40
3     A.  Yes, I did.  10:22:42
4     Q.  So, in the early '80s, you were sued in a  10:22:52
5  traffic accident case?  10:22:56
6     A.  Yes, I was.  10:22:56
7     Q.  And what happened with that accident?  10:22:56
8     A.  What do you mean, what happened, sir?  10:23:04
9     Q.  Tell me about the accident briefly.  10:23:06
10     A.  Briefly, let's see.  A gentleman walked up  10:23:08
11  between two cars early in the morning, and I struck  10:23:12
12  him.  10:23:14
13     Q.  And was he injured?  10:23:16
14     A.  Yes, he was.  10:23:18
15     Q.  Was he killed?  10:23:18
16     A.  No, he was not.  10:23:22
17     Q.  And you got a judgment against you for a  10:23:22
18  hundred thousand dollars?  10:23:24
19     A.  That's correct.  10:23:26
20     Q.  Did you have insurance?  10:23:26
21     A.  No, I did not.  10:23:28
22     Q.  And then in '85 you got -- you were in  10:23:32
23  another traffic accident?  10:23:36
24     A.  Yes.  10:23:38

1  understood the question.  Is that fair?  10:19:
2     A.  Yes.  10:19:
3     Q.  Let's start with these depositions.  Let me  10:19:
4  see if we've got some information here in the  10:19:
5  interrogatories.  What can you tell me about those  10:19:
6  cases?  10:19:
7     A.  I'm not sure I know what you mean.  What  10:19:
8  can I tell you?  As to what?  10:19:
9     Q.  I found -- there is some information in  10:19:
10  your interrogatories.  Let me start by showing you  10:19:
11  Defendant Soto's Response to Plaintiff's First Set  10:19:
12  of Interrogatories.  I just ask you to flip through  10:19:
13  it, see if these are the answers you gave to the  10:19:
14  questions and if this is your signature on the  10:19:
15  verification page, all right, Officer?  10:19:
16     A.  Is there something specifically here you  10:19:
17  want me to look at?  10:19:
18     Q.  I want you to tell me if those are the  10:19:
19  answers you gave to the interrogatories, if that's  10:20:
20  your signature on the verification page.  10:20:
21     A.  Yes, that's my signature.  10:22:
22     Q.  Are those the answers you gave to your  10:22:
23  interrogatories, sir?  10:22:
24     A.  Yes.  10:22:

8

1     Q.  You got sued in that case, too?  10:23:
2     A.  No.  I sued.  10:23:
3     Q.  Plaintiff.  I'm sorry.  That is what it  10:23:
4  says.  10:23:
5        So, you were in an accident and you were  10:23:
6  the plaintiff in that case?  10:23:
7     A.  Yes.  10:23:
8     Q.  And you got a $25,000 settlement?  10:23:
9     A.  Yes.  10:23:
10     Q.  And then a year later you filed bankruptcy?  10:23:
11     A.  Yes.  10:24:
12     Q.  Was that here in the Northern District of  10:24:
13  Illinois?  10:24:
14     A.  Yes.  10:24:
15     Q.  Were you granted a discharge?  10:24:
16     A.  Yes.  10:24:
17     Q.  Do you know when you were granted your  10:24:
18  discharge?  10:24:
19     A.  The specific date, no.  10:24:
20     Q.  How about the year?  10:24:
21     A.  1988, I believe.  10:24:
22     Q.  Was that a Chapter 7, Chapter 13?  10:24:
23     A.  I think it was a Chapter 13.  10:24:
24     Q.  Like a work-out where you paid some of your  10:24:

30

1    Q.   Yes.                                 10:48:07

2    A.   Special employment.              10:48:04

3    Q.   Special employment.  The special employment  10:48:06

4  that you were doing for CTA on the day of the    10:48:08

5  incident, how far back were you doing that special  10:48:10

6  employment?  How far previous to the incident?  10:48:14

7    A.   I believe that was the first day I had done  10:48:16

8  that in probably a year, year and a half.      10:48:20

9    Q.   What about before that?  So, the previous  10:48:36

10  time, in the year, year and a half before, was that  10:48:38

11  same type of work, special employment as CPD officer  10:48:44

12  on CTA transportation?             10:48:48

13    A.   Yes.                         10:48:52

14    Q.   Has your -- have you ever been suspended  10:48:50

15  or -- have you ever been suspended by CPD?    10:49:04

16    A.   Yes.                         10:49:08

17    Q.   How many times?             10:49:08

18    A.   I don't recall specific numbers.  I would  10:49:14

19  guess maybe three, four times.          10:49:18

20    Q.   In your whole career?          10:49:22

21    A.   Yes.                         10:49:24

22    Q.   What's the longest suspension you've ever  10:49:26

23  had?                               10:49:30

24    A.   15 days.                    10:49:32

1    Q.   What did you get that for?  What was the  10:49:36

2  allegation?                   10:49:36

3    A.   That I damaged property.        10:49:38

4    Q.   And what property was it you allegedly  10:49:41

5  damaged?                    10:49:44

6    A.   I broke a window.          10:49:44

7    Q.   What window?             10:49:48

8    A.   A vehicle window.          10:49:48

9    Q.   Of what vehicle?          10:49:48

10    A.   I don't recall whose vehicle.     10:49:50

11    Q.   Was it a police vehicle?       10:49:54

12    A.   No.                       10:49:54

13    Q.   A citizen's vehicle?        10:49:56

14    A.   Yes.                       10:50:00

15    Q.   Anyone you knew or were related to?   10:50:00

16    A.   No.                       10:50:06

17    Q.   What happened in that incident?    10:50:10

18    A.   I got 15-day suspension.       10:50:12

19    Q.   What happened in the actual incident?  10:50:12

20    A.   I broke a window.          10:50:14

21    Q.   Why did you break a window?      10:50:16

22    A.   I thought it was my car.       10:50:18

23    Q.   You thought it was your car?     10:50:22

24    A.   Yes.                       10:50:24

31

1    Q.   Were you locked out of your car?    10:50:22

2    A.   I thought it was my car.       10:50:26

3    Q.   Did you have keys to your car?     10:50:30

4    A.   I don't recall.  I think -- yes.  I think I  10:50:34

5  did.                           10:50:36

6    Q.   Why didn't you just open the lock with your  10:50:36

7  keys?                         10:50:38

8    A.   I was intoxicated.  I thought it was my  10:50:38

9  car.                          10:50:42

10    Q.   Okay.  Were you on duty?       10:50:42

11    A.   No.                       10:50:44

12    Q.   Have you ever been charged with DUI?   10:50:50

13    A.   No.                       10:50:54

14    Q.   Have you ever been counseled by CPD about  10:50:50

15  alcohol use?                 10:51:02

16    A.   No.                       10:51:02

17    Q.   Have you ever been placed on a personal  10:51:04

18  concerns program?             10:51:06

19    A.   No.                       10:51:10

20    Q.   Where did this happen, the window incident?  10:51:10

21    A.   My best recollection would be on -- in the  10:51:16

22  vicinity of Archer and Quinn.        10:51:20

23    Q.   What year was this, approximately?   10:51:22

24    A.   I would say the late '80s or early '90s.  10:51:28

32

1    Q.   Were you charged with any crime in    10:51

2  connection with that incident?        10:51

3    A.   Damage to property.         10:51

4    Q.   A misdemeanor?           10:51

5    A.   Yes.                    10:51

6    Q.   What happened with that case?     10:51

7    A.   It was -- let's see.  Resolved.    10:51

8    Q.   You pled?             10:52

9    A.   No.                   10:52

10    Q.   It was thrown out?         10:52

11    A.   Yes.                   10:52

12    Q.   SOL'd or nolle?          10:52

13    A.   Nolle.               10:52

14    Q.   Do you know why it was nolle'd?    10:52

15    A.   The gentleman didn't wish to pursue it, the  10:52

16  victim.                     10:52

17    Q.   Did you pay for his window?      10:52

18    A.   Yes.                   10:52

19    Q.   And if you believed it was your car, why  10:52

20  did you break the window?         10:52

21    A.   I was intoxicated.         10:52

22    Q.   Was it an accident?         10:52

23    A.   I'm not sure I understand the question.  10:52

24    Q.   Did you break the window on purpose?  10:52

```
 1    A.    Yes.                                    10:52:46
 2    Q.    So -- and I understand you were        10:52:46
 3  intoxicated, but even in an intoxicated state, why  10:52:52
 4  would you break the window of your own car?       10:52:52
 5    A.    Because I couldn't get in.              10:52:54
 6    Q.    What -- three or four times suspended.  Do  10:53:04
 7  you remember when the most recent suspension was?  10:53:08
 8    A.    I believe that was the most recent      10:53:12
 9  suspension.                                       10:53:14
10    Q.    So, nothing, no suspensions since the early  10:53:16
11  '90s?                                             10:53:20
12    A.    Not that I can recall.                  10:53:22
13         MR. MURRAY:  Or late '80s, from what he  10:53:24
14  said.                                             10:53:26
15         MR. ALEXANDER:  I was giving him the    10:53:26
16  benefit of the doubt.                             10:53:28
17  BY MR. ALEXANDER:                                 10:53:30
18    Q.    All right.  What about the other ones?  10:53:34
19  What were those incidents or what was the -- if you  10:53:36
20  can tell me what the allegations were, if you     10:53:40
21  prefer.                                           10:53:42
22    A.    I really don't remember.  It's been quite a  10:53:44
23  long time ago.  I think -- let's see.  The one    10:53:46
24  was -- had to do with a medical check.  I wasn't  10:54:02
```

Patti Blair Court Reporters, p.c.
(312) 782-8376

```
 1  home when they came to check on me for a medical.  10:54:10
 2    Q.    You called in sick?                     10:54:14
 3    A.    Yes.                                    10:54:14
 4    Q.    And why weren't you home?               10:54:16
 5    A.    I was home.                             10:54:18
 6    Q.    Why didn't you come to the door?        10:54:20
 7    A.    They never came to the door.            10:54:22
 8    Q.    They said they came to the door and they  10:54:24
 9  didn't?                                           10:54:26
10    A.    Right.                                  10:54:26
11    Q.    And that was sustained against you?     10:54:26
12    A.    Yes.                                    10:54:28
13    Q.    What else?  Was your doorbell not working?  10:54:30
14    A.    Do you want to know something else, or are  10:54:44
15  you on the same question?                         10:54:46
16    Q.    I'm back to the last one.               10:54:46
17    A.    Okay.  My doorbell was working.         10:54:48
18    Q.    All right.  Yes.  Now on to the next.   10:54:50
19    A.    I believe it was intoxicated while carrying  10:55:02
20  a firearm off duty.                               10:55:08
21    Q.    How many days were you suspended for that,  10:55:14
22  do you think?                                     10:55:16
23    A.    I think it was three.                   10:55:16
24    Q.    What happened in that incident?         10:55:20
```

Patti Blair Court Reporters, p.c.
(312) 782-8376

35

```
 1    A.    I'm not sure what you mean, what happened.  10:55:28
 2    Q.    Tell me about the incident.             10:55:30
 3    A.    That I can recall, it was disturbance in a  10:55:32
 4  bar.  Some words were exchanged.  Police were     10:55:38
 5  called.  And I went to the station.              10:55:42
 6    Q.    Were you arrested?                       10:55:50
 7    A.    No.                                     10:55:52
 8    Q.    Was this late '80s, do you think?       10:55:54
 9    A.    No.  This was early '90s.  Mid '80s.    10:55:56
10    Q.    Early to mid '80s?                       10:56:02
11    A.    Yes.                                    10:56:04
12    Q.    What bar were you in?                    10:56:04
13    A.    I'm trying to think.  The Redwood.      10:56:06
14    Q.    The Redwood?                             10:56:16
15    A.    That's what it was called.              10:56:20
16    Q.    Was anyone injured?  Was there a fight at  10:56:22
17  the bar?                                          10:56:26
18    A.    No.                                     10:56:26
19    Q.    Just words?                              10:56:26
20    A.    Yes.                                    10:56:28
21    Q.    And had you driven to the bar?          10:56:30
22    A.    No.                                     10:56:40
23    Q.    At the police station they determined that  10:56:44
24  you were intoxicated?                             10:56:48
```

Patti Blair Court Reporters, p.c.
(312) 782-8376

36

```
 1    A.    Yes.  They had me blow a Breathalyzer.  10:56:48
 2    Q.    What did you blow?                       10:56:52
 3    A.    Point -- I don't believe I recall.  I think  10:56:54
 4  it was point one something.                       10:56:56
 5    Q.    It was over the driving limit at that time?  10:57:00
 6    A.    I think so.  I don't recall specifically.  10:57:00
 7    Q.    And you were off duty, right?           10:57:12
 8    A.    Yes.                                    10:57:14
 9    Q.    Do you feel like you have a drinking     10:57:22
10  problem, sir?                                     10:57:24
11    A.    No.                                     10:57:24
12    Q.    Have you ever had a drinking problem?    10:57:26
13    A.    Maybe.                                  10:57:32
14    Q.    Maybe in the past are you saying?       10:57:34
15    A.    Maybe in the past.                      10:57:36
16    Q.    Are you like a member of Alcoholics     10:57:38
17  Anonymous?                                        10:57:44
18    A.    No.                                     10:57:44
19    Q.    So, you haven't quit drinking?          10:57:44
20    A.    Pardon me?                               10:57:46
21    Q.    Have you quit drinking?                  10:57:46
22    A.    As much as I did before, yes.           10:57:48
23    Q.    So, you cut down on your drinking?       10:57:50
24    A.    Yes.                                    10:57:54
```

Patti Blair Court Reporters, p.c.
(312) 782-8376

**[Page 146]**

A. around at people. I was observing him.

Q. Well -- go ahead.

A. I base this on my years of experience as a police officer.

Q. And what about his mannerisms triggered something?

MR. MURRAY: Go ahead.

MR. ALEXANDER: Sorry. Did you answer, sir?

MR. MURRAY: Yes, he did.

MR. ALEXANDER: What did he say?

MR. MURRAY: I'm just kidding.

BY THE WITNESS:

A. Just the way he kept looking at people, watching citizens around the platform.

Q. People-watching?

A. Well, in a manner of speaking. To me, the way his body language was, the way he was looking at people, just in general, like I said, it's my observation based on my years of experience.

Q. Did it have anything to do with the fact that he's black?

A. No.

Q. Have you ever been accused of using racially

**[Page 147]**

A. No.

Q. Never in your whole career?

A. Never.

Q. Do you use any racially derogatory language?

A. No.

Q. So was there anything about his clothes that seemed unusual to you?

A. No.

Q. Did he appear to be carrying any weapons or contraband?

A. I didn't see his pockets, I didn't see any in his hands.

Q. Did you see a bulge that might have indicated a weapon?

A. I didn't get close enough to observe that, sir.

Q. How far away from him were you?

A. Approximately -- there's a platform there, so probably watching him from the other side of the platform, maybe to the right, to the left, might be directly behind him. I didn't stay in one particular spot, okay? I didn't observe him from a stationery location. I walked around him, looked at him, tried

**[Page 148]**

A. to size him up.

Q. So you walked all the way around him?

A. Not all the way around. He was leaning up against a pole.

Q. Okay. And?

A. I was watching him to see if he was smoking, any infractions, as I did with everybody who's on the platform.

Q. But particularly this man?

A. Yes, particularly this man.

Q. Did you notice any infractions while you were there on the platform?

A. Not at that point, no.

Q. And what happened next?

A. I observed him get on the train.

Q. Were you standing with Officer Arnolts at this point?

A. No, I was not.

Q. Where was he?

A. He was on the platform.

Q. How far away from you about?

A. I don't know.

Q. Couldn't see him?

A. I wasn't looking for him, sir.

**[Page 149]**

Q. Okay. And the train, the northbound train, came?

A. Yes.

Q. And what happened?

A. He entered the train.

Q. He, Mr. Hicks?

A. Mr. Hicks entered the train and I entered the train behind him.

Q. A different train?

A. No, the same car on the same train.

Q. The same car on the train? Different door?

A. No, the same door.

Q. You went in behind him?

A. Not directly behind him. I believe there was some other citizens that entered at the same time.

Q. You went in after him?

A. Yes.

Q. Was the train crowded?

A. Not that much. There were still seats available in the first car that we had entered.

Q. Do you know how many cars were in that consist of train?

A. No, I do not.

234

1  They thought I was going to have a heart attack, my

2  blood pressure elevated enough.

