

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BILLIE RAY LEWIS, Plaintiff, | ) | No. 04 C 3904 |
| v. | ) | Suzanne B. Conlon, Judge |
| CITY OF CHICAGO, *et al.*, Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Christopher Hicks died during or immediately following his arrest by Chicago police officers. His brother Billie Ray Lewis, as special administrator of the estate, sues the City of Chicago, and police officers Louis Soto, Artemio Pena, Robert Arnolts, and Brian Devan, (collectively "defendants") for civil rights violations under 42 U.S.C. § 1983 (Counts I and II), wrongful death (Count III), pain and suffering under Illinois' survival statute (Count IV), and intentional infliction of emotional distress (Count V). He claims the city is liable for any judgment rendered against the officers (Count VI). Before the court are defendants' motion for bifurcation and the parties' excessive number of motions *in limine*.[1]

## I. Motion for Bifurcation

The city moves for a separate trial of the *Monell* policy claim in Count II under Fed. R. Civ. P. 42(b). It argues the § 1983 policy claim should be tried separately from the claims against the individual police officers in order to avoid undue prejudice and to serve the interests of justice. The

[1]Defendants withdrew 22 motions *in limine*. The city withdrew motions 1 and 3. The individual defendants withdrew motions 5 through 19, and 21 through 25.

city is willing to stipulate to entry of judgment against it on Count II if the jury finds the police officers violated Hicks' constitutional rights as alleged in Count I. Motion, Ex. A. Lewis failed to respond to the motion for bifurcation. Nevertheless, it remains within the court's discretion to bifurcate a trial. *Treece v. Hochstetler*, 213 F.3d 360, 364-65 (7th Cir. 2000). Rule 42(b) permits a separate trial of any issue when separation would further the convenience of the parties, avoid prejudice, or promote judicial economy. *Lopez v. City of Chicago*, 2002 U.S. Dist. LEXIS 3458, at *4 (N.D. Ill. Feb. 28, 2002), *citing, Berry v. Deloney*, 28 F.3d 604, 610 (7th Cir. 1994). This broad discretion has been applied to suits involving *Monell* claims. *See, e.g., Treece*, 213 F.3d at 365; *Jones v. City of Chicago*, 1999 U.S. Dist. LEXIS 3358 (N.D. Ill. March 10, 1999).

Bifurcating *Monell* claims has several advantages. First, in most cases, a disposition of the individual claims will either legally or practically end the litigation. *Lopez*, 2002 U.S. Dist. LEXIS 3458, at *5. If a plaintiff fails to prove that he suffered a constitutional injury based on an individual police officer's conduct, his claim against the city fails. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571 (1986). If a plaintiff prevails against an individual police officer, he may not want or need to move forward on the *Monell* claims because Illinois law requires local governments to pay tort judgments for compensatory damages entered against government employees. 745 ILCS 10/9-102. Second, bifurcation generally results in an earlier disposition of the action if discovery relating to the *Monell* claims is stayed. *Lopez*, 2002 U.S. Dist. LEXIS 3458, at *6. Third, bifurcation can remove potentially unfair prejudice against police officers at trial. Without bifurcation, the jury would likely hear evidence against the city of acts of alleged police misconduct committed by other police officers. *Id.*

Bifurcation of *Monell* claims also has disadvantages. For example, police officers may be able to defeat a claim through the defense of qualified immunity. *Id.*; *Medina v. City of Chicago*, 100 F. Supp. 2d 893, 896 (N.D. Ill. 2000). If a plaintiff loses his claim against a police officer based on qualified immunity, he may still go forward with his policy claim against the city. *Lopez*, 2002 U.S. Dist. LEXIS 3458, at *7. Thus, a second trial is not avoided, and a large part of the second trial is inevitably duplicative of the first trial. Moreover, a judgment against a police officer (even if paid by the city) may be less likely to prompt the city to act to prevent future violations than a judgment against the city on a *Monell* policy claim. *Medina*, 100 F. Supp. 2d at 896-97, *citing Amato v. City of Saratoga Springs*, 170 F.3d 311, 317-18 (2nd Cir. 1999).

Defendants first argue bifurcation would serve the interests of justice because it would avoid the needless costs and burdens of a second trial. They argue there may be no need to try the policy claim at all if the jury concludes the police officers did not violate Hicks' constitutional rights. Motion at 3-4. Similarly, they argue there would be no need to try the policy claim even if the jury concludes the police officers violated Hicks' constitutional rights because the city has agreed to stipulate to the entry of judgment against it for compensatory damages flowing from any constitutional violations. *Id.* at 4-5. Defendants advance numerous hypothetical scenarios where the policy claim would not need to be separately tried. *Id.* However, defendants ignore the possibility that the jury may render a verdict for the police officers based on their qualified immunity defense. If Lewis loses the estate's claims against the individual officers based on qualified immunity, he may still proceed with his *Monell* claim against the city. In this situation, bifurcation would not avoid a second trial, and a second trial of the *Monell* claim would be duplicative of the

first trial against the police officers.[2] Given the possibility of duplicative trials, the court is not persuaded that the interests of justice warrant bifurcation.

Defendants next argue bifurcation is warranted to avoid unfair prejudice. They argue that evidence inadmissible against the police officers might be heard by the jury as part of the *Monell* case against the city. They assert the danger of unfair prejudice runs to the city as well because an essential element against it is the underlying constitutional violation. The judicial system generally trusts jurors to understand and follow limiting instructions regarding consideration of evidence against some defendants and not others. *See, e.g., United States v. Rollins*, 301 F.3d 511, 520 (7th Cir. 2002). The court is confident any risk of prejudice can be cured through appropriate limiting instructions at trial. Accordingly, defendants' joint motion for bifurcation is denied.

## II. Motions *in Limine*

### A. Standard of Review

Evidence is excluded on a motion *in limine* only if the evidence is clearly inadmissible for any purpose. *Hawthorne Partners v. AT&T Technologies*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). Motions *in limine* are disfavored; admissibility questions should be ruled upon as they arise at trial. *Id.* If evidence is not clearly inadmissible, evidentiary rulings must be deferred until trial to allow questions of foundation, relevancy and prejudice to be resolved in context. *Id.* at 1401. Denial of a motion *in limine* does not mean evidence contemplated by the motion will be admitted at trial. Instead, denial of the motion means the court cannot or should not determine whether the evidence

---

[2]Defendants rely on *Treece*, 213 F.3d at 364-65 to argue the interests of justice favor bifurcation. However, the *Treece* court did not address the qualified immunity defense and the possibility of duplicative trials. *Id.*

in question should be excluded before trial. *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989).

