IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BILLIE RAY LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 C 3904 |
| | ) | |
| v. | ) | Judge Conlon |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Magistrate Judge Schenkier |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING & CERTIFICATE OF SERVICE

**FILED**

JUN 2 9 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

To:  Daniel S. Alexander
119 N. Peoria, Ste. 3a
Chicago, IL 60607
Facsimile No. (312) 850-2704

**PLEASE TAKE NOTICE** that on June 29, 2005, we caused to be filed with the Clerk of the above Court **DEFENDANTS' MOTION TO QUASH PORTIONS OF PLAINTIFF'S NOTICE TO PRODUCE AT TRIAL**, a copy of which is attached hereto and herewith served upon you.

**PLEASE TAKE FURTHER NOTICE** that we shall appear before the Honorable Judge Suzanne B. Conlon or any judge sitting in her stead in courtroom 2325 of the Dirksen Building, 219 South Dearborn Street, Chicago, Illinois, on July 5, 2005, at 9:00 a.m., or as soon thereafter as counsel may be heard, to present the attached Motion.

**WE HEREBY CERTIFY** that we served this notice and motion on Plaintiff in this case by faxing a copy to his attorney at his fax number stated above, at or before 5:30 p.m. on June 29, 2005.

| | |
|---|---|
| CITY OF CHICAGO | All Individual-Defendants |
| By: _____ | By: _____ |
| Christopher M. Murray | Robert W. Barber |
| Assistant Corporation Counsel | Special Assistant Corporation Counsel |
| City of Chicago Department of Law | Individual Defense Litigation Division |
| Commercial and Policy Division | 30 North LaSalle St., Ste. 1400 |
| 30 North LaSalle St., Suite 700 | Chicago, Illinois 60602 |
| Chicago, Illinois 60602 | (312) 744-5890 |
| (312) 744-6648 | Attorney No. 00110280 |
| Attorney No. 6244700 | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BILLIE RAY LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 C 3904 |
| | ) | |
| v. | ) | Judge Conlon |
| | ) | |
| CITY OF CHICAGO, et al., | ) | Magistrate Judge Schenkier |
| | ) | |
| Defendants. | ) | |

**FILED**

JUN 2 9 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## DEFENDANTS' MOTION TO QUASH PORTIONS OF PLAINTIFF'S NOTICE TO PRODUCE AT TRIAL

Defendant City of Chicago ("City"), by its attorney Mara S. Georges, and Defendant

Officers Arnolts, Devan, Pena, and Soto, by one of their attorneys Robert W. Barber, move to

quash portions of Plaintiff's Notice to Produce at Trial for the following reasons:

1.      This case is set for trial on July 7, 2005.  Under the Court's rulings, a jury will

hear Plaintiff's federal and state law claims against the Defendant Officers and his Monell claim

against the City.  However, this Court limited Plaintiff's Monell claim to a specific issue:

Whether the City failed to retrain police officers who were once trained in neck restraints in other

control and restraint techniques.  See Memorandum Opinion and Order dated April 26, 2005

(Exhibit A) at 10-11.  In so ruling, this Court dismissed Plaintiff's claims that the City failed to

train its police officers in CPR and failed to investigate, discipline, and supervise its police

officers.  Id. at 12-14.

2.      On June 14, 2005, Plaintiff served the defendants with a Notice to Produce at

Trial, requesting that they produce twenty-three individuals and various "tangible items."  See

1

Plaintiff's First Notice to Produce at Trial (Exhibit B). Defendants move to quash Plaintiff's Notice to Produce as it relates to eleven of those individuals and four of the five tangible items requested.

3.     First, of the eleven individuals, Plaintiff failed to disclose seven of those witnesses (Cmdr. Matthew Tobias, former CPD Supt. Terry Hillard, CPD Supt. Phil Cline, Police Board Pres. Patricia Bobb, Police Board V.P. Scott Davis, Ald. Ike Carrothers, and Richard J. Daley (who is deceased)) during the course of discovery, each of whom Plaintiff will presumably call in an effort to prove his Monell claim. See Defendant City of Chicago's First Set of Interrogatories to Plaintiff (Exhibit C) at 3 ¶ 3; Plaintiff's Amended Answers to City's First Set of Interrogatories to Plaintiff (Exhibit D) at 12. Because Plaintiff failed to disclose these witnesses to the City in discovery, he should not be entitled to require that the defendants produce them at trial.

4.     Second, the four additional witnesses (Sgt. Jackie Campbell, Lori Lightfoot, Rachel Johnston, and Sgt. Mary Conley) were disclosed by the City as witnesses who would testify to matters that are no longer at issue in this case given the Court's ruling on the City's motion for summary judgment: Sgt. Campbell was expected to testify to police recruit training in 2004 (the time of the occurrence);[1] Lori Lightfoot was expected to testify to CPD's internal investigation and discipline of police officers; Rachel Johnston was expected to testify to the distribution of CPD written directives (which has no relevance to a failure to retrain control and restraint techniques); and Sgt. Mary Conley was expected to testify to CPD's Behavioral

---

[1] See Exhibit A at 11 (stating that "Lewis does not challenge the adequacy of the current police academy training program. The city's arguments based on the current program must be rejected.")

Intervention System and Personnel Concerns Program, two CPD programs that relate to Plaintiff's failure to investigate and discipline claims that have been dismissed. Thus, each witness's testimony as it relates to this case is now irrelevant.

5. Third, as to the witnesses that the City is willing to produce, Plaintiff has requested they be present for the entire trial that is expected to last two weeks. This is unreasonable, and the City requests that Plaintiff be required to specify the exact dates such witnesses will be needed.

6. Finally, Plaintiff has requested that the City produce several tangible items, including a folding baton, an OC spray canister with holster, all originals of the documents and photos in the defendants' possession that are included in the pretrial order; and "original quality recordings of all recorded calls and radio transmissions relative to this case."[2] The first two items, a folding baton and OC spray canister with holster, were never included in the pretrial order and, therefore, should not have to be produced. The original documents and photos that Plaintiff requests should likewise not have to be produced, as copies of these documents are acceptable under the Federal Rules. Finally, "original quality recordings of all recorded calls" is vague and leaves the defendants guessing as to what Plaintiff has requested. Plaintiff has already been provided with tapes of all 911 calls to the City's Office of Emergency Management and Communications. If Plaintiff wants the tapes to be converted to another format or have the tapes enhanced, he can do so himself. Thus, the defendants object to Plaintiff's request that they produce these items at trial.

WHEREFORE, the City requests that this Court enter an order quashing Plaintiff's

---

[2] Defendants have no objection to producing the personal effects of Christopher Hicks that are in the City's possession.

3

Notice to Produce at Trial to the extent requested in this Motion, and grant such other relief that

this Court deems appropriate.