3      Q.   Did anyone ever tell that you you did have a

4  heart attack?

5      A.   No.

6      Q.   All right.  Did you do a tactical response

7  report about this incident?

8      A.   No.

9      Q.   Are you sure about that?

10     A.   Yes.

11     Q.   Well, let me show you bates stamped IDL

12  double 07.  Isn't that a tactical response report

13  that appears to be from you?  It's got your name at

14  the top?

15     A.   Yes, it has my name at the top.

16     Q.   Is it your testimony that you've never seen

17  that report?

18     A.   That's correct.

19     Q.   So you did not do that report?

20     A.   No, I did not.

21     Q.   Do you know who did that report?

22     A.   I believe it's down there at the bottom

23  of -- who signed it is down there.

24     Q.   So reporting member Steven T. Regnier

PATTI BLAIR COURT REPORTERS, P.C.  (312)782-8376

235

1  (phonetic)

2      A.   I believe so.

3      Q.   Who's that?

4      A.   I have no idea.

5      Q.   You've never met that man?

6      A.   No.

7      Q.   Never talked to him?

8      MR. BARBER:  To your knowledge.

9  BY THE WITNESS:

10     A.   To my knowledge, no.

11     Q.   Did he ever ask you to review this report?

12     A.   I don't know who that is.  To my knowledge I

13  never saw that report.

14     Q.   Did anyone ever ask you to review a tactical

15  response report?

16     A.   Not to my knowledge.  At some point the

17  nurses at the hospital forbid everybody from coming

18  in to see me.

19     Q.   Everybody?

20     A.   Yes.

21     Q.   Even the FOP guy?

22     A.   Yes.

23     Q.   Well, have you ever done a tactical response

24  report before?

PATTI BLAIR COURT REPORTERS, P.C.  (312)782-8376

236

1      A.   Before the incident?

2      Q.   In your career?

3      A.   I believe once.

4      Q.   What was that incident about?

5      A.   A fight.

6      Q.   What kind of fight?

7      A.   With a mental.

8      Q.   With a mental?

9      A.   Yes.

10     Q.   When did that happen?

11     A.   April of this year.

12     Q.   What happened?

13     A.   I don't understand the question.

14     Q.   Tell me about the incident.  What happened?

15     A.   It was a mental on 26th Street creating a

16  disturbance, shouting at people, cursing at people,

17  urinating on the sidewalk, wouldn't leave the area.

18  Some other officers called for an assist, and they

19  tried to escort him away from the area, and he spat

20  on one, and I was an assist.

21     Q.   Did you use force on him?

22     A.   Did I use force?  I imagine I used some type

23  of force.

24     Q.   Well, what type of force did you use?

PATTI BLAIR COURT REPORTERS, P.C.  (312)782-8376

237

1      A.   Non-deadly.

2      Q.   Could you be more specific?

3      A.   I don't recall exactly what I did, but I

4  helped cuff him, and wrestle him to the ground, I

5  believe.

6      Q.   Was he a black man?

7      A.   I believe he was.

8      Q.   When you say mental, what do you mean by

9  that?

10     A.   They put him in the psychiatric ward of the

11  hospital.

12     Q.   Okay.  So you don't know -- I mean I was

13  going to ask you questions about this tactical

14  response report in this case, but you didn't fill it

15  out, you've never seen it, you don't know anything

16  about it, right?

17     A.   No, sir.

18     Q.   Are you aware that the other three defendant

19  officers had to do tactical response reports?

20     A.   Yes.

21     Q.   Were you curious why you didn't have to do

22  one?

23     A.   No.

24     Q.   Why not?

PATTI BLAIR COURT REPORTERS, P.C.  (312)782-8376

250

1   Q.   Okay.

2   A.   I could have.

3   Q.   Did you have your little citation book with

4 you?

5   A.   Yes, I did.

6   Q.   How many times have you given people

7 citations for passing between "L" cars?

8   A.   Probably -- in the last three years?

9   Q.   Okay.

10   A.   Maybe six.

11   Q.   And what about if we go back before that?

12 Your whole experience with CTA?

13   A.   None.

14   Q.   You mean other than the last three years

15 there were none?

16   A.   That's correct.

17   Q.   And you never tried to arrest anybody for

18 it?

19   A.   No.

20   MR. MURRAY:  Asked and answered.

21 BY MR. ALEXANDER:

22   Q.   The three people you gave citations, were

23 they black or white?

24   MR. BARBER:  I think he said six.

PATTI BLAIR COURT REPORTERS, P.C. (312)782-8376

251

1   MR. MURRAY:  Six in the last three years.

2   MR. ALEXANDER:  Sorry about that.

3 BY MR. ALEXANDER:

4   Q.   The six people you've given citations to for

5 crossing between trains, were they black or white?

6   MR. MURRAY:  Objection.  Assumes they fall

7 under those two categories.

8 BY THE WITNESS:

9   A.   Well.  It's been so long ago, I really can't

10 remember, sir.  It wasn't that significant of an

11 issue in my working there.

12   Q.   Wasn't that significant of their race?

13   A.   It was not significant that I gave them a

14 ticket.

15   Q.   Done any more CTA special employment since

16 the incident?

17   A.   No.

18   Q.   Why not?

19   A.   I choose not to.

20   Q.   Why?

21   A.   I believe those are my personal reasons.

22   Q.   Well, I'm entitled to ask you?

23   A.   Excuse me?

24   Q.   I'm entitled to ask you?

PATTI BLAIR COURT REPORTERS, P.C. (312)782-8376

252

1   A.   And I just told you, I don't feel like it.

2   Q.   Are you refusing to answer?

3   A.   No, I answered you.  I don't feel like

4 working it.

5   MR. BARBER:  He doesn't want to.

6   MR. ALEXANDER:  Got you.

7 BY MR. ALEXANDER:

8   Q.   Can you explain why you don't want to?

9   A.   No.

10   Q.   You didn't see any civilians in the area of

11 the incident?

12   MR. MURRAY:  Asked and answered.

13   MR. BARBER:  That was asked a long time ago.

14 You've asked him that question, and he's answered

15 that question.

16 BY MR. ALEXANDER:

17   Q.   Did you see any?

18   A.   As I said before, no, I wasn't aware of any.

19   Q.   That was a nice summer evening, wasn't it,

20 Officer?

21   MR. BARBER:  Objection, form.

22   MR. ALEXANDER:  You can answer.

23 BY THE WITNESS:

24   A.   Well, from my recollection, it was

PATTI BLAIR COURT REPORTERS, P.C. (312)782-8376

253

1 Springtime, it wasn't summer yet.

2   Q.   May 26, it was a nice May evening, wasn't it

3 Officer?

4   A.   I believe so.

5   MR. MURRAY:  Objection.  Form.

6 BY MR. ALEXANDER:

7   Q.   Wednesday evening on a busy Loop street

8 about 10:30 p.m.?

9   A.   If you say so.

10   Q.   Are you disputing that?

11   A.   I'm not disputing anything.  You're telling

12 me.

13   Q.   And there's a lot of public transportation

14 and bus stops and colleges in the area?

15   A.   And I believe those are closed also.

16   Q.   All of those are closed?

17   A.   The library's closed, the college is closed.

18   Q.   What about the bus stops?

19   A.   I'm -- I wasn't looking so I'm not aware.

20   Q.   Did you see a white man in his 60s at the

21 bus stop observing what was going on?

22   A.   No, sir, I did not.

23   Q.   Did you see people going by with cell phones

24 observing what was going on?

PATTI BLAIR COURT REPORTERS, P.C. (312)782-8376

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION

 3
   BILLIE RAY LEWIS, as Brother,        )
 4 Next Friend, and Special             )
   Administrator of CHRISTOPHER HICKS,  )
 5 deceased,                            )
                                        )
 6              Plaintiff,              )
                                        )
 7      -vs-                            )  04 C 3904
                                        )
 8 CITY OF CHICAGO, and CHICAGO POLICE  )
   OFFICERS L. SOTO, Star 8403;         )
 9 A. PENA, Star 18513; ROBERT ARNOLTS, )
   Star 19998; and BRIAN DEVAN,         )
10 Star 3871,                           )
                                        )
11              Defendants.             )

12        The Deposition of ROBERT ARNOLTS taken

13 before THOMAS A. MANNO, C.S.R., within and for the

14 State of Illinois, pursuant to the provisions of

15 the Federal Rules of Civil Procedure of the United

16 States District Court pertaining to the taking of

17 depositions, taken at 119 North Peoria Street,

18 Chicago, Illinois 60607, Suite 3A, commencing at

19 the hour of approximately 10:00 o'clock a.m. on

20 the 27th day of October, 2004.
```

**Page 2**

```
 1   A P P E A R A N C E S:

 2
       SMITH, COFFEY & ALEXANDER, LTD., By
 3     Mr. Daniel S. Alexander and
       Mr. Phillip L. Coffey
 4     119 North Peoria Street
       Chicago, Illinois 60607
 5     Suite 3A
       312-850-2600
 6
       Appeared on behalf of the Plaintiff.
 7

 8
       CORPORATION COUNSEL, By
 9     Mr. Robert M. Barber and
       Mr. Christopher M. Murray
10     30 North LaSalle Street
       Chicago, Illinois 60602
11     Suite 1400
       312-744-5890
12
       Appeared on behalf of the Defendants
13     City of Chicago, and Police Officers
       Soto, Pena, Arnolts and Devan.
14

15   ALSO PRESENT:

16       L. Soto, A. Pena, and Brian Devan.
```

**Page 3**

```
 1                 I N D E X

 2 WITNESS:                          PAGE:

   Robert Arnolts

   Examination by Mr. Alexander:        6

   EXHIBITS:

   IDL 44                              168
   IDL 45                              168
   IDL 47                              169
   IDL 48                              170
   IDL 51                              171
   IDL 52                              172
   IDL 66                              172
   IDL 69                              174
   IDL 72                              174
   IDL 75                              174
   IDL 82                              176
   IDL 83                              176
   City 126 & 127                      178
   City 178                            184
   IDL 11 & 12                         188
   IDL 15 & 16                         189
   City 493                            219
```

**Page 4**