**B. The City's Motion *in Limine***

The city moves to exclude Lewis' police procedures expert, John Sullivan, from testifying. The city argues Sullivan should be barred from testifying because he rendered an opinion that the city was negligent in failing to train police officers. According to the city, this opinion bars him from testifying because he did not use the words "deliberately indifferent." The city does not challenge Sullivan's qualifications. Lewis responds that Sullivan will not opine that defendants were negligent; rather, he will testify regarding the adequacy of police training and will provide an analysis of whether the force used was excessive. Lewis points to Sullivan's deposition testimony where he explained that he did not use the word negligence to convey a legal standard of care.

The city does not identify an evidentiary basis for exclusion of Sullivan's testimony. Presumably, the city's theory is that Sullivan's testimony is irrelevant because it relates to negligence and not deliberate indifference. Irrelevant evidence is not admissible. Fed. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, waste of time, and jury confusion. Fed. R. Evid. 403. Sullivan's testimony is not clearly inadmissible. As described in the Memorandum Opinion and Order denying defendants' summary judgment motions, Sullivan offered many opinions regarding the adequacy of the city's police training. Sullivan Dep. 199-200, 263-67. For example, he testified that the Chicago Police Department showed a blatant disregard for the

public's safety by failing to properly retrain police officers in restraint and control tactics. *Id.* at 247-48, 260-61. Sullivan's opinions are potentially relevant to the *Monell* claim against the city. The jury will decide whether evidence that is admitted meets the deliberate indifference legal standard. The city's motion *in limine* must be denied.

### C. The Police Officers' Motions *in Limine*

The individual defendants move to exclude four categories of evidence.

#### 1. Bar or Limit Expert Economist Testimony

The individual defendants move to bar or limit Lewis' expert economist, Stan Smith, from testifying regarding losses attributable to: (a) lost wages and employee benefits, (b) replacement services, such as advice, counsel, guidance and instruction, (c) enjoyment of life, and (d) society or relationship. Defendants argue the evidence is inadmissible under Fed. R. Evid. 702. Defendants do not attack Smith's credentials. Rather, they argue his testimony will not assist the jury in understanding evidence. Lewis concedes the motion with respect to Smith's opinions about loss of advice, counsel, guidance and instruction, loss of accompaniment services, loss of value of life, and loss of society or relationship. Response at 2. Lewis' concession is not surprising given the number of courts that have excluded testimony in these categories. *See, e.g., Mercado v. Ahmed*, 974 F.2d 863 (7th Cir. 1992); *Ayers v. Robinson*, 887 F. Supp. 1049 (N.D. Ill. 1995); *Doe v. Tag, Inc.*, 1993 U.S. Dist. LEXIS 16356, at *7-9 (N.D. Ill. Nov. 16, 1993); *Saia v. Sears Roebuck & Co., Inc.*, 47 F. Supp. 2d 141 (D. Mass. 1999). Accordingly, the motion *in limine* is granted with respect to Smith's testimony relating to loss of advice, counsel, guidance and instruction, loss of accompaniment services, loss of value of life and loss of society or relationship.

With respect to Smith's testimony about lost wages, employee benefits, and lost household services, Fed. R. Evid. 702 permits a witness to testify as an expert if his specialized knowledge will assist the trier of fact in understanding the evidence or issues. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The court is obligated to prevent the jury from hearing unreliable expert testimony. This obligation does not include a determination whether an expert's opinions are correct. The court's obligation is to examine the reliability of the expert's methodology. *Id.* at 593-96; *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-44 (11th Cir. 2003), *citing Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 153-54 (1999). Under Fed. R. Evid. 703, an expert may rely on facts or data in formulating his opinion if these factors are reasonably relied upon by experts in the particular field in forming opinions or inferences.

**a. Lost Wages**

The individual defendants argue Smith's opinion regarding lost wages and employee benefits should be barred because his calculations are unreliable and are not based upon objective evidence. The crux of defendants' argument is that Smith's calculation is unreliable because he uses only two years of sporadic work history records to project anticipated full-time earnings for the remainder of Hicks' estimated 37.7 years of life expectancy. Lewis acknowledges Hicks' prior work history records are incomplete, but argues Smith is nevertheless entitled to rely on the prior earnings records to estimate future lost wages. The court agrees. Smith's expert report reveals that he relied on Hicks' prior employment records from Tyson Foods and Home Depot, and on an interview with Hicks' brother (among other things) to formulate his opinions. Def. Mot. Ex. A at 1. He uses the $10 an hour Hicks earned at his last job at Home Depot to project future earnings. He uses the life expectancy table published by the National Center for Health Statistics, United States Life Tables,

2001, Vol. 52, No. 14, National Vital Statistics Reports, 2004, to calculate lost earnings on a year by year basis through the estimated life expectancy. Def. Mot. Ex. A at 3. His calculations allow the jury to estimate lost wages through any assumed retirement age. *Id.* Defendants concede an expert may reasonably rely on prior earnings records to calculate future earnings. Motion at 2-3. But they claim available prior earnings records are too scarce to support Smith's estimate. Defendants' arguments may be convincing on cross-examination, but they do not warrant exclusion of Smith's testimony under Rule 702. The individual defendants' motion to bar Smith from testifying regarding lost wages and benefits is denied.

**b. Loss of Household Services**

The individual defendants argue Smith's opinion on the loss of household services should be barred because his opinion runs afoul of Fed. R. Evid. 702. Specifically, defendants argue the calculations are highly speculative because Hicks "did not provide traditional marital services to his estranged wife. . . ." Def. Mot. at 5. They claim there is no evidence Hicks offered replacement services to his estranged wife and, therefore, their relationship is not one the legislature intended to protect under the Illinois Wrongful Death Act, 740 ILCS 180/1. Without elaborating, Lewis argues that Smith's methodology "would pass a test similar to the test used in *Daubert*." Response at 3.

The Supreme Court set forth five factors to guide a court in assessing the reliability of expert testimony: (1) "whether a theory or technique . . . can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the known or potential rate of error;" (4) "the existence and maintenance of standards controlling the technique's operation;" and (5) whether the technique or method has met with general acceptance. *Id.* at 593-94. The *Daubert* analysis applies to both scientific testimony and expert testimony that involves technical

or other specialized knowledge. *Kumbo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999). The court must also consider whether the evidence is relevant. This requires a determination as to whether the evidence will assist the jury in determining the existence of any material fact. *Daubert*, 509 U.S. at 591-93. Lewis bears the burden of establishing Smith's expert testimony meets these standards. *Schrott v. Bristol-Myers Squibb Co.*, 2003 U.S. Dist. LEXIS 18890, at *3 (N.D. Ill. Oct. 22, 2002).

Smith estimates Hicks would have provided 1.0 to 2.0 hours of household services per day. *Id.* As support for his estimate, he cites a study from New York State College of Human Ecology. *Id.* He also values household services at a rate of $7.26 per hour, citing a study from the Journal of Forensic Economics. *Id.* The individual defendants do not challenge Smith's qualifications, methodology or his underlying data. Rather, they argue his testimony is irrelevant because Hicks did not provide traditional marital services to his wife. Their argument is based primarily on the fact that Hicks was separated from his wife and they lived in different states. There is evidence Hicks frequently spoke with his wife and was planning to move to California to reconcile with her. Def. Mot. Ex. A at 4.