Respectfully submitted,

CITY OF CHICAGO

By: _____

Christopher M. Murray
Assistant Corporation Counsel
City of Chicago Department of Law
Commercial and Policy Division
30 North LaSalle St., Suite 700
Chicago, Illinois 60602
(312) 744-6648

All Individual Defendants

By: _____

Robert W. Barber
Special Assistant Corporation Counsel
Individual Defense Litigation Division
30 North LaSalle St., Ste. 1400
Chicago, Illinois 60602
(312) 744-5890
Attorney No. 00110280

4

Order Form (01/2005)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 3904 | **DATE** | 4/26/2005 |
| **CASE TITLE** | LEWIS vs. CITY OF CHICAGO, et al. | | |

**DOCKET ENTRY TEXT:**

The City of Chicago's motion for summary judgment on Count II [71-1] is denied. In accordance with Fed.R.Civ.P. 56(d), Count II is limited to Lewis' claim that the city failed to adequately retrain its police officers in restraint and control techniques. The parties shall present their joint final pretrial order and agreed pattern jury instructions on May 25, 2005 at 9:00 a.m.; plaintiff's draft pretrial order shall be given to defendants by May 16, 2005, 2005. Trial is set on July 7, 2005 at 9:00 a.m. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

Notices mailed by judge's staff.

■ [ For further detail see attached order.]

| | Courtroom Deputy Initials: | CB |
|---|---|---|



04C3904 LEWIS vs. CITY OF CHICAGO, et al.

Page 1 of 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BILLIE RAY LEWIS,                          )
                                           )
                    Plaintiff,             )      No. 04 C 3904
                                           )
        v.                                 )      Suzanne B. Conlon, Judge
                                           )
CITY OF CHICAGO, *et al.*,                 )
                                           )
                    Defendants.            )

## MEMORANDUM OPINION AND ORDER

Christopher Hicks died during or immediately following his arrest by Chicago police officers.

His brother Billie Ray Lewis, as special administrator of the estate, sues the City of Chicago, and

police officers Louis Soto, Artemio Pena, Robert Arnolts, and Brian Devan, for civil rights violations

under 42 U.S.C. § 1983 (Counts I and II), wrongful death (Count III), pain and suffering under

Illinois' survival statute (Count IV), and intentional infliction of emotional distress (Count V). He

claims the city is liable for any judgment rendered against the officers (Count VI). The city moves

for summary judgment on Count II pursuant to Fed.R.Civ.P. 56.

## BACKGROUND

All facts are undisputed unless otherwise noted.[1]  Officers Soto, Pena, Arnolts and Devan

are Chicago police officers. On May 26, 2004, all four officers participated in Hicks' arrest. Hicks

died during or immediately following his arrest. The medical examiner ruled Hicks' death a

---

[1] The city filed a statement of undisputed facts ("City facts"). Lewis responded to the City facts ("Pl. Resp. facts") and filed a statement of additional undisputed facts ("Pl. facts"). The city responded to Lewis' additional facts ("City Resp. facts").

1

homicide and determined the cause of death to be asphyxiation due to restraint. Pl. facts ¶ 27. As set forth in the court's April 11, 2005 memorandum opinion denying in part the police officers' summary judgment motion, there are numerous factual issues surrounding Hicks' arrest. For example, Lewis presents evidence that Officer Soto placed Hicks in a choke hold and that the choke hold contributed to Hicks' death by asphyxiation. Pl. facts ¶¶ 7, 10, 27, 30. Officer Soto denies using a choke hold, but admits placing Hicks in a headlock. Pl. facts ¶ 49. For purposes of deciding this motion, the court views the evidence in Lewis' favor, and must assume Officer Soto placed Hicks in a choke hold that contributed to his death by asphyxiation.

## I. Chicago Police Department Training

Lewis claims Hicks' death resulted from the city's failure to train, supervise and discipline its police officers. Pl. Resp. facts ¶¶ 5-6. In 1985, the Chicago Police Department ("CPD") was certified by the State of Illinois to train police officers. Pl. Resp. facts ¶ 15. In the police academy, CPD recruits are trained on control and restraint techniques. Pl. Resp. facts ¶ 25. Before leaving the academy, recruits must pass an operations simulation test to demonstrate that they can properly perform the restraint techniques. *Id.* Currently, CPD does not train its police officers to use choke holds and neck restraints. Pl. Resp. facts ¶ 11. Lewis presents evidence that CPD taught neck restraints, including a carotid neck restraint or "sleeper hold," at the police academy until 1983. Pl. facts ¶ 31. Officer Soto attended the police academy in 1977. Pl. facts ¶ 32. The city claims the police academy training and testing protocol was followed "at all times relevant to the Complaint." City facts ¶ 25. Presumably, police recruits were trained and tested on control and restraint techniques when Officer Soto attended the policy academy.

In addition to police academy training, police officers receive in-service training. Pl. Resp. facts ¶ 26. The majority of in-service training occurs at roll call. *Id.* Roll call training consists primarily of lectures and videos called "streaming videos." *Id.* In 2002, CPD presented a series of lectures and streaming videos regarding General Order 02-08, the CPD written directive that prohibits the use of excessive force or unwarranted physical force. City facts ¶¶ 27-28. The streaming videos discuss general use of force principles. They do not demonstrate specific holds or restraint techniques. Pl. facts, Ex. 1 at 34-35. Officer Soto sometimes missed roll call. He did not view the use of force streaming videos. Pl. Resp. facts ¶ 27. Nor did he recall ever seeing General Order 02-08. *Id.* at ¶ 29. CPD's written directives and streaming videos were available for review at any police district. City facts ¶ 31. There is no evidence officers who missed roll call training were required to make up the training.

Officer Soto could not recall what use of force training he received in the police academy. Nor could he recall what control techniques he was taught in the police academy. Pl. facts ¶ 39. Lewis presents evidence that CPD knows restraint tactics and use of force skills diminish if not practiced over time. Pl. facts ¶ 42. CPD does not provide any hands-on retraining or retesting of control techniques after police officers leave the police academy. Pl. facts ¶¶ 40, 42. For example, Lieutenant Michael Mealer testified that CPD does not provide a refresher course on control tactics. *Id.* at ¶ 40. He testified further that except for officers who are promoted into new positions or when a new weapon is introduced to the police force, CPD provides no post-academy training on control tactics or use of force. *Id.* According to Lieutenant Mealer, the streaming videos do not address specific control techniques. Pl. facts, Ex. 1 at 34-35. Lieutenant Mealer testified that he has no way

3

of knowing whether police officers correctly use control tactics unless he sees the officers using them on the street. Pl. facts Ex. 1, at 42-43.

Officer Soto was told not to use choke holds. Pl. Resp. facts ¶ 60. He could not remember when, how, or by whom he was told not to use choke holds. *Id.* According to Lieutenant Mealer, police officers were notified not to use neck restraints. He did not remember when or how the officers were notified. According to Lieutenant Mealer, the decision not to use choke holds was made in response to public concern over the use of neck restraints. Pl. Facts, Ex. 1 at 7-8. According to Patrick McNulty, CPD Assistant Deputy Superintendent, police officers were trained in the use of a "sleeper hold" in 1970. The sleeper hold was used to close off the blood passage to the suspect's brain until the suspect lost consciousness. Pl. facts Ex. 5, at 102-103. At some point, CPD informed officers not to use the sleeper hold. Assistant Deputy McNulty could not recall when or how officers were notified of this change in policy. *Id.* at 103-104. There is no evidence CPD issued any written directives or notice to officers. For example, Sergeant Jackie Campell, who formerly supervised physical skills training, testified that she is unaware of a written order prohibiting use of choke holds. Pl. facts, Ex. 6 at 14-15. Lewis presents evidence that CPD failed to retrain police officers who were originally trained to use neck restraints in alternative restraint techniques. Pl. facts ¶¶ 40, 42, Ex. 1 at 34-35.