```
 1      MR. BARBER: We're now on the record
 2 before the deposition of Mr. Arnolts.
 3      MR. ALEXANDER: Mr. Alexander has been claiming that we
 4 haven't given him certain reports.
 5      MR. ALEXANDER: No. Actually I said I
 6 couldn't find certain reports.
 7      MR. BARBER: You were claiming we didn't
 8 give them to you.
 9      MR. ALEXANDER: No, I said I couldn't
10 find them, and I was asking if you guys were sure
11 you gave them to us.
12      MR. BARBER: And I'm sure I gave it to
13 you, and here it is. IDL 00009 is the tactical
14 response report--
15      MR. ALEXANDER: May I see it?
16      MR. BARBER: --from Officer Pena that you
17 were asking about yesterday. You had it in your
18 file yesterday and you got it in your file today.
19      MR. ALEXANDER: Well, I appreciate that.
20 Now, what about this officer's statement?
21      MR. BARBER: Let me see that pile of
22 papers.
23      MR. ALEXANDER: Okay.
24      MR. BARBER: With your big smile on your
```

COPY

EXHIBIT
G

Page 33

1    A. Yes, depending on the situations.
2    Q. When would you wear a uniform as a tac
3  officer in 16?
4    A. When the school teachers are picketing at
5  the college. When different other labor units are
6  on strike.
7    If we're assigned to a separate district,
8  we're usually put in uniform.
9    Q. So like when you're in labor suppression
10 mode, you wear a uniform?
11      MR. BARBER: Objection, form of the
12 question.
13   MR. ALEXANDER: Q. Is it just during labor
14 strikes that you wear a uniform?
15      MR. BARBER: Is that some sort of
16 sarcastic remark?
17      MR. ALEXANDER: I never do that.
18      MR. BARBER: And the laugh that occurred
19 with it?
20      MR. ALEXANDER: Q. Is it generally when
21 there's labor problems that you wear a uniform in
22 16?
23   A. No. I stated that when we're detailed
24 out, we wear a uniform, or for parades in the

Page 34

1  district. Out of the district, we're in uniform.
2    Q. Did you receive any training, for
3  example, when you became a tac officer, about --
4  are there any special considerations when you're
5  effecting an arrest of a citizen and you're not in
6  uniform?
7      MR. MURRAY: Objection, compound form.
8      THE WITNESS: Can you repeat the
9  question?
10   MR. ALEXANDER: Q. Did you receive any
11 training as to whether there were any special
12 considerations when you effect a citizen's arrest
13 when you are not in uniform?
14   A. As far as I know, it's the same.
15      You identify yourself as a police whether
16 you're university uniform or not.
17   Q. So there's no special precautions you
18 need to make when you arrest someone in
19 plainclothes?
20   A. I just make sure I have a star visible
21 and I identify myself.
22   Q. So essentially after your first year -- I
23 just want to make sure I got this all right.
24      After your first year as a probationary

Page 35

1  police officer, you became a tac officer in 16,
2  and you're still there to this day as a tac
3  officer?
4    A. Yes.
5    Q. Have you ever been suspended or had any
6  discipline against you as a CPD officer?
7    A. Yes.
8    Q. How many days were you suspended for?
9    A. I was suspended one time for five days.
10   Q. And the other times?
11   A. I believe I have a day coming, which I
12 haven't received, for a car accident, because I
13 had either two or three within a year's period.
14   Q. Did you get -- like for three accidents
15 in a year, you get a day?
16   A. I'm not sure if it's three or two.
17   Q. Does it matter whether or not the
18 accident is your fault?
19   A. Yes.
20   Q. So they try to make a determination as
21 that who's at fault?
22   A. Yes.
23   Q. That seems fair, doesn't it?
24      The five days suspension -- what was that

Page 36

1  for?
2    A. Allegations that I wrote a parking ticket
3  on a car that wasn't there, and I didn't affix it
4  to the vehicle.
5    Q. And they sustained that allegation?
6    A. The Union and I appealed and won the
7  appeal with the Board.
8      The Superintendent of Police reversed it,
9  and instead of three days, he gave me five days.
10   Q. But in any event, did OPS investigate
11 this, or was it an IAD, or who investigated the
12 allegation?
13   A. Internal Affairs Division.
14   Q. And IAD sustained it? I'm talking about
15 in the beginning now. IAD sustained the
16 allegation?
17   A. Yes.
18   Q. And then the process you just described
19 happened?
20   A. Yes.
21   Q. Was this -- the car that you allegedly
22 wrote the ticket for, was that somebody that you
23 knew?
24   A. No, I did not know him.

Page 49

1   A. Physical arrests?
2   Q. Yes.
3   A. No.
4   Q. What about more than 10?
5   A. I don't believe so, no.
6   Q. So you think it's probably less than 10
7   physical arrests you've made for people crossing
8   between trains?
9   A. Yes, I would believe so.
10  Q. Can you go any further? Can you say 5 to
11  10? You think it's more than 10?
12  A. I have no idea from that point.
13  Q. How many tickets have you issued for
14  people crossing between trains?
15  A. I have no idea.
16  Q. More than 50?
17  A. Again, I have no idea how many I've
18  written.
19  Q. More than 100?
20  A. I have no idea.
21  Q. Do you think you've given 1,000 tickets
22  out?
23  A. I don't believe so, no.
24  Q. Do you think you've given 500 tickets

Page 50

1   out?
2   A. No, I don't believe so.
3   Q. What about 300?
4   A. No, I don't think so.
5   Q. What about 200?
6   A. No, I don't think so.
7   Q. What about 100?
8   A. I don't recall.
9   Q. So it's possible you've given out 100
10  tickets?
11  A. It's possible.
12  Q. Is there some kind of record of the
13  tickets you have written for people crossing
14  between trains?
15  A. The tickets I write are turned in, so
16  they must be stored someplace.
17  Q. Do you show up in court on those tickets
18  that you write?
19  A. Only if I'm notified to appear in court.
20  Q. So they're not given a key date when
21  you're normally in Court?
22  A. They're given the date of my misdemeanor
23  court date.
24  Q. So that's the day you're normally in

Page 51

1   court, right?
2   A. On misdemeanor charges. This is a city
3   ordinance. It goes to 400 Superior.
4   Q. That's where you show up -- 400 West
5   Superior?
6   A. I don't show up.
7   MR. BARBER: Objection. He said he
8   doesn't show up until he's notified.
9   MR. ALEXANDER: Q. When you do show up,
10  that's where you go?
11  A. If I was to be notified.
12  Q. Okay. So you don't have to show up on
13  the first court date when they're up?
14  A. On ordinance violations, when you write
15  ANOV tickets, you don't have to appear in court
16  unless they notify you. It's different than a
17  misdemeanor.
18  Q. Because this is a municipal ordinance?
19  A. Misdemeanor arrests are physical arrests.
20  ANOV's are just tickets that are issued.
21  Q. The arrest you made for people crossing
22  between trains, have those mostly been black
23  people?
24  A. I don't believe so, no.

Page 52

1   Q. So you think it's been mostly white
2   people then?
3   A. I wouldn't be able to know unless I
4   looked at the records.
5   MR. ALEXANDER: I'll get you guys a
6   letter. I'm going to be requesting a search for
7   those tickets -- names and address of people he's
8   ticketed.
9   MR. ALEXANDER: Q. You think you're more
10  inclined to arrest someone for crossing between
11  the trains if they're black, officer?
12  A. No, I do not.
13  Q. Do you keep your arrest reports for
14  anyone you've arrested for crossing between
15  trains?
16  A. Do I keep copies of arrest reports?
17  Q. Yes.
18  A. No, I do not.
19  Q. Do you turn those in to the CTA?
20  A. The arrest reports?
21  Q. Yes. What kind of -- if you arrest
22  somebody for crossing between the trains, what
23  kind of paperwork do you do?
24  A. We do an arrest report and a complaint,

Page 57

1  A. If he's running away, pointing a gun
2  behind him shooting at me.
3  Q. Now, is this the type of offense like you
4  just said, a forcible felony that would justify
5  deadly force for someone running away?
6     MR. BARBER: What offense?
7     MR. ALEXANDER: The one here -- crossing
8  between L trains.
9     THE WITNESS: At the time he was crossing
10 between the cars. He was not running away.
11    MR. ALEXANDER: Q. He did run from you at
12 some point, right, sir?
13    A. Yes, he had.
14    Q. And is the offense he committed of
15 crossing between trains -- is that the type of
16 forcible felony that would allow to you use deadly
17 force to stop someone from fleeing?
18    A. No, it is not.
19    Q. Was Mr. Hicks -- did you notice him have
20 any weapons at any time?
21    A. No. I never saw a weapon.
22    Q. Have you ever been accused of using
23 racially derogatory language to any citizen?
24    A. Yes, I have.

Page 58

1  Q. How many times?
2  A. I can recall -- I recall one, but I can't
3  recall if there's been more.
4  Q. How long ago was that?
5  A. July 3rd, 2003, I believe.
6  Q. What was the allegation in that incident?
7     MR. MURRAY: Objection. It's stated as
8  written.
9     MR. ALEXANDER: Q. You can answer.
10    A. I believe she stated I called her a
11 stupid bitch, and I might have -- I can't recall
12 if she said I called her a nigger. I believe so.
13    Q. Was this was a black woman making the
14 complaint?
15    A. Yes, it was.
16    Q. We should have a CR on that one.
17    Do you associate with any black people
18 outside of work, Officer?
19    A. Yes, I do.
20    Q. Who?
21    A. Fellow police officers.
22    Q. Who?
23    A. Quan Spencer, when I used to go out
24 drinking.

Page 59

1  Q. Where is he?
2  A. He's assigned to the 16th District.
3  Q. Do you have any black officers on your
4  tactical team?
5  A. At this time, no, I do not.
6  Q. How about in the neighborhood where you
7  live? Do you have any black folks there?
8  A. There's some black families in the
9  neighborhood, yes.
10 Q. Do you socialize with them?
11 A. No, I do not.
12 Q. Do you ever use racially derogatory
13 language, officer?
14 A. No, I do not.
15 Q. Did you listen to any tapes in
16 preparation for your deposition today?
17 A. Yes, I have.
18 Q. Which tapes, do you know?
19 A. I believe I heard a tape with a couple of
20 911 calls, and a tape of a Citywide 1 possibly, or
21 another radio frequency.
22 Q. Did you hear a tape of that Position 3
23 that you use when you're in the tunnel?
24 A. No, I don't believe so.

Page 60

1  Q. Have you ever heard a tape of those
2  transmissions?
3     MR. BARBER: What transmissions?
4     MR. ALEXANDER: Good point.
5     MR. ALEXANDER: Q. Did you make any calls on
6  your radio in connection with this incident while
7  you were in the tunnel?
8  A. No, I had not.
9  Q. Did you make any calls on Citywide 1?
10 A. I believe, no, I did not.
11 Q. Did you make any calls, period?
12    MR. MURRAY: Are you talking still in the
13 tunnel?
14    MR. ALEXANDER: No. The whole incident.
15    THE WITNESS: I don't recall if I had or
16 not.
17    MR. ALEXANDER: Q. And if you had made a
18 call, you have already said you didn't make one in
19 the tunnel.
20    So if you did make any radio
21 transmissions, it would have been on Citywide 1;
22 is that true?
23 A. On this date, I don't know if I was at a
24 Citywide radio or a CTA radio.

Page 213

1    Q. Let's go to 276272.
2     Here we've got you and Officer Bacius,
3 accused by Louis Madison on November 13th of '01.
4     MR. BARBER: What's the number there?
5     MR. ALEXANDER: 276272.
6   MR. ALEXANDER: Q. Mr. Madison says that I
7 guess you guys arrested him for drinking on the
8 public way, and you took his keys without
9 inventorying them or returning them. Do you
10 remember that allegation?
11    A. Yes, I do.
12    Q. And what happened with that incident?
13    A. I don't know what it was -- what the
14 outcome was.
15    Q. No. I mean, what happened at the
16 incident itself?
17    A. The subject was walking -- I don't know
18 what street he was walking on -- drinking an
19 alcoholic beverage on the city sidewalk, at which
20 time we stopped and placed him under arrest, and
21 transported him I believe to the 17th District,
22 and processed him.
23    Q. Do you arrest everybody you see walking
24 down the street drinking?

Page 214

1    A. At that time, yes. If they don't have
2 IDs.
3     MR. MURRAY: Objection to form, vague.
4    MR. ALEXANDER: Q. Did Mr. Madison have an
5 ID?
6    A. I don't recall if he did or not.
7    Q. He was a male black, wasn't he?
8    A. I believe so, yes.
9    Q. Let's go to 292166.
10     And in this one, Angie Curington accuses
11 you and Officer Bacius, on September 3rd of '03,
12 well, of some activity relative to her apartment
13 -- searching her apartment. Do you recall
14 anything about this incident?
15    A. No, I do not.
16    Q. Well, she, meaning Angie Curington -- is
17 your partner's name Tom Bacius?
18    A. No, it is not.
19    Q. She said somebody called her saying they
20 were Officer Tom -- that her home had been
21 burglarized, and she had to sign a consent form.
22 Does this ring a bell at all?
23    A. No, it doesn't.
24    Q. Looks like Officer Bacius saying she

Page 215

1 signed a consent-to-search the apartment.
2    A. Was she arrested? Who was the arrestee?
3    Q. I only have the summary sheet. Looks
4 like there was some marijuana found.
5     Luis Delgado is her boyfriend who might
6 have been arrested.
7    A. Luis Delgado.
8    Q. Yes.
9    A. Yes.
10    Q. Do you remember that now?
11    A. I remember Luis Delgado.
12    Q. Well, what happened?
13    A. What's the date on this?
14    Q. This incident is September 3rd, '03.
15    A. I believe Luis Delgado was under arrest
16 for PCS. He had an amount of crack cocaine on
17 him.
18     I believe we went to his residence where
19 he lived with his girlfriend. I don't know what
20 her name is.
21    Q. Maybe that's the complainant here?
22    A. It's possible.
23    Q. And what happened?
24    A. She signed a consent-to-search. We

Page 216

1 explained he's in custody. She signed a
2 consent-to-search. We went there with a
3 Sergeant Mullane and I believe one other officer.
4     She was with us. We did a search of his
5 residence -- the apartment -- recovered a small
6 amount of cannabis. It was taken and inventoried.
7    Q. Is that still illegal?
8    A. What's illegal?
9    Q. Cannabis?
10    A. I don't know. You smoke it?
11    Q. I can't admit to it on the record. All
12 right. Let's see.
13     (Brief pause.)
14     MR. ALEXANDER: Off the record for a
15 second.
16     (WHEREUPON, a discussion was had off
17     the record, after which the
18     deposition continued.)
19     I got your employee complaint history,
20 which thanks to the FOP, only goes back five
21 years. That's for another day. I just need to
22 check and see if we got all these. We got 'em all
23 on the first page.
24     (Brief pause.)

Page 217

1     290725. Here you go. Okay. There's one
2 more that I need to go through with you officer,
3 and I think we're getting close to the end of our
4 little exercise.
5     MR. ALEXANDER: Q. This looks like a
6 complaint by LaDonna Hall. Date of incident, July
7 3rd, '03. Do you remember anything yet?
8     A. Yes. I brought it up earlier.
9     Q. Oh, you did? Which one was this?
10     A. July 3rd of '03, downtown at the
11 fireworks. The July 3rd fireworks.
12     Q. What happened again?
13     A. There was a small kind of a mini riot
14 where people were running around, fighting.
15     MR. MURRAY: Is there a lawsuit pending
16 on this?
17     THE WITNESS: Not that I know of.
18     MR. ALEXANDER: Not yet.
19     THE WITNESS: And we, the police, formed
20 a line, keeping people out of the street.
21     There was at least one or two people in
22 the street that were being placed under arrest.
23     Mrs. Hall kept trying to push her way by,
24 getting by me, keeping her back on the sidewalk,

Page 218

1 at which time she threw a 32-ounce soft drink in
2 my face, at which time I placed her into custody.
3     MR. ALEXANDER: Q. She threw, I take it, the
4 liquid of the soft drink and not the cup?
5     A. The liquid.
6     Q. What did you arrest her for?
7     A. I believe battery to PO.
8     Q. Do you know what happened with that
9 charge against her?
10     A. Last I knew, it went to Branch 46 for
11 trial, and that's the last I've seen of it.
12     Q. Did you testify at the trial?
13     A. I was never called to Branch 46, so I
14 don't know what happened with it.
15     Q. And she's a female black, right?
16     A. Yes.
17     Q. Now, I haven't seen -- ah. Now I see
18 what you're saying.
19     She also accuses you of calling her a
20 nigger and a stupid bitch, and slamming her to the
21 ground, right?
22     A. That's correct.
23     Q. And I take you did deny that?
24     A. I didn't call her a stupid bitch or a

Page 219

1 nigger, but she was placed on the ground and
2 handcuffed.
3     Q. You did put her on the ground?
4     A. That's correct.
5     Q. Did you slam her on the ground?
6     A. She charged at me. I stepped out of the
7 way and pushed her to the ground. There was
8 another officer assisting with the handcuff.
9     Q. She also says that there were officers
10 physically abusing a friend of hers, and she
11 attempted to intervene. That she spilled a soft
12 drink on the officer when the officer pushed her.
13     That's not how you remember it?
14     A. It's not what happened, no.
15     Q. Did Ms. Hall come over to you and explain
16 that her friend had asthma, and that the officers
17 needed to stop kicking him because he could die?
18     A. No, she did not.
19     Q. City 493, is that the arrest report you
20 did for Ms. Hall in that incident?
21     (Document tendered to the witness.)
22     A. Yes. That's correct.
23     (Document tendered to counsel.)
24     Q. Thanks. The people that were rioting in

Page 220

1 the street, were they all black people?
2     A. I can't recall. I believe a large
3 majority of them were different factions of a
4 gang, I think. They were fighting between
5 themselves.
6     Q. And what about them makes you believe
7 they were gang members?
8     A. Some were shouting gang -- I saw hands
9 going up, which, they were giving out gang signs
10 back and forth. They are yelling back and forth,
11 Kings and whatever. I don't know. I can't recall
12 at this time.
13     Q. Where was this fireworks display?
14     A. Taste of Chicago. July 3rd fireworks. I
15 don't know where -- it's right on the lake, I
16 believe. We were assigned to the streets for
17 crowd and traffic control.
18     MR. ALEXANDER: Just give me a minute
19 here to consult with my cohorts.
20     (Brief recess.)
21     MR. ALEXANDER: Q. Other than, you know, what
22 you already testified to, talking with detectives,
23 et cetera, did you give any statements about this
24 incident -- strike that.

**2**

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE NORTHERN DISTRICT OF ILLINOIS
    EASTERN DIVISION
3   BILLIE RAY LEWIS, as brother )
    and next friend, and Special )
4   Administrator of            )
    CHRISTOPHER HICKS, deceased, )
5                               )
6       Plaintiff,              )
                                )
7       -vs-                    ) No. 04 C 3904
8   CITY OF CHICAGO and CHICAGO )
    POLICE OFFICERS L. SOTO,    )
9   Star 84031; A. PENA, Star   )
    18513; ROBERT ARNOLTS,      )
10  Star 19998; and BRIAN DEVAN, )
    Star 3871,                  )
11                              )
12      Defendants.             )
13
14       The Deposition of RICHARD AZTLAN, taken before
15  THOMAS A. MANNO, C.S.R. and Notary Public within and for
16  the State of Illinois, pursuant to the provisions of the
17  Federal Rules of Civil Procedure of the United States
18  District Court, pertaining to the taking of depositions,
19  taken at 119 North Peoria Street, Suite 3-A, Chicago,
20  Illinois 60607, at the hour of approximately 1:30
21  o'clock p.m. on November 26th, 2004.
22
23
24

**2**

APPEARANCES:

2   SMITH, COFFEY & ALEXANDER, LTD., By
    Mr. Daniel S. Alexander
3   119 North Peoria Street
    Chicago, Illinois 60607
4   Suite 3-A
    312-850-2600

        Appeared on behalf of the Plaintiff.

        CORPORATION COUNSEL, By
7   Mr. Robert W. Barber and Mr. Christopher M. Murray
    30 North LaSalle Street
8   Chicago, Illinois 60602
    Suite 1400
9   312-744-5890

10      Appeared on behalf of the Defendants,
        City of Chicago, and Police Officers
11      Soto, Pena, Arnolts, Devan.
12
13
14
15
16
17
18
19
20
21
22
23
24

**3**

1       I N D E X
2   WITNESS:                PAGE:
3   Richard Aztlan
4   Examination by Mr. Alexander    4
5   NO EXHIBITS.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**4**

1           (Witness sworn.)
2           RICHARD AZTLAN,
3   being first duly sworn, was examined and testified as
4   follows:
5           EXAMINATION
6       By MR. ALEXANDER:
7   Q. Could you state your full name, please?
8   A. Richard M. Aztlan, A-Z-T-L-A-N.
9   Q. That's the elusive correct spelling of your
10  name. All right.
11      How are you employed, sir?
12  A. My primary employment is a sergeant of police
13  with the City of Chicago, assigned to the Mass Transit
14  Unit.
15  Q. What's your other employment?
16  A. I'm an adjunct faculty at Westwood College
17  teaching criminal justice. I'm also a licensed private
18  detective.
19  Q. That's a lot to write down.
20      Have you ever given a deposition before?
21  A. Yes, I have.
22  Q. How many times?
23  A. Maybe four.
24  Q. Well, obviously you know you have to answer

**EXHIBIT**
H

74

1  question.
2  THE WITNESS: Usually an ANOV is issued.
3  MR. ALEXANDER: Q. A what?
4  A. An ANOV.
5  Q. An ANOV?
6  A. A-N-O-V.
7  Q. What's that?
8  A. It's a citation that's non-criminal. It's
9  much like a parking ticket, and the ANOV is issued.
10  However, if the individual is unable to
11  provide proper identification, then the individual is
12  arrested physically, and what we call "long form" --
13  charged with the ordinance offense.
14  Q. Do you know what the fine is, normally, for
15  crossing between L trains?
16  A. No.
17  Q. Do you ever just give people a warning like,
18  hey, you're not supposed to do that?
19  A. No.
20  Q. So either they always get a ticket or they're
21  arrested?
22  A. Correct.
23  Q. On those ANOV forms, do you record the race of
24  the person involved? You know, like, drunk white

75

1  I too am a man of color--
2  Q. Is that right?
3  A. --I would ask questions.
4  Q. You consider yourself, what, African-American?
5  A. No. I consider myself Mexican-American. And
6  so does society.
7  Q. And do you experience discrimination because
8  of your color?
9  A. Throughout my career in the employment of the
10  City of Chicago -- I came on this job with a master's
11  degree, and I'm only a sergeant.
12  Q. You might have a good case. What's your
13  master's in?
14  A. Urban Studies, Public Administration, and I
15  got it before I came on the job.
16  Q. I have to say I agree with you.
17  So you're sensitive to the issue, in other
18  words?
19  A. Extremely.
20  Q. Well, do you think it happens that police
21  target people of color?
22  A. Not when I'm supervising them.
23  Q. So do you talk to your officers about that
24  issue?

76

1  suburban guy, something like that?
2  A. I believe we do not, because they are not
3  really criminal.
4  Q. So only if someone's arrested does the race
5  get recorded?
6  A. Yes. Then the race would be recorded.
7  Q. Do you ever take a look and see what the
8  racial configuration of the people that your officers
9  are arresting consists of?
10  A. Arresting physically?
11  Q. Yes.
12  A. I review the reports, and I do note the race.
13  Q. Do you keep records of that?
14  A. No.
15  Q. You just do like a thing in your head and see
16  if it looks like they're only arresting black people?
17  MR. MURRAY: Objection, form.
18  THE WITNESS: That would not be the issue.
19  MR. ALEXANDER: Q. Well, what is the issue?
20  A. The issue is whether they're arresting them
21  for committing an offense.
22  Q. So to you it wouldn't matter if it was only
23  black people being arrested?
24  A. If I saw there were only black people, because

76

1  A. We have, on occasion, discussed it at roll
2  calls.
3  Q. Now, I'm sure you're aware a lot of -- you
4  heard about all the allegations of racial profiling.
5  So I mean, what a lot of municipalities have done is,
6  you know -- they have to record the race of every stop
7  basically, and they can see who their officers are
8  stopping.
9  Have you ever thought anything like that might
10  be appropriate?
11  MR. MURRAY: Objection. Form, foundation,
12  vague.
13  THE WITNESS: We are required to comply with
14  that, and we do on stops that do not result in the
15  issuance of an ANOV or in the issuance of an arrest.
16  We do have what are known as "field contact
17  cards," where we are required to state the race and the
18  probable cause and circumstance that caused the stop.
19  MR. ALEXANDER: Q. And your officers do that?
20  A. Correct.
21  Q. So if they stop someone and, say, gave them a
22  warning, sort of like a white person going through the
23  exit and an alarm goes off and they sort of just wave
24  them through. If they did that, they would have to

**77**

1  write it down; is that right?
2      A.  I would probably discipline them for that.
3      Q.  Do you keep these cards so that you can look
4  at the records?
5      A.  They're submitted to our unit, and then the
6  unit submits them to the department.  We have these
7  field contact cards.  They are issued.
8      Q.  Who keeps them, do you know?
9      A.  I can't tell you, but the statistics are
10  compiled.
11          However, remember, when they're arrested,
12  that's all part of the arrest report.
13      Q.  I understand, except what we don't -- do they
14  do a field contact card if there's an ANOV?
15      A.  No, not on an ANOV.
16      Q.  So we don't know on an ANOV what their race
17  is?
18      A.  No.
19      Q.  Don't you think that's a flaw in the
20  statistical system?
21      A.  It's a non-criminal offense.
22      Q.  Well, you can call it that, but they to have
23  pay a fine, and it's still a non-criminal offense when
24  you arrest them, right, sir?  If they don't have ID's?

**78**

1      A.  Then we charge them with the ordinance
2  violation.  Then it's quasi-criminal at that point
3  because they're physically arrested.
4      Q.  The ANOV is not a charge of a municipal
5  violation?
6      A.  It's an ordinance violation that doesn't
7  involve going to a court, for example.  They would go to
8  a hearing officer.
9      Q.  Do you think Mr. Hicks would have been treated
10  the way he was treated in this case if he was a white
11  suburban?
12          MR. MURRAY:  Objection, speculation.
13          MR. ALEXANDER:  Q.  You can answer.
14      A.  I don't know all the circumstances.
15      Q.  Deputy Chief McNulty -- do you remember seeing
16  him at the hospital?
17      A.  Yes.
18      Q.  Did you talk with Deputy Chief McNulty?
19      A.  Nothing more than, "I'm Sergeant Aztlan, Mass
20  Transit."  That's about it.
21      Q.  Did you see Deputy Chief McNulty talk to Soto
22  or Arnolts?
23      A.  No.
24      Q.  Did you see Pat Camden at the hospital?

**79**

1      A.  I think I saw Pat Camden at the Area.
2      Q.  Area 4?
3      A.  Yes, I think I saw him there.
4      Q.  Was he there with Sid Davis and the
5  detectives?
6      A.  I don't recall.
7      Q.  In case you're wondering what I'm doing, I
8  have every reference to your name by your officers here
9  in their deposition.  That's the beauty of these little
10  indexes they give you.
11          So let's see.  Now I've got -- this is
12  Officer Arnolts saying he went back to 18th and State to
13  drop off the CK squad car.
14          And he went up with the CTA Mass Transit Unit
15  with Sergeant Aztlan, and from there the watch commander
16  asked if everything was okay.  Is that right as far as
17  you know -- your part of it?
18      A.  I don't recall it specifically.
19      Q.  He must be talking about when you guys -- this
20  would be after Area 4, right, when you went back to the
21  station?
22          MR. MURRAY:  Objection, form.
23          MR. ALEXANDER:  Q.  I asked him -- okay.  We're
24  talking about Area 4.  I think he's saying it was like

**80**

1  5:00 or 6:00 in the morning.  It was already light.  It
2  was light out.  He's in Area 4.  He leaves.  It's light
3  out.  He drove back to 18th and State.
4          Is that where you guys are located -- 18th and
5  State?
6      A.  Correct.
7      Q.  He went up into the CTA Mass Transit Unit with
8  Sergeant Aztlan.  So you don't recall that?
9      A.  No, I don't.  If he was turning the car in, it
10  was the end of the tour.  That was the end.  It was
11  done.
12          I don't know whether he drove himself to
13  Area 4, or how he got back.  I don't recall.
14      Q.  This is Soto.  Soto says, if I had my cell
15  phone, I probably called him, meaning you, at the scene.
16          Do you remember if he called you or you think
17  you called him?
18      A.  I can't tell you.
19      Q.  He says he had your cell number.
20      A.  Everybody has my cell number at roll call.
21          We do this because the radios are often off,
22  because they're on CD.  So they're riding around the
23  trains.
24      Q.  CD means "batteries"?

**ORIGINAL**

1

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3  BILLIE RAY LEWIS, as Brother, )
    Next friend, and Special      )
 4  Administrator of CHRISTOPHER  )
    HICKS, deceased,              )
 5                                )
             Plaintiff,           )
 6                                )
         vs.                      )  No. 04 C 3904
 7                                )  Hon. Suzanne Conlon
    CITY OF CHICAGO, and CHICAGO  )
 8  POLICE OFFICERS L. SOTO, Star )
    8403, A. PENA, Star 18513,    )
 9  ROBERT ARNOLTS, Star 19998,   )
    and BRIAN DEVAN, Star 3871,   )
10                                )
             Defendants.          )
11
12        The deposition of LAURA P. SORIA, taken

13  pursuant to the Federal Rules of Procedure, before

14  Kathleen A. Hilgard, C.S.R. No. 084-004093, Certi-

15  fied Shorthand Reporter within and for the County

16  of Cook, State of Illinois, at 30 North LaSalle

17  Street, Suite 1400, Chicago, Illinois, on the 28th

18  day of December 2004, pursuant to subpoena.

19        APPEARANCES:

20           ALEXANDER & ASSOCIATES, LTD., by
             MR. DANIEL S. ALEXANDER
21           MR. CHRISTOPHER R. SMITH
             (119 North Peoria Street, Suite 3A
22            Chicago, Illinois  60607)
                appeared on behalf of the plaintiff;
23
24
```