Damages for loss of consortium may be recovered in an Illinois wrongful death action. *Countryman v. County of Winnebago*, 135 Ill. App. 3d 384, 388, 481 N.E.2d 1255 (2nd Dist. 1985). Consortium encompasses both material services and intangibles such as society, guidance, companionship, and sexual relations. *Id.* A spouse's loss of consortium is a pecuniary injury. *In re Air Crash Disaster Near Chicago*, 771 F.2d 338, 339 (7th Cir. 1985). A widow is presumed to have suffered pecuniary loss when a husband dies. *Id.* It is undisputed Hicks was married to his wife at the time of his death. Defendants cite no authority to support their argument that separated

spouses are not entitled to consortium damages. While their separation may be relevant to the amount, if any, of consortium damages awarded to Hicks' widow, there is no legal basis to exclude evidence of the damages. *See, e.g., Planned Parenthood v. Vines*, 543 N.E.2d 654, 657-58 (Ind. App. 1989) (court affirmed loss of consortium award to husband who was separated from his wife). The jury will decide whether Hicks' wife is entitled to any consortium damages. Based on the record, Smith's expert testimony on household services is not clearly admissible. The individual defendants' motion *in limine* is denied.

### 2. Bar Use of the Term "Homicide"

The medical examiner ruled Hicks' death a homicide and determined the cause of death to be asphyxiation due to restraint. The individual defendants seek to exclude use of the term "homicide" and the medical examiner's determination about the manner of Hicks' death because "Mr. Hicks' estate is suing civilly for money, not to determine in what manner Mr. Hicks' life expired." Motion at 10. Lewis responds that the official manner of Hicks' death is relevant to the case and does not unfairly prejudice defendants. The manner of Hicks' death is clearly relevant to the excessive force and wrongful death claims. The crux of Lewis' case is that the police officers used excessive force that resulted in Hicks' death.

The individual defendants next argue the medical examiner's determination of the manner of death is a legal conclusion that would unfairly prejudice defendants and confuse the jury. Relevant evidence is inherently but fairly prejudicial. Rule 403 is not intended to exclude relevant evidence simply because it is detrimental to one party's case. The relevant inquiry is whether *unfair prejudice* from the evidence substantially outweighs its probative value. *United States v. Bogan*, 267 F.3d 614, 622 (7th Cir. 2001). Evidence is unfairly prejudicial only if it will induce the jury to decide

the case on an improper basis, commonly an emotional one, rather than on the evidence presented. *Id.* at 623.

Alternatively, defendants argue the probative value of the evidence is outweighed by danger of unfair prejudice and jury confusion. According to defendants, the term "homicide" is commonly associated with murder, but is used by the medical examiner's office merely to refer to death caused by another person. Defendants will have the opportunity to cross-examine the medical examiner about the meaning of the term "homicide." Certainly a jury is capable of understanding the term. The individual defendants' motion to bar use of the term homicide and to exclude the medical examiner's death certificate is denied.

### 3. Opinions of Police Procedures Expert

The individual defendants seek to bar Lewis' police procedures expert, John Sullivan, from testifying that: (a) the police officers used excessive force by applying a choke-hold/neck restraint with undue severity resulting in Hicks' death; (b) the use of a choke-hold/neck restraint resulted in Hicks' death; (c) there is documentation that Hicks died from an improperly restrained choke-hold; (d) his focal point is on the evidence, the witness statement, and the medical examiner's statement that a choke hold was applied; and (e) there is a preponderance of evidence that a choke hold was used.[3] Defendants further seek to limit Sullivan's testimony to an opinion that use of a choke-hold would be excessive if the officers were not confronted with a situation that is likely to cause death or great bodily harm.

---

[3]Sullivan testified to these matters in his deposition in direct response to defendants' counsel's questions relating to Hicks' cause of death and the officers' use of force.

Lewis represents that Sullivan will not give opinions on medical issues or conclusions regarding cause of death. He admittedly is not qualified to do so. Def. Mot. Ex. E at p. 178. Accordingly, Sullivan is barred from offering medical opinions about the cause of Hicks' death. Nor is he permitted to offer opinions about the strength of the evidence.

Lewis seeks to introduce Sullivan's opinions regarding police training, restraint tactics, the danger of choke-holds and an analysis of the police officers' use of force in this case against professional standards. Sullivan may rely on deposition testimony and official medical examiner's reports as the basis of his opinion. Pl. Resp. at 5-6. Expert testimony on the issue of the proper level of force to be used by police officers in various situations is generally admissible in excessive force civil rights cases. *Kladis V. Brezek*, 823 F.2d 1014 (7th Cir. 1987); *Falk v. McNamara*, 1990 U.S. Dist. LEXIS 3747, at *12 (N.D. Ill. March 30, 1990). Indeed, defendants do not claim otherwise. Sullivan may testify regarding proper police procedures and policies, restraint techniques, use of force and police training and education.

The individual defendants seek to bar Sullivan from offering opinions regarding the force used in this case. They argue Sullivan's testimony is based on credibility determinations. An expert witness should not be permitted to state opinions about disputed underlying facts. *Falk*, 1990 U.S. Dist. LEXIS 3747, at *12. That testimony would not aid the jury. It is the jury's role to decide disputed facts. Sullivan is barred from offering opinions about disputed facts.

The issue remains whether Sullivan can opine on whether the police officers used excessive force under an assumed set of facts. Defendants claim Sullivan's opinion should be barred because it is based on disputed evidence. An expert may rely on evidence in the record to form the basis of his opinion if the evidence is of the type reasonably relied on by experts in his field. *See* Fed. R.

Evid. 703; *Keys v. City of Harvey*, 1996 U.S. Dist. LEXIS 805, at *14-15 (N.D. Ill. Jan. 24, 1996) (expert may rely on officers' deposition testimony to form basis of excessive force opinion). Sullivan relies on the medical examiner's report, deposition testimony about the cause of death, and use of a neck restraint in forming his excessive force opinion. Pl. Resp. Ex. 1 at 179-180. Defendants do not claim this evidence is an improper basis for forming an excessive force opinion under Rule 703. Defendants' first argument must be rejected.