## II.     CPD Supervision and Discipline

CPD provides remedial training to police officers who have used excessive force. Pl. Resp. facts ¶ 33. Allegations that a police officer used excessive force are investigated by CPD's Office of Professional Standards ("OPS"). *Id.* at ¶ 44. For every complaint of excessive force made against a CPD police officer, OPS initiates a complaint register file and conducts an investigation. *Id.* at ¶

4

46. When conducting an investigation, OPS investigators are required to contact all complainants and witnesses when necessary to reach a sound conclusion in the case. City facts ¶ 49. However, OPS investigators are not sworn officers and do not have subpoena power. Pl. Resp. facts ¶ 48. OPS officers have no power to compel witnesses to provide statements. *Id.*

From 1994 through 2002, OPS initiated 25,895 investigations into allegations of excessive force and found substantial evidence to justify disciplinary action in 1,939 cases. Pl. Resp. City facts ¶ 52. OPS supervisor Amy Braley investigated Officer Soto's use of force on Hicks. She was unable to obtain information from the Chicago Transit Authority and to identify 911 callers. Pl. facts ¶ 48.

Detective Galbreth led CPD's investigation of Hicks' death. All four officers at the scene testified they told Detective Galbreth about Officer Soto's use of a headlock. Pl. facts ¶ 49. Detective Galbreth did not report Officer Soto's use of a headlock. *Id.* According to Detective Galbreth, no one told him about the headlock or that there were civilian witnesses to the incident. *Id.* at ¶¶ 49, 50. Officer Arnolts testified he told two detectives about civilian witnesses. *Id.* Assistant Deputy Superintendent Patrick McNulty did not call a round table to investigate Hicks' death because he had already spoken to the officers involved and no other witnesses were brought to his attention. *Id.* at ¶ 51.

## III.    Police Procedures Expert Testimony

According to John L. Sullivan, Lewis' police procedures expert, all police officers should be trained not to use choke holds. He testified further that CPD should have provided in-service retraining on alternative control tactics to officers who were originally trained to use choke holds. Pl. facts, Ex. 2 at 263-64. In Sullivan's opinion, all police officers should receive mandatory

retraining and retesting on use of force tactics. Pl. Resp. facts ¶ 9, Ex. 2 at 266-67. Sullivan opines

that CPD's failure to retrain police officers caused Officer Soto to use improper restraint techniques

that resulted in a "street-type brawl" and Hicks' death. Pl. facts, Ex. 2 at 123, 127-128, 134, 169,

179. Sullivan testified that it is obvious police officers will not retain the use of force skills taught

in the police academy unless they are retrained and retested on those skills. *Id.* at 199-200. In his

opinion, CPD showed a blatant disregard for the public's safety by failing to properly retrain police

officers in restraint and control tactics. *Id.* at 247-48, 260-61. Sullivan also opined that CPD failed

to properly investigate Hicks' death. *Id.* at 236-37, 245-46. His opinion is limited to CPD's

investigation of Hicks' death. *Id.* He has not studied CPD's supervision and management. *Id.* at

240.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate when the moving papers and affidavits show there is no

genuine issue of material fact and the movant is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. National Human

Resource Committee, Inc.*, 218 F.3d 719, 723 (7th Cir. 2000). A party seeking summary judgment

bears the initial responsibility of informing the court of the basis for its motion, and identifying

evidence that demonstrates the absence of a genuine issue of material fact. The non-moving party

must then come forward with evidence and designate specific facts that establish there is a genuine

triable issue. *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). A genuine issue of material fact

exists when the evidence would support a reasonable jury verdict for the non-moving party. *Insolia

v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

6

## II.   Analysis

In Count II, Lewis seeks to hold the city liable under 42 U.S.C. § 1983 for its alleged failure to train, supervise, control and discipline police officers.  The city argues there is no evidence of a CPD policy that caused Hicks' constitutional injury.  Lewis counters that there is substantial evidence the CPD failed to properly retrain officers in use of force and CPR skills, and failed to properly investigate and discipline officers who used excessive force.

Title 42 U.S.C. § 1983 provides, in relevant part, that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

A municipality is liable under § 1983 when its policy or custom causes the constitutional violation at issue. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38 (1978).  A plaintiff can establish municipal policy in three ways: (1) an express policy that, when enforced, caused a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, was so permanent and well-settled as to constitute custom or usage with the force of law; and (3) the act of a person with final policymaking authority. *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).  According to the city, Lewis fails to present any evidence that CPD has a policy, custom or practice that resulted in the officers' use of excessive force.  For purposes of this motion, the court must assume the officers used excessive force.

7

### A.  City's Failure to Retrain Officers

Lewis claims CPD's failure to retrain officers in proper control and restraint tactics caused Officer Soto to use a choke hold.[2]   Inadequacy of police training may serve as a basis for § 1983 liability where the failure to train amounts to deliberate indifference to constitutional rights. *City of Canton v. Harris*, 498 U.S. 378, 388, 109 S.Ct. 1197, 1204 (1989). A city is liable under § 1983 only when its failure to train reflects a deliberate or conscious choice. *Id.* at 389, 109 S.Ct. at 1205. To show deliberate indifference, a plaintiff must show that the need for more or different training is so obvious and the inadequacy so likely to result in constitutional injuries, that the city policymakers were deliberately indifferent to the need. *Id.* at 390, 109 S.Ct. at 1205.

In *City of Canton*, the Supreme Court provided an example of deliberate indifference:

> city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.

*Id.* at n. 10.  The Supreme Court elaborated on the standard to be applied in failure to train cases. The Court explained that municipal liability is not imposed merely because a police officer is unsatisfactorily trained because the officer's shortcomings may result from factors other than a deficient training program. *Id.* at 391, 109 S.Ct. at 1206.  Nor does liability attach merely because

---

[2]  The city argues Lewis' policy claims should be barred because they are not alleged in the complaint and were disclosed at the "eleventh-hour." In response, Lewis attaches correspondence showing the parties agreed to complete policy discovery after the occurrence witnesses were deposed and that he revealed his policy arguments in a November 4 letter. Given the parties' agreement, the city's argument must be rejected. Moreover, the complaint alleges the CPD failed to instruct, train, supervise, control and discipline police officers. Complaint, ¶¶ 10-11.

an injury could have been avoided with better or more training. *Id.* Rather, a plaintiff must prove that the training deficiency caused the constitutional deprivation. *Id.*

The city argues Lewis cannot demonstrate deliberate indifference because CPD trains its police recruits not to use choke holds and neck restraints. The city's argument misses the point because it relies on CPD's current training program. The current training program is not at issue. The issue is whether CPD adequately retrained officers who were originally trained to use neck restraints. Lewis presents evidence that CPD taught neck restraints, including a choke hold or sleeper hold, in the police academy until at least 1983. Officer Soto attended the police academy in 1977. For purposes of this motion, the present training program is irrelevant. The court must focus on Officer Soto's training.