---

**Page 2**

```
 1  APPEARANCES:  (Cont'd.)

 2           HONORABLE MARA S. GEORGES
             CORPORATION COUNSEL, by
 3           MR. CHRISTOPHER M. MURRAY
             Assistant Corporation Counsel
 4           (30 North LaSalle Street, Suite 900
              Chicago, Illinois  60602-2340)
 5             appeared on behalf of the defendant
               City of Chicago;
 6
             MR. ROBERT W. BARBER
 7           Special Assistant Corporation Counsel
             MS. MARY McDONALD
 8           Assistant Corporation Counsel
             (30 North LaSalle Street, Suite 1400
 9            Chicago, Illinois  60602-2502)
               appeared on behalf of the defendants
10             Chicago Police Officers L. Soto, Star
               8401, A. Pena, Star 18513, Robert
11             Arnolts, Star 19998, and Brian Devan,
               Star 3871.
12
13                 *  *  *  *  *  *  *
14
```

---

**Page 3**

```
 1                    I N D E X

 2  Witness:                             Page

 3  LAURA P. SORIA

 4      EXAMINATION BY:

 5      MR. BARBER .......................... 4
 6      MR. MURRAY .......................... 53
        MR. ALEXANDER ....................... 61
 7
        FURTHER EXAMINATION BY:
 8
        MR. BARBER .......................... 74
 9      MR. ALEXANDER ....................... 78
        MR. BARBER .......................... 82
10      MR. MURRAY .......................... 86
11
12
13
14
15                E X H I B I T S
16  Number:                    Marked for Id.
17      1 ............................... 8
        2 ............................... 51
18      3 ............................... 64
        4 ............................... 73
19
20
21
22
23
24
```

---

**Page 4**

```
 1                 (Witness sworn.)

 2              LAURA P. SORIA

 3  called as a witness herein, having been first duly

 4  sworn, was examined and testified as follows:

 5                    EXAMINATION

 6  BY MR. BARBER:

 7       Q.   Okay.  Ma'am, would you state your

 8  name, please?

 9       A.   Laura P. Soria, middle initial is

10  Pilar.

11       Q.   I'm sorry?

12       A.   Middle initial is Pilar.

13       Q.   And your -- how do you spell your last

14  name?

15       A.   S as in Sam, o-r-i-a.

16       Q.   Okay.  You're here this afternoon for

17  your deposition concerning events that you saw on

18  May 26th, 2004.

19            If at any time this afternoon my

20  questions or the questions of any of the other

21  attorneys here don't make any sense to you, if you

22  can't understand them or whatever, please let us

23  know so that we can clarify the question.

24       A.   Okay.
```

**EXHIBIT
I**

1    MR. ALEXANDER:  Okay.  I'm ready for the
2  tape.
3    MR. SMITH:  Okay.
4        (Tape playing.)
5    EMERGENCY OPERATOR:  Chicago emergency,
6  Wilson.
7    FEMALE CALLER:  I just wanted to report a
8  fight on Congress and State.  I was just driving in
9  my car and there's --
10   EMERGENCY OPERATOR:  How many people are
11 fighting?
12   FEMALE CALLER:  Three people.  Two guys have
13 a guy -- a guy on the floor in a choke hold.  I
14 just wanted to report it.
15   EMERGENCY OPERATOR:  Do you know if they're
16 male white, black, or Hispanic?
17   FEMALE CALLER:  Two white men and a black
18 male.
19   EMERGENCY OPERATOR:  Congress and State.
20   FEMALE CALLER:  Yeah.
21   EMERGENCY OPERATOR:  Was it two male whites
22 or two -- or one male white and one male black?
23   FEMALE CALLER:  Two male whites on -- on a
24 male black.  They had the male, he's black or

URLAUB, BOWEN & ASSOCIATES, INC.
(312) 781-9586

---

1  Hispanic, in a choke hold.
2    EMERGENCY OPERATOR:  Okay.  I'll send the
3  police.
4    FEMALE CALLER:  Thank you.  Bye.
5        (Stop tape.)
6    THE COURT REPORTER:  Let me just tell you, I
7  didn't -- the operator, I could hardly hear her.
8  So I'm --
9    MR. ALEXANDER:  You know, the reason I didn't
10 ask you to do it is because it's so hard to hear,
11 and I believe Mr. Barber said do the best you can
12 do.  So I -- you know, I don't think it should have
13 been transcribed.  I mean, the tape speaks for
14 itself, but ...
15   MR. BARBER:  We can give you -- and take this
16 down.  We can give you a copy of the tape when you
17 type up the transcript of the deposition.  That
18 would be helpful?
19   THE COURT REPORTER:  Yes.
20 BY MR. ALEXANDER:
21   Q.    I -- as I was listening to the tape, I
22 heard your words to -- you said on top of a black
23 man on the floor, I think were your words.  Did you
24 hear that, ma'am?

URLAUB, BOWEN & ASSOCIATES, INC.
(312) 781-9586

---

71

1    A.   I heard that, but it also said on the
2  ground as well.
3    Q.   Oh, okay.  And that was -- and you were
4  saying that to the 911 caller as you were observing
5  it, right, ma'am?
6    A.   Yes.
7    Q.   And -- okay.
8    MR. BARBER:  Well, I'm going to object to
9  that.  She said she wasn't sure whether she said it
10 as she was observing it or she said it after she
11 observed it later on.
12   MR. ALEXANDER:  You can object.  I asked some
13 follow-up questions, so, you know, that's what I
14 do.
15   MR. BARBER:  Okay.
16 BY MR. ALEXANDER:
17   Q.   All right.  So --
18   MR. BARBER:  But what you are doing is
19 misstating her previous testimony.
20   MR. ALEXANDER:  That's not correct, actually.
21 I didn't say that you previously said blah-blah-
22 blah; I asked her a new question.
23   MR. BARBER:  Okay.
24   MR. ALEXANDER:  You're entitled to do the

URLAUB, BOWEN & ASSOCIATES, INC.
(312) 781-9586

---

72

1  same too.
2    MR. BARBER:  Okay.
3  BY MR. ALEXANDER:
4    Q.   Did I -- I know I started to, did I ask
5  you this:  You didn't make any other 911 calls that
6  day or evening?
7    MR. MURRAY:  Asked and answered.
8    MR. ALEXANDER:  I thought I asked her that.
9  I wasn't sure.
10 BY MR. ALEXANDER:
11   Q.   And it's fair to say that you did not
12 see the -- I'm reading, actually, paragraph 3, you
13 did not see the black man trying to hit the -- the
14 white men at all, did you, ma'am?
15   A.   No.
16   Q.   I mean, that -- that -- I know it's
17 true that our voices sound a little different when
18 they're played back on tape, but you recognize this
19 to be your 911 call, don't you, a tape of it,
20 ma'am?
21   A.   Yes.
22   Q.   Okay.  When you -- after you did the
23 U-turn and came back on the scene, did you stop
24 your car or did you just keep on driving?