The individual defendants next argue Sullivan's ultimate opinion regarding the use of excessive force would not assist the jury. Fed. R. Evid. 704 permits expert testimony that embraces an ultimate issue to be decided by the trier of fact if the testimony is otherwise admissible. Defendants argue the testimony is not otherwise admissible because it would not assist the jury, relying on *Pena v. Leombruni*, 200 F.3d 1031, 1034 (7th Cir. 1999). In *Pena*, the Seventh Circuit affirmed the district court's exclusion of expert testimony regarding whether a police officer used excessive force. It was undisputed that the police officer shot and killed a victim in the course of arrest. The appellate court concluded "[the police officer's] behavior was unambiguously dangerous; the question whether the danger was sufficiently lethal and imminent to justify the use of deadly force was within lay competence." *Id.*

Unlike *Pena*, this case does not involve the undisputed shooting of a victim. Rather, there are disputed facts about the nature of the restraint used on Hicks. Sullivan's opinion regarding whether excessive force was used under an assumed set of circumstances with an evidentiary basis may assist the jury. *See United States v. Mohr*, 318 F.3d 613, 624-25 (4th Cir. 2003); *Davis v. Mason County*, 927 F.2d 1473, 1484-85 (9th Cir. 1991). Sullivan may not offer his opinion about disputed facts, but he may testify about his opinions concerning the reasonableness of the force used under

different assumed facts with an evidentiary basis. The jury ultimately may reject Sullivan's assumed set of facts, but his opinion may nevertheless assist them in deciding the reasonableness of the degree of force used. The individual defendants' motion to limit Sullivan's testimony to an opinion that the use of a choke-hold would be excessive if the police officers did not face death or great bodily harm is denied.

**4. Racial Motivation**

The individual defendants move to exclude evidence or arguments regarding race under Fed. R. Evid. 402 and 403. They argue Lewis should be barred from mentioning race, asking questions about race, or suggesting race was a motive for Hicks' arrest or the police officers' conduct during the arrest. Defendants cite examples where Lewis' counsel questioned witnesses in depositions about race. Defendants also cite examples where eyewitnesses used race to describe the arrest incident.

Lewis contends he should be permitted to cross-examine the individual defendants regarding their racial bias if they testify that they were suspicious of Hicks for other reasons. For example, they testified in their depositions that they followed Hicks onto a train because they were suspicious of him. They claimed to be suspicious because of his demeanor and because he did not board the first train that stopped at the station. Lewis seeks to cross-examine the individual defendants as to whether they were suspicious of Hicks because of his race. Lewis also argues that he should be permitted to question them about their racial bias because one police officer described bystander witnesses at the scene as suspicious. The bystanders were African-American. Lewis argues he should be permitted to question the individual defendants why they did not interview witnesses, including questions about whether race was a factor. Based on the record, evidence relating to race

is not clearly inadmissible for all purposes. Questions relating to the admissibility of racial evidence shall be resolved in context at trial.

Lewis argues that the 911 call and eyewitness testimony are relevant and not unfairly prejudicial. The 911 call and other eyewitness descriptions are clearly relevant. Moreover, this evidence is not unfairly prejudicial merely because the witnesses used race to identify the police officers and Hicks.

### D. Lewis' Motions *in Limine*

Lewis moves to exclude 18 categories of evidence. Defendants concede three of the categories should be excluded. Def. Resp. at 4, 12, 16. Accordingly, the court bars evidence or references to Hicks' prior drug use and the circumstances under which Lewis' attorneys were employed or their retainer agreement. The court also bars the testimony of Clarence Chapman. The court next addresses the disputed motions.

#### 1. Hicks' Prior Arrests and Conviction

Hicks was convicted of the misdemeanor of resisting and evading arrest in 2001. Pl. Mot. at 1. He served 20 days in jail and paid a $200 fine. *Id.* He was also arrested for driving under the influence of alcohol in 1990, but he was not convicted. *Id.* at 1-2. Lewis moves to exclude this evidence under Fed. R. Evid. 404. Defendants argue the evidence is admissible under Fed. R. Evid. 404(b) because it shows identity, lack of mistake and *modus operandi,* and because their expert witness relied on the evidence in forming his opinion that alcohol had an effect on Hicks' actions. Defendants summarize the circumstances surrounding both prior arrests and argue that they show Hicks "exhibited a pattern of becoming aggressive or combative with police officers when he was

stopped and/or under the influence of alcohol." Response at 2. Defendants' summary of the prior arrests is unsupported by citations to the record.

Fed. R. Evid. 404 (b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

Evidence of Hicks' prior arrests and conviction does not meet the standards for admissibility set by the Seventh Circuit in *United States v. Hernandez*, 84 F.3d 931, 935 (7th Cir. 1996). Defendants fail to explain how the prior drunken driving arrest and misdemeanor conviction for resisting arrest show identity or lack of mistake. Neither party disputes identity or claims mistake. Defendants argue Hicks' limited criminal history shows his *modus operandi* of becoming combative with police officers. However, this is just another way of saying Hicks had a propensity to resist arrest. Rule 404(b) evidence is inadmissible for this purpose. Moreover, the 1990 arrest is too remote in time to have any probative value.

Defendants argue Hicks' criminal history is admissible because their expert witness, James O'Donnell, relied on it to form his opinions. This argument is frivolous. An expert may rely on inadmissible evidence in forming his opinion; an expert's reliance on otherwise inadmissible evidence is not a basis for admissibility. Fed. R. Evid. 703. Defendants cannot use their expert witness as a means to introduce otherwise inadmissible evidence.[4]

---

[4]The court notes that O'Donnell's report is filled with inadmissible evidence not bearing on his ultimate opinions. Defendants shall not be permitted to introduce irrelevant and highly prejudicial evidence that serves no purpose other than to taint Hicks' character.

Finally, defendants argue that if Lewis introduces evidence that Hicks was not a resister or a fighter, they should be permitted to rebut this evidence with his two prior arrests and misdemeanor conviction. As an initial matter, character evidence that Hicks was not a resister is likely inadmissible under Rule 404 (a). However, if Lewis introduces this type of evidence, defendants may be permitted to introduce evidence that Hicks resisted arrest on prior occasions. The court reserves ruling on this limited issue until trial. Counsel and witnesses shall not refer to Hicks' prior arrests or conviction in their opening statement or during witness examinations absent reconsideration of this issue outside the jury's presence.

### 2. Alcohol in Hicks' System at Time of Death

Lewis moves to exclude evidence that Hicks' body had a .094 alcohol level at the time of his autopsy. Fed. R. Evid. 401, 402 and 403. Lewis contends that because Hicks was not driving and there is no medical evidence that his alcohol consumption contributed to his death or that he exhibited signs of intoxication, his blood alcohol level is irrelevant and prejudicial. Lewis also seeks to exclude the evidence because defendants' expert witness testified that Hicks may have a functional tolerance for alcohol. Defendants respond that Hicks' blood alcohol level is relevant to his conduct at the time of the incident. They proffer evidence that Hicks resisted arrest. They argue a reasonable trier of fact could infer that Hicks' blood alcohol level contributed to his combative behavior at the time of arrest.

The motion *in limine* must be denied. Evidence of Hicks' blood alcohol level is potentially relevant to whether Hicks resisted arrest or became combative with police officers. A reasonable jury could conclude Hicks was more likely to become combative if he was legally intoxicated. *See*

*Saldino v. Winkler*, 609 F.2d 1211, 1214 (7th Cir. 1979). While the evidence may be detrimental to Lewis' case, it is not *unfairly* prejudicial.