Lewis presents evidence the city stopped teaching choke holds after Officer Soto left the police academy, presumably due to risk of injury or death. According to Lieutenant Mealer, CPD stopped teaching choke holds in response to public concern raised over their use. Pl. facts, Ex. 1 at 7. There is no evidence CPD provided any written directive or order to police officers to stop using neck restraints. Indeed, the evidence is to the contrary. Pl. facts, Ex. 6 at 14-15. Although Officer Soto testified he was told not to use choke holds, he could not remember when, how or by whom. There is no evidence he or other police officers trained to use neck restraints were later provided retraining on alternative restraint tactics. Lewis presents evidence that police officers received no retraining on restraint tactics after police academy training.

Based on this evidence, a jury could reasonably find the need for retraining was so obvious and the failure to provide it so likely to result in a constitutional violation that the city's failure to provide retraining amounts to deliberate indifference. CPD is aware police officers are required to

9

arrest fleeing suspects. CPD taught its officers control and restraint tactics, in part, to allow them

to accomplish this task. CPD determined choke holds were too dangerous to use, trained new police

recruits not to use them, but failed to retrain officers who were originally taught to use choke holds

in alternative restraint methods. Even though Officer Soto acknowledged he was later instructed not

to use a choke hold, a reasonable jury could conclude that he used the choke hold because CPD

failed to train him in alternative restraints.

In addition, Lewis presents evidence that CPD knew restraint skills diminish over time.

According to Lewis' police procedures expert, police officers do not retain the restraint skills taught

in the police academy and they need retraining to maintain those skills. Officer Soto could not recall

what tactics he learned in the police academy. According to Lewis' expert, police officers who are

properly trained in restraint techniques would not have reacted with the "shoddy" techniques that

resulted in a street brawl with Hicks. Pl. facts, Ex. 2 at 123, 127, 134-35. In the expert's opinion,

the city's failure to retrain and retest police officers on restraint tactics shows a blatant disregard for

the public's safety. Id. at 134-35, 248. Based on this evidence, a jury could reasonably conclude that

had Officer Soto been retrained on proper restraint techniques, he would not have used the prohibited

choke hold to restrain Hicks. Viewing this evidence in Lewis' favor, a jury could conclude that CPD

acted with deliberate indifference in failing to retrain police officers.

The city relies on *Palmquist v. Selvik*, 111 F.3d 1332, 1347 (7th Cir. 1997). In *Palmquist*, a

Bensenville police officer shot and killed Palmquist during the course of an arrest. His estate sued

under § 1983 for excessive force, alleging the police department inadequately trained police officers

in handling abnormally behaving persons. The department's training included instruction on

handling abnormal behavior. Id. at 1345. The court determined the claim that the police department

10

should have offered better or more training did not meet the standards set forth in *City of Canton*, 489 U.S. at 391. No evidence was submitted to show village policymakers were aware of the need for more training. Nor was there any evidence of other instances of excessive force used in restraining abnormal behavior. 111 F.3d at 1346. Because of the failure to show training deficiencies and that the village policymaker's were aware of training deficiencies, the jury's verdict – on the failure to train claim – was reversed. *Id.* at 1346-47.

The city's reliance on *Palmquist* is misplaced. Lewis does not challenge the adequacy of the current police academy training program. The city's arguments based on the current program must be rejected. *Palmquist* did not involve a basic policy change to the police training program. Lewis presents evidence that could reasonably support a jury verdict that the need for retraining on alternative restraint tactics was obvious, given the known risk posed by choke holds.

The city relies on *Latuszkin v. City of Chicago*, 250 F.3d 502 (7th Cir. 2001) to argue that Lewis has not shown policymakers were aware of the alleged training deficiencies. According to the city, only the City Council and the Police Board are CPD policymakers. City facts ¶ 61. In *Latuszkin*, a claim was brought against the city for the death of plaintiff's wife, who was killed by a police officer driving while intoxicated after he left a party in the police station's parking lot. In affirming dismissal of the complaint, the appellate court held plaintiff had not alleged a city policy or custom that caused his wife's death. Specifically, he failed to allege city policymakers knew about the police department parties, nor did he allege any facts suggesting that city policymakers should have known about the parties. *Id.* at 505.

Similarly, the city argues there is no evidence the City Council or Police Board was deliberately indifferent to the alleged training deficiencies. *Latuszkin* is distinguishable on many

11

grounds. First, *Latuszkin* was not a failure to train case. Thus, it did not involve a policy decision to prohibit use of choke holds because of the known associated risks. Second, unlike *Latuszkin*, Lewis presents evidence that city policymakers *should have known* of the risk of injury if police officers trained to use choke holds were not retrained in alternative restraint methods. Lewis presents evidence that a policy decision was made to prohibit choke holds in response to public concern over the risk of using neck restraints. Pl. facts, Ex. 1 at 7-8. Neither party identifies the policymaker. Under § 2-84-030 of the Chicago Municipal Code, the Police Board has the power to adopt rules and regulations governing CPD. It is reasonable to infer that the Police Board knew or should have known of the policy change and the reasons for it. Lewis' expert testified that the need to retrain police officers in restraint techniques is obvious because those skills diminish over time. Pl. facts, Ex. 2 at 198-200. Several high ranking CPD officials acknowledged that restraint skills fade over time. Pl. facts, ¶ 42. A jury could reasonably conclude from this evidence that CPD policymakers were deliberately indifferent to the need to retrain police officers on restraint techniques.

In sum, summary judgment must be denied on Lewis' failure to retrain claim. However, the scope of Lewis' failure to retrain claim must be limited in accordance with Fed.R.Civ.P. 56 (d). He argues the city failed to retrain police officers in CPR skills. As set forth in the court's April 11, 2005 memorandum opinion, Lewis presents no evidence the police officers had a duty to administer CPR. *See* 4/11/05 Memorandum Opinion at 16, Dkt. No. 89. The Illinois Tort Immunity Act, 745 ILCS 10/4-105, immunizes officers from liability for failing to furnish medical care. The Act only requires police officers to summon medical care. Because police officers cannot be liable for failing

12

to administer CPR, the city cannot be liable for failing to adequately train them in CPR. *See, e.g.,*

*City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

### B.    Failure to Properly Investigate and Discipline Officers

Lewis asserts CPD  failed to properly investigate excessive force claims.  He argues CPD's

failure to investigate and discipline created an atmosphere where officers believed they could violate

citizens' rights without fear of reprisal.  The city argues summary judgment is warranted because

there is no evidence of a city policy, practice or custom not to investigate or discipline.  To establish

liability under § 1983, Lewis must show that a city policy, practice or custom with respect to

investigations and discipline proximately caused Hicks' constitutional deprivation.  *Calusinksi v.*

*Kruger*, 24 F.3d 931, 936 (7th Cir. 1994).

Lewis argues CPD intentionally covered up Hicks' homicide.  He points to obvious

omissions in Detective Galbreth's report, and OPS' failure to conduct a thorough investigation.

Lewis relies on *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993).  In *Wilson*, police

officers were charged with torture arising from a policy of such treatment of suspects.  Dismissal of

the complaint against the city was affirmed because there was no evidence of a city policy that

caused the constitutional deprivation.  *Id.* at 1240-41.  The court noted a plaintiff can prove a city

practice or policy to condone police brutality by showing policymakers ignored policy brutality

complaints.  *Id.* at 1240.  Lewis relies on this language to support his § 1983 claim against the city

for failure to properly investigate and discipline.