URLAUB, BOWEN & ASSOCIATES, INC.
(312) 781-9586

1    TRANSCRIBED FROM DIGITAL RECORDING

2          IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION

4    BILLIE RAY LEWIS, as brother,      )  No.  04 C 3904
    Special Administrator of deceased,   )
5                           )
           Plaintiff,           )
6                           )
           vs.               )
7                           )
    CITY OF CHICAGO, et al.,        )  Chicago, Illinois
8                           )  May 12, 2005
           Defendants.         )  8:34 A.M.
9

           TRANSCRIPT OF PROCEEDINGS - Motion
10    BEFORE THE HONORABLE SIDNEY I. SCHENKIER, Magistrate Judge

11   APPEARANCES:

12   For the Plaintiff:        THE LAW OFFICES OF SMITH
                          & COFFEY, LTD.
13                      119 North Peoria
                     Suite 3A
14                      Chicago, Illinois  60607
                     BY:  MR. CHRISTOPHER RUDOLF SMITH
15

    For Defendant City:       CITY OF CHICAGO, DEPARTMENT OF LAW
16                      30 North LaSalle Street
                     Suite 900
17                      Chicago, Illinois  60602
                     BY:  MR. CHRISTOPHER MICHAEL MURRAY
18

    For Individual Defendants:   CORPORATION COUNSEL'S OFFICE
19                      30 North LaSalle Street
                     Suite 1400
20                      Chicago, Illinois  60602
                     BY:  MS. MARY SARA McDONALD
21

           PAMELA S. WARREN, CSR, RPR
22           Official Court Reporter
         219 South Dearborn Street
23                Room 1928
         Chicago, Illinois   60604
24             (312) 294-8907

25   **NOTE:**  Please notify of counsel speaker identification.

**EXHIBIT**

J

1  or no.

2       MR. SMITH:  The defense would say no to that.

3       THE COURT:  Okay.

4       MR. SMITH:  We would say yes to it even though it

5  probably doesn't involve our particular client.

6       THE COURT:  Uh-huh.

7       MR. SMITH:  Because in this case we -- if I can give

8  you some history of the facts in terms of --

9       THE COURT:  Sure --

10      MR. SMITH:  -- we were first being told that this was

11 an incident that started where a man went from one train car to

12 another.

13      THE COURT:  Can I ask a question?

14      MR. SMITH:  Yes.

15      THE COURT:  Tell me how you think it advances the

16 case.

17      MR. SMITH:  Well, Judge, because it -- we think that

18 it may show a pattern that these officers were out there that

19 day stopping people on -- based on profiling and without any

20 basis.  And they did a number of stops without any real arrests

21 or reports of crimes within this two-hour time period.  And we

22 have gotten one of them, and it reflects almost a similar

23 incident in a sense to the situation we have here.  Now we

24 don't have a resulting death at the other end of it --

25      THE COURT:  Your claims here don't involve wrongful

1   arrest.  They don't involve false arrest.  You have an

2   excessive force claim.  You have a wrongful death claim.  You

3   have a Monell claim against the city with respect to failure to

4   retrain.  You don't have in the case a claim that says the

5   person was wrongfully encountered.

6          So how does -- let's assume that people were stopping

7   people and they shouldn't have been doing that.  How does that

8   advance your claim here that there was excessive force used in

9   this encounter?

10         MR. SMITH:  Well, Judge, in our view the -- what

11  happens preceding the excessive force is certainly relevant to

12  the force.  A police officer has the right to escalate force.

13         THE COURT:  Well, look, what was happening preceding

14  to this encounter?

15         MR. SMITH:  Yes.

16         THE COURT:  All right.

17         MR. SMITH:  Well, I --

18         THE COURT:  Anything that the police officer -- what

19  if a police officer was having an affair, and he came from

20  having the affair to this encounter, would that be relevant?

21         MR. SMITH:  No, I'm agreeing with you in that.

22         THE COURT:  Okay.

23         MR. SMITH:  And now -- when I say anything relevant, I

24  am talking about relevant to this incident between Mr. Hicks

25  and the arresting officers.

1    THE COURT:  Okay.

2    MR. SMITH:  We would suggest that anything would be

3  relative -- relevant to that.  But I do believe that

4  essentially -- it may not be admissible, but it certainly is

5  something that we can explore --

6    THE COURT:  Okay.

7    MR. SMITH:  -- the behavior of those officers,

8  including the fact that there may be witnesses to the behavior

9  of those officers and what they were acting like and doing that

10  day.  Who knows, maybe even they might be witnesses to what

11  happened to Mr. Hicks.

12    THE COURT:  Who knows.

13    MR. SMITH:  And --

14    THE COURT:  Discovery is over.  Your motion is denied.

15    MR. SMITH:  Thank you, Judge.

16    MS. McDONALD:  Thanks, Judge.

17    MR. MURRAY:  Thank you.

18    THE COURT:  We have a -- and I will terminate the

19  referral for this particular motion, which was the referral

20  dated May 9th, I think.  We have the matter also up for a

21  settlement conference.

22    MR. SMITH:  Yes, Judge.

23    THE COURT:  We have the date June 3rd.

24    MR. MURRAY:  That's correct.

25    THE COURT:  Everybody in line for that?

```
1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION
3
   BILLIE RAY LEWIS, as Brother,      )
4  Next Friend, and Special          )
   Administrator of CHRISTOPHER       )
5  HICKS, deceased,                   )
                                      )
6               Plaintiff,            )
                                      )
7             vs.                     )  No. 04 C 3904
                                      )  Honorable
8  CITY OF CHICAGO, and CHICAGO       )  Suzanne Conlon
   POLICE OFFICERS L. SOTO,           )
9  Star 8403, A. PENA, Star 18513,    )
   ROBERT ARNOLTS, Star 19998, and    )
10 BRIAN DEVAN, Star 3871,            )
                                      )
11              Defendants.           )
12
13          The deposition of JESSE HALL, M.D., taken
14  pursuant to notice, before Marcia Yoshizumi, CSR
15  No. 84-003537, Certified Shorthand Reporter and
16  a notary public within and for the County of Cook,
17  State of Illinois, at 5839 South Maryland,
18  Room W656, Chicago, Illinois, on January 25th,
19  2005.
20       APPEARANCES:
21            SMITH, COFFEY & ALEXANDER, LTD., by
              MR. DANIEL S. ALEXANDER
22            (119 North Peoria Street
                Chicago, Illinois  60607)
23                appeared on behalf of the plaintiff;
24
```

EXHIBIT

K

Page 30

1  missing, is it, Doctor? It was recovered in the
2  hospital and inventoried, correct?
3     A.  Yes.
4     Q.  It was recovered by two hospital
5  technicians from Mr. Hicks' mouth at the hospital.
6        MR. ALEXANDER: Are you asking him if he
7  knows that? Personal knowledge of that?
8  BY MR. BARBER:
9     Q.  Well, have you seen that in the
10 records?
11    A.  It's been alluded to, yes.
12    Q.  Okay. And just, you know, to end this
13 particular series of questions, Ericka Stewart
14 did testify that her boyfriend, Christopher Hicks,
15 always was chewing a straw and had it wadded up in
16 his mouth; is that correct?
17    A.  She said she frequently observed that,
18 correct.
19    Q.  And she told him on occasion that he
20 should stop doing that, because he's going to choke
21 to death, correct?
22    A.  She indicated that. Her expertise in
23 making that judgment I believed to be not high.
24    Q.  Okay. Well, I mean, I would never

Page 31

1  have even -- I wouldn't have even raised the straw
2  issue, except that you raised it. And so I'm
3  just --
4        MR. ALEXANDER: Sure.
5  BY MR. BARBER:
6     Q.  -- you know, asking a few follow-up
7  questions about it. Okay? Is that fair?
8     A.  You have every right to ask any
9  question you'd like to.
10    Q.  Were you in the military?
11    A.  Yes.
12    Q.  What branch were you in?
13    A.  The Air Force and the National Security
14 Agency.
15    Q.  And you went into the military right
16 after high school?
17    A.  Yes.
18    Q.  Were you trained to do CPR in the
19 military?
20    A.  Yes.
21    Q.  Was that in your basic training?
22    A.  It was -- I don't actually recall if it
23 was in basic training or in flight school. Since
24 I was an airborne translator, my recollection, it

Page 32

1  was actually after basic training. But I'm just
2  fuzzy.
3        I know there was a CPR course.
4     Q.  Okay. Do --
5     A.  In my vague memory, it was -- it was in
6  part compelled by flight status.
7     Q.  Okay. And you were an enlisted man in
8  the Air Force?
9     A.  Yes.
10    Q.  And you were in approximately four
11 years?
12    A.  Yes.
13    Q.  And during those four years, were you
14 on flight status the entire time?
15    A.  Not the entire time. I think for
16 somewhere between 18 to 24 months.
17    Q.  Do you recall how long the training was
18 in CPR in the Air Force?
19    A.  No.
20    Q.  Was it like a block of training on one
21 particular day?
22    A.  I really don't recall.
23    Q.  Okay. And did you receive training
24 more than once in CPR in the Air Force?

Page 33

1     A.  I don't recall.
2     Q.  I'm sorry?
3     A.  I don't recall.
4     Q.  Were you certified in CPR as a result
5  of your training in the Air Force?
6     A.  I don't recall what the assessment was
7  following the training period.
8     Q.  What -- I don't understand what that
9  means. What do you mean the assessment following
10 the training period?
11    A.  More recent in my memory has been
12 certification by formal American Heart Association
13 courses, which I have taken over the years once
14 entering the health care field, from medical school
15 on. And they actually have, as part of that
16 course, a formal assessment which leads to your
17 certification, which is the performance of basic
18 CPR on a simulator.
19        So I don't recall as far back now,
20 some 30 years ago, in the Air Force whether we
21 simply had a course or whether the course completed
22 with someone's judgment about whether you were
23 doing it properly on a simulator or not.
24    Q.  Okay. So I understand, you don't --

9 (Pages 30 to 33)

Page 34

1  what you're saying is you don't recall whether you
2  were certified in CPR, or if you were, I guess --
3      MR. ALEXANDER: I think it's answered.
4  BY MR. BARBER:
5      Q.  -- rated or scored --
6      A.  Correct.
7      Q.  -- on your training.
8      A.  Correct.
9      Q.  Okay. Now, during the four years that
10  you were in the Air Force, did you ever have an
11  occasion to perform CPR on an emergency basis?
12      A.  No.
13      Q.  During the four years that you were in
14  the Air Force, did you ever receive recertifica-
15  tion -- retraining in CPR after the first training
16  you received?
17      A.  I don't recall. The Air Force has many
18  things you just do automatically on schedule, so
19  you just go do them.
20      Q.  But as you sit here today, you can't
21  state if you did or you didn't.
22      A.  I don't recall.
23      Q.  Okay. Have you had -- did you receive
24  training in medical school in pathology?

Page 35

1      A.  Yes.
2      Q.  Did you receive training in forensic
3  pathology in medical school?
4      A.  No.
5      Q.  Okay. Now, what was the extent of your
6  training in pathology during medical school?
7      A.  One takes a full quarter course at this
8  medical school that is titled Clinical Pathologic --
9  Pathophysiologic Correlation, or CPP. And for
10  between four to six hours a day, five days a week,
11  for an entire quarter, you'd correlate slides to
12  disease processes to the physiologic and patho-
13  physiologic consequences of what you were seeing
14  and what the disease processes are.
15      In advance of that, you actually
16  have a histology course, which just gets you famil-
17  iar with the nature of normal tissue structure,
18  appearance, and the approaches to analyze tissue
19  specimens. That would be core information that
20  anybody would take.
21      Then in the course of your ongoing
22  clinical training, assuming that you weren't, in
23  fact, specializing in pathology in any way, it
24  would be common on other clinical rotations to

Page 36

1  review pathology material, which continues on into
2  your life as a practitioner. So I still regularly
3  review pathology material relevant to the people
4  I'm caring for, the predominance of that material
5  being lung material, because that is a good deal of
6  what I do.
7      Q.  And when you say "pathology material,"
8  what are you referring to?
9      A.  Tissue specimens.
10      Q.  Okay. You're not actually doing post-
11  mortem examinations on deceased humans.
12      A.  I haven't participated in a postmortem
13  exam, other than as an observer, since medical
14  school.
15      Q.  Okay. And I think you already said
16  that you had not been trained in forensic pathology;
17  is that correct?
18      A.  Correct.
19      Q.  On your c.v., which we have marked as
20  Exhibit No. 1 -- actually, the June 2004 one that
21  we marked, there are many publications.
22      Do any of these publications relate
23  to any of the issues that we're dealing with in
24  this particular case?

Page 37

1      A.  The publication globally relevant to
2  the case would be reference 232 and 235, which is a
3  textbook of critical care medicine. That includes
4  chapters on cardiopulmonary resuscitation, causes
5  of respiratory failure.
6      MR. ALEXANDER: Can I -- can I have you check
7  that against the new one and make sure we've got
8  the right names?
9      THE WITNESS: Well, the numbers would be
10  different --
11      MR. ALEXANDER: Okay.
12      THE WITNESS: -- because the numbering is
13  what changes over time.
14      MR. BARBER: Right.
15      THE WITNESS: And you handed me something
16  marked Exhibit 1, and it's from June, and those
17  references are 232 and 235, which is Hall, Schmidt,
18  and Wood, Principles of Critical Care, McGraw-Hill.
19  And 232 was published in 1992 and 235 was published
20  in 1998.
21      MR. BARBER: Okay. I don't -- I don't mean
22  to confuse things. The only c.v. I had was the
23  June 2004 one.
24      MR. ALEXANDER: That's the only one we had

Deposition of JESSE HALL, M.D., 1/25/2005

Page 46

1    Q.   Well, it's a term that's used in the
2  postmortem examination.
3    A.   Which is not to say it's not a lay
4  term.
5    Q.   Okay.
6    A.   If you pick up Gray's Anatomy textbook
7  and look up "back," you would probably be referred
8  to caudad segment of the body or posterior spine or
9  posterior cervical region. So "back" maybe to the
10  lay public means anything from the back of your
11  neck down to the tip of your spine.
12    Q.   Okay. Well, let's use that, the back
13  of your neck down to the tip of your spine.
14        Externally, there were no signs of
15  any injury to that area of the body, correct?
16    MR. ALEXANDER:  Are you excluding the limbs
17  and the hips?
18  BY MR. BARBER:
19    Q.   That -- Doctor, you're not including
20  the limbs and the hips in your definition of the
21  back, are you?
22    A.   No.
23    Q.   Okay.
24    MR. ALEXANDER:  It's good to be clear.

Page 47

1        And you're talking about visible,
2  right?
3    MR. BARBER:  That was the question.
4    MR. ALEXANDER:  I guess whether it's visible
5  externally, I guess, would be the --
6    MR. BARBER:  That actually was the question.
7    MR. ALEXANDER:  Okay. Good job.
8    THE WITNESS:  Nothing listed under External
9  Evidence of Injury.
10  BY MR. BARBER:
11    Q.   Okay. So when you say that the injury
12  in the truckdriver case where the person was
13  sandwiched between two semis, and he had a -- had
14  a crushing injury to the chest, you said it was
15  similar to the injuries in this particular case,
16  what injuries are you talking about?
17    MR. ALEXANDER:  No, he didn't say that --
18    THE WITNESS:  I didn't say that. If you
19  somehow construed me to say that, I apologize.
20    MR. BARBER:  Okay.
21    THE WITNESS:  But I actually believe that I
22  didn't say that. And I was commenting exclusively
23  on the other case, which I find shares little with
24  this one.