**3. Witnesses' Prior Criminal Arrests and Convictions**

Lewis moves to bar evidence or references to his witnesses' prior criminal arrests or convictions under Fed. R. Evid. 609. He does not identify any prior arrests or convictions. Defendants identify three witnesses who have convictions. They argue the convictions are admissible under Fed. R. Evid. 609, which provides:

> (a) **General Rule**. For the purpose of attacking the credibility of a witness,
>
> (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year. . . .
>
> (2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.
>
> (b) **Time Limit**. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction is supported by specific facts and circumstances substantially outweighs its prejudicial effect.

According to defendants, Billie Ray Lewis was convicted of income tax fraud in 2004. This conviction is admissible under Fed. R. Evid. 609 (a)(2). According to defendants, Gary Dean Lewis was convicted of possession of a controlled substance in 1998 and was sentenced to 16 months in prison. This conviction is admissible under Fed. R. Evid. 609(a)(1) because its probative value is not outweighed by the risk of unfair prejudice.

According to defendants, Alfred Dale Lewis, Sr. was convicted of five crimes punishable by imprisonment in excess of one year. Defendants list each conviction in their response. Convictions

in the past ten years or release from confinement in the past ten years are admissible under Fed. R. Evid. 609 (a)(1). Convictions beyond the ten year period are inadmissible because their probative value does not outweigh the risk of unfair prejudice.

### 4. Testimony of Expert Pharmacologist

Lewis moves to bar the testimony and opinions of defendants' pharmacologist expert, James O'Donnell, under Fed. R. Evid. 702. O'Donnell's expert reports contain four opinions:

> 1. In my opinion, with reasonable pharmacological certainty, Mr. Christopher Hicks was intoxicated and impaired by alcohol at the time he fled from and fought with the Police. Mr. Hicks, an alcoholic, had prior incidents where he, while intoxicated, fled from and fought with the police. As noted above, had [sic] two prior incidents where he fled from and fought with Police while intoxicated.
>
> 2. Alcohol, at very low levels, acts as a disinhibitor, by releasing the inhibiting controls on behavior in the higher levels of the brain. A blood alcohol level of 94mg% exceeds the presumptive level of intoxication (80mg%) in the Illinois Motor Vehicle Code. This intoxication probably precipitated his erratic, bad judgment, and violent behavior on May 26, 2004.
>
> 3. A 94mg% BAC represents the equivalent of approximately 5 to 6 beers in is [sic] body at the time of his death. If his drinking occurred over a period of 3-4 hours before the incident, then Mr. Hicks probably consumed approximately 8 beers (or alcohol equivalent in other beverages).
>
> 4. [I]t is probable that Mr. Kendall's ability to perceive and remember an incident would be impaired and, thus, his testimony as to his recollection of events would be, at the very least, suspect.

Pl. Mot. Ex. 4-5.[5] As support for these opinions, O'Donnell relies on deposition testimony of Hicks' former girlfriend that he was an "abusive alcoholic," that she believes Hicks may have died from chewing on a straw, and that she thought the manner of Hicks' death was "funny." O'Donnell

[5]The exhibits attached to Lewis' motion are unnumbered. O'Donnell's reports are the fourth and fifth attached documents.

Report at 2. He also relies on deposition testimony of family members regarding Hicks' drinking history and military and arrest records. *Id.* at 3-4.

Lewis argues O'Donnell's testimony and opinions are unsupported by reliable facts and scientific methodology. First, Lewis challenges the reliability of the data supporting O'Donnell's opinions. Second, he challenges the methodology used because O'Donnell did not apply a tolerance factor. Third, he argues O'Donnell's opinions regarding Hicks' behavior at the time of the incident should be excluded because it is based on the individual defendants' account of the incident. Finally, he argues O'Donnell's opinion regarding Kevin Kendall should be barred because it lacks a scientific basis. Defendants respond that O'Donnell's testimony is based on reliable facts and scientific methodology.

**a. First Opinion**

With respect to his first opinion, O'Donnell's conclusion that "Hicks, an alcoholic, had prior incidents where he, while intoxicated, fled from and fought with the police. As noted above, he had two prior incidents where he fled from and fought with Police while intoxicated" is not based on any specialized knowledge and would not assist the jury as required by Fed. R. Evid. 702. O'Donnell concludes that "with reasonable pharmacological certainty, Mr. Christopher Hicks was intoxicated and impaired by alcohol at the time he fled from and fought with the Police" is "a scientific conclusion based on [Hicks'] blood alcohol level and [his] behavior . . . at the time of the May 26th, 2004 incident." O'Donnell Dep. Ex. 1 at 128. He does not identify any scientific methodology used to reach the conclusion that Hicks was impaired by alcohol. Indeed, his deposition testimony suggests his opinion is based largely on the individual defendants' account of Hicks' conduct, rather than scientific methodology. He testified that a blood alcohol level of 94 "is not significant in

physically and mentally impairing" a person, and that there are large individual differences in the impairment produced by alcohol consumption. O'Donnell Dep. Ex. 1 at 62, 72. Because defendants have not established O'Donnell's first opinion is based on a scientific methodology, it is inadmissible under Rule 702.

Moreover, O'Donnell's first opinion would not assist the jury because it is based on the fact that Hicks' blood alcohol level was over the legal limit for operating a motor vehicle and the individual defendants' description of Hicks' conduct at the time of the arrest. Presumably, the defendants will present evidence relating to Hicks' blood alcohol level and the individual defendants' account of his conduct. The impact of Hicks' alcohol consumption on his conduct at the time of arrest is a jury issue, and O'Donnell's testimony on this issue is barred.

**b. Second Opinion**

O'Donnell's second opinion that Hicks' intoxication "probably precipitated his erratic, bad judgment, and violent behavior on May 26, 2004" is inadmissible because there is no indication this opinion is based on reliable scientific methodology and it would not assist the jury. *See Daubert*, 509 U.S. at 593-94. The jury will hear the evidence regarding Hicks' conduct during the arrest and shall decide whether Hicks was violent. Specialized knowledge is not required to make this determination. Accordingly, Lewis' motion is granted with respect to this opinion.

O'Donnell's second opinion states that "[a]lcohol, at very low levels, acts as a disinibitor, by releasing the inhibiting controls on behavior in the higher levels of the brain." This opinion is inadmissible because defendants have not established the opinion meets the *Daubert* standard. Although O'Donnell cites three articles in his report as support for the effects of intoxication on cognitive functions and motor skills, he provides no scientific support for his conclusion that alcohol

precipitates violent behavior.[6] O'Donnell Dep. at 136. Defendants seek to admit this evidence to prove Hicks acted violently and resisted arrest. But O'Donnell provides no scientific support for his conclusion that low levels of alcohol cause violent behavior. Moreover, the record does not reveal that his opinion is based on theories that can be and have been scientifically tested. Nor is there any indication of the potential or known rate of error. Indeed, O'Donnell admits the effects of alcohol vary significantly on an individual basis. In sum, O'Donnell's opinion does not meet *Daubert's* reliability standards.