Lewis' reliance on *Wilson* is misplaced.  He presents no evidence that the city was

deliberately indifferent to excessive force complaints prior to Hicks' death.  He relies exclusively

on evidence relating to CPD's and OPS' deficiencies in investigating Hicks' death.  His evidence

falls far short of a practice, custom or policy with respect to investigations or discipline. *See Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998) ("[a] plaintiff cannot establish a § 1983 claim against a municipality by simply alleging that the municipality failed to investigate an incident or to take punitive action against the alleged wrongdoer"). Lewis presents no evidence that CPD's alleged failure to investigate excessive force allegations and discipline officers proximately caused Hicks' constitutional injury. Absent evidence of a causal link between the alleged failure to investigate and discipline and Hicks' death, Lewis' § 1983 claim cannot stand. *See City of Canton*, 489 U.S. at 385, 109 S.Ct. at 1203. Lewis' claim that the city failed to investigate and discipline CPD police officers does not withstand summary judgment under Fed.R.Civ.P. 56(d).

## CONCLUSION

There are factual issues whether the city failed to adequately retrain its police officers in restraint and control techniques. Thus, the city's motion for summary judgment on Count II must be denied. However, there are no factual issues regarding Lewis' claim that the city's failure to train police officers on CPR, failure to investigate excessive force complaints and failure to discipline police officers for using excessive force proximately caused Hicks' constitutional injury. Accordingly, these issues do not withstand summary judgment under Fed.R.Civ.P. 56(d).

April 26, 2005 ENTER:

Suzanne B. Conlon
Suzanne B. Conlon
United States District Judge

14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BILLIE RAY LEWIS, as Brother, Next Friend, )
and Special Administrator of CHRISTOPHER )
HICKS, deceased, )
                                        )
          Plaintiff, )
                                          )
          v. )      No. 04 C 3904
                                          )
CITY OF CHICAGO, and CHICAGO POLICE )      Judge Conlon
OFFICERS L. SOTO, Star 8403, A. PENA, Star )
18513, ROBERT ARNOLTS, Star 19998, and )
BRIAN DEVAN, Star 3871, )
                                          )
          Defendants. )

## PLAINTIFF'S FIRST NOTICE TO PRODUCE AT TRIAL

To:    Robert Barber                   Chris Murray
       Asst. Corp. Counsel           Asst. Corp. Counsel
       30 N. LaSalle Street,. Suite 1400    30 N. LaSalle Street, Suite 700
       Chicago, IL 60602             Chicago, IL 60602

      **PLEASE TAKE NOTICE** that, pursuant to Fed.RCiv.Proc. 34, the defendants are commanded to produce at the trial of this cause, beginning on July 7, 2005 and continuing until finished, the following party witnesses and documents/things in the possession of defendants:

      **SEE ATTACHED RIDER TO FIRST NOTICE TO PRODUCE AT TRIAL.**

                      _____
                      One of Plaintiff's attorneys

Daniel S. Alexander
Smith, Coffey & Alexander
119 North Peoria, Suite 3A
Chicago, Illinois 60607
312-850-2600



## **Certificate of Service**

The undersigned attorney hereby certifies that he served the foregoing pleading to:

Asst. Corp. Counsel Robert Barber, Suite 1400 (Fax 312-744-6566)
Asst. Corp. Counsel Chris Murray, Suite 900 (Fax 312-744-1054)
30 North LaSalle
Chicago, IL 60602

by fax on June 13, 2005, and by hand delivery on June 14, 2005, prior to 4:30 p.m.

Daniel S. Alexander

Daniel S. Alexander
SMITH, COFFEY & ALEXANDER, LTD.
119 North Peoria, Suite 3A
Chicago, Illinois 60607
312-850-2600

## RIDER TO FIRST NOTICE TO PRODUCE AT TRIAL

Party Witnesses:

Officer Louis Soto
Officer Robert Arnolts
Officer Brian DeVan
Officer Artemio Pena
A.D.S. Patrick McNulty
Detective Rickey Galbreth
EMT Kevin Byrne
Sgt. Richard Atzlan
OPS Amy Braley
OPS Crytal Foster
Sgt. Jackie Campbell
Lori Lightfoot
Rachel Johnston
Vince Nyenke, OEC
Lt. Micheal Mealer
Commander Mathew Tobias
Sgt. Mary Conley
Sup. Terry Hilliard
Sup. Phil Cline
Board Pres. Patricia Bobb
Board V.P. Scott Davis
Alderman Ike Carrothers
Mayor Richard J. Daley

Tangible Items:

All personal property, clothing, or any tangible thing taken from the clothing or body of the decedent, or from the scene of the incident.

A CPD issue folding baton.

A CPD issue OC spray canister with holster.

Originals of all documents and photos in possession of defendants, which any party has put on their exhibit list.

Original quality recordings of all recorded calls and radio transmissions relative to this case.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS.
EASTERN DIVISION

BILLIE RAY LEWIS, as Brother, Next Friend,　)
and Special Administrator of CHRISTOPHER　)
HICKS, deceased,　)
　)　　No. 04 C 3904
　　　　　Plaintiff,　)
　)　　Judge Conlon
　　　　　v.　)
　)　　Magistrate Judge Schenkier
CITY OF CHICAGO, and CHICAGO POLICE　)
OFFICERS L. SOTO, Star 8403, A. PENA, Star　)　　Jury Demand
18513, ROBERT ARNOLTS, Star 19998, and　)
BRIAN DEVAN, Star 3871,　)
　)
　　　　　Defendants.　)

## DEFENDANT CITY OF CHICAGO'S FIRST
## SET OF INTERROGATORIES TO PLAINTIFF

Defendant City of Chicago ("City"), by its attorney Mara S. Georges, Corporation Counsel,

requests under Fed. R. Civ. P. 33 that Plaintiff Billie Ray Lewis, as special administrator of

Christopher Hicks, answer the following interrogatories within thirty (30) days of service of this

request:

1.　In Paragraph 10 of the Complaint, Plaintiff alleges that "[t]he Constitutional

violations detailed above were only possible for the defendant officers to perpetrate because of the

customs, policies and practices of CPD, whereby the CITY failed utterly to instruct, supervise,

control and discipline the defendant officers." Please state with specificity:

　　(a)　The nature of the constitutional violations alleged in Paragraph 10.

　　(b)　Each and every custom, policy, and practice of the City and the Chicago
　　　　Police Department that are at issue in Paragraph 10.

1


EXHIBIT
C

(c)     Which of these policies that are at issue in Paragraph 10 are express policies of the City and the Chicago Police Department.

(d)     Which of these policies that are at issue in Paragraph 10 are something other than express policies of the City and the Chicago Police Department; in each instance, state the exact nature of the policy at issue (*e.g.*, custom or practice).

(e)     Each and every fact upon which Plaintiff relies in support of the allegation that the City and the Chicago Police Department failed utterly to instruct, supervise, control, and discipline the Defendant Officers.