Page 48

1        We could continue to pursue it, but
2  I --
3    MR. BARBER:  Oh, all right. I'm sorry.
4    THE WITNESS:  You just asked me about
5  instances of asphyxia, and so I've tried to do my
6  best. You also asked, had I ever had a similar --
7  a case regarding asphyxia during police restraint
8  or words to that effect, and I said no. And so
9  I've just tried to complete the other matters
10  concerning asphyxia.
11    MR. BARBER:  Okay.
12    THE WITNESS:  That would be the complete
13  list.
14  BY MR. BARBER:
15    Q.   Okay. And I guess I misunderstood you.
16  I thought you were saying there was -- there were
17  injuries that were similar to the injuries here.
18    A.   All I said was that a contusion of a
19  muscle under the microscope has the same appearance
20  whether it would be due to a blow to the muscle, a
21  crush injury to the muscle, a strangulation. All
22  of those fall in the category of a blunt trauma.
23        While the truck accident had both
24  obvious external and internal injuries, sometimes

Page 49

1  the contusion is limited to an internal injury of
2  the muscle. In other words, there can be contusion
3  without an external manifestation of it, particu-
4  larly if it has occurred relatively shortly before
5  death, because contusion takes some period of
6  time to manifest itself. All of us who have been
7  bruised have probably watched the bruise grow for a
8  period of time, and you need to be alive for it to
9  grow.
10    Q.   Okay. And in terms of the cases that
11  you've worked on before -- or the cases that you've
12  worked on in addition to this case, have you ever
13  been involved in a case where the issue was police
14  officers not rendering CPR? I'm not talking about
15  paramedics. I'm talking about police officers.
16    A.   No.
17    Q.   Approximately how many medical-legal
18  cases do you consult on in a year?
19    A.   About a dozen, I'd say.
20    Q.   And what percentage of your income is
21  derived from consulting on these cases?
22    A.   I don't know as a percent of my income.
23        I keep the total amount of consulta-
24  tion time to 10 percent or less of my total time.

Page 102

1 Q. Okay. Including the back.
2 A. Yes.
3 Q. And that's using the laymen's term
4 "back."
5 Okay. What did Officer Arnolts do?
6 Putting aside CPR, what did Officer Arnolts do in
7 relation to the significant compression of the
8 structures of the neck?
9 A. I don't have any information specifi-
10 cally about his involvement in the -- in the direct
11 compression of the structures of the -- neck.
12 To the extent that he maintained
13 Mr. Hicks' body in an immobilized position from
14 whatever vantage point he had that made it
15 mechanically more possible for compression to
16 be applied to the anterior neck, then there would
17 be an involvement, conscious or not, in what
18 happened.
19 Q. Okay. And it's your opinion, I guess,
20 that based on your review of the material in this
21 case that it's Officer Soto that applied the
22 pressure that compressed the structures of the
23 neck resulting in the asphyxiation.
24 MR. ALEXANDER: I'm going to object to that.

Page 103

1 That's based on the officer's own testimony at
2 deposition. So he's not even -- it's not a fair
3 question.
4 THE WITNESS: Again, I think if you're begin-
5 ning by excluding the issue of CPR --
6 MR. BARBER: Yes.
7 THE WITNESS: -- and you are -- or you are
8 requesting me to rely entirely on the testimony
9 that I have seen to date, then it would appear from
10 that testimony that Officer Soto applied the direct
11 compressive force on the structures of the neck.
12 BY MR. BARBER:
13 Q. Do you have any -- is it your opinion
14 that Officer Soto in his description of the -- of
15 his encounter with Christopher Hicks is not telling
16 the truth --
17 MR. ALEXANDER: I'm going to object.
18 BY MR. BARBER:
19 Q. -- based on your review of the informa-
20 tion you've been given?
21 MR. ALEXANDER: How would he know?
22 THE WITNESS: I have no information to make
23 that judgment.
24

Page 104

1 BY MR. BARBER:
2 Q. You mentioned congestion of the lungs
3 at some point during your testimony today.
4 What is the significance of conges-
5 tion in the lungs?
6 MR. ALEXANDER: Other than what he -- do you
7 want him to repeat his testimony?
8 MR. BARBER: Well, I don't know that we asked
9 any questions about the congestion in the lungs.
10 MR. ALEXANDER: He explained why he thought
11 it was significant.
12 BY MR. BARBER:
13 Q. Okay. I'm sorry. Could you just very
14 briefly explain again.
15 MR. ALEXANDER: I can tell you what he said.
16 THE WITNESS: I believe I --
17 MS. PASCALE: He can tell us.
18 THE WITNESS: -- stated -- I believe I stated
19 and will state again that when significant effort
20 is made, particularly by a vigorous individual, to
21 breathe against an obstructed airway, it is common
22 for that large drop in pressure inside the chest
23 cavity generated by breathing effort against an
24 occluded airway to cause an increase in blood

Page 105

1 return into the lungs and an edema formation in
2 the lung, even over a relatively brief period of
3 time. So to the eye of the pathologist, this
4 would manifest as lung congestion.
5 BY MR. BARBER:
6 Q. I assume that there are other causes
7 of congestion in the lungs just generally, as a
8 general statement.
9 A. As a general statement, there are.
10 Q. In this particular case, are there any
11 factors present that could be the cause of the
12 congestion in the lungs, other than the occlusion
13 of the air passage?
14 A. CPR, at least if it is conducted
15 promptly upon cessation of cardiac function, can be
16 associated with congestion in the lungs.
17 Now, of course, here, there's some
18 hiatus between the arrest that Mr. Hicks has and
19 the institution of CPR, and that may have an impact
20 how likely CPR is to be an explanation for the
21 congestion.
22 Q. But it is a possible explanation.
23 A. It is a possible explanation.
24 Q. Are there any other factors present in

27 (Pages 102 to 105)

Page 106

1  this case, other than CPR and the occlusion of the
2  airway, that would be a cause of congestion in the
3  lungs?
4      A.  No.
5      Q.  Pardon?
6      A.  No.
7      Q.  You talked about the -- we talked about
8  the hemorrhage to the left sternohyoid muscle.
9          Now, you said that that's evidence
10  of trauma, correct?
11      A.  Yes.
12      Q.  Okay.  And you indicated that you think
13  the trauma was caused by pressure on the structures
14  of the neck.
15      A.  I believe with utter certainty that
16  external forces were applied to that muscle at some
17  point shortly before his death.
18      Q.  Okay.  And that the force could be a
19  blow to the neck during the struggle with Mr. Hicks,
20  correct?
21      A.  Could be.
22      Q.  And it could -- it could have nothing
23  to do with compressing the neck structures during
24  the struggle, correct?

Page 107

1      A.  That is possible.
2      Q.  Now, you also mentioned petechiae.
3          I don't know if I asked you, but if
4  I did, if you could just very briefly answer the
5  question again:  What is your opinion of the cause
6  of the petechiae in this particular case?
7      A.  The act of asphyxiation.
8      Q.  Is there any other cause of petechiae,
9  just as an general matter?
10      MR. ALEXANDER:  Objection.
11  BY MR. BARBER:
12      Q.  Not -- just general.  Not limiting to
13  anything in this case.
14      MR. ALEXANDER:  Objection; incomplete
15  hypothetical.
16      THE WITNESS:  Any causes of petechiae?  You
17  now want a list of any cause of petechiae?
18  BY MR. BARBER:
19      Q.  Well, there are other causes.
20      A.  Sure.
21      Q.  Okay.  And what are some of the causes?
22      A.  Coagulopathies that make you more
23  likely to bleed in various parts of your body.
24      Q.  Okay.

Page 108

1      A.  Severe coughing.
2      Q.  All right.
3      A.  Elevation -- other causes apart from
4  coughing that elevate your interthoracic pressure,
5  like being on a mechanical ventilator.
6      Q.  Okay.
7      A.  Those are the main causes.
8      Q.  Can a rise in blood pressure cause
9  petechiae?
10      A.  Yes, a hypertensive crisis could do it.
11      Q.  And is it fair to say that during the
12  struggle with -- that Mr. Hicks was engaged in with
13  the police officers, that his blood pressure was
14  elevated?
15      A.  Well, we don't know how much it was
16  elevated.  No one measured it.
17          But in exercise, your blood pressure
18  does go up.  It's distinctly rare for even highly
19  exercising individuals to hemorrhage into their
20  eyes.
21      Q.  How about in a situation where you're
22  in -- in a fight-or-flight situation where it's
23  extremely stressful, the adrenalin is rising, the
24  blood pressure is rising.  Is it possible that in

Page 109

1  that situation, the blood pressure could rise
2  sufficiently to cause petechiae?
3      MR. ALEXANDER:  Objection; incomplete
4  hypothetical.
5      THE WITNESS:  It is remotely possible that
6  that could occur.
7          Again, petechial hemorrhage is not a
8  common marker for individuals that have a stress-
9  ful, even an agitated stressful circumstance befall
10  them.
11  BY MR. BARBER:
12      Q.  In this particular case, other than
13  asphyxiation, are there any causes -- is there
14  anything present that could have caused the
15  petechiae?
16      A.  In this case?
17      Q.  Yes.
18      A.  It has been opined by Dr. Wetli that
19  CPR itself could cause petechiae.  And I suppose
20  that's possible.  It's not very common.
21          Certainly I've seen many patients
22  undergo a great deal of CPR, usually more success-
23  ful than in this case, and petechiae are not a
24  common finding.

Page 110

1    Q.   Have you read any studies on the
2  relationship between petechiae and asphyxiation?
3    A.   Studies of it?
4    Q.   Studies, yeah, medical studies reported
5  in journals like the -- you know, accepted medical
6  journals, authoritative journals?
7    MR. ALEXANDER:  Peer-reviewed journals.
8    THE WITNESS:  Not in recent memory.
9  BY MR. BARBER:
10    Q.   Okay.  Do you know Dr. Wetli?
11    A.   No.
12    Q.   Have you ever heard of him?
13    A.   No.
14    Q.   Do you know Dr. Cunliffe?
15    A.   Not personally.
16    Q.   Have you -- other than this case, have
17  you ever heard of her?
18    A.   Not that I recall, although we, I
19  think, have been in the same city for some length
20  of time.  And maybe via cases, one way or another,
21  our paths may have crossed.  I've certainly
22  requested records from Cook County on occasion
23  for clinical purposes, and I may have seen other
24  reports by her.

Page 111

1    Q.   Do you know Dr. Donoghue, the chief
2  medical examiner of Cook County?
3    A.   Not personally.  I know who --
4    Q.   Of him.
5    A.   -- that is, yes.
6    Q.   Okay.  Do you have an opinion as to
7  his expertise and qualifications as a forensic
8  pathologist?
9    MR. ALEXANDER:  Entertaining him as an
10  expert?
11    THE WITNESS:  No.
12  BY MR. BARBER:
13    Q.   You don't.
14    Okay.  Dr. Hall, you have an opinion,
15  number three -- we're getting to the end.
16    A.   Since I only offered three, I assume
17  that we're closing in.
18    Q.   Right.  Slowly, but surely.
19    A.   Step by step.
20    Q.   Let me just read a second.  I read it
21  a number of times, but let me read it again.
22    Okay.  Are you -- are you aware
23  of the State of Illinois standards regarding CPR
24  training for police officers?

Page 112

1    A.   No.
2    Q.   Are you -- do you have any information
3  that the CPR training that is provided police
4  officers by the Chicago Police Department is below
5  the standards of the State of Illinois?
6    A.   No.  It's not my area of expertise.  I
7  don't -- as an expert, I have no opinion to offer
8  on what the level of expertise or expectation
9  should be for police officers with regard to CPR
10  competence.
11    Q.   Okay.  Are there any national --
12    A.   But I didn't offer any, I hope, in
13  this --
14    Q.   No, you didn't.  I'm just asking.
15    Are there any national standards
16  that you're aware of in terms of acquired expertise
17  for police officers?
18    MR. ALEXANDER:  He's already testified that
19  he doesn't have an opinion on this.
20    MR. BARBER:  National standards.
21    MR. ALEXANDER:  And so, I mean, you can ask
22  him thirty questions.  He's not offering an
23  opinion.  He doesn't have an opinion.
24    MR. BARBER:  Right.  I'm asking him if he's

Page 113

1  aware of any national standards.
2    THE WITNESS:  None that I have looked at in
3  any careful, detailed way, but they may have been
4  alluded to in the report of a defense expert.
5  BY MR. BARBER:
6    Q.   In this case?
7    A.   Yes.
8    Q.   Oh, okay.
9    Other than that, are you aware of
10  any?
11    A.   No.
12    Q.   In the State of Illinois, is there any
13  requirement, to your knowledge -- and I think I
14  know what your answer is going to be, but I just
15  have to ask the question -- is there any --
16    MR. ALEXANDER:  Then don't.
17  BY MR. BARBER:
18    Q.   -- requirement, to your knowledge, that
19  police officers be trained in CPR?
20    A.   I don't have knowledge about any.  I
21  think that was covered by my earlier broad state-
22  ment that I don't have an opinion as to the
23  training and competence that police officers should
24  or shouldn't have.

URLAUB, BOWEN & ASSOCIATES, INC.     312-781-9586

**Page 114**

1  Q. Okay. I have --
2  MR. ALEXANDER: So you don't -- you don't
3  have to keep asking him these questions, because he
4  has no opinion on it.
5  BY MR. BARBER:
6  Q. I have one final question.
7  Do you have any knowledge regarding
8  whether or not there are any requirements in the
9  State of Illinois that police officers should be
10  retrained and recertified on a periodic basis in
11  CPR?
12  A. I don't.
13  Q. What is your understanding as to the
14  training that the officers in this case had for
15  CPR?
16  A. In their depositions, they indicated
17  that they had received training in the police
18  academy.
19  Q. Okay. Did they indicate that they
20  received any retraining over the years as a police
21  officer from the Chicago Police Department?
22  A. I don't recall the details of their
23  response to that question.
24  Q. All right. Was there testimony by the

**Page 115**

1  police officers that they didn't feel competent in
2  performing CPR?
3  A. I don't recall if that was a uniform
4  response they had, but it was mentioned at least
5  once in their depositions.
6  Q. By one officer?
7  A. At least once.
8  Q. Okay. Well, I mean, at least once by
9  each officer or by one officer?
10  A. Like I said, being in at least one
11  deposition, I recall.
12  MR. ALEXANDER: And then one said he couldn't
13  breathe, the one that was making the cell phone
14  calls.
15  BY MR. BARBER:
16  Q. Okay. Do you agree that if CPR is not
17  performed correctly, it can cause damage to the
18  individual that they're trying to rescue?
19  A. Yes.
20  Q. Pardon?
21  A. Yes.
22  Q. Okay. And what kind of damage can be
23  caused to the individual that somebody is trying to
24  rescue by improper CPR?

**Page 116**

1  A. Likely, the biggest risks would be
2  direct trauma to structures of the chest related to
3  cardiac compression.
4  I mean, I guess you could define for
5  me how broadly you take the term be to, "improper
6  CPR." I mean, even with proper CPR, one can get
7  things like rib fractures. But I suppose that it
8  would be worse if you got the rib fracture and you
9  weren't doing proper CPR, because then you'd have
10  both an injury and a failure to provide a life-
11  saving therapy.
12  Q. Okay. But I guess -- all right.
13  That's one thing that could happen,
14  because if it's not done properly, it wouldn't be
15  successful. That's what you're saying, right?
16  A. Right. So one of the -- if it wasn't
17  done properly, one of the worst things, in terms of
18  an effect for the victim, would be that you'd lose
19  the opportunity to save them.
20  Q. Okay. Just putting that in a slightly
21  different way, is it possible to improperly do CPR
22  and cause a death by improper CPR?
23  A. I guess, in a sense, if you have truly
24  lost respirations, neurologic function, and pulse,

**Page 117**

1  you're circumstances are reasonably dire. And to
2  think about the things that could make it worse are
3  kind of hard. That's called death. So anything
4  you could do to pull the person back from that
5  probably could be put in the plus column.
6  Now, if you did it ineffectively,
7  your chance of pulling them back would be less. If
8  you started CPR on an individual who had simply
9  lost consciousness and, in fact, had adequate
10  ventilation and adequate cardiac function and you
11  began to get in the way of normal ventilation and
12  cardiac function in your well-intended efforts,
13  that would be a problem, although not relevant to
14  this case.
15  Q. Well, if somebody has a heartbeat,
16  should you do chest compression?
17  A. Do you mean by a heartbeat, electrical
18  or palpable or both?
19  Q. Palpable.
20  A. No.
21  Q. All right. You should not do chest
22  compression.
23  A. Correct.
24  Q. Why?