O'Donnell's second opinion also concludes that "[a] blood alcohol level of 94mg% exceeds the presumptive level of intoxication (80mg%) in the Illinois Motor Vehicle Code." This testimony would not assist the jury because it states a fact that does not require specialized knowledge. Accordingly, O'Donnell's second opinion is inadmissible under Fed. R. Evid. 702. Even if O'Donnell's second opinion were admissible under Rule 702, it is inadmissible under Rule 403. As set forth above and below, defendants are permitted to introduce evidence relating to Hicks' blood alcohol level and the estimated number of drinks he had to reach that blood alcohol level. Expert testimony on the effects of alcohol may improperly focus the jury on Hicks' drinking rather than the actual conduct of the parties during the incident.

#### c. Third Opinion

Finally, in his third opinion O'Donnell concludes that "[a] 94mg% BAC represents the equivalent of approximately 5 to 6 beers in his body at the time of his death. If his drinking occurred

---

[6]Defendants point to O'Donnell's testimony that he "probably" could find authority to support this proposition. Response at 8. However, O'Donnell has not provided authority for his conclusion. Defendants bear the burden of establishing O'Donnell's testimony is admissible under Rule 702. *Schrott*, 2003 U.S. Dist. LEXIS 18890, at *3.

over a period of 3-4 hours before the incident, then Mr. Hicks probably consumed approximately 8 beers (or alcohol equivalent in other beverages)." O'Donnell explained that his calculation was based on Hicks' weight, blood alcohol level, volume of distribution and concentration of alcohol in beer. O'Donnell Dep. at 130-31. He described his opinion as a straightforward scientific calculation using these factors. *Id.* Lewis does not challenge O'Donnell's methodology or qualifications to render this opinion. Rather, he argues the opinion is irrelevant to any issue in the case. Defendants do not respond to this argument.

Testimony relating to the approximate number of drinks Hicks consumed to reach a blood alcohol level of 94mg% is potentially relevant to defendants' claim that Hicks resisted arrest. As described above in connection with Lewis' motion to bar evidence relating to Hicks' blood alcohol level, defendants argue that Hicks' alcohol consumption is relevant to their claim that Hicks resisted arrest. A reasonable jury could conclude Hicks was more likely to resist arrest if he was drinking. O'Donnell's testimony about the number of drinks Hicks consumed to reach a blood alcohol level of 94mg% would place the blood alcohol level in perspective for jurors. Accordingly, the motion is denied with respect to O'Donnell's third opinion.

**d. Fourth Opinion**

The admissibility of O'Donnell's fourth opinion about Kevin Kendall's ability to perceive and remember the incident requires little discussion. O'Donnell states: "[g]iven the well known acute impairments to perception and memory caused by alcohol, as well as the well known organic brain damage and cerebral atrophy associated with years of chronic alcohol abuse, it is probable that Mr. Kendall's ability to perceive and remember an incident would be impaired. . . ." Pl. Mot. Ex. 4 at 1. He cites several articles to support his opinions about the effects of alcohol (including an

article he authored), organic brain damage and cerebral atrophy. *Id.* He has no opinion whether Kendall, an eyewitness to the incident, in fact suffers from organic brain damage or cerebral atrophy. O'Donnell Dep. at 155. Defendants present no evidence that Kendall suffers from these ailments. O'Donnell's opinion about Kendall is irrelevant and inadmissible under Rules 702 and 402.

Moreover, O'Donnell's opinion is improper because it opines on Kendall's credibility. He bases his opinion on the fact that Kendall's testimony contradicted other witnesses. An expert witness is not permitted to state opinions about whose version of the events is true. *Falk*, 1990 U.S. Dist. LEXIS 3747, at *12. His fourth opinion is inadmissible for this reason as well. The motion to bar O'Donnell's fourth opinion is granted.

**5. Erika Stewart's Testimony**

Lewis moves to bar the testimony of Erika Stewart under Fed. R. Evid. 402 and 403. Stewart, Hicks' ex-girlfriend, provided a sworn statement to defendants. Lewis did not attach the sworn statement to his motion *in limine*. The court is unable to determine whether *all* testimony concerning the contents of the statement should be barred.

The parties describe parts of Stewart's proposed testimony. For instance, she stated that Hicks acted "crazy." She provided specific examples of his conduct, including an instance when Hicks vandalized her car. Defendants claim testimony about Hicks' relationship with Stewart is relevant to determining the amount of damages, if any, awarded to Hicks' wife. They argue that evidence regarding Hicks' relationship with his ex-girlfriend is relevant to Hicks' relationship with his wife. While evidence that Hicks *had* a girlfriend may be relevant, *Countryman v. County of Winnebago*, 135 Ill. App. 3d 384, 388, 481 N.E.2d 1255 (2nd Dist. 1985), evidence relating to a purported "crazy" relationship with Stewart or any other ex-girlfriend is irrelevant. There is simply

no basis for admitting evidence that Hicks vandalized Stewart's car, told her he had used drugs and had domestic problems with other ex-girlfriends, or that Stewart once called the police because Hicks refused to leave her home. This evidence and other similar evidence is inadmissible under Fed. R. 402. Even if Hicks' girlfriend problems had any probative value, it would be inadmissible under Fed. R. Evid. 403 because of the likelihood of unfair prejudice, jury confusion of issues, and waste of trial time.

### 6. Gerry Suchanek's Expert Testimony

Lewis moves to exclude the testimony and opinions offered by defendants' expert economist, Gerry Suchanek.

#### a. Medical Testimony

Lewis first moves to strike Suchanek's opinion regarding Hicks' decreased life expectancy based on chronic drinking. Suchanek's expert report states, "[e]xtensive research by the medical profession world-wide has demonstrated that men in the age groups of 30-59 and 39-65 who average more than five drinks per day have increased all-cause mortality risk. . . . Most studies show that the increased all-cause relative to risk of mortality is between 2.2 and 2.3. . . ." Applying this medical research, Suchanek opines that Hicks' life expectancy was diminished from 33.4 years to 14.52 years. Defs. Mot., Ex B at 9. He uses the same data to reduce Hicks' work-life expectancy from 18.4 years to 8 years. *Id.* Lewis claims Suchanek is not qualified to opine on Hicks' life expectancy because he is not a medical expert. He argues there is no medical evidence Hicks would not have had a normal life expectancy and that Suchanek's methodology is unreliable because the medical studies he relies on are unreliable.