(f)     Each and every fact, or other information, upon which Plaintiff has knowledge as to how the City and the Chicago Police Department "instructed, supervised, controlled and disciplined the defendant officers" on or before the date that Plaintiff's Complaint was filed.

(g)     Each and every incident (other than the incident alleged in the Complaint) of which Plaintiff is aware upon which he relies in support of the allegations that the customs, policies, and practices of the City and the Chicago Police Department that are at issue in Paragraph 10 exist. Please identify each incident by date, place, time and police officer(s) involved. Also state the name, last known address, and phone number of the citizen(s) involved and any witnesses.

(h)     What would constitute adequate instruction, supervision, control, and discipline of the Defendant Officers with respect to the constitutional violations alleged in Paragraph 10.

2.     In Paragraph 11 of the Complaint, Plaintiff alleges that "[t]hese failures include (1) failure to take any steps to control, instruct, or discipline police officers with multiple citizen complaints of excessive force and brutality, thus maintaining an atmosphere and climate where Constitutional violations are not prosecuted or punished, encouraging officers to violate rather than respect the Constitutional rights of citizens; (2) failure to track, notice, act upon, or correct patterns of abuse by officers with multiple complaint files, thus encouraging a climate of Constitutional abuses; and (3) teaching officers to use a choke hold which has an unreasonable risk of causing

2

death to citizens; (4) failure to instruct or train officers in what constitutes improper use of excessive

force." Please state with specificity:

(a) Each and every fact upon which Plaintiff relies in support of the allegation that the City and the Chicago Police Department failed to take any steps to control, instruct, or discipline police officers with multiple citizen complaints of excessive force and brutality.

(b) Each and every fact upon which Plaintiff relies in support of the allegation that the City and the Chicago Police Department maintained an atmosphere and climate where constitutional violations are not prosecuted or punished, encouraging officers to violate rather than respect the constitutional rights of citizens.

(c) Each and every fact upon which Plaintiff relies in support of the allegation that the City and the Chicago Police Department failed to track, notice, act upon, or correct patterns of abuse by officers with multiple complaint files.

(d) Each and every fact upon which Plaintiff relies in support of the allegation that the City and the Chicago Police Department encourage a climate of constitutional abuses.

(e) Each and every fact upon which Plaintiff relies in support of the allegation that the City and the Chicago Police Department teach officers to use a choke hold which has an unreasonable risk of causing death to citizens.

(f) Each and every fact upon which Plaintiff relies in support of the allegation that the City and the Chicago Police Department failed to instruct or train officers in what constitutes improper use of excessive force.

(g) Each and every incident (other than the incident alleged in the Complaint) of which Plaintiff is aware upon which he relies in support of the allegations that the alleged failures at issue in Paragraph 11 exist. Please identify each incident by date, place, time and police officer(s) involved. Also state the name, last known address, and phone number of the citizen(s) involved and any witnesses.

(h) What would constitute adequate instruction, supervision, control, and discipline of Chicago Police Officers with respect to the constitutional violations alleged in Paragraph 11.

3.    Identify by name, home address, home phone number, and social security number each person who will testify at trial in support of the allegations contained in Paragraphs 10 and 11 of the Complaint. For each person identified, state the substance as to what he or she will testify to.

4.    Pursuant to Fed. R. Civ. P. 26(a)(2), if plaintiff intends to call expert witnesses at trial, please state:

  (a)    The full name and address of each expert witness, followed by the subject matter on which each expert witness is to testify.

  (b)    Each expert witness's conclusions and opinions and the grounds therefore.

  (c)    Each expert witness's qualifications.

The foregoing Interrogatories shall be deemed continuing in nature and if any further information comes to the knowledge of plaintiff or his attorneys, plaintiff is hereby requested without further notice to file and serve supplemental answers.

                               Mara S. Georges
                               Corporation Counsel

              By:    _____

                               Christopher M. Murray
                               Assistant Corporation Counsel

City of Chicago Department of Law
30 North LaSalle Street, Suite 900
Chicago, IL 60602
(312) 744-9653

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BILLIE RAY LEWIS,              )
            Plaintiff,      )
                         )     No.  04 C 3904
     vs.                )
                         )     JUDGE CONLON
CITY OF CHICAGO, et al.,     )
            Defendants.   )

### PLAINTIFF'S AMENDED ANSWERS TO CITY'S FIRST SET OF
### INTERROGATORIES TO PLAINTIFF

Now comes plaintiff, Billie Ray Lewis, through his attorneys, Smith, Coffey &

Alexander, and in accordance with Rule 33 of the Federal Rules of Civil Procedure, provides the

following  amended answers to City's First Set of Interrogatories to plaintiff:

**INTERROGATORY NO. 1 A**

**ANSWER:**

The Constitutional violations are the Fourth Amendment excessive force claims detailed

in plaintiff's Complaint.

**INTERROGATORY NO. 1B**

**ANSWER:**

Plaintiff objects in that the City has not yet produced for deposition all the policy

witnesses whose depositions have been requested by plaintiff, and has only in the last two or

three weeks tendered documents requested.

Without waiving this objection, plaintiff can, at this time, identify the following customs,

practices, and policies at issue in Paragraph 10 of the Complaint:

1.    There is an express policy by omission, or a custom and practice, that CPD provides

no effective continuing education or training to its officers in use of force, defensive tactics, and



EXHIBIT
D

proper arrest procedures. Some defendant officers testified that they received no training in these areas since the Academy. The only such "training" is the use of streaming videos occasionally shown at roll call. Plaintiff's police procedures expert, John Sullivan, will testify that these videos are grossly inadequate, for reasons including that there is no testing or evaluation to determine if the officers' have absorbed the information, and no hands on training in these physical skills that necessarily diminish over time without practice, and that this policy failure contributed to the death of Chris Hicks. See also, Rule 26 disclosures, all documents produced by all parties in this case, all deposition testimony to date. Investigation continues.

    2.    There is an express policy by omission, or a custom and practice, that CPD has no written directives against use of chokeholds, gives recruits no written notice or written lesson plan regarding the prohibition against chokeholds during their academy training, and never had mandatory re-training of officers regarding chokeholds when CPD stopped training officers in the use of chokeholds in the 1980s. For example, Officer Soto, who used a chokehold to asphyxiate Chris Hicks in this case, was trained to use chokeholds in the Academy, and he testified he still believes that chokeholds can be effective, and he was never given any written notice or re-training on the prohibition against chokeholds. The lack of communication to officers on this dangerous technique is illustrated by the testimony of Deputy Superintendent McNulty, who is normally in command of CPD during the night hours. ADS McNulty testified that he was aware that the "sleeper" chokehold was no longer to be used, but he did not know the reason for the change in policy. Plaintiff's expert John Sullivan will testify that this is a glaring policy deficiency which falls far short of contemporary police standards and contributed to Chris Hicks' death in this case. See also Rule 26 disclosures, all documents produced by all parties, and all deposition testimony. Investigation continues.