Deposition of JESSE HALL, M.D., 1/25/2005

Page 118

1    A.   Because you have -- without further
2  information, such as what their blood pressure is,
3  et cetera, you don't have sufficient information in
4  an emergent situation that you will enhance their
5  circumstances by trying to squeeze on the heart,
6  and you may cause damage or deterioration of their
7  cardiac rhythm, because presumably they have one if
8  they have a clearly palpable pulse.
9         That, of course, leaves the other
10  question about their airway and their breathing,
11  because that would be an ideal circumstance under
12  which to institute ventilatory support, because
13  if you have a pulse and you haven't lost it yet,
14  and if circumstances arose from something like
15  asphyxiation, this would be the golden moment in
16  which you could save them by a relatively simple
17  CPR maneuver called breathing for them.
18    Q.   Okay.  Breathing for them, that would
19  be, in this instance, mouth-to-mouse respiration,
20  correct?
21    A.   Correct.
22    Q.   Certainly, the police officers didn't
23  have any equipment to do it in any other fashion,
24  correct?

Page 119

1    MR. ALEXANDER:  To do what in any other
2  fashion?
3    MR. BARBER:  Breathing for the -- Mr. Hicks.
4    MR. ALEXANDER:  They didn't have lips?
5    MS. PASCALE:  Breathing for Mr. Hicks.
6  BY MR. BARBER:
7    Q.   Mouth to mouth.
8         You understood the question,
9  correct?
10    A.   I believe I did.
11    Q.   Okay.  What's the answer.
12    A.   They would have to, in order to supply
13  ventilatory support, perform mouth-to-mouth --
14    Q.   Because there are --
15    A.   -- breathing.
16    Q.   There are other ways to do that,
17  correct?
18    A.   Yes.
19    Q.   Mechanical ways.
20    A.   Correct.
21    Q.   Ambu bag or --
22    A.   As well as a simple guard-mask device
23  that takes away the actual lip-to-lip contact or
24  mouth-to-mouth contact, but still is you supplying

Page 120

1  the breath with your mouth.
2    Q.   Okay.  But as far --
3    A.   That is an aesthetically better system,
4  mechanically the same.
5    Q.   All right.  The Ambu bag, which is a,
6  you know, generic term, is a a -- what I'm referring
7  to is another method as some sort of, you know,
8  device to do the breathing for the individual.
9         The officers didn't have any kind
10  of equipment other than their own mouths to do
11  mouth -- to do breathing for Mr. Hicks, correct?
12    A.   Correct.
13    Q.   Okay.  And they also didn't have any
14  shields to make that barrier between Mr. Hicks and
15  themselves, correct?
16    A.   Correct.
17    Q.   And you said that would be a more
18  aesthetic way to do it.  Is that what you said?
19    A.   Yes.
20    Q.   And what do you mean by that?
21    A.   Some people might be reluctant to
22  perform mouth-to-mouth ventilation on someone they
23  didn't know.
24    Q.   Okay.  And do you quarrel with that

Page 121

1  reluctance?
2    MR. ALEXANDER:  I'll object as to form and
3  vagueness.
4    THE WITNESS:  People have it or they don't.
5  BY MR. BARBER:
6    Q.   Do you -- well, do you -- is it a valid
7  reluctance?
8    MR. ALEXANDER:  Objection; form, vagueness.
9    THE WITNESS:  I'm not sure what you mean by
10  "valid."  Some people have that reluctance to aid
11  someone.
12  BY MR. BARBER:
13    Q.   Okay.  A lot of people have that
14  reluctance; is that correct?
15    MR. ALEXANDER:  Objection; form, vagueness,
16  foundation.
17    THE WITNESS:  I really don't know the numbers
18  on, you know, how many people do or don't have
19  this reluctance.  When people are educated about
20  CPR and have it as a skill, if you want it -- as
21  an example, the cities that have put in place these
22  projects where citizens, people, implement this
23  therapy -- Seattle Heart Project, for instance --
24  they have CPR by -- done by a variety of people,

31 (Pages 118 to 121)

Deposition of JESSE HALL, M.D., 1/25/2005

Page 126

1  yes, actually, you'd be able to do it.
2      A.   I'm sure I would try to make my best go
3  at what all the circumstances were and risks to me.
4      Q.   Okay.  The same thing that the police
5  officers did in this case?
6      MR. ALEXANDER:  I'm going to object to that.
7  That is -- that is so offensive, I can't begin to
8  tell you.  They stood and watched this man die
9  while making cell phone calls to their superiors.
10  And now you're going to say on the record that they
11  did everything they can do to help this guy?
12  BY MR. BARBER:
13      Q.   See, Doctor, this is what I mean, you
14  know, about attorneys testifying during deposi-
15  tions.
16      A.   Um-hmm.
17      MR. ALEXANDER:  Try to be a little less
18  offensive to the family in this case.
19      THE WITNESS:  I don't --
20      MR. MURRAY:  You're arguing to the jury.
21      THE WITNESS:  I don't have an opinion about
22  all the factors that they weighed, how they weighed
23  them, and how carefully they weighed them.  And
24  so, again, I don't have an opinion about what, as

Page 127

1  generically -- as police officers generically, they
2  should or shouldn't have done.  That's sort of a
3  policy-and-procedure set of issues for the police
4  department, and then individually what they should
5  or shouldn't have done within the framework of
6  those guidelines and policies.
7      MR. BARBER:  Okay.
8      THE WITNESS:  I can only tell you what would
9  have happened if they would have done it.
10  BY MR. BARBER:
11      Q.   And do you know what the policy is of
12  the Chicago Police Department in terms of --
13      MR. ALEXANDER:  He's just told you eight
14  times that he's not making an opinion on policy.
15  Why don't you ask him about his medical opinion?
16  That's all he has is a medical opinion on whether
17  or not CPR would have been effective.  Why don't
18  you try asking him some questions about that?  Then
19  we can get somewhere here.
20  BY MR. BARBER:
21      Q.   Do you know what the policy is, Doctor,
22  of the Chicago Police Department regarding whether
23  or what -- on whether or not police officers are
24  required to perform CPR?

Page 128

1      A.   No.
2      Q.   Your opinion number three is:  Had
3  effective CPR been instituted promptly upon
4  Mr. Hicks becoming unresponsive, more likely than
5  not, cardiopulmonary function could have been
6  restored prior to or in conjunction with the
7  measures provided by the ambulance that was
8  summoned.
9          Okay.  Now, what do you mean by
10  "promptly"?
11      A.   Certainly if the circumstances are that
12  the individual is unresponsive and not breathing,
13  yet there is a palpable pulse, institution of
14  ventilation prior to the loss of pulse has an
15  extreme likelihood of maintaining cardiovascular
16  functioning and, in fact, even restoring spontane-
17  ous breathing, and also likely resulting in the
18  avoidance of severe, irreversible brain injury.  It
19  is likely that if a person is unresponsive and not
20  breathing and has a pulse, that over the course of
21  a minute in this circumstance or less, they are
22  likely to have cardiovascular deterioration to a
23  point where now they have inadequate circulation,
24  and CPR still has a chance of restoring function,

Page 129

1  but that chance decrements, or decreases, signifi-
2  cantly from the circumstance of a pulse being
3  present.  And if one waits very much longer beyond
4  that point, then the restitution of an adequate
5  circulation and the avoidance of a significant
6  brain injury becomes less and less.
7      Q.   What if a pulse is not present?  What
8  if there's a sudden cardiac event and there is no
9  pulse?
10      A.   Then it would depend a great deal on
11  what the cause of the sudden cardiac event is.
12      Q.   What if it's ventricular fibrillation,
13  a rhythm -- an electrical problem that causes a
14  sudden cardiac event?
15      A.   Well, that, of course, is what happens
16  after asphyxiation.  So if you wait till that point
17  in time and the pulse is gone, then things are less
18  simply reversed, until you have a greater access
19  to technology.  You don't have much capacity to
20  reverse a condition like ventricular fibrillation
21  with simply mouth-to-mouth ventilation and chest
22  compressions.  You need cardioversion to reverse
23  that circumstance.
24      Q.   Okay.  And cardioversion is?

33 (Pages 126 to 129)

Page 130

1    A.   Shocking the heart.
2    Q.   All right.  And the police officers did
3 not have that capability on the street, correct?
4    A.   Correct.
5    Q.   What do you mean when you say "effective
6 CPR"?  What do you mean by "effective"?
7    A.   Well, I believe we talked a little bit
8 earlier about the fact that you need to breathe for
9 the patient, and if that's their only deficit -- in
10 other words, they still have a palpable pulse, but
11 they got into the circumstance of unconsciousness
12 and not breathing by loss of ventilatory capacity,
13 then that would be effective CPR if you sort of
14 knock out the chest compression piece, because you
15 don't need it, but it's restitution or restoration
16 of adequate ventilation.  So you'd have to perform
17 adequate mouth-to-mouth ventilation.  That means a
18 good seal and achieving an open airway, although
19 we, of course, have already walked through that the
20 airway is not permanently damaged in this circum-
21 stance.  So those things should be doable.  And you
22 need to apply a large enough breath to get this
23 individual ventilated.
24        If you are talking about a circum-

Page 131

1 stance in which, in addition to the immediate
2 consequences of the asphyxiation, that is, loss of
3 responsiveness and cessation of breathing, you've
4 also lost the pulse, then you would have to perform
5 adequate chest compressions, which means at an
6 acceptable rate, which is 90 in a minute, and with
7 acceptable compression of the chest, moving the
8 anterior chest posteriorly so that you have an
9 acceptable cardiac output during this period of
10 time, until you had greater modalities of treatment
11 to restore cardiac rhythm.
12    Q.   Okay.  So it's not simply breathing for
13 an individual, puffing into somebody's mouth.  You
14 have to do it adequately.
15    A.   Again, you do need to breathe for
16 them adequately, one way or another, under both
17 scenarios.  And if you have a pulse, then all of
18 your focus will be on breathing for them adequately,
19 because you don't have to tend to the circulation
20 yet.
21    Q.   Okay.  But it's got to be done in the
22 proper way to be effective, correct?
23    A.   Like everything we do.
24    Q.   All right.  And it's the same for the

Page 132

1 chest compressions.  It's not just a matter of
2 pushing on somebody's chest.  It's doing it in the
3 proper and adequate way for it to be effective,
4 correct?
5    A.   Yes.
6    Q.   And for an untrained person, it's
7 highly unlikely that that person is going to do it
8 in an adequate fashion, correct?
9    A.   Yes.
10    Q.   In fact, there are people in hospitals,
11 trained nurses, doctors, medical personnel in
12 hospitals that don't adequately perform CPR,
13 correct?
14    A.   Yes.
15    Q.   People that have much more training
16 than these particular police officers in this
17 particular case, correct?
18    A.   Yes.
19    Q.   So to do CPR adequately to rescue a
20 person is not an easy thing to do, correct?
21    A.   Correct.  It requires training, and
22 people who are not medically trained can do it
23 properly, and people who are trained medically can
24 do it improperly.  It comes down to basically

Page 133

1 training people to do it properly.
2    Q.   All right.  And it's more likely than
3 not that a untrained person is going to do it
4 improperly.
5    A.   Yes.
6    Q.   And, as a matter of fact, the percent-
7 ages of improper CPR is well over -- of being
8 performed is well over 50 percent, correct?
9    A.   In some studies, correct.
10    Q.   Even by trained medical people.
11    A.   Correct.
12    Q.   So how is it that you say, more likely
13 than not -- that an untrained police officer
14 performing CPR, it would be more likely than not
15 that pulmonary function could have been restored?
16    MR. ALEXANDER:  Would you mind telling me
17 where he says that, an "untrained police officer"?
18    MR. BARBER:  Well, that's what we have in
19 this case.
20    MR. ALEXANDER:  Oh, really.  That's funny.
21 I thought every single one testified they had the
22 training at the exam.
23        You know you -- I'm going to object
24 as to form, foundation, misstating testimony --

**Page 1**

```
                                                    1

        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

BILLIE RAY LEWIS, as Brother,    )
Next Friend, and Special         )
Administrator of CHRISTOPHER     )
HICKS, deceased,                 )
                                 )
               Plaintiff,        )
                                 )
         vs.                     ) No. 04 C 3904
                                 )
CITY OF CHICAGO, and CHICAGO     )
POLICE OFFICERS L. SOTO, Star    )
8403, A. PENA, Star 18513,       )
ROBERT ARNOLTS, Star 19998,      )
and BRIAN DEVAN, Star 3871,      )
                                 )
               Defendants.       )
```

            The deposition of **GLENN TERRY SMITH**,

taken pursuant to notice of taking deposition,

before Bernice Betts, C.S.R. No. 084-003788,

Certified Shorthand Reporter and a notary public

within and for the County of Will, State of

Illinois, at Suite 1400, 30 North LaSalle Street,

Chicago, Illinois, on the **21st day of January 2005.**

            APPEARANCES:

            SMITH, COFFEY & ALEXANDER, LTD., by
            MR. CHRISTOPHER R. SMITH
            (119 North Peoria Street, Suite 3A
            Chicago, Illinois  60607)
               appeared on behalf of the plaintiff;

*URLAUB, BOWEN & ASSOCIATES, INC.*
*(312) 781-9586*

**Page 2**

```
                                                    2

  APPEARANCES:  (Cont'd.)

        HONORABLE MARA S. GEORGES
        CORPORATION COUNSEL, by
        MR. ROBERT W. BARBER
        Special Assistant Corporation Counsel
        MS. MARY MCDONALD
        Assistant Corporation Counsel
        (30 North LaSalle Street, Suite 1400
        Chicago, Illinois  60602)
           appeared on behalf of the defendants
        Chicago Police Officers L. Soto, Star
        8403, A. Pena, Star 18513, Robert
        Arnolts, Star 19998, and Brian Devan,
        Star 3871.

        *  *  *  *  *  *  *

                 I N D E X

Witness:                                    Page

GLENN TERRY SMITH

     Examination by:

        Mr. Barber ...................... 3


                 E X H I B I T S

Number                        Marked for Identification

(None marked.)
```

*URLAUB, BOWEN & ASSOCIATES, INC.*
*(312) 781-9586*

**Page 3**

```
                                                    3

                 (Witness sworn.)

             GLENN TERRY SMITH

called as a witness herein, having been first duly

sworn, was examined and testified as follows:

                 EXAMINATION

BY MR. BARBER:

     Q.   Sir, would you state your name, please.

     A.   Glenn Terry Smith.

     Q.   And is your first name spelled

G-l-e-n-n?

     A.   Yes.

     Q.   And Terry?

     A.   Terry-

     Q.   T-e-r-r-y?

     A.   Yes, sir.

     Q.   S-m-i-t-h?

     A.   Yes, sir.

     Q.   Have you ever given a deposition

     A.   No, I haven't.

     Q.   Have you ever testified in court

     A.   No, I haven't.

     Q.   Okay.  Hopefully it won't take t

          I'm going to be asking you some

questions.  Mr. Smith, the attorney, may ask you
```

EXHIBIT

L

*URLAUB, BOWEN & ASSOCIATES, INC.*
*(312) 781-9586*

**Page 4**

```
                                                    4

some questions.

     A.   Okay.

     Q.   Just try to remember to keep your voice

up, okay?

     A.   Um-hmm.

     Q.   And, also, verbally answer the

questions.  Nodding your head, hand gestures, or

um-hmm is hard for the court reporter to get down,

so we try to verbalize all our answers; all right?

     A.   Okay.  All right.

     Q.   And one final thing:  If a question is

confusing and you don't understand it, please let

me know, and I'll change it, because we don't want

you to answer a question that you don't understand,

okay?

     A.   Yes, sir, I understand.

     Q.   How old are you?

     A.   I'm -- today is my birthday, as a

matter of fact.  I'm 42 today.

     Q.   Happy birthday.

     A.   Thank you.

     Q.   So that was my next question, what's

your date of birth.  It would be 1/21, what '6 --

     A.   3.
```

*URLAUB, BOWEN & ASSOCIATES, INC.*
*(312) 781-9586*

41

the one?