The parties have not identified the medical studies Suchanek relied on in calculating Hicks' reduced life-expectancy and work life-expectancy. Nor does Suchanek's report identify them. Def. Mot. at Ex. B. The court is unable to determine whether Suchanek's opinion regarding reduced life-expectancy is based on theories that have been tested and subjected to peer review. Nor can the court determine whether Suchanek's opinion regarding a 50% reduced life expectancy is generally accepted by experts in the field.

No basis has been advanced to determine whether the medical research Suchanek relies on is the type of data reasonably relied upon by expert economists in formulating damages calculations. Defendants' response asserts that economic experts traditionally use "life expectancy tables, work-life expectancy tables, work-productivity tables, 3-7ear T-Bill Rates, etc. in calculating their expert opinion on issues relevant to economic loss." Response at 14. They state further, "[t]he use of health factors are often applied in working with these tables." *Id.* Defendants do not contend economic experts reasonably rely on the kind of medical studies used by Suchanek. The record does not provide a sufficient basis to determine whether Suchanek's opinions regarding reduced life-expectancy and work life-expectancy are admissible under Rule 702.

Expert economic testimony regarding shortened life-expectancies is potentially admissible. *See Michels v. United States*, 815 F. Supp. 1244 (S.D. Ia. 1993); *Lopinto v. Crescent Marine Towing*, 2004 U.S. Dist. LEXIS 15019 (E.D. La. Aug. 2, 2004); *Harrington v. United States*, 2002 U.S. Dist. LEXIS 16185 (S.D. Ia. Aug. 28, 2002). Suchanek's testimony may be admissible to rebut Lewis' economic expert's use of the normal life-expectancy given the proper foundation. Ruling on the admissibility of this evidence must await trial. Defendants shall not refer to Hicks' reduced life-

expectancy and work life-expectancy in their opening statements or until a foundation for this testimony has been established under Rule 702.

**b. Military Evidence**

Lewis moves to bar Suchanek's opinions relating to Hicks' military career. Suchanek's report contains findings relating to Hicks' military service from 1987 through 1993, including disciplinary actions for absences and driving under the influence of alcohol. These incidents are too remote in time to bear any relevance to this case. Any probative value these incidents may have is substantially outweighed by their prejudicial effect. The motion *in limine* is granted with respect to military disciplinary actions.

Lewis also moves to bar Suchanek from testifying that Hicks dropped rank in the army in 1993. Defendants claim this evidence is relevant to Hicks' performance in future employment. Again, the evidence is too remote in time to have probative value on damages calculations. Any arguable probative value is substantially outweighed by prejudicial effect, jury confusion and waste of trial time. The motion *in limine* is granted with respect to Hicks' reduction in rank in the army.

Lewis moves to bar Suchanek from opining that Hicks' military training does not translate into civilian training. Defendants respond that Suchanek is familiar with what one learns in the military and can opine that specific military training is not equivalent to civilian training. Response at 16. They claim the evidence is relevant to the issue of Hicks' prospective employability. Suchanek attended the United States Army Command and General Staff College and the United States Army War College. He was an enlisted member of the military from February 1991 through August 1991, March 1993 through June 1993, and December 1995 through July 1996. Lewis has not established that Suchanek's testimony regarding Hicks' military training is clearly inadmissible.

### c. Testimony Regarding Psychology, College Admissions and Tax Issues

Lewis moves to bar a range of opinions stated in Suchanek's deposition. He challenges Suchanek's opinions that Hicks would not have changed career paths, life styles, and would not have completed college. Defendants respond that calculating future earnings requires a degree of educated guessing about underlying assumptions. Defendants are correct. However, in his deposition, Suchanek went beyond explaining the assumptions he used. He testified that, "I can state, definitively, that the probability would be very, very zero that he would do so [go to college] successfully. Very near zero I mean to say." Suchanek Dep. at 70-71. He admitted he had not done any studies on college success. *Id.* at 71. While it is appropriate for Suchanek to make future calculations based on underlying assumptions, he may not offer purported expert opinions on those assumptions unless they are admissible under Fed. R. Evid. 702.

Lewis argues Suchanek's economic analysis should be barred because it relies on incomplete information. Unlike Lewis' expert, Suchanek uses only documented prior earnings to calculate lost future earnings. Lewis contends there is a high probability Hicks' earnings records are incomplete and therefore Suchanek's calculation is unreliable. Lewis' argument may be convincing on cross-examination, but it does not bar Suchanek's testimony. Lewis does not challenge his underlying methodology or the reliability of the prior earnings records. Indeed, Lewis' expert relies on the same documents. Lewis' motion *in limine* to bar Suchanek's economic analysis is denied.

The court reserves ruling on the motion with respect to Suchanek's opinion that Hicks' tax returns are bogus. Lewis does not challenge Suchanek's qualifications to evaluate Hicks' tax returns.

To the extent Lewis relies on Hicks' tax returns as evidence of earnings, Suchanek's testimony may be relevant.

**7. Kendall's Cocaine Use**

Lewis moves to bar evidence relating to Kevin Kendall's previous cocaine use. Kendall testified that he started using cocaine daily in 1985. He continued to use cocaine until about one week before his deposition, except for a three month period in 2004 when he was in a rehabilitation program. He testified he had not used cocaine the day he witnessed Hicks' arrest. Defendants argue evidence of Kendall's cocaine addiction is relevant to credibility as a witness. They seek to question Kendall about whether he is using cocaine at the time of trial, and whether he used cocaine on the day of Hicks' arrest. They also seek to use evidence of his cocaine use to impeach his ability to recall the event.

Kendall's cocaine use is potentially relevant to his credibility and the reliability of his memory of the incident. The court may admit evidence concerning a witness' past drug use insofar as it relates to his possible inability to recollect and relate. *United States v. Robinson*, 956 F.2d 1388, 1397 (7th Cir. 1992). Cross-examination concerning past drug use is permitted if the witness' memory or mental capacity is legitimately at issue. *Id.* Evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony. *Id.* Cross-examination about a witness' illegal drug use may be barred when used for the sole purpose of a general character attack. *Id.* Defendants have proffered sufficient evidence to place Kendall's memory legitimately at issue. *See* Resp. at 20-21. They describe inconsistencies between his affidavit and his deposition testimony. *Id.* Moreover, Kendall testified inconsistently regarding his

use of cocaine on the day of Hicks' arrest. Defendants may cross-examine Kendall about his prior and current cocaine use.

### 8. Medical Diagnosis by Paramedics

Lewis moves to bar testimony from paramedics who responded to the scene about the cause of Hicks' death, whether there were symptoms of choking, and as to diagnosis of petechia in the eyes. He claims these opinions are beyond the competency of non-doctors. Defendants respond that they do not intend to elicit any medical diagnosis from the paramedics. Accordingly, the motion is granted with respect to medical opinions.

Defendants intend to examine the paramedics about their observations when they arrived on the scene, including an observation there was no petechia in Hicks' eyes. According to the paramedics, petechia is bleeding in the eyes observable upon pupil examination. Def. Resp. Ex. 12 at 80. The paramedics are permitted to testify regarding their observations about Hicks' eyes.