3.  There is an express policy by omission, or a custom and practice, that CPD does not require any continuing education in CPR, a skill that diminishes over time if not practiced. In addition, there is no clear policy in effect that either requires officers to make best efforts to use CPR on arrestees in extreme distress, or that, at a minimum, requires officers to take reasonable steps to assess the physical state of arrestees in distress, including assessing whether the arrestee has an unobstructed airway. (See testimony of City policy witnesses, documents produced to date.) One of the defendant officers testified that he did not perform CPR on Chris Hicks because it had been so long since he had been trained. Plaintiff expert John Sullivan will testify that this policy failure contributed to Chris Hick's death. Plaintiff expert physician Jesse Hall will testify that CPR would probably have saved the life of Chris Hicks. In this case, not only did the officers not attempt CPR after choking Mr. Hicks to a non-responsive state, they first dispersed witnesses before calling for an ambulance, then left Mr. Hicks face down on the pavement, handcuffed behind his back, and made no attempt to assess his airway or ease his inability to breathe prior to the EMTs having to tell the officers to uncuff Mr. Hicks. Instead, Officer Soto used the time waiting for the ambulance to make cell phone calls to his supervisor, and then shortly later to his Fraternal Order of Police representative. See also Rule 26 disclosures, all documents produced by all parties, and all deposition testimony. Investigation continues.

4.  A variety of express policies, express policies by omission, and customs and practices of CPD combine to create an atmosphere where police officers believe they can routinely violate the civil rights of citizens without fear of reprisal. It is an express policy that police brutality complaints are investigated by the Office of Professional Standards ("OPS"), whose investigators have no police powers, no subpoena power, no power to bring criminal

3

charges, and are inadequately trained to investigate. (One of the OPS investigators in this case, who failed to competently follow up on witness leads, testified that she had no formal training after joining OPS.) Further, not only is the head of OPS under the direction, power and control of the Superintendent of CPD, but OPS investigators are told not to interview witnesses or investigate police misconduct while the police themselves are involved in the investigation. (See testimony of OPS investigators involved in this case, and the former head of OPS.) For example, in this case OPS investigators saw 5-6 potential witnesses at the scene of the incident, but did not attempt to interview them or even record their identities because CPD detectives were investigating the incident. They were unable, despite numerous requests, to get from even the City of Chicago's CTA the names of bus drivers who were driving the route by the scene at the time of the incident. Because of the lack of subpoena power, OPS could not locate any of the 911 callers who witnessed the killing, although plaintiff's attorneys were easily able to do so. Further, OPS investigators were unable to force eyewitnesses to produce identification.

Further, serious incidents such as the death of a young, healthy arrestee in police custody must be investigated thoroughly, promptly, and without regard to where the facts lead. (Expert John Sullivan will testify as to this requirement.) Instead, the testimony of the defendants and CPD witnesses have demonstrated that there was a coordinated attempt to obstruct justice and cover up the wrongdoing of the defendant officers in this case. For example, the detectives investigating the incident consistently omitted from all of their many reports the fact that Officer Soto admitted using a "headlock" on Chris Hicks, and the other defendant officers also witnessed this. The detectives delayed getting material information to the medical examiner and to OPS. The detectives failed to examine, photograph, and send for blood and tissue sample the weapons and accessories of the involved officers. The detectives failed to conduct a proper canvass for

4

witnesses and then did not record witness information, and the detectives failed to use subpoenas to identify the 911 callers. Here, the pattern of using omission and selective witness identification to hide the involvement of the four defendant officers in the homicide of Chris Hicks necessarily sends a message that CPD officers will be shielded from criminal liability for their serious civil rights abuses.

Further, it is an express policy by omission, or a custom and practice, that serious incidents such as this are not fully investigated by a police oversight board, with civilian and police members who are not under the control of CPD. (Plaintiff expert John Sullivan will testify as to this.) Here there was not even a round table conducted; there was no criminal investigation despite the homicide by asphyxia finding by the medical examiner, and there was no attempt by the detectives or anyone at CPD to explain the death of Chris Hicks. This custom and practice, or policy by omission of a lack of a transparent or even marginally competent investigation in incidents of serious police misconduct necessarily sends a message to the troops that even brutally excessive and fatal force will be shielded from serious consequences. This is further reinforced by an express policy which allows officers involved in serious incidents to refuse to discuss the incident with detectives or even their direct supervisors, and which allows the officers to first be able to discuss the incident with their FOP representative, as was done in this case, where the FOP representative actually met two of the officers involved at the hospital and drove two officers to the scene of the incident and to the police station.

While most of the above are policies that cut across all CPD misconduct incidents, plaintiff does intend to use two other cases to demonstrate how custom and practice creates an atmosphere where officers believe they can violate citizens' rights with impunity. The two cases are: Decedent Joey Regalado was beaten and choked by CPD officers until he was paralyzed.

His family sued CPD and a federal jury found excessive force and awarded $28 million in 1999. Following the incident, the officers were not disciplined or prosecuted, nor did CPD institute any mandatory training or written warnings about using chokeholds. Decedent Robert Russ was shot to death by CPD officers. A federal jury found excessive force and awarded $9.6 million in 2003. The officers involved were not prosecuted, and CPD never instituted any mandatory continuing education for use of force involving testing or demonstrated learning. See also Rule 26 disclosures, all documents produced by all parties, and all deposition testimony. Investigation continues.

**INTERROGATORY 1C**

**ANSWER:**

See answers to 1B above. Investigation continues.

**INTERROGATORY 1D**

**ANSWER:**

See answers to 1B above. Investigation continues.

**INTERROGATORIES 1E and 1F**

**ANSWER:**

Plaintiff objects, overly burdensome, questions call for a narrative response. It would be impossible to list in this format each and every fact supporting plaintiff's policy claims, as there are thousands of pages of testimony and documents supporting plaintiff's claims. Plaintiff has, in answers to 1B above, attempted to apprise as fully as possible in this format the essence and basic factual basis of his policy claims. See also Rule 26 disclosures, all documents produced by all parties, and all deposition testimony. Investigation continues.

**INTERROGATORY 1G**

**ANSWER:**

See answers to 1B above, where plaintiff lists two cases he intends to use to demonstrate custom and practice. Plaintiff is still attempting to gather detailed information regarding these cases, however, all the information requested is in the possession of the City of Chicago, and, in fact, plaintiff requests that City of Chicago supply the requested detailed information to him.

**INTERROGATORY 1H**

**ANSWER:**

Plaintiff objects due to relevancy. It is plaintiff's burden to show that policies or practices violate constitutional standards, not to provide a blueprint for how modern well-run police departments address their problems. Without waiving this objection, plaintiff offers the following advice: Have required continuing education in use of force, defensive tactics, and CPR, where the officers are tested in writing and in physical proficiency. Officers should receive, as part of this training, a written notice explaining the ban on chokeholds and the reasons therefore. There should be clear written policies disseminated to all officers that explain that officers are required to attempt CPR on arrestees in serious distress, or at a minimum, assess the arrestee, including the state of his airway, and to take reasonable steps to ease any difficulty with the arrestee's breathing and prepare him for EMT assisted CPR. A CPD requirement for rendering CPR could be accompanied by an order that all officers carry compact bio shields so they could perform resuscitation without fear of disease, as is required at many police departments.