A. No. It's one further east.

Q. Okay.

A. I think it was.

Q. All right. Do you know what his job was at the Home Depot?

A. Basically, I think it was just a laborer.

Q. Okay. And do you know how long he worked at Home Depot?

A. No, I don't.

Q. Did you know that he left employment at Home Depot?

A. Yes, I know he left there.

Q. Okay. And did he tell you why he left there?

A. I think he was just looking for a higher paying job.

Q. Okay. And as far as you know, that was the reason?

A. Yes, sir.

Q. Okay. Any other companies that he worked for that you can give us the names of?

A. No, sir.

42

Q. Up here in Chicago.

A. No, sir.

Q. Okay. And is that the only job that he had up here that you're aware of?

A. I don't know, sir.

Q. Now, after -- how about -- you said as you guys were growing up, you were good friends, correct?

A. Yes.

Q. And is it fair to say that when he came back to Chicago and you would -- you know, you connected up with him, that you remained good friends?

A. Yes.

Q. Okay. Now, did he have other friends here in Chicago?

A. Yes, he had other schoolmates he went to school with.

Q. Okay. But I'm talking about -- you know, that was a bad question.

After he came back in 2003 and stayed up here, other than you, did he have any friends up here?

MR. SMITH: Objection to form.

43

BY MR. BARBER:

Q. Other than you and Erica Stewart, did he have any friends up here that you know of?

A. No -- I mean, I'm pretty sure he had other friends, but I didn't know who he went to visit or anything like that.

Q. Okay. You're not aware of the names of any other friends he may have had up here --

A. No, sir.

Q. -- that he spent time with after he moved back here from Shreveport?

A. No, sir. No, sir.

Q. Okay. Now, you saw him on the day that he died, correct?

A. Yes.

Q. Where was it that you saw him that day?

A. He came to my apartment, to my home.

Q. And that's the same address that you gave us earlier?

A. Yes, sir. Yes, sir.

Q. Okay. Why did he come to your apartment that day?

A. Well, he came to -- he came to visit, first of all, and he came to -- he was supposed to

44

start employment at a new job the following day. I had took him to get the -- for the interview, and it was a job he was very happy about, and he was talking about, you know, he'd be glad when he start his new job.

Q. Okay. Where was that job?

A. It was at a -- it was working for a company to transport senior citizens to their medical appointments and to the store. I don't know the name of the company.

Q. But you took him to the interview for the job?

A. Yes.

Q. When was he interviewed for the job in relation to the date that he died?

A. I think it was a week prior to that.

Q. Okay. Where was it? What was the location of that interview?

A. Wow. I can't remember the location. I just knew it was on the North Side, it was a little bit past North Avenue, but I don't remember the exact address.

Q. You don't remember what street it was on or anything?

45

1    A.   No.

2    Q.   Okay.  And do you remember -- so you

3 drove him over there?

4    A.   Yes.

5    Q.   Do you have any idea who it was he

6 talked to there?

7    A.   No, I don't.

8    Q.   Okay.  Do you have any documents at

9 home, any pieces of paper, anything that would

10 indicate the name of this company or the location?

11    A.   No, I don't.

12    Q.   Do you know any way how we could find

13 out the name of this company that he was going to

14 start working for?

15    A.   All I know, it's the company that

16 trans- -- they drive white minivans with the blue

17 and white -- blue and red stripes on them.

18    Q.   Okay.  But is there any person that

19 you can think of that would know the name of this

20 company and its location?

21    A.   He told me the name of the young lady

22 that interviewed him, but I can't remember her

23 name.  I can't remember.

24    Q.   Right.  But what I'm trying to get at

*URLAUB, BOWEN & ASSOCIATES, INC.*
*(312) 781-9586*

46

1 is, is there some other person that would know the

2 name of this company that you're aware of that

3 would know --

4    A.   No, that I'm aware of.  I don't know

5 who else he told about it.

6    Q.   Okay.  And he was going to be a driver

7 for this company?

8    A.   Yes, sir.

9    Q.   Did he have a valid driver's license?

10    A.   Yes, sir.

11    Q.   Okay.  So he came over to your house.

12    A.   Yes, sir.

13    Q.   And what was the reason again?  Oh, to

14 visit?

15    A.   Yes.

16    Q.   And what -- any other reason why he

17 came over to your house?

18    A.   Well, I think he wanted a ride over to

19 his brother's house.

20    Q.   Okay.  And anything else?

21    A.   Basically that's it.

22    Q.   Okay.  And while you were with him, you

23 talked about this new job that he was going to

24 start the next day?

*URLAUB, BOWEN & ASSOCIATES, INC.*
*(312) 781-9586*

47

1    A.   Yes, sir.

2    Q.   Okay.  And anything else that you

3 talked about?

4    A.   We were going to go into business

5 together.  We was talking about going into real

6 estate together once he got employment.

7    Q.   And what else did you talk about?

8    A.   Well, he told me he had went to see his

9 godmother, and someone else, a couple more friends

10 he -- from the old neighborhood where he lived,

11 where his mom lived.

12    Q.   Okay.  He had seen them that day?

13    A.   Yes.

14    Q.   Do you know the names of those people?

15    A.   No, I don't.

16    Q.   Okay.  Now, you say he was going to go

17 into business with you?

18    A.   Yes.

19    Q.   When were you going to start that

20 business up?

21    A.   Well, we was going to try to save some

22 money together, like I said, when he -- once he got

23 employment.

24    Q.   Okay.  Now, did he have any assets at

*URLAUB, BOWEN & ASSOCIATES, INC.*
*(312) 781-9586*

48

1 all that you're aware of?

2    A.   I'm not -- I don't know, sir.

3    Q.   Okay.  Did you ever have to lend him

4 money?

5    A.   Well, I lent him money while he was --

6 when he wasn't employed.

7    Q.   Okay.  You did lend him money?

8    A.   Yes.

9    Q.   How often would you do that?

10    A.   It wasn't that often.  Maybe a couple

11 times, that's about it.

12    Q.   All right.  And have -- he didn't

13 support you in any way, did he?

14    A.   No.

15    Q.   I mean, financially.

16    A.   No.

17    Q.   Okay.  How much would you lend him when

18 you would lend him money?

19    A.   About 20.  $20, $25.

20    Q.   To your knowledge, did he have a bank

21 account anywhere?

22    A.   I don't know, sir.

23    Q.   Did he have any -- own any property of

24 any kind?

*URLAUB, BOWEN & ASSOCIATES, INC.*
*(312) 781-9586*

Case: 1:04-cv-05304 Document #: 122 Filed: 05/25/05 Page 149 of 153 PageID #:1898

# STATE OF ILLINOIS
## MEDICAL EXAMINER'S - CORONER'S
## CERTIFICATE OF DEATH

STATE FILE NUMBER: 608354

REGISTRATION DISTRICT NO. 10

CASE #: 422 MAY 2004

**1. DECEASED - NAME** (FIRST, MIDDLE, LAST): CHRISTOPHER HICKS

**2. SEX:** MALE

**3. DATE OF DEATH:** MAY 26, 2004

**4a. AGE - LAST BIRTHDAY (YEARS):** 39

**5a. STATE OF BIRTH:** CHICAGO

**5b. DATE OF BIRTH:** APR 2, 1965

**6a. HOSPITAL OR OTHER INSTITUTION - NAME:** NORTHWESTERN MEMORIAL HOSPITAL

**6b. PLACE OF DEATH:** ER

**6c. CITY, TOWN, OR ROAD DISTRICT NUMBER:** COOK

**8a. MARRIED, NEVER MARRIED, WIDOWED, DIVORCED:** MARRIED

**8b. NAME OF SURVIVING SPOUSE:** MERLENE NTRN

**9. USUAL OCCUPATION:** LABOR

**KIND OF BUSINESS OR INDUSTRY:**

**11a. RESIDENCE - STATE:** ILLINOIS

**11b. COUNTY:** GENERAL

**11c. CITY, TOWN OR ROAD DISTRICT NO.:** CHICAGO

**11d. STREET AND NUMBER:** 7355 N MADISON

**11e. ZIP CODE:** 60644

**7. SOCIAL SECURITY NUMBER:** 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

**13a. EDUCATION:** 12

**13c. COUNTY:** COOK

**14a. RACE:** BLACK

**14b. OF HISPANIC ORIGIN?** NO

**15. EVER IN U.S. ARMED FORCES?** YES

**16. MOTHER - NAME:** FLORENCE WASHINGTON HARRISON

**20c. HOUR:** 10:30 P.M.

**20d. LOCATION:** CHICAGO, COOK, IL

---

## PART I.

(a) ASPHYXIA

DUE TO, OR AS A CONSEQUENCE OF:

(b) RESTRAINT

DUE TO, OR AS A CONSEQUENCE OF:

(c)

**PART II.** Other significant conditions contributing to death but not resulting in the underlying cause given in PART I (a).

**17a. MED REC:** SAMUEL HICKS

**17b. RELATIONSHIP:** 

**19. MANNER OF DEATH:** HOMICIDE

**20a. DATE OF INJURY:** MAY 26, 2004

**20b. PLACE OF INJURY:** STREET

**21a. THE DECEDENT WAS PRONOUNCED DEAD ON:** MAY 26, 2004 AT 11:13 P.M.

**22a. HOW INJURY OCCURRED:** RESTRAINT

**22b. DATE SIGNED:** SEP 14, 2004

**23b. DATE SIGNED:** SEP 14, 2004

I CERTIFY THAT IN MY OPINION BASED UPON MY INVESTIGATION, IN THE INQUISITION, THIS DEATH OCCURRED AT THE TIME, DATE AND DUE TO THE CAUSE(S) AND IN THE MANNER STATED.

**22b. ME SIGNATURE:** EDMUND R. DONOGHUE, M.D.

**23b. SIGNATURE:** CLARE H CUNLIFFE, M.D.

**24a. BURIAL, CREMATION, REMOVAL:** BURIAL

**24b. CEMETERY OR CREMATORY - NAME:** ABRAHAM LINCOLN

**24c. LOCATION:** ELWOOD, ILLINOIS

**24d. DATE:** JUN 18, 2004

**25a. FUNERAL HOME:** RIDGEMOOR CHAPELS 6453 N IRVING PARK RD CHICAGO, ILLINOIS 60634

**25b. FUNERAL DIRECTOR'S ILLINOIS LICENSE NUMBER:** 034-011599

**26a. LOCAL REGISTRAR'S SIGNATURE:** STEVEN T. ZEMAITY

**26b. DATE FILED BY LOCAL REGISTRAR:** SEP 17, 2004

VR202 (Rev. 8/93)    28a.    Illinois Department of Public Health - Office of Vital Records    BASED ON 1999 U.S. STANDARD CERTIFICATE

---

STATE OF ILLINOIS
COUNTY OF COOK
CITY OF CHICAGO

JAN 14 2005

I, JOHN L. WILHELM M.D., LOCAL REGISTRAR OF VITAL STATISTICS OF THE CITY OF CHICAGO, DO HEREBY CERTIFY THAT I AM THE KEEPER OF THE RECORDS OF BIRTHS, STILLBIRTHS AND DEATHS FOR THE CITY OF CHICAGO BY VIRTUE OF THE LAWS OF THE STATE OF ILLINOIS AND THE ORDINANCES OF THE CITY OF CHICAGO; THAT THE ACCOMPANYING CERTIFICATE ON THIS SHEET IS A TRUE COPY OF A RECORD KEPT BY ME IN ORDINANCE OF SAID LAW AND ORDINANCES.

THIS CERTIFICATE COPY VALID WHEN MULTICOLOR SIGNATURE SEAL IS AFFIXED.

CITY OF CHICAGO
DEPARTMENT OF PUBLIC HEALTH



EXHIBIT
M

# OFFICE OF THE MEDICAL EXAMINER
## COUNTY OF COOK, ILLINOIS

### REPORT OF POSTMORTEM EXAMINATION

**NAME** Christopher Hicks

**AGE** 39    **RACE** Black    **SEX** Male

**ADDRESS** 5355 W. Madison Avenue

**CITY & STATE** Chicago, Illinois

**CASE NO.** 422 May 2004

**DATE OF DEATH** May 26, 2004

**DATE EXAMINED** May 27, 2004 (10:30 am)

**EXAMINED BY** Clare H. Cunliffe, M.D.

---

### EXTERNAL EXAMINATION:

The body is received clothed in a hospital gown. A pair of white sneakers, a black cap, a navy head rag, a pair of blue jean shorts, a brown belt, a pair of white socks, green boxer shorts, black jeans, a white t-shirt, and a cream knit top which has been cut accompany the body.

The body is that of an adult Black male, weighing 218 pounds, measuring 6 feet in length, and appearing the stated age of 39 years.

The body is slightly warm to touch. Rigor mortis is present to an equal extent in all joints. Postmortem lividity is well developed in the posterior dependent portions of the body.

The hair is short, black and curly with a few gray hairs. The eyes are slightly open. The cornea are clear. The irides are brown. The skeleton of the nose is intact. The right earlobe is pierced one time, and the left earlobe is pierced two times. There is a short black and gray beard and a short mustache. The lips and frenulum are without special note. The teeth are natural and in good condition.

The chest is symmetrical. The abdomen is slightly protuberant. The external genitalia are normal male and circumcised.

The fingernails are short to medium length. Black ink is present on the fingertips. Identification bands are present about the left and right wrists.

The back and buttocks are without special note.





**EXHIBIT**

N

Christopher Hicks                                    Page 6
#422 May 2004

ANATOMIC DIAGNOSES:
1.  Abrasions of the right and left hands, right and left
    knees and shins.

2.  Bilateral conjunctival petechiae.

3.  Hemorrhage within left sterno-hyoid muscle of the
    anterior neck.

4.  Hemorrhage within musculature of right upper back and
    right posterior shoulder.

5.  Hemorrhage within subcutaneous tissue of right elbow,
    and subcutaneous tissue of left wrist.

6.  Cardiomegaly, 489 grams.

7.  Left ventricular hypertrophy.

8.  Focal moderate coronary atherosclerosis-right coronary
    artery with 50% narrowing.

9.  Pulmonary congestion.

10. Cerebral edema.

OPINION:  This 39-year-old Black male, Christopher Hicks, died of
          asphyxia due to restraint.

MANNER OF DEATH:     Homicide.

                              _Clare H. Cunliffe,_ MD
                              CLARE H. CUNLIFFE, M.D.
                              Deputy Medical Examiner

CHC:mb
6/16/04                                 SEPTEMBER 16 2004

## CERTIFICATE OF SERVICE

I hereby certify that I have caused true and correct copies of the above and foregoing

**DEFENDANT OFFICERS NOTICE OF FILING OF THE INDIVIDUAL DEFENDANTS**

**MOTIONS IN LIMINE AND THE INDIVIDUAL DEFENDANTS' MOTIONS IN**

**LIMINE** to be mailed, to the address therein shown, on May 25, 2005.

Robert Barber
Special Assistant Corporation Counsel
Attorney for the Individual Defendants

Mary McDonald
Assistant Corporation Counsel
Attorney for the Individual Defendants.