### 9. Testimony of Hicks' Wife

In four sentences, Lewis moves to exclude testimony from Hicks' wife relating to his alcohol use, mental health issues, bad acts, arrests, employment discipline, counseling, and an alleged miscarriage of a baby. Lewis does not cite specific testimony, nor does he attach a deposition transcript. Defendants do not oppose the motion with respect to the miscarriage. Accordingly, the motion is granted with respect to the miscarriage, and denied as to the remaining issues.

### 10. Character or Bolstering Evidence Regarding Individual Defendants

Lewis does not seek to attack the character of any individual defendant based on reputation or unrelated events. He claims defendants should therefore be barred from bolstering themselves with testimony of commendations and awards. Defendants object that the motion is vague and argue

they should be permitted to elicit sufficient information to allow the jury to assess their credibility. Evidence of commendations and awards may be relevant to credibility, and is not clearly inadmissible.

**11. Closing Arguments**

Lewis moves to bar defendants from making certain arguments in their closing arguments. Defendants do not object to the motion, except with respect to one argument: that Lewis' damage request is shocking. Defendants claim there is nothing improper about arguing that a plaintiff's damages request is shockingly high. Defendants have the right to argue about the evidence and all reasonable inferences from the evidence. *Rebolledo v. Herr-Voss Corp.*, 101 F. Supp. 2d 1034, 1037 (N.D. Ill. 2000). Presumably, Lewis will offer evidence and argument regarding the amount of damages. Defendants are entitled to challenge the reasonableness of that evidence and Lewis' arguments. The motion *in limine* is denied with respect to closing arguments about the damages sought.

**12. Collateral Source Payments**

In one sentence, Lewis moves to bar evidence relating to collateral source payments for medical bills, and references to whether medical or funeral bills have been paid. Fed. R. Evid. 401, 402 and 403. Defendants concede the motion with respect to collateral source payments. Accordingly, the motion is granted with respect to collateral source payments.

Defendants object to the motion insofar as it seeks to exclude evidence of unpaid medical and funeral bills. They argue the evidence is relevant to determining damages because it shows Hicks had no income to support his wife. They contend it is relevant to show the estranged

relationship between Hicks and his wife because she did not pay his medical and funeral bills. Evidence of the unpaid bills is not clearly inadmissible for any purpose, and the motion is denied.

### 13. Hicks' Mental Health History

Lewis moves to bar Hicks' mental health history, including evidence he was an alcoholic, under Fed. R. Evid. 401, 402 and 403. He argues evidence of Hicks' mental health history is irrelevant and prejudicial, particularly because no psychological or psychiatric experts have been disclosed. He also argues mental health history is generally inadmissible in excessive force claims, citing *Wallace v. Mulholland*, 957 F.2d 333 (7th Cir. 1992) and *Rascon v. Hardiman*, 803 F.2d 269 (7th Cir. 1986). In *Wallace*, 957 F.2d at 336, court stated:

> [t]he lesson of *Rascon* is the danger that a jury will conclude that a mentally deficient plaintiff, regardless of his actual behavior, somehow 'asked for' mistreatment at the hands of two policemen is greater than the value of such evidence to explain the police officers' use of force. That general proposition seems especially correct where – as here – the police officers had no specific knowledge of Michael's condition before they tried to take him away. The trial judge found, and we agree, that the forbidden evidence would have shifted the focus from Michael's actions to his condition. Only his actions can justify the use of force. Evidence as to the general propensity of people suffering his ailments to make similar attacks would have been of more prejudicial than probative value to the defendants.

Defendants claim *Wallace* does not apply because they seek to introduce evidence that Hicks was an alcoholic to mitigate damages. They argue his disease affected his ability to work, keep a job, hold a relationship and support his spouse. Admissible evidence that Hicks was an alcoholic *may* be relevant to damages, but not to liability. However, the record is unclear whether defendants have admissible evidence that Hicks was an alcoholic, whether his alleged alcoholism affected his marriage or impacted his ability to work. Ruling on the admissibility of unspecified evidence must await trial. The parties shall not refer to Hicks' alleged alcoholism in their opening statements.

Defendants respond further that they should be permitted to introduce evidence that Hicks had alcohol in his system at the time of the incident and that the individual defendants observed his unusual conduct. This evidence does not relate to Hicks' mental health history and is potentially relevant, admissible evidence. Defendants further claim their expert witness should be permitted to testify regarding Hicks' prior incidents involving alcohol and altercations with the police. As an initial matter, these incidents are not evidence of Hicks' mental health history. And, as set forth above, the two prior arrests and misdemeanor conviction are inadmissible under Rule 404(b) and 403, even if O'Donnell relied on them in forming his opinions. Fed. R. Evid. 703.

Defendants also proffer testimony from Hicks' former girlfriend that he was "crazy" and had issues. They provide no legal basis for the admissibility of this evidence. The former girlfriend's testimony on these subjects is barred under Fed. R. Evid. 402 and 403.

### 14. Evidence of Domestic Battery

Lewis moves to bar Stewart from testifying that Hicks told her about a domestic disturbance he had with another ex-girlfriend. Lewis argues the testimony is hearsay and highly prejudicial. Defendants respond Hicks' statement is admissible under Rule 801(d)(2) and is relevant to calculating damages because it is probative of the kind of relationship Hicks had with his wife. This argument must be rejected. *See Huff v. White Motor Corp.*, 609 F.2d 286, 290-91 (7th Cir. 1979) (statements of decedent were inadmissible against estate under 801(d)(2)). Hearsay testimony Hicks had a domestic disturbance with an ex-girlfriend on an unknown date is irrelevant to Hicks' relationship with his wife. There is no probative value, but the evidence is clearly prejudicial. The motion *in limine* is granted under Fed. R. Evid. 402, 403 and 802. sbc

### 15. Random Acts of Misconduct

Lewis moves to bar references to Hicks' alleged prior work infractions, such as inappropriate conduct with a female staff member and allowing a minor to sit on his forklift. Defendants respond that the motion is overly broad and ambiguous to the extent it does not identify all random acts of misconduct Lewis seeks to exclude. Defendants also oppose the motion with regard to two identified instances. Defendants claim the two examples are relevant to determining damages because they establish Hicks' unemployability. They also argue the instance involving inappropriate conduct with a female employee is relevant to determining his relationship with his wife.

The motion is granted with respect to the two specific instances. The two instances do not evidence unemployability, nor are they probative of Hicks' relationship with his wife. Defendants apparently seek to use this evidence to disparage Hicks' character.

## III. Conclusion

Defendants' joint motion for bifurcation is denied. The city's motion *in limine* to bar Sullivan's testimony is denied. Lewis' and the individual defendants' motions *in limine* are granted in part and denied in part.

June 27, 2005

ENTER:

Suzanne B. Conlon
United States District Judge