As to the atmosphere where CPD officers believe they can violate citizens' rights without fear of retribution, major sea changes are needed in the culture of CPD and the mechanisms in place to investigate police misconduct. CPD managers need to learn a lesson from the Catholic

Church pedophile scandal, that hiding misconduct is not justified for the greater good of the organization, and that, instead, it creates an atmosphere where violators are drawn and thrive. Whenever serious police misconduct is alleged, there needs to be a thorough, complete, competent, and transparent investigation, even if the facts point to serious civil liability or criminal misconduct. OPS needs to be restructured, so that its investigators have real power, police and subpoena power, and adequate training, so that they can perform real investigations of police misconduct. There needs to be some sort of civilian oversight board for investigating serious police misconduct, a board not under the control of the Superintendent of Police. CPD needs to decrease the hold of the FOP on the investigation process, including that all complaint registers are expunged after five and that FOP reps can be the first to talk to officers after a serious incident. As officers are investigated, disciplined, fired, or prosecuted, other officers will begin to get the message that serious civil rights violations are not tolerated.

**INTERROGATORY 2A**

**ANSWER:**

Plaintiff objects, overly burdensome, questions call for a narrative response. It would be impossible to list in this format each and every fact supporting plaintiff's policy claims, as there are thousands of pages of testimony and documents supporting plaintiff's claims. Plaintiff has, in answers to 1 above, attempted to apprise as fully as possible in this format the essence and basic factual basis of his policy claims. See also Rule 26 disclosures, all documents produced by all parties, and all deposition testimony. Without waiving this objection, plaintiff states: see answers to Interrogatory 1 above. In addition, there is no program in place at CPD to regularly evaluate CPD officers. All C.R. complaints are expunged after five years. OPS, as discussed above, has inadequate power and training to conduct proper investigations. Thus there is no

proper investigation of misconduct to begin with, which OPS investigations are relied upon by the CPD managers who track problems with officers. There is no quality continuing education on use of force and defensive tactics. Investigation continues.

**INTERROGATORY 2B**

**ANSWER:**

See answers to Interrogatories 1 and 2 above, including: Plaintiff objects, overly burdensome, questions call for a narrative response. It would be impossible to list in this format each and every fact supporting plaintiff's policy claims, as there are thousands of pages of testimony and documents supporting plaintiff's claims. Plaintiff has, in answers to 1 and 2 above, attempted to apprise as fully as possible in this format the essence and basic factual basis of his policy claims. See also Rule 26 disclosures, all documents produced by all parties, and all deposition testimony. Investigation continues.

**INTERROGATORY 2C**

**ANSWER:**

See answers to Interrogatories 1 and 2 above, including: Plaintiff objects, overly burdensome, questions call for a narrative response. It would be impossible to list in this format each and every fact supporting plaintiff's policy claims, as there are thousands of pages of testimony and documents supporting plaintiff's claims. Plaintiff has, in answers to 1 and 2 above, attempted to apprise as fully as possible in this format the essence and basic factual basis of his policy claims. See also Rule 26 disclosures, all documents produced by all parties, and all deposition testimony. Investigation continues.

**INTERROGATORY 2D**

**ANSWER:**

See answers to Interrogatories 1 and 2 above, including: Plaintiff objects, overly burdensome, questions call for a narrative response. It would be impossible to list in this format each and every fact supporting plaintiff's policy claims, as there are thousands of pages of testimony and documents supporting plaintiff's claims. Plaintiff has, in answers to 1 and 2 above, attempted to apprise as fully as possible in this format the essence and basic factual basis of his policy claims. See also Rule 26 disclosures, all documents produced by all parties, and all deposition testimony. Investigation continues.

**INTERROGATORY 2E**

**ANSWER:**

See answers to Interrogatories 1 and 2 above, including: Plaintiff objects, overly burdensome, questions call for a narrative response. It would be impossible to list in this format each and every fact supporting plaintiff's policy claims, as there are thousands of pages of testimony and documents supporting plaintiff's claims. Without waiving this objection, plaintiff states that he has, in answers to 1 and 2 above, attempted to apprise as fully as possible in this format the essence and basic factual basis of his policy claims, including that CPD used to teach officers the choke hold and taught Officer Soto the chokehold he used to kill Chris Hicks, then never gave Soto any refresher training on use of force, defensive tactics, and never gave any written notice that the choke hold it taught Soto was no longer to be used. See also Rule 26 disclosures, all documents produced by all parties, and all deposition testimony. Investigation continues.

10

**INTERROGATORY 2F**

**ANSWER:**

See answers to Interrogatories 1 and 2 above, including: Plaintiff objects, overly burdensome, questions call for a narrative response. It would be impossible to list in this format each and every fact supporting plaintiff's policy claims, as there are thousands of pages of testimony and documents supporting plaintiff's claims. Plaintiff has, in answers to 1 and 2 above, attempted to apprise as fully as possible in this format the essence and basic factual basis of his policy claims. See also Rule 26 disclosures, all documents produced by all parties, and all deposition testimony. Investigation continues.

**INTERROGATORY 2G**

**ANSWER:**

See answer to 1 above. Plaintiff does intend to use two other cases to demonstrate how custom and practice creates an atmosphere where officers believe they can violate citizens' rights with impunity. The two cases are: Decedent Joey Regalado was beaten and choked by CPD officers until he was paralyzed. His family sued CPD and a federal jury found excessive force and awarded $28 million in 1999. Following the incident, the officers were not disciplined or prosecuted, nor did CPD institute any mandatory training or written warnings about using chokeholds. Decedent Robert Russ was shot to death by CPD officers. A federal jury found excessive force and awarded $9.6 million in 2003. The officers involved were not prosecuted, and CPD never instituted any mandatory continuing education for use of force involving testing or demonstrated learning. The detailed information sought is in the possession of defendant City of Chicago. See also Rule 26 disclosures, all documents produced by all parties, and all deposition testimony. Investigation continues.

11

**INTERROGATORY 2H**

**ANSWER:**

See objections and answers to 1H above.

**INTERROGATORY 3**

**ANSWER:**

Plaintiff may call all the defendants, all witnesses previously deposed, including policy witnesses named by City. Plaintiff may also call all witnesses previously disclosed by any party, including City policy witnesses whose depositions have been noticed but not taken. Plaintiff will call his police procedures expert, John Sullivan, whose Rule 26 information has been previously disclosed. As the City has only recently complied with plaintiff's discovery, his investigation is necessarily incomplete. Investigation continues.

**INTERROGATORY 4**

**ANSWER:**

See plaintiff's previous Rule 26 disclosures.

Dated:                                      Respectfully submitted,

Smith, Coffey & Alexander
119 North Peoria Street, Suite 3A
Chicago, IL 60607
Tel:    312.850.2600
Fax:    312.850.2704

## CERTIFICATE OF SERVICE

I the undersigned attorney hereby certifies that I have caused a true and correct copy of

the foregoing pleading to be hand delivered to the person(s) named below at the address(es)

therein shown, on this February 14, 2005, prior to 4:30 P.M..

Christopher Murray
Assistant Corporation Counsel
30 N. LaSalle Street, #900
Chicago, IL 60602

Robert W. Barber
Special Assistant Corporation Counsel
30 North LaSalle Street, Suite 1400
Chicago, IL 60602

Christopher R. Smith


Christopher R. Smith
Smith, Coffey & Alexander
119 North Peoria Street, Suite 3A
Chicago, IL 60607
Tel:    312.850.2600
Fax:   312.850.